UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

JOHN T. BELL,

      Plaintiff,                          Case No.: 07 CV 7086 DARRAH/KEYS

v.

COMTRUST, INC.,

      Defendant.
_____/

**COMTRUST'S MOTION FOR SUMMARY
<u>JUDGMENT AND INCORPORATED MEMORANDUM OF LAW</u>**

Pursuant to this Court's Order of January 15, 2008, Defendant ComTrust, Inc. ("ComTrust") hereby moves for summary judgment on its petition to vacate, or alternatively modify or correct, a December 10, 2007 Arbitration Award against ComTrust in the amount of about $600,000.

## INTRODUCTION

Plaintiff lost money following recommendations from his broker in the highly risky field of commodity options speculation.  Plaintiff's counsel believed it would be too troublesome to execute on a judgment against the broker and the introducing broker firms he worked for, so counsel tried, in an NFA arbitration, to pass the broker's alleged wrongdoing off on the perceived "deep pockets" – the Futures Commission Merchant ("FCM") firms ComTrust and Alaron that counsel alleged had something to do with Plaintiff's trading.  The NFA rules, which are a material part of the agreement to arbitrate, do not make this easy.  For an FCM to be responsible for the activities of an introducing broker, there must be either a guarantee agreement between them (there indisputably was none between ComTrust and the IBs here), or in the case

of independent introducing brokers ("IIBs"), the FCM must have had so much control over the IIB that the IIB is effectively a "de facto branch office" of the FCM.

Plaintiff, for his part, honestly testified at the final hearing that ComTrust had nothing to do with his trading and he did not know why ComTrust had even been named in the case. Notwithstanding, counsel tried two theories: that ComTrust supposedly breached its account agreement with Plaintiff by ignoring alleged "red flags" associated with Plaintiff's transactions; and that the IIBs were ComTrust's agent. The problem with the first theory is that the controlling NFA rules expressly <u>reject</u> any obligation an FCM has to monitor a customer's financial condition once personal information is obtained and basic risks are disclosed (in this case it was undisputed they were). The problem with the second theory is that Plaintiff had no evidence to support that the IBs were a "de facto branch office" of ComTrust. This lack of evidence was in fact borne out by the Arbitration Award: the Panel apparently made no determination on the supposed agency theory, and staked the entire Award against ComTrust on Plaintiff's "red flags" arguments. Since the NFA rules expressly do not permit such a theory, the Award exceeds the Panel's authority under the parties' arbitration agreement, and vacatur is required.

### STATEMENT OF UNDISPUTED FACTS

1)      In May 2006, Plaintiff initiated an NFA arbitration claim directed at the alleged sales practices of Plaintiff's broker, Mitchell Goldberg. Plaintiff sued Goldberg, the two independent introducing brokers Goldberg had worked for, ProTrade and Corporate Commodities (the "IIBs"), and two FCMs, Alaron Trading and ComTrust. Plaintiff asked for nearly $800,000 in supposed out of pocket losses, about $575,000 of which allegedly represented "commissions and fees." NFA Claim, Ex. A hereto.

2)      Before beginning to trade, Plaintiff entered into an Account Agreement with ComTrust, which contained, among other things, a standard CFTC risk disclosure, an Additional Risk Disclosure, a provision expressly releasing ComTrust from any liability arising from the IIB's actions, and an agreement to arbitrate any claims in connection with his commodity trading account.  Account Agreement, Ex. B hereto.

3)      In regards to ComTrust's release and relationship with its IIBs, the agreement provided:

> In the event that this is an Introduced Account from an Independent Introducing Broker, Customer agrees that ComTrust is not responsible or liable whatsoever for any matters relating to sales practices, trading practices, errors in order entry or any similar or other matters, it being expressly understood, agreed and acknowledged by Customer that ComTrust's sole responsibilities hereunder relate to the execution, clearing, accounting and confirmation of transactions for the account of the Customer on various exchanges in accordance with the instructions received by ComTrust from the Independent Introducing Broker for and on behalf of Customer in accordance with usual and customary practices.  Customer agrees to refrain from bringing any action or counterclaim against ComTrust and will assert any such claim against only the Independent Introducing Broker (or, where applicable, the non-employee commodity pool operator or commodity trading advisor) for any redress with respect to any matter other than ComTrust's gross negligence or willful misconduct in executing, clearing and/or accounting of transactions for the account of Customer.  I AGREE NOT TO COMMENCE ANY LEGAL OR ADMINISTRATIVE PROCEEDING AGAINST COMTRUST UNTIL ANY DEFICIT BALANCE IN THE ACCOUNT(S) IS SATISFIED.

Ex. B at ¶ 23.

4)      Plaintiff's NFA arbitration submission further bound the parties and the arbitrators by the "rules and bylaws of NFA."  Plaintiff's submission to NFA thus became a material part of the parties' agreement to arbitrate.  Ex. A hereto.

5)     Plaintiff's original Statement of Claim alleged supposed violations of the "Commodity Exchange Act 7 U.S.C. 1 et al.," and the "Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/2 et seq.," among other theories.  Ex. A hereto.

6)     Plaintiff subsequently moved for leave to file an amended Statement of Claim, which the NFA permitted.  The Amended Statement of Claim alleged five new counts: 1) breach of Plaintiff's customer agreement; 2) breach of fiduciary duty; 3) negligent misrepresentation; 4) negligence/failure to supervise; and 5) fraud.  Plaintiff's Amended Statement of Claim did not allege a violation of any particular section of the Commodity Exchange Act ("CEA"), and made no mention at all of Illinois' fraud statute.  *See* Ex. C hereto.

7)     The final hearing was held before the panel in October 2007.  *See* Hrg. Trans. ("Group Ex. H hereto").[1]  Plaintiff called five witnesses: Plaintiff; Plaintiff's daughter; Plaintiff's expert; a principal from Alaron FX; and ComTrust's principal Stuart Mehler.

8)     Plaintiff testified that he had no complaint against ComTrust and never recommended naming ComTrust in the case.  Hrg. Trans. Part 1 at 156, Group Ex. H hereto.

9)     Plaintiff testified he received communications from Stuart Mehler from ComTrust after his trading had concluded.  *Id.*, Part 1 at 94-95.  Stuart Mehler later confirmed he spoke to Plaintiff 16 times after Plaintiff's trading had concluded, and that he provided Plaintiff with information on how to pursue a claim before the NFA against the IIBs.  *Id.*, Part 3 at 56-59.

10)     Plaintiff's daughter testified that that she only became involved after Plaintiff's trading had ceased and Plaintiff told her he lost money.  *Id.*, Part 2 at 4.

11)     She testified she never talked to ComTrust.  *Id.*, Part 2 at 32.  However, she claimed she looked at ComTrust's web site and supposedly saw a page claiming generally that

[1] ComTrust is filing the Hearing Transcript separately, as it is voluminous and comprises 7 parts.

4

ComTrust would assist IBs in certain areas of their business, yet she admitted she did not know what that meant. *Id*., Part 2 at 17. There was no evidence Plaintiff saw this page, and the page was in fact dated long after Plaintiff had stopped trading. *Id*., Part 6 at 7.

12)     The evidence was further undisputed that this page was reserved for <u>guaranteed</u> IBs, and not the IIBs at issue. It was uncontested that ComTrust provided no support to the IIBs' business beyond preparing account opening documents, keeping the customers accounts, and delivering the IIBs' commissions to them as agreed. *Id*., Part 4 at 26; Part 7 at 37-40; 42-43.

13)     Alaron's principal testified exclusively on Plaintiff's supposed theory that Alaron's guarantee agreement with one of the IBs at issue somehow transferred to a successor IB, where Plaintiff actually did some trading. *Id*. at Part 2 at 38 - Part 3 at 6. It had nothing to do with ComTrust.

14)     Plaintiff's putative "expert" admittedly had no apparent expertise or even basic knowledge of the suitability rules applicable to the commodities industry. *Id*., Part 3 at 20-21; Part 4 at 1.[2] Yet, this putative expert offered numerous opinions on alleged "red flags" that arose over the course of Plaintiff's trading and that, according to the putative expert, should have alerted ComTrust to the supposed unsuitability of the trading. *Id*., Part 3 at 14 - Part 4 at 7.

---

[2] The most telling testimony on this was from Plaintiff's counsel's own direct examination:

> Attorney Prosnitz:  Okay.  Professor, were you licensed as a commodity trading advisor?
> Professor Balsar: (Inaudible)
> Attorney Prosnitz:  Alright.  And by virtue of being licensed as a CTA, did you have to go through suitability training?
> Professor Balsar: I passed the exam (inaudible).
> Attorney Prosnitz:  And were you trained in suitability at all?
> Professor Balsar: I was not.
> Attorney Prosnitz:  So you don't recall the exam covering that subject?
> Professor Balsar: That was a long time ago.

Hrg. Trans., Part 4 at 1, Group Ex. H hereto.

15) Stuart Mehler of ComTrust testified that he never heard of a complaint against ComTrust from Plaintiff. He spoke with Plaintiff 16 times and offered him avenues for pursuing claims against the IIBs, including referring him to a contact at the NFA. *Id.*, Tab 3 56-59.

16) Stuart Mehler testified ComTrust had no interest in the amount of commissions the IIBs charged, and that ComTrust charged only a relatively small per trade amount in fees, most of which went to covering ComTrust's clearing expenses. *Id.*, Tab 3 at 62-63.

17) He testified that the IIBs had sole responsibility to supervise their employees; that ComTrust provided the IIBs no leads, trade recommendations, or manuals; that the IIBs had the right to do business with however many FCMs as they pleased; that the IIBs controlled entirely the amount of commissions they charged; and that ComTrust never gave the IIBs authority to hold themselves out as ComTrust's agents. *Id.*, Part 4 at 62; Part 6 at 20, 21, 37-38.

18) When examined on why ComTrust would have had access to certain IIB financial records, Stuart Mehler explained it was part of ComTrust's necessary compliance with federal law (as well as NFA Compliance Rule 2-9) to undertake "Anti-Money Laundering" procedures, and further that it was necessary to ensure the IIBs could cover margin calls if the customers could not, as it was the IIBs' responsibility to do. *Id.*, Part 5 at 37; Part 7 at 13-14. In any case, there was no evidence ComTrust reviewed the relevant IIBs' financials.

19) There likewise was no evidence that ComTrust had officers, directors or employees in common with the IIBs, or that ComTrust had any ownership interest in the IIBs. Rather, Stuart Mehler confirmed, at the end of the hearing, exactly what Plaintiff's account agreement spelled out in detail: ComTrust's role was limited to clearing trades. *Id.*, Part 7 at 20.

20) Following the final hearing, the Panel issued its written Award, identifying the particular issues it considered and decided:

6

> The following issues were presented to and decided by the undersigned arbitrators: Breach of Contract, Breach of Fiduciary Duty, Negligent Misrepresentation, Failure to Supervise, Fraud, Violations of the CEA 7 U.S.C. Section 1, et al., Violation of NFA Compliance Rules 2-2 and 2-4, Violation of Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/2 . . . [and] Plaintiff's request for punitive damages, interest, costs and attorneys fees . . . .

Award, Ex. D hereto.

21)    The Panel found Goldberg (who defaulted), the IIBs, and ComTrust "jointly and severally liable" for an award of "compensatory damages" in the amount of $594,292.[3]  The amount of compensatory damages approximates the alleged amount of commissions and fees charged almost entirely by the IIBs to Plaintiff's trading account.  Plaintiff received no other relief.

22)    Following the Award, ComTrust filed a timely request pursuant to § 10(c), NFA Code of Arb., to modify or correct the Award on the basis that the Panel made no apparent determination of agency.  Without any agency decision, ComTrust argued that the $594,292 joint and several award holding ComTrust liable for commissions the IIBs received was an evident miscalculation, as ComTrust's total revenue from the per trade clearing fee it charged amounted to about $96,900, only about half of which represented profit.  *See* Petition For Modification, Ex. E hereto.

23)    The NFA refused to send to Petition to Modify to the Panel for its consideration. Ex. F hereto.

---

[3] The other FCM Alaron was dismissed.

**ARGUMENT**

**The Panel Exceeded Its Authority In Awarding On A
Claim Of Unsuitability That Does Not Exist Under NFA Rules**

The Seventh Circuit Court of Appeal has held vacatur appropriate where the arbitrators "violated the agreement to arbitrate, as by corruption, evident partiality, exceeding their powers, etc." *Wise v. Wachovia Securities, LLC*, 450 F.3d 265, 269 (7th Cir. 2006) (emphasis added). An arbitration panel exceeds its powers when it openly <u>ignores</u> the terms of the arbitration agreement governing the proceedings. *Id.* (stating that when an arbitration panel fails to interpret the terms of a contract, it has exceeded the authority granted to it by the parties); *First Commercial Fin. Group v. Baghdoian*, 812 F. Supp. 837, 839 (N.D. Ill. 1993) (stating that when an arbitration panel exceeds its powers by ignoring, rather than misinterpreting, a contract). An award entered by an arbitration panel that has exceeded its authority is subject to vacatur pursuant to 9 U.S.C. §10(a)(4).

In this case, Plaintiff agreed to "submit [his claims] to arbitration in accordance with the Bylaws and Rules of NFA." The Panel was thus bound by these terms and was required to apply the rules and regulations promulgated by the NFA, including NFA's Legal and Procedural Guide for NFA Arbitrators (the "Procedural Guide"), in reaching its decision.

Relying on the arbitration agreement, ComTrust proceeded to the final hearing with the expectation that it could <u>only</u> be found liable if Plaintiff satisfied at least one of the three specific grounds set forth by NFA for imposing liability on an FCM, which are:

    a.    ComTrust engaged in wrongful conduct in connection with Plaintiff's account;

    b.    ComTrust acted as a guarantor FCM for the IIBs ProTrade or Corporate Commodities pursuant to a written guarantee agreement that was in effect during the time Plaintiff maintained his account; or

      c.     ComTrust had a principal-agent relationship with ProTrade or Corporate Commodities.

*See* Legal & Procedural Issues For NFA Arbitrators ("NFA Guide") at 15-16, excerpted hereto at Ex. G.  ComTrust relied on its agreement that it could not be found liable for the losses sustained by Plaintiff if none of these circumstances were present.

It was undisputed that ComTrust had no guarantee relationship with either of the IIBs.  It was also apparent the arbitrators made no determination on agency.  The Award contains a specific list of the matters the panel identified as having considered and decided:

> Breach of Contract, Breach of Fiduciary Duty, Negligent Misrepresentation, Failure to Supervise, Fraud, Violations of the CEA, 7 U.S.C. § 1, *et al.*, Violation of NFA Compliance Rules 2-2 and 2-4 [and] Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2.

Ex. D hereto.  Any theory or allegation of an agency relationship is conspicuously absent from this list.  What remains is Plaintiff's theory that ComTrust had a duty to monitor Plaintiff's trading and respond to alleged "red flags" that allegedly arose in the course of trading.  This is a theory of suitability, and it formed the central basis for Plaintiff's breach of contract and breach of fiduciary duty claims.  Indeed, Plaintiff's suitability theory against ComTrust was the sole subject of the testimony of Plaintiff's putative expert, and it dominated much of counsel for Plaintiff's arguments to the Panel for relief against ComTrust.

The problem is that the NFA, along with the CFTC, specifically <u>declined</u> to adopt a suitability rule.  *See* NFA Compliance Rule 2-30, Interpretive Notice.  In its place, the NFA adopted a rule (Rule 2-30) requiring FCMs to discover certain background information on customers and to provide customers with specific risk disclosures -- all of which ComTrust indisputably did -- with the idea that the customers then could decide whether speculating in futures or options was suitable for them.  As the interpretive notice of the rule explains, once the

FCM obtains the customer information and makes the disclosures, the obligation to decide suitability lies exclusively <u>with the customer</u>:

> When the CFTC declined in 1978 to adopt a "suitability" rule, after releasing a proposed rule for comment, it stated that it was unable "to formulate meaningful standards of universal application." . . . NFA found the same difficulty, and for that reason <u>the Rule is premised on NFA's conclusion that the customer is in the best position to determine the suitability of futures trading</u> if the customer receives an understandable disclosure of risks from a futures professional who "knows the customer." NFA believes that the approach taken in Rule 2-30 is preferable to one which would erect an inflexible standard that would bar some persons from using the futures markets.

*See id*.  The NFA Guide for arbitrators highlights this authority, instructing arbitrators that "[n]either the Commodity Exchange Act nor CFTC regulations impose suitability requirements on the futures industry."  NFA Guide at 3, Ex. G hereto.  Under this description of the rule, once the basic background information is obtained, the broker's duty is simply to supply a standard risk disclosure required by CFTC rules, or a more detailed disclosure for some customers whose background information suggests they need it.  In this case, ComTrust supplied Plaintiff with both the CFTC disclosure and an "Additional Risk Disclosure."  *See* Ex. B hereto.  The sufficiency of these risk disclosures was never an issue.

What Plaintiff argued, and apparently succeeded on, was much different: that "red flags" <u>in the course</u> of Plaintiff's trading (long after ComTrust had satisfied its obligations under Rule 2-30 to obtain background information and provide risk disclosures) created a duty on ComTrust to intervene in the trading.  The controlling NFA rules, however, make clear that no such claim is possible:

> The rule does <u>not</u> require the customer to inform the broker of material changes in his financial condition after the account is opened <u>and the firm has no duty to monitor a customer's financial condition</u>.

NFA Guide at 3 (emphasis added).

10

The Panel exceeded its authority in awarding on a claim that is impossible under the NFA Rules, which the parties expressly agreed would govern. Likewise, the Panel exceeded its authority by holding ComTrust liable for Plaintiff's losses on grounds <u>other</u> than those specifically enumerated in NFA's Procedural Guide. This is grounds for vacating the Award.

### <u>No Evidence Supported An Agency Theory</u>

Without a possible claim of wrongdoing against ComTrust directly, the only basis for a joint and several award against ComTrust was a claim that the IIBs were ComTrust's agent. But not only did the arbitrators not consider this claim, there was no evidence to support it.

The NFA's Procedural Guide makes clear that an FCM such as ComTrust may only be responsible for the actions of an IIB if it can be shown that the IIB is a *de facto* branch office of the FCM. *See* NFA Guide at 15, Ex. G hereto. The NFA's Guide further explains:

> [A]n agency relationship is not established if the IB and the FCM work as 'independent business entities' and the only services the FCM provides to the IB are 'back office' services (e.g. calculating margin and net equity and collecting margin) and sending confirmation, purchase and sale, and monthly statements directly to the customers that had been "introduced" by the IIB to the carrying FCM."

*Id.* at 16.

This is consistent with long-held authority that "an entity is considered autonomous – and thus not an agent – even if it: (1) supplies the FCM's account-opening documents to customers; (2) explains how to complete the account-opening documents; (3) collects account-opening documents and sets up an account at the FCM for the customers; (4) represents that its trades would be through the FCM; and (5) the FCM benefits from its relationship with the introducing entity." *Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp., Inc.*, 2006 WL 1789018 at *21 (S.D. Fla. May 30, 2006). The analysis relied upon in *Gibraltar*, as well as the

11

NFA Guide, comes directly out of a CFTC opinion, *Reed v. Sage, Inc.*, [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,943 (CFTC October 14, 1987):

> In examining the relationship between a [FCM] and an [IB] to determine whether an agency relationship exists, a factfinder must be cognizant of Congress' understanding that "a significant number of 'agents' of [FCMs] are, in fact, independent businesses that utilize the services of [FCMs] for clearing and recordkeeping functions and for safeguarding of investors' funds." S. Rep. No. 884, 97th Cong., 2d Sess. 41 (1982). Thus, those factors that have historically been present in almost every relationship between a futures commission merchant and its "agent" will not be sufficient to establish that an introducing broker is the agent of an FCM.

*Id*. (emphasis added). The CFTC further explained:

> [A]gents have carried all of their accounts on a fully-disclosed basis with an FCM which provided "back office" services for those accounts and as such, was responsible for compliance with the minimum financial, recordkeeping, and reporting requirements established by the Commission and its predecessors agency, the Commodity Exchange Authority ("CEA"). The FCM also provided confirmation, purchase and sale, and monthly statements (as well as any cash remittances) directly to the customers which had been "introduced" by the agent to the carrying FCM. Generally, the agent was compensated by the FCM on a per-trade basis – *i.e.*, the agent would in some manner be allocated a percentage of the commissions charged by the FCM on the trades made by the agent's customers.

According to *Reed*, "[w]hen only these factors are present… then the facts and circumstances do not establish an agency relationship." *See id.* (emphasis added).

The *Gibraltar* court, relying on *Reed* and other CFTC opinions, examined the three forms an agency relationship can take: 1) an express agency relationship, where the parties formally agree to the creation of agency relationship; 2) an "implied actual agency" relationship, where the principal acquiesces to let the other party hold itself out as its agent, the principal provides "substantial support" to the agent, and the principal controls the agent's activities; and 3) "implied apparent authority," where third-parties are reasonably led to believe there is an agency

relationship. *Gibraltar*, 2006 WL 1789018 at *20-22. In terms of agency, this was a case of "no evidence." Indeed, all the evidence soundly established that this was a case of independent companies engaged in a generic FCM/IIB relationship. There was, for one, no contention of an express agency relationship.

As for the second possibility, and given the NFA's controlling exclusion of an FCM's normal "back-office" functions from the equation, there was also no evidence of an implied actual agency relationship. The one thing Plaintiff relied on was ComTrust's ability to review financial information of the IIBs. But the mere ability to receive information is not evidence of *agency*, as any court has construed it. As the *Gibraltar* court underscored, agency is largely about <u>control</u>. *See Gibraltar*, 2006 WL 1789018 at *21 (finding that [the FCM] "exercised far less control over Gibraltar than in other circumstances where the purported agent was determined to have been acting autonomously rather than as an agent of the purported principal"). The normal hallmarks of control in an FCM/IIB relationship – ownership, financial support, support in soliciting customers and research, common employees – were totally missing in this case.[4] And, as for ComTrust's ability to review the IIBs' financial records, the evidence was undisputed that this was both part of ComTrust's Anti-Money Laundering responsibilities under the NFA rules and federal law, and part of ComTrust's need to protect its own net capital in the event excessive debt forced a margin call. Hrg. Trans., Part 5 at 37; Part 7 at 13-14, Group Ex. H hereto. This was hardly a meaningful basis for a finding of agency.

---

[4] Plaintiff's counsel relied greatly on the ultimate outcome in *Reed*, Comm. Fut. L. Rep. (CCH) ¶ 23,943, to support his theory that receiving financial information would suffice. In fact, the factors the CFTC relied on in *Reed* were far more typical of an agency relationship: "[the FCM] provided [the IB] with research and trading information which was passed on to customers . . . [the AP] represented to [the investor] that [the IB] was "part of" [the FCM], and . . . [the IB] did essentially all its business through [the FCM]." *Id.* at *26. The evidence in this case directly contravened every one of these factors.

13

In addition, there was no evidence of "implied apparent authority." Plaintiff clearly never thought the IIBs were ComTrust's agents. Plaintiff testified that ComTrust did nothing wrong and that he never even wanted ComTrust be named in the case. Hrg. Trans. Part 1 at 156, Group Ex. H hereto. Far from believing the IIBs were agents of ComTrust, the undisputed evidence was that Stuart Mehler gave guidance to Plaintiff on how to sue the IIBs in the NFA. Hrg. Trans. Part 3 at 56-59, Group Ex. H hereto. In addition, Plaintiffs' account agreement expressly disavowed any agency relationship between ComTrust and the IIBs. *See* Ex. B at ¶ 23.

Plaintiff's counsel attempted to put Plaintiff's daughter on as a substitute for Plaintiff in order to try to create evidence of "implied apparent authority." But she admittedly had no involvement at any point during Plaintiff's actual trading, and she testified she understood nothing from the web site page she supposedly found relating to ComTrust (which post-dated all of Plaintiff's trading in any event). This also was not plausible evidence of an "implied apparent authority" theory of agency. Hrg. Trans., Part 2 at 17, 32; Part 6 at 7, Group Ex. H hereto.

Accordingly, there was <u>no evidence</u> to support Plaintiff's burden under the arbitration agreement to show, by way of an agency relationship, that the IIBs were "de facto branch offices" of ComTrust. In this regard, the First Circuit has recognized, specifically with respect to the issue of agency, that an absence of meaningful evidence supporting an arbitrators' decision is grounds for vacatur. In *Labor Relations Div. of Const. Industries of Mass., Inc. v. Teamsters Local 379*, 156 F.3d 13, 20-21 (1st Cir. 1998), the court vacated an arbitration award based on agency where the arbitrator "reached conclusions which were entirely unsupported by the testimony in this case;" where "there was simply no evidence to support the arbitrator's conclusion that [the alleged agents] were subject to constant supervision;" where the arbitrator "failed to recognize the significance of certain evidence supporting independent [] status of [the

alleged agent;" and where the arbitrator failed to factor "[u]ncontradicted evidence" into his analysis.  Notably, the Seventh Circuit in *Wise* recognized *Labor Relations* as the type of "no evidence" case that could support vacatur under the statutory grounds of exceeding authority or corrupt motive.  *See Wise*, 450 F.3d at 269.

In this case, a finding of agency was a fundamental requirement under the parties' arbitration agreement to holding ComTrust liable.  Assuming the Panel even considered agency (which it apparently did not), it exceeded its authority in holding ComTrust liable.

### Alternatively, the Award Against ComTrust Should be Modified Or Corrected

Alternatively, the Award should be modified or corrected because there is an evident miscalculation in the amount of the joint and several liability imposed upon ComTrust.  Further, the Panel awarded upon matters not submitted to it.  9 U.S.C. §11(a) and (b).

The $575,000 in compensatory damages awarded by the Panel approximates the total the commissions and fees paid by Plaintiff in connection with his commodity trading account.  In fact, ComTrust only received a $17.00 clearing fee for each trade placed by Plaintiff, for a total of about $96,900.  After paying clearing fees, ComTrust received a net total of $45,600 on the approximately 5,700 contracts traded by Plaintiff.  *See* NFA Petition to Modify, Ex. E. hereto.

Given that ComTrust made no trade recommendations, did not participate in any of the alleged fraudulent communications with Plaintiff, and all of the remaining commissions generated by Plaintiff's trading went to the introducing brokers (which set their own commission rates), the clearing fees paid to ComTrust represent the maximum damages attributable to ComTrust's activities as an FCM.  Yet, the Award purports to hold ComTrust liable – jointly and severally with the IIBs – for the entire $575,000 in commissions and fees generated from Plaintiff's account.

15

The only theory that could possibly make ComTrust jointly and severally liable for the commissions and fees paid to the IIBs (or any other out-of-pocket damages suffered by Plaintiff as a result of the IIBs alleged wrongdoing) is a principal-agent theory.  The face of the Award confirms that the Panel did not consider the matter of agency – an issue that the controlling NFA guidelines specifically state cannot be assumed and must be examined on a case-by-case basis. NFA Guide at 15-16, Ex. G hereto.

Accordingly, the Award should be modified to exclude, or at least limit, the joint and several award against ComTrust to accurately reflect the maximum damages that Plaintiff could possibly be entitled to from ComTrust's clearing activities: about $96,900, which amounts to $45,600 after accounting for the clearing fees paid by ComTrust.  9 U.S.C. §11(a).

Furthermore, the Panel awarded upon matters not submitted to it.  As noted above, the Award specifically identifies Violations of the CEA, 7 U.S.C. § 1, *et al.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2.   These claims are listed in Plaintiff's initial statement of claim, filed in May 2006, under the section entitled "Violations."  Plaintiff abandoned these specific claims in his amended statement of claim, filed in September 2006.

It is well-settled that an amended complaint supersedes the prior pleading in all respects, such that the "prior pleading is in effect withdrawn as to all matters not restated in the amended pleading, and becomes *functus officio*."  *E.g., Duda v. Board of Educ. of Franklin Park Public School Dist. No. 84*, 133 F.3d 1054, 1057 (7th Cir. 1998) (citations omitted) (emphasis added); *ABN AMRO, Inc. v. Capital Intern. Ltd*., 2007 WL 845046 at *13 (N.D. Ill. Mar 16, 2007) ("when a litigant files an amended complaint or counterclaim, the allegations in the prior pleading are superseded and are no longer operative, even in the case where the initial filing

occurred"). The NFA rule on amended pleadings, § 6(k) of the NFA Arbitration Code, says nothing to the contrary.

When Plaintiff's Amended Statement of Claim dropped the alleged claims under the Commodity Exchange Act ("CEA") and the Illinois' fraud statute, those claims were withdrawn from the arbitration, and thus should not have been considered or decided in the case, as the Award indicates. The Panel, therefore, concededly "awarded upon" matters not submitted to it. Accordingly, the Award must be modified to remove any consideration or finding of purported violations of the CEA or Illinois' fraud statute, 815 ILCS 505/2. 9 U.S.C. § 11(b).

**WHEREFORE**, ComTrust respectfully requests that the Court grant ComTrust's Petition to Vacate the Award with respect to ComTrust. Alternatively, ComTrust requests that the Court modify or correct the Award with respect to ComTrust to reflect the maximum amount that ComTrust received from the trades placed by Plaintiff, and to remove reference to claims that were withdrawn from the case.

Respectfully submitted:

GARY M. SINCLAIR

Gary M. Sinclair
Attorney for Respondent ComTrust
2043 N. Mohawk Street
Chicago, IL 60614
Tel: 773-871-4389
Fax: 773-871-8534
E mail: gary@garyslaw.com

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused to be served a true and correct copy of the foregoing document via this Court's electronic filing system and facsimile upon Howard B. Prossnitz, Esq., Law Offices of Howard Prossnitz, 200 W. Madison Street, Suite 2670 Chicago, Illinois 60606 on this 29th day of January 2008.

GARY M. SINCLAIR