CHAIRMAN:        Let me begin with some introductions, if I may.  In accordance with the Court of Arbitration, this matter between Mr. John Bell, the Claimant, and Respondents, Pro Trade Features and Options (inaudible), which are (inaudible).  This was submitted to this arbitration panel.  My name is Daniel (inaudible).  I'm the Chairperson of the panel.  Seated to my left and your right is Mr. Mark Danievsky and on my right and your left is Mr. Jim Langford.  We are the panel of arbitrators charged with the responsibility of hearing this case and rendering an award.  I must begin by stating at the time we were given that responsibility, we all are in (s/l) pretty good health.  So that we need to (inaudible) hear this (inaudible).  There are a number of preliminary matters that I want to take up this morning before we begin the hearing.  I'll just begin by saying that we have read all the papers that the parties have submitted.  In front of us are the exhibits that have been submitted by the parties and (inaudible) requires that we disclose that we have not read all of those carefully, although we have them now in our possession and will follow them carefully through the arbitration of this hearing.  The pleadings that have been filed in this matter are of record and will become part of the hearing record for the purposes this case.  If a document for whatever reason is not accepted and is not going to be (inaudible) this part of the record, then (inaudible) this case.  Before we begin to the formalities of the hearing, I'd like to advise the parties of some rulings that have (inaudible) motions that were filed even preceding the hearing.

ATTORNEY PRASNITZ:  Mr. (inaudible), Howard (s/l) Prasnitz on behalf of the Claimant.  I would like the opportunity, to be very honest, (inaudible).

CHAIRMAN:       I'll give you that opportunity.  First of all, each of the parties have filed a motion to amend their hearing plan… excuse me… to add an additional witness. None of those requests seem out of line or unfair to anyone.  Since all three parties have submitted a motion on those regards, the panel will allow those motions.  Second, there was a motion for summary judgment filed by Alan, including some exhibits.  There has been a response filed to that and it is the… the panel's intention, present, and can take it under advisement until the evidence has been heard in the case.  And then to determine what, if any, further action is required on that motion.  So that motion need not be formally renewed if it would be pliable and… and under advisement by the panel that it be made, if you wish to make the record do that, at the conclusion of either the Claimant's evidence or of all of the… all of the evidence.  In addition to that, the Claimant has made a request… it's not really a motion, but a request… to have a subpoena issued upon the NFA for certainly regulatory matters.  The panel has reviewed that request and… and discussed it and I'd like to begin by asking Mr. (s/l) Prasnitz for some direction on why that subpoena… as to the necessary relevance and where you would expect to go with it.


ATTORNEY PRASNITZ:   Okay.  First of all, I just want to address the law that this is an arbitration proceeding.  Rules of evidence don't apply, so I think that as a body of equity, the discretion should be exercise in le… in hearing more evidence rather than less.  These are discrete pieces of evidence which relate to the time when the Alaron guarantee of ProTrade, and we also allege that applying to Corporate Commodities, Inc, when it was in effect.  The NFA has informally advised me that, according to NFA

records, that guarantee agreement was in effect from July 29, 2005 through October 13, 2005. October 13th is when, uh, Alaron told the NFA that it was in effect. Most of Mr. Bell's losses, over $500,000, occurred during the time period of that guarantee. So that's… that's why, you know, that piece of information is important. I thought it was a matter of public record. If there's some NFA staff willing to… I mean, they gave me the information without a subpoena over the phone, but they said if I wanted a written record… I asked them to confirm, but they told me, well, they said I needed to request a subpoena, so I requested a subpoena. But that's a matter of public record. So that's why the dates of the guarantee are important. And the other piece of information we're seeking in the net worth filing of the introducing (inaudible) ProTrade. Once again, they informally gave me the information over the telephone. They indicated that ProTrade filings fell beneath the net worth requirement for IBs at the time, which is why ProTrade then entered into this agreement with Alaron, so it provides a little background for why the Alaron deal was signed. So that's… that's the purpose of my requests.

CHAIRMAN:          Counselor (inaudible), your response?

MAN:                    As… as to the first issue that the time period during which the guarantee was in effect, uh, in the guarantee was a guarantee of a single IB ProTrade (inaudible) and it is not an issue. So the guarantee was out there for a few months (inaudible) same days that I know of. And Mr. Prasnitz doesn't (inaudible) business that wasn't done by ProTrade through my client. I mean, there… there… there's no issue as to that. Um, as to the net worth filing, I don't see how that has any relevance here. Uh,

3

ProTrade became a guaranteed IB and then he's doing business.  So whether it had net worth that required it to be guaranteed IB or not, it… no… no one's disputing that the… the guaranteed IB agreement was signed.  It's not an issue, so I don't know what ProTrade's network has to do with it.

ATTORNEY PRASNITZ:   Yeah.  I mean, if we have a stipulation that the guarantee that was in effect from July 29, 2005 through October 13, 2005, that takes care of… of that issue.  I mean, we have a major dispute about whether the agreement applies to Corporate Commodities as well as ProTrade.  We allege it does and will be producing evidence that Corporate Commodities was the successor.  But… but if we have stipulation as to the base of the guarantee, that solves that issue.  As to the net worth, I think, you know, if… if ProTrade continued to make filings showing it wasn't meeting the minimum capital requirements, we think that's important because it showed they needed a guarantee and it shows… it underscores, you know, the importance that, you know, (inaudible) and it also raises a question of why (s/l) ComTrust would continue to do business with someone who wasn't meeting their own net worth requirements without ComTrust getting a guarantee.  So I think we raise the standard issues.

CHAIRMAN:        It… it… none of the questions that I'm directing, Counsel, here are against the (inaudible) participant in the advocacy process, but it's difficult to understand these issues.  In fact, what we have are papers that have been filed by the parties without very much factual support in… in terms of a (inaudible).  So I'm asking the questions so that I can try to decide what boundaries of the (inaudible) are so that we

can stay focused on what is relevant to the (inaudible) and not things that fall outside or around the margins there.    We can spend a great deal of time on (inaudible) underscoring the resolution (inaudible).  So, as I understand your position, Mr. Prasnitz, two, three issues, one of which I don't see as a… a… an issue on whether or not there is some successive liability issues here.  I don't think it's (inaudible).

ATTORNEY PRASNITZ:    No, that's… that's a legal (inaudible)…

CHAIRMAN:         That's your right.  Right, right.

ATTORNEY PRASNITZ:    … issue that is (inaudible).

CHAIRMAN:         Right.    The second issue is the one regarding things that (inaudible).  Third is (inaudible) the way we have requirements and one (inaudible).  But it's made it (inaudible)… I'm sorry, go ahead.

MAN:                Well, no, I was… I was just going to say, this just seems like, you know it doesn't (inaudible) it doesn't happen that (inaudible).  So a… an independent IB, which ProTrade, I assume, was through ComTrust that day, it was an independent IB and it was… it cleared trades for ComTrust in June and July of 2005.  I think that's the facts.  I don't… we're not a party to that.  But if you can't guarantee an IB, but if you can't be guaranteeing an IB, you didn't have the capital funds.  If they had watched the money or didn't have money in the company that looks large (inaudible) to continue to

do business with the guaranteed IB as ProTrade, they signed… regardless of (inaudible) they signed a guaranteed IB agreement.  So I'm not… I just don't… I… I… I don't understand what their net capital at this juncture, because it did sign a guaranteed IB agreement.  I don't think they… I don't know if this is legitimate, but they didn't… they didn't do any if it was.  But the fact that they signed it, they… at that point, they don't have capital.


MAN:              (inaudible)


CHAIRMAN:        Yeah, I… I did.  I mean, all of the sudden, you know now just mention somehow ComTrust in this matter.  The fact is is that a incoming IB files their YFI with EFA.  That's the process.  It's going to take (inaudible) whether or not they can continue in business.  It's (inaudible) trust ComTrust.  These people are under-capitalized and can't do this as well.  It's not ComTrust's (inaudible) constantly in prior or the independent IB, whether this guy's got a capital requirement.  So this argument now that somehow the fact that there was a (inaudible) and the they're contesting (inaudible) and divisions with them is really not an issue.  That's in a day's decision-making and not ComTrust because ComTrust doesn't get a copy of (inaudible).  They don't know what the impact to the client is.  They rely on NFA to tell them really (inaudible) and we will turn to very shortly (inaudible) issues that we're trying to (inaudible).  We'll return to the mix.  (inaudible)potential abuse of (inaudible) stipulation and (inaudible) that there was an agreement in place between July 29th and October 13th.  Is that in dispute?

ATTORNEY PRASNITZ:    Not in dispute.

CHAIRMAN:        That's okay.  That is not your (inaudible).  Um… yes?

ATTORNEY PRASNITZ:    Just… just licensing.  We understand it's a guarantee with ProTrade.

CHAIRMAN:        Yeah, I meant to say that.  If I didn't, that's (inaudible).

ATTORNEY PRASNITZ:    Okay, thank you.

CHAIRMAN:        Sorry.  Yeah, and the Claimant's position is that it guarantees everything during that period, but these are legal issues, so I…

ATTORNEY PRASNITZ:    Right.  (inaudible)…

CHAIRMAN:        Yes, the stipulation is only as to what (inaudible).

ATTORNEY PRASNITZ:    Okay.  (inaudible)

CHAIRMAN:        Yes.  So, uh… so we'll take that as… as evidence in this case.  I'd like to allow us two minutes to talk about this and then go (inaudible).  All right?

ATTORNEY PRASNITZ:    Sure.

CHAIRMAN:        Okay.  We'll adjourn for just a couple minutes.

(OFF THE RECORD)

(BACK ON THE RECORD)

CHAIRMAN:        All right.  Thank you, ladies and gentlemen.  We will enter into evidence the following stipulation.   The effective dates of ProTrade's guarantee agreement with Alaron Trading Corporation is from July 29, 2005 to October 13, 2005. And taking that stipulated fact into evidence, the panel would deny the request for the issuance of the subpoena to the NFA for the remainder of the documents sought from the NFA.  In the proceedings that are about to begin, the parties may, if they wish, make opening statements.  Following the opening statements, the Claimant and respondents in that order are permitted to present witnesses and documentary evidence and, of course, they have the right to cross-examine the witnesses of the opposing party.  All the witnesses in this case will be sworn under oath before they're allowed to give their testimony.  Keep in mind, please, gentlemen, that in presenting your case or defense that any statements that might have been made to each other or in the confines of (inaudible).  After each side has completed the presentation of their case, called all of their witnesses and offered all of the documents that they wish to have into evidence, that party's case will be closed.  At the time all the cases are closed, the parties will be

called upon to make brief closing statements if they wish.  They, of course, may be waived.  Following those summations by the lawyers, assuming they are made, the hearing will be declared closed and we'll ask all of the attorneys (inaudible).  Finally, as has already been mentioned here, arbitration proceedings are far less formal than the proceedings that occur in court, but it doesn't mean that (inaudible) conducted with a minimum amount of decorum and orderliness so that we can get through all of the evidence in a way that (inaudible) hearing.  Nevertheless, the panel has very broad discretion in determining what facts will be received into evidence and we will very likely exercise that discretion during this hearing.  So, having said that, I'm going to call upon each of the lawyers present here today to introduce the parties that they have.  Mr. (inaudible)…

ATTORNEY PRASNITZ:    I will have some preliminary matters before we go into the opening statements.

ATTORNEY PRASNITZ:    As… as would I.

CHAIRMAN:        Okay.

ATTORNEY PRASNITZ:    As would I.

(LAUGHTER)

CHAIRMAN:          None… none of which is totally unexpected.  But I would ask, just so that we have a good record here and also to assist the panel, would you… starting with you, Mr. Sinclair, would you please introduce the gentleman seated to your right?

ATTORNEY SINCLAIR:    Sure.  I'm Gary Sinclair.  I'm the attorney for ComTrust and this is Mr. Stuart Maylor, who is a representative of ComTrust.

CHAIRMAN:          Mr. David?

ATTORNEY DAVID:       I'm Henry David, counsel for Illinois Trading Corporation and Alaron's corporate representative, Barry Isaacson, is sitting to my right.

CHAIRMAN:          Okay.  Mr. Prasnitz?

ATTORNEY PRASNITZ:    My name is Howard Prasnitz, attorney for the Claimant, John Bell.  Sitting to my left is Mr. Bell and sitting to his left is his daughter, Debra (s/l) Kahn.

CHAIRMAN:          Thank you very much.  Mr. Sinclair, since you raised your hand first…

(LAUGHTER)

ATTORNEY SINCLAIR:    Okay.    I have a number of issues.    Number one, in my answer (inaudible) answers, I raised a motion to dismiss on legal grounds, on contractual grounds, based on the fact that Mr. Bell signed the agreement and there appears to be no dispute regarding the fact that neither Corporate nor ProTrade were guaranteed by ComTrust.   And in the contra… in the contract, paragraph 23, which I have highlighted in my… my motion, it states in the event that introduced the account, from an independent personal broker, the customer's (inaudible), that ComTrust is now responsible or liable (inaudible) matters (inaudible) practices (inaudible) matters, it being expressly understood and it being acknowledged that a customer, any customer, that ComTrust's sole responsibility under (inaudible) related to the execution and clearing, accounting and information, adopting the business (inaudible).   And it goes on to say that uh… that they will not bring action against them in any (inaudible).   Now, this is dealing in coordination with the law which states that an FCM is not responsible for the actions of an independent (inaudible) broker.   That's good.   That's been settled law a long, long time ago.   And unless an extraordinary showing is made that there's an agency relationship, (inaudible) of the FCM (inaudible) interest in (inaudible).    In addition, and this is information that was provided in the (inaudible), Mr. Prasnitz's (inaudible) he included the (inaudible) of Dan (s/l) Stianovic.   This is (inaudible) against ProTrade and Corporate.   And if you look at that complaint, you will see that NFA did not name ComTrust as a supervisor of either Corporate or ProTrade.   And, in fact, in Section 2 of that complaint, where they have a section that deals directly with agents, again, ComTrust is not named.   Com… ComTrust is not named as far as they didn't supervise and there was no agency.   Now, this is Mr. Prasnitz's exhibit, the Corporate

exhibit, the uh, (inaudible) C.  And in addition, you can look at the document and see that that… that ComTrust was not on notice legally that there was even a complaint filed because this complaint was actually not filed until the first demand for arbitration was filed by Mr. Bell.  And that in the amended complaint, the amended demand, they included this case against… against ProTrade Corporate.  We've also made the statement that these trades were verified, that there are sections in a (s/l) comp document which, again, requires a claimant or a customer to notify ComTrust immediately of any discrepancies in the account.  There's no allegation that in (inaudible) that Mr. Bell notified or put ComTrust on notice that there was any problem with his account.  And, in fact, the only conversation that took place with ComTrust occurred after the trading had ceased in the account, after all the losses had been realized.  There is case law and congressional statements to support the fact that an independent… that an FCM is not responsible for the actions of (inaudible).  And there has not been a ruling that the claimant is at (s/l) CMPC reparations where inde… where an FCM is held responsible for the acts of an independent.  I think, yeah, there was a case of that cited by Mr. Prasnitz, which specifically says that an FCM is not responsible for the acts of the independent IB.  So based on the fact that there's a contractual agreement not to sue, there is case law that, in turn, that FCMs are not responsible for the acts of independent IBs.  And Mr. Prasnitz own… I'm sorry, Mr. Bell's own exhibits showing that in the case where ProTrade and Corporate were named by the NFA and (inaudible), there is no claim that ComTrust either supervised or was an agency for that (inaudible) ProTrade or  appropriately agents for ComTrust.  (inaudible) we should be dismissed.

CHAIRMAN:          Mr. Prasnitz?


ATTORNEY PRASNITZ:   Yes.  I anticipated that they would have this argument, so I've compiled a binder of legal authorities showing what Mr. Sinclair said is simply not correct.  I tendered these to counsel yesterday.  I'd like… this is a compilation, which of course, I've already cited and I'm very… (inaudible).  Well, first of all, the short answer to Mr. Sinclair's motion is that I don't think motions to dismiss are even allowed in these proceedings.  He filed a motion to dismiss that was rejected by the (inaudible).  But since he raised these issues, I want to respond to them.  First, simply, his articulation of the law is not correct.  A future commission merchant may be responsible for the action of independent introducing broker and it is in that issue as to whether or not an agency exists.  The leading initial case on this subject was (s/) Read vs. Saggs, decision by the CFTC in 1987.  The CFTC said, "We reject the brokerage firm's argument that the Commission's regulation suggests future commission merchants may not be held responsible for the conduct of introducing brokers unless they have entered into a guarantee agreement.  Nothing in the language of the regulations remotely suggests this."  And then the CFTC goes on to explain it's a fact issue against stipulations.  And that remains good law today.  One document we've not seen and I'm requesting production of is the… which I've requested production of the log and I still have not got it, which is (inaudible) the agreement between ComTrust and ProTrade and I'd like that to be produced because that directly relates to these… to these issues.  But the law… this law continues to be good.  It is… it's applied almost on a weekly basis by the CFTC

in connection with actions involving the unauthorized (inaudible) contracts, including the firms, is routinely found liable in those cases when… when it fails to supervise.  It's also (inaudible)… it's also been continued to be applied by courts.  For instance, a recent decision, September 6, 2007, in the Federal Court of the Eastern District of Michigan, CFTC v. (s/l) Malayan Trading, explains that under Section 2A1B of the Act, strict liability is imposed on principles for the unlawful acts of their agents.  Agency liability may be found even if their principle does not direct the unlawful acts or even if the principle acts on the knowledge of the unlawful acts.  Whether an agency relationship exists does not turn on any one fact, but on overall assessment of the totality of the circumstances, which exactly… that's exactly why we're having this hearing.  Because it turns on the overall circumstances whether or not an agency relationship exists.  Just… just a couple of points that suggest that there was an agency.  The ProTrade website… half of it is devoted to ComTrust documents.  They were working as partners here. Anybody going on the ProTrade website sees the ComTrust account statements. Secondly, among the fact issues to be explored are whether ProTrade did use any other account statements besides whether… besides the ComTrust statements.  On the ComTrust website, the ComTrust website says we're not just here to clear trades for (inaudible) brokers, we're here to provide compliance, training, ethics.  So we have a whole host of fact issues as to what did ComTrust do?  Right on its website, it says we're not just here to clear your trades, we're here for compliance, ethics, etc. Ratification, waiver, which is alleged, those are all fact issues.  Whether Mr. Bell is competent to waive, that's his (inaudible) and right now his memory necessitating (inaudible).  So this man (inaudible).  If… if… if the statement of (inaudible) there are

numerous fact issues.  The fact that NFA did not prosecute ComTrust, that… that was, uh… that (inaudible).  I mean, it's… it's undisputed that Mr. Goldberg has been (s/l) barred from the industry.  He was… he worked for ProTrade.  ProTrade has been barred from the industry.  Corporate Commodities, Inc., has been barred from the industry.  The question for this panel is to examine the totality of… totality of facts as to whether or not ComTrust had an agency relationship and is, therefore, vicariously liable, and whether or not this guarantee agreement applies to them.  So the… you know, that's… that's why we're here.  These are all numeric factors.

ATTORNEY SINCLAIR:    I just need to respond briefly.  First of all, Mr. Prasnitz is quoting cases that had to do not with (inaudible) except for the state case, which is ten years old, and there's never been another case in which an introducing broker has had… in which an FCM has been held responsible for the acts of an independent introducing broker.   He taking cases that are (s/l) 4X cases where there is no registration.   It's a totally different body of law on 4X than it is for independent introducing brokers.   As I said, in the case in which he didn't bring up (inaudible) including (inaudible) pursue the case, they talk about how Congress intentionally wrote the law to exclude liability for independent introducing brokers for FCMs for their asset independent introducing brokers.  It's not the other way around where, oh, there's going to be liability unless we prove there isn't.  It's if… if there isn't liability unless they prove there is and there's nothing alleged in the complaint that puts us on notice that he is suggesting that Mr. Bell relied on anything or that any agency actually existed.  So…

CHAIRMAN:        Well, it seems like… it seems to me and I'm going to take the liberty of speaking on behalf of the analyst, extremely difficult to deal with motions of this magnitude when we're seeing a mosaic of facts that are being highlighted by the lawyers in the case without understanding either their chronological or… disorder or the… the totality of all the facts and service (inaudible).  Not waiving any of those arguments while proceeding in the hearing, certainly legal arguments are always relevant to the outcome of cases and it may be that we're going to need to do some work here, the lawyers are going to need to do some work to… to get those arguments in the proper context.  But… but it's virtually, speaking for myself, impossible to absorb both the law and facts necessary to make these decisions on an impromptu basis.  I have not seen any of this in advance of the presentation that's being made this morning, so I think the appropriate way to get to proceed to the hearing, reserving the rights to raise these functions at the appropriate time and… and then we'll be advised as to what the law is on… on all sides of the issue and we'll know what the relevant facts are that the law has provided (inaudible) to make some sort of formal decision rather than some knee-jerk reaction to what we're hearing here this morning.  So if I haven't made it clear, we'll take that portion under advisement (inaudible).

MAN:        (inaudible) the hearing.  You indicated that, as we know, officers (inaudible) for example.  However, in the Claimant's claim, he has raised an issue that supposedly Mr. Bell was pressured to settle.  I'm asking that that entire section be removed from the (inaudible) because it is inappropriate in the context of our equation.  Any settlement discussions, first of all, shouldn't have been brought to the table, should

not have been included in this… in this (inaudible). And… and I'm asking the panel to disregard any of those issues regarding settling that took place before the case was filed.

CHAIRMAN:          (inaudible)

ATTORNEY PRASNITZ:   Well, there's one piece of this, which is that after the case was filed, after Mr. Bell was represented by counsel, we would proffer evidence that people from ComTrust continued to call him afterwards to pressure him into a settlement. So without going into the settlement, I just think that that… that that (inaudible)…

ATTORNEY SINCLAIR:     (inaudible)

ATTORNEY PRASNITZ:   Well, just (inaudible) it's happening.

ATTORNEY SINCLAIR:     Not only that, there's nothing that prohibits my client from talking to Mr. Bell. It's referring to me, as counsel, from talking to Mr. Bell. But Mr. Bell and Mr… Mr. Maylor or ComTrust can have conversations, whether or not he has counsel.

CHAIRMAN:          I… I think the general rule is that discussions in whatever context, settlement or with a law firm or a demand, are inappropriate from the point of fact of an

arbitration hearing, unless I could be convinced that there's some other factual circumstance to the otherwise. And I'm only going to be convinced in the most difficult manor. I think we should disregard that.

ATTORNEY PRASNITZ:    Well, what if the evidence was a question about the case?

CHAIRMAN:         Well, I don't…

ATTORNEY PRASNITZ:    Or persuasion about the (inaudible)…

CHAIRMAN:         No, I… I think the same general rule applies.

ATTORNEY PRASNITZ:    Okay.

CHAIRMAN:         A subcategory of the same general rule. I think Mr. Sinclair's point is well taken, so…

ATTORNEY SINCLAIR:    And my third issue is this is the first time I've learned that Mr. Bell is apparently going to come up with some testimony.

CHAIRMAN:         Mr. Pra…

ATTORNEY SINCLAIR:    He said he can't remember when he went to high school.

(ALL TALKING AT ONCE)

ATTORNEY SINCLAIR:    Anyway, there's more to that and I'm not suggesting… the point is is that Ms. McDonald is here and I don't know if she's here… she's supposedly going to be a witness.  She's not part… generally, in almost every arbitration I've been involved in and I hope this… well, witnesses are excluded from the hearing until they are called to testify.  And unless there is an extraordinary reason that Ms. McDonald needs to be in the room, I'm going to request that she be excluded before the hearing goes forward because she's a witness and not a party.

ATTORNEY PRASNITZ:    General practice is that counsel makes a motion to exclude and it's granted.  So if that's a motion to exclude, fine, I… step out.

CHAIRMAN:        Okay.  Motion will be granted.

ATTORNEY PRASNITZ:    If that's a request.

ATTORNEY SINCLAIR:    (inaudible)

ATTORNEY PRASNITZ:    Okay.

ATTORNEY SINCLAIR:    Thank you.  Uh, I have two separate things to discuss.  The first has to do with counsel's suggestion this morning that he wants to… I… I don't know if he wants to introduce (s/l) cabinets and I guess that would be my issue if he does on this supposed successor liability.  Now, I don't think there's any question that there's nothing in the statement of claim, which is not your run of the mill statement of claim, it's a statement of claim, probably 10 pages, 42 paragraphs.  There's nothing in the statement of claim that said anything about successor liability or Alaron having some type of successor liability issue or responsibility.  But it really goes beyond that because, as you know, parties are responsible for filing hearing plans.  In your hearing plans, you're asked to (inaudible) the legal and factual issues that are going to come before the panel.  If you look at Claimant's hearing plan, there is nothing in the hearing plan that talks about successor liability.  In fact, the hearing plan says on page 2 the primary fact issue to be resolved is whether or not an agency relationship existed between Mitchell, who I assume is Mr. Goldberg, and respondent firms.  I understand that.  But nothing about successor liability.  If you look at the response that Mr. Prasnitz filed to the motion for summary judgment… three-page response… again, nothing about successor liability.  In fact, page 90 says Alaron should be held liable for the act of introducing broker ProTrade.  The act of ProTrade, nothing about the acts of somebody who might be a successor to ProTrade.  Gentlemen, the bottom line here and I am not here to delay this proceeding… my next motion is going to be a suggestion (inaudible).  But it's not an issue that's before this panel.  If counsel doesn't intend to introduce any facts, if this is simply a legal argument, then I will tell you right now, you should make this legal argument, we can argue it as a matter of law based on the facts that he's

alleged in his… his statement of claim with whatever registration facts are a matter of public record.  But I never wanted… didn't take any discovery on this issue.  My client didn't take any discovery on this issue.  It wasn't anything that was ever out there to be a part of this case and I… I have no… I don't want to be surprised by facts on an issue that I didn't know was here.  So if this is a question of the introduction of evidence and the issue of our "successor" liability, then I'm… I'm prepared, if the panel wants to brief the legal aspects of this issue, because I don't think we have any successor (inaudible). I know we don't have any successor liability.  That's fine.  But it… it… it wasn't made a fact issue in this case.  There is a reason for things like hearings and… so that we at least have some adequate notice and it wasn't there.  So I… I am asking to bar the introduction of… I'm not asking… not saying they can't argue it as a legal theory.  I can even make that argument that I can handle the legal part.  But I don't think he should be entitled to start introducing facts when I wasn't prepared to bring in those facts, it wasn't in the hearing plan and the first time it came up was within some materials he sent to the NFA within the last week.

CHAIRMAN:          Mr. Prasnitz, before you respond to that, let me ask you the same question.  Do you intend to introduce evidence on that issue or, in fact, are you making an argument based on inferences that might arise from the evidence?

ATTORNEY PRASNITZ:    I intend to introduce evidence.  It's not… he's misphrased. It's not successor liability, Your Honor, it's a question of interpreting a guarantee which applies to successors.    Successor liability means whether or not the successor,

Corporate Commodities.   Those are… anyhow, but the answer is yes.   The short answer is yes and I know (inaudible) to present it as the way I wish to do it.

CHAIRMAN:          I'm sorry to make you leave the room again, but I need to (inaudible).  Go ahead (inaudible)

MAN:               We're on your time right now, so it's…

CHAIRMAN:          Okay, thanks.

(OFF THE RECORD)

(BACK ON THE RECORD)

CHAIRMAN:          (inaudible).  On this issue surrounding successor liability, why don't you consider the process.  Give us now what… if we were in court, there would be an offer of proof.  Tell me (inaudible)…

ATTORNEY PRASNITZ:   Oh, yeah.  (inaudible)

CHAIRMAN:          … to give (inaudible) an opportunity to decide whether we have a real objection to this or if…

ATTORNEY PRASNITZ:    Right.

CHAIRMAN:          … somebody can, you know, uh…

ATTORNEY PRASNITZ:    Starting with… forget the term successor liability.    The question is does the guarantee apply to successors?  Okay, that's the question.  Does… because the guarantee agreement in its state, does this apply to successors?  That's…

CHAIRMAN:          Let's use names.

ATTORNEY SINCLAIR:    Well, the guarantee agreement is that the successor doesn't have (inaudible)…

(BOTH TALKING AT ONCE)

ATTORNEY PRASNITZ:    He's not a… he's not a successor.

ATTORNEY SINCLAIR:    Yes, it (inaudible).

ATTORNEY PRASNITZ:    Well, I'll… let me quit before I (inaudible).

CHAIRMAN:          Why don't you point us to what you're referencing and (inaudible)?

ATTORNEY PRASNITZ:     Yeah.  I've got (inaudible).

CHAIRMAN:          Which is, by the way, why I asked you (inaudible).  I think we can move it quicker the…

ATTORNEY PRASNITZ:     Yeah, sure.

ATTORNEY SINCLAIR:     Right.

ATTORNEY PRASNITZ:     I got… I got (inaudible)… down here.

(ALL TALKING AT ONCE)

CHAIRMAN:          Okay.  Now we're on again.

ATTORNEY PRASNITZ:     Oh, you know, I got… I got a… I got a (inaudible). I've got… copy the whole thing and then the provision I'm referring to is on the form which is on the very last page.

CHAIRMAN:          All right.  Well, then just (inaudible) to where…

ATTORNEY PRASNITZ:     Okay.    We're looking at the Alaron/ProTrade guarantee (inaudible), okay?

CHAIRMAN:          Mr. Prasnitz, this is it, right?

ATTORNEY PRASNITZ:    Correct.

CHAIRMAN:          Okay.

ATTORNEY PRASNITZ:    Correct.  So to start with, I'm relying on… take paragraph 15.

CHAIRMAN:          What page is that on?

ATTORNEY PRASNITZ:    That's page 7.

CHAIRMAN:          (inaudible)?

ATTORNEY PRASNITZ:    Right.  Oh, no, it's just… it's on 15B, the first sentence.

CHAIRMAN:          Mmm hmm.

ATTORNEY SINCLAIR:    We found the line.

CHAIRMAN:          (inaudible)

ATTORNEY PRASNITZ:    There is… 15B says as provided here, this agreement shall be binding upon and used for the benefits of the parties hereto.  That would be Alaron and ProTrade and their respective successors and assigns.  So our point is, this agreement inures to the benefit of ProTrade's successor and our argument is that Corporate Commodities, Inc. was the successor of ProTrade.  And the reason we make that argument is complete identity of ownership, Michelle (s/l) LeBruce, and this was ac… this is in our exhibits from the NFA complaint, so these facts aren't a surprise.  All the facts, I mean, (inaudible) are in our exhibit book.  Michelle LeBruce was the sole owner of ProTrade and the sole owner of Corporate Commodities, Inc.  As stated in our exhibit book, ProTrade transferred most of its assets to Corporate Commodities.  That's in the book.  ProTrade switched most of its employees to Corporate Commodities.  That's in the book.  Also in the book is that the NFA considered these people to be essentially in the same business, same commission structure.  So that… so the facts I'm trying to get are all in a book, the exhibit book, and it relates to this… relates primarily to this language.  This agreement shall be binding upon, inured to the benefit of the parties, therefore enter successor, so we say this is inures the benefit of successor, Corporate Commodities.  There's also language in the guarantee itself, the CFTC form.  That's on page 10, which was (inaudible).  If you look at… these paragraphs aren't indented, but if you look at CFTC form 1FRB, the… the second paragraph where it starts "This guarantee agreement", it says this guarantee agreement shall be enforceable regardless of the subsequent incorporation, merger, consolidation of either of the futures commission merchant or the introducing broker.  What may change is the compensation, nature, personnel or location of the futures commission

merchant or the introducing broker.  Our legal argument is that there was a de facto…

de facto merger between ProTrade and Corporate Commodities, Inc.  And then, finally,

we're also relying on the last two sentences, which says this guarantee agreement is

binding and is and shall remain in full force and effect unless terminated in accordance

with the rules and regulations of the Senate Commission, termination of the agreement

will not affect the liabilities (inaudible) Commission (inaudible) with the respect to

obligations of the introducing broker.  So our… our position in a nutshell is this

guarantee was in effect from July 29, 2005 to October 13, 2005 and because of the

language saying applies to… inures to the benefit of successors, our argument rely on

facts in the exhibit book is Corporate Commodities was the successor to ProTrade.  And

if the… and… and we also have a fact issue.  It's like why did you wait three months to

cancel it?  You entered into a guarantee with our company, uh, and then, you know, you

let three months go by before you canceled it?  I mean, what happened?  Was there

some recognition in your (inaudible) after we got this guarantee out?  You know, these

are factors just to be explored, but that's… that's not the crux of it.  The crux of it is the

language of the agreement.


CHAIRMAN:          Okay.  Mr. (inaudible)?


ATTORNEY SINCLAIR:     I submit to you, too, a number of things.  First of all, this fact

issue is not in any way, shape or form identified in this hearing plan.  Not there.  This

fact issue is not identified in any way, shape or form in this response and motion for

summary judgment.  Mr. Prasnitz, at the last minute I believe, because of his concerns

about the bona-fides of the motion, has come up with a new theory.  I don't know what witness he's going to call from ProTrade or from Corporate Commodities.  I haven't seen any documents that he has in his possession with respect to the issue of all the assets being transferred, the issue of who's registration's changed or who might have been dually registered, which is in fact, the case.  Remember, people who were dually registered?  That's a matter of public record.  I won't… I won't disagree with that in any… in any way, shape or form.  Not any way, shape or form.  But, hey, if I can't get discovery, did I get any idea that he was going to claim that the assets or virtually all of the assets were transferred and therefore there was a de facto merger?  It hasn't… it hasn't been raised.  Now he… in… in some… in some documents he filed with the NFA, some letters he sent that (inaudible) in the last week, he called it a successor liability.  I appreciate the fact that that's not what he's calling it anymore, but here's nothing in writing up to now that says de facto merger.  So if he's got evidence about transfers of assets… well, I'd like to see that, (inaudible).

CHAIRMAN:          Mr. Prasnitz, you pointed to this document which you pointed to some… some sections of and mentioned the… the arbitration complaint that's included in your exhibits.

ATTORNEY SINCLAIR:     (inaudible)

CHAIRMAN:          I'm sorry?

ATTORNEY SINCLAIR:     (inaudible)

CHAIRMAN:         Uh, yeah, that's what I meant.  And… thank you.  The complaint that it is, in fact, stated within the complaint.  Now, do you have any other evidence on this point other than those facts…

ATTORNEY PRASNITZ:   No.

CHAIRMAN:            … in the argument (inaudible)?

ATTORNEY PRASNITZ:   And that's what I'm going to rely on.

ATTORNEY SINCLAIR:    That's kind of where I was going with this.  That's…

ATTORNEY PRASNITZ:   (inaudible)

ATTORNEY SINCLAIR:    Okay?   Then what we have are, at that point, legal argument.  Well, and… and… and part of this burden of proof on the issues that support the argument.

ATTORNEY PRASNITZ:   I… I agree with you and… and so if there's nothing else that's going to be intro… and I… and I apologize.  If there's nothing else that's going to be introduced on the issue beyond the… the BCC complaint, I'm… I'm fine with that.

CHAIRMAN:          As I said to you earlier, my point here is not to be contentious at all. I'm trying to set the boundaries so that I understand what it is we need to address during this hearing.  See, if… if… what I… what the panel has now heard is essentially the evidence that we're going to get on this issue and now, in anticipation of what the argument is going to be.  I think I'm going to allow it because I understand it better and it appears to be in the mainstream of the issues of this case.  Is it a separate claim?  Can you wait for some other issue?  I don't… I don't know if it's…

ATTORNEY PRASNITZ:   It's in important point in this… and (inaudible).   I don't… based on… based on if… if there's no other evidence, then I'm not… then I'm not surprised (inaudible).

CHAIRMAN:          Well, if there is, I'm pretty sure you'll point it out to me.

ATTORNEY PRASNITZ:   I… I… I will.   If I could, I've had one… one more point (inaudible).  I'm trying to figure out a way to make this whole hearing simpler rather than more complex.

CHAIRMAN:          Okay.

ATTORNEY PRASNITZ:   Um, and… and I say that in a… in a… from a factual perspective.  I am not, in any way, shape or form, going to sit here and contest the

results of the trading or the fact that the BCC has found Mr. Goldberg and… and ProTrade and Corporate Commodities responsible.  So… and my point is, we don't need, from my perspective, to hear any of that… that evidence.  It's there.  I don't know if Mr. Sinclair feels any differently.  I think the only issue that's really left here is the issue of is one of these SCMs responsible for some or all of what occurred?  Not… no one's saying that… that Mitch… is it Mitchell Goldberg?  Yeah, it's Mitchell Goldberg.  No one's saying Mr. Goldberg wasn't… wasn't a good guy.

CHAIRMAN:        What's your (inaudible), Mr. Sinclair?

ATTORNEY SINCLAIR:    Well, I… the… I don't think we can defend against what Mitchell Goldberg did because we didn't guarantee him and we didn't supervise him.  And I would agree that we are not here to dispute what Mitchell Goldberg did.  I would agree.  So we can't because we… we… I'm not suggesting we… we ever had any control over Mitchell Goldberg or what he did.

CHAIRMAN:        As… as a friendly suggestion under this process, and even (inaudible) take it to be more than I'm going to and so the potential of a witness…

ATTORNEY PRASNITZ:    Well, I mean, 85% of the focus of my case is going to be on issues of vicarious liability as to… as opposed to what happened in (inaudible).  But I do want to introduce a little bit of evidence that the underlying trading was reckless and

31

establish the losses.  But, you know, I agree with him that that is kind of a small piece of the case.

CHAIRMAN:          Well, to… to quote the authoritative figure of my mother, (LAUGHTER) it is what it is.  (LAUGHTER)  And so, you know, I think that the trading (inaudible) are going to speak for themselves in terms of both the chronology and the transactions that occurred.  If that's not in contention… and, again, look it's your case and…

MAN:               Yeah.

CHAIRMAN:          … and all of you can put on your case, I'm sure, quite capably.  But to the… to the extent that we can focus on the evidence that will be important to the resolution of the matters that are really contested here and not the extraneous issues, which perhaps in a different setting we could all agree upon, I think we're all better served.  So I… I take your… your position, uh, uh… being one of let's… let's focus on what needs to be focused on.  We have the docu… we can argue all the documents you want.  I'm already beginning to see perhaps the wisdom of a little briefing in this case. That may be required at some point that I am following the course of the evidence.  But I think it… it… this case is already suggesting to me that hearing the evidence will help us as a panel unfamiliar with the detail that… that you are shape the requests for that kind of information so that we can make a decision on what this… what we (inaudible). So what I would like to do, if we're finished with these points is let you tailor your cases

around this idea that you will present the evidence on… on this issue of who is responsible, not why so much. And then… and if we can focus on that and get started with the hearing, I think the chance of (inaudible).

ATTORNEY SINCLAIR:    Yeah, I… I (inaudible). I just… well I find that tomorrow morning at 9:00 I'm going to have an expert for about half an hour talk about the losses and the reckless. But (inaudible)…

CHAIRMAN:        That was really…

ATTORNEY SINCLAIR:    If the rest of it is going to be all in… in (inaudible)…

CHAIRMAN:        Well, I don't get involved in that. (inaudible).

ATTORNEY PRASNITZ:    That's wonderful. I just… I was looking for one shortcut.

ATTORNEY SINCLAIR:    I… I…

ATTORNEY PRASNITZ:    And I appreciate that. My question I had for you is, does my client need to be here all day for this? He would prefer to do a couple of other things. I don't know why the…

CHAIRMAN:            I… I certainly would not take any negative inference from this. I'm… I'm neither a juror nor easily influenced.  So, you know, I can certainly live without him as… as all of you can.  I mean, look, this is a… this is your case and… and we certainly aren't going to read anything into the fact that if someone's not here, they're not interested.  Obviously, they are.  So we have no problem.

ATTORNEY SINCLAIR:    Right.  I will want to call him as a witness and we'll have to just agree on the scheduling, but that's not (inaudible).

ATTORNEY PRASNITZ:    He's (inaudible)…

CHAIRMAN:            How many other witnesses will you have?

ATTORNEY PRASNITZ:    We're going to have, uh… Mr. Bell, his daughter, the expert, (s/l) Brimsley, and then there's, of course, the (inaudible).

CHAIRMAN:            I'd only raise one other issue that we've touched upon but it's just clear that it's a fair question coming in.  You said in your statement that there may be some issue about Mr. Bell's… I don't remember if you said memory or competency.

ATTORNEY PRASNITZ:    Right.

CHAIRMAN:            (inaudible) or his.

ATTORNEY PRASNITZ:    Right.


CHAIRMAN:          Is that… is that truly an issue?


ATTORNEY PRASNITZ:    Well, I think competence is… I… I'm not a doctor, okay. Competence seems to be a, uh, an overstatement.  But there's… right now today, his… his memory is really shot.  He can't remember where he went to high school.  He sometimes gets confused about things.  So I'm not going to spend a lot of time with him, basically because he doesn't remember much.   Like he'll he worked for Container Corporation for two years and I know he worked for them for 30 years.


CHAIRMAN:          All right.  So…


ATTORNEY PRASNITZ:    So the answer is he's a gentleman of some advanced age.


CHAIRMAN:          Right.


ATTORNEY PRASNITZ:    And we all understand that.  And we'll just try to understand as best we can…


CHAIRMAN:          Right.

ATTORNEY PRASNITZ:   … what his testimony is.   But it seems to me that his testimony…

CHAIRMAN:        It's not that important.

ATTORNEY PRASNITZ:   … is not the critical piece of this case.

CHAIRMAN:        No, no.  (inaudible)

ATTORNEY PRASNITZ:   (inaudible).

ATTORNEY SINCLAIR:   That's exactly correct.

CHAIRMAN:        Well… well, I'll take (inaudible)…

(LAUGHTER)

ATTORNEY PRASNITZ:   (inaudible) that was inappropriate.

MAN:             All right.  (inaudible)

ATTORNEY PRASNITZ:   It might… it might be.

CHAIRMAN:          All right.  So… well…

ATTORNEY PRASNITZ:    (inaudible) see if my (inaudible)…

ATTORNEY SINCLAIR:    I will send my client back to his office.  He's on the… I know he's over on West Washington, so he's available to come back when we need him.

CHAIRMAN:          He's… he's available (inaudible)…

(ALL TALKING AT ONCE)

ATTORNEY SINCLAIR:    However, my suggestion would be let's call him right after your expert tomorrow morning.

ATTORNEY PRASNITZ:    Okay.

ATTORNEY SINCLAIR:    I've got a feeling today's going to be a short day because I don't… I mean…

CHAIRMAN:          I want to get as much done as possible.  I want to try this case in a day and a half, so let's go.

ATTORNEY SINCLAIR:    Uh, my two points… I did make a motion to (inaudible) Mr. Goldberg.  I don't know if you saw that.

CHAIRMAN:        I did see that.

ATTORNEY SINCLAIR:    Okay.

CHAIRMAN:        Um… I… I'd like to hold on to that because (inaudible) all together and so I think you are entitled to that relief…

ATTORNEY SINCLAIR:    Okay.

CHAIRMAN:        … that you're seeking.  But I want to… I want to wait until we get to the end of all the evidence and do what's (inaudible).

ATTORNEY PRASNITZ:  Okay.    And  then  I  would  also  request  that  the ComTrust/ProTrade Corporate… ComTrust… no, ComTrust, ProTrade and ComTrust Corporate introducing broker (inaudible) evidence.  Do those documents exist?

ATTORNEY SINCLAIR:    Uh, I'll check with my client, but I mean, the point is… is why is he asking for them today?  I don't know, but I would object to producing them only from the standpoint that there is a procedure to request the document and all of the

sudden today he says, "I want to see them."  He did ask for them before, but there was no (inaudible) filed.

CHAIRMAN:          Well… I understand.  If they're available, would you see if you can get them produced, please.

ATTORNEY SINCLAIR:     Okay.

CHAIRMAN:          Thank you.  As a matter of fact, I'll give you five minutes or so.

ATTORNEY SINCLAIR:     Okay.

CHAIRMAN:          And it'll be… why… why don't we convene at 10:45?

ATTORNEY PRASNITZ:    (inaudible)

ATTORNEY SINCLAIR:     That would be okay.

CHAIRMAN:          Thank you.

(OFF THE RECORD)

(BACK ON THE RECORD)

ATTORNEY SINCLAIR:    (inaudible) because, frankly, what Mr. (inaudible) is saying is inconclusive.  But I just thought (inaudible) can't remember.  Now we… I believe we're entitled to (inaudible) or some (inaudible) providing whether or not we can use (inaudible).    With Mr. Prasnitz' suggestion that he can't remember this, he can't remember that, then we don't know what he can remember and what he can't remember, which leaves us in the position of not knowing and puts you in the position of having to interpret what you can believe and what you can't believe because he's already made a… a statement (inaudible).

ATTORNEY PRASNITZ:    Yes, it is.  And but… that's… that's the position the arbitrator panel is… is making some decision as to what they can and can't believe and what he can or can't remember.

ATTORNEY SINCLAIR:    But you've got a medical (inaudible).

CHAIRMAN:        I don't know that we got… I don't know that we…

ATTORNEY SINCLAIR:    You don't?

CHAIRMAN:        I don't know that we do.  That's not what I heard.

ATTORNEY PRASNITZ:    No.  I mean, I'm not aware of any diagnosis.

ATTORNEY SINCLAIR:    Then the statement's irrelevant.

ATTORNEY PRASNITZ:    Okay.

ATTORNEY SINCLAIR:    And by… because I don't want to feel like I'm going to start asking Mr. Bell questions and I'm going to look like the bad guy if Mr. Bell can't remember or if I try to be a little more resonant on cross-examination and Mr. Bell doesn't get it and I look like I'm some sort or ogre.

CHAIRMAN:        Can I, um… I would not think of characterizing you as an ogre.

ATTORNEY SINCLAIR:    Mmm hmm.

CHAIRMAN:        Uh, in terms of… I d understand what the problem is.  But I… I in no way (inaudible) make that determination in advance.  Let's hear what he has to say and decide from that.

ATTORNEY SINCLAIR:    All right.  All right.

(ALL TALKING AT ONCE)

CHAIRMAN:        You may begin.  I have… no, wait a minute, I have something that I want to do.  Uh…

(ALL TALKING AT ONCE)

CHAIRMAN:        Before we begin the formal part of the hearing, I'm going to ask the two gentlemen in the room who are going to testify to stand, raise their right hand and take the oath (inaudible) to tell the truth.  Stand please.  Raise your right hand.  Do you swear or affirm the testimony you're about to give in this matter will be the truth, the whole truth, so help you God?

MAN:             I do.

MAN:             I do.

CHAIRMAN:        Thank you.  You may have a seat.  Okay.  Mr. Prasnitz, you may now begin.

ATTORNEY PRASNITZ:   Thank you.  All right.  Good morning, once again.  Howard Prasnitz for the Claimant.  Thank you for your questions (inaudible).  If I might just, uh… what I believe the evidence will show is this.  Okay.  Here's the… whoops.  Here's the background on Mr. Bell.  He's 81 years old and I've already put the panel on notice there's going to be confusion because he's got memory problems.  We're just going to

have to deal with it question by question and be sensitive to that.  And, frankly, I think the important evidence is going to relate to vicarious liability, not to Mr. Bell's memory. He has a B.A. in Engineering.  He worked as a packaging engineer for Consolidated, I believe, Container Corporation for almost his entire career.  He is a World War II veteran who served in France in combat during the second World War.  Mr. Bell opened his ComTrust  account on June 13, 2005.  He was retired for 15 years a the time the account was opened, so he'd been retired a long time when he opened that commodity account.  His wife suffered a stroke at about this time, July 4, 2005 approximately, so he was under a considerable amount of stress at that time.  He was convinced to put the majority of his net worth and almost all of his liquid net worth into commodity contracts. He put in $800,000…  well, like $795,000 and all that money was gone.  That was his retirement money.  That's why we're here today, because he lost that $800,000.  His daughter is going to testify that he had a lot of trouble getting through to Mitch Goldberg. He was relying on Mr. Goldberg to make these decisions.  As I mentioned, he lost $793,595 and was charged $575,932 in fees and commissions, $217,663 was lost in trade.  Many of these contracts were allowed to expire worthless, no action was taken, the account was handled recklessly.  During the time it… during the time that this guarantee was in effect, a $550,634 was lost.  That's reflected in the expert report attached to this and in that statement (inaudible).  Okay.  As you know, well, first of all, Mr. Goldberg, with whom Mr. Bell was dealing, had been barred from the industry for four years before he even dealt with Mr. Bell.  He was barred from 1999 to 2003.  By a recent order, Mr. Goldberg is out of the industry, ProTrade is out of the industry, CCI is out of the industry and the NFA complaint, which is part of the exhibits, refers at length

to Mr. Bell.  So the reason they're out of the industry is directly related to what happened to Mr. Bell.  So I don't think that… for the purpose of this dispute, I don't think there's much controversy that there was a fraud involving Goldberg, ProTrade, CCI and Mr. Bell.  That's really not why we're here today.  The… the question today is what about the clearing firms.  Okay.  As I said, the focus today is on the guarantee agreement, whether it applied to Corporate Commodities and… and here's what happened just by chronological.  Mr. Bell entered into an account agreement with ComTrust June 2005.  He… ComTrust clears the trades.  Then… then Com… then ProTrade goes to Alaron for a guarantee agreement.  So it enters into a guarantee agreement on July 29, 2005.  That agreement is allowed to stay in effect by Alaron through October 13th, even though ProTrade was not clearing through Alaron, but continued to use ComTrust.  So among the fact issues are, why would Alaron enter into this agreement and let ProTrade and then its successor, Corporate Commodity or CCI, continue to trade?  I mean, just… well, the guarantee agreement does not just relate to whether trades are cleared through Alaron.  The guarantee agreement says we guarantee this guy will not violate the commodity laws.  So the Claimant's position that that guarantee was in effect, that it applied to both ProTrade and the successor, CCI, and that there's nothing in the agreement which in any way limits it to guaranteeing trades cleared through Alaron.  The claim language of the agreement is it's a guarantee. We guarantee that if you violate the commodity laws, we will be responsible.  That's why we allege that it applies to what happened here.  Then the other part of the case is the fact buster, whether there was an agency between ComTrust and ProTrade, between ComTrust and CCI.  Here's the agreement, which I've already, you know, highlighted,

before I got… the key card here is paragraph two.  This… this is the customer agreement between Mr. Bell and ComTrust.  It says all transa… paragraph two is the key provision.  It says all transactions from my account shall be subject to the regulations of all applicable federal, state and self-regulatory agencies, including the constitutional rules and customs as the same may be constituted from time to time in the exchange, market or place and a clearing associations, if any were executed, or, if different, their house rules.  We allege a breach of that agreement.  The agreement is between… directly between ComTrust and Mr. Bell.  ProTrade is not a party to this agreement.  This is directly between Mr. Sinclair's client and Mr. Bell.  We allege paragraph two was breached.  Now I'm sure that they're going to be arguing, well, there's that qualifying language.  This paragraph is solely for your protection and if we violate the rules, it's got to breach the agreement.  I think that's going to be an issue that's going to have to be grieved after the hearing because a number of courts have struck down those type of waiver provisions.  That's the language I just talked to you and, once again, directly between ComTrust and Bell, ComTrust agrees that transactions will follow the laws.  And, of course, our position is, as a… that ComTrust is responsible there, is responsible under the control person section of the Commodity Exchange Act and the acts of its agent and that the acts of ProTrade and CCI… those acts made ComTrust vicariously liable.  I think we've talked about this already, that the… that when the agreement went into effect, Alaron, for some reason, did not bother to check that ProTrade already had a clearing firm and Alaron chooses not to terminate the agreement until October 13, 2005.  That's what I was about to tell everybody (inaudible) if they weren't (inaudible) with you, why did you leave the guarantee in

effect?   And this is the guarantee agreement which we've talked about (inaudible) before, which this is the CFTC form which says the guarantee is enforceable despite merger of the introducing broker.  We allege there was (inaudible) a merger between ProTrade and CCI.   And here's the guarantee letter we talked about.   This is the guarantee of Alaron.   It says it inures to the benefit of the parties, which would be ProTrade, and their respective successors.   Once again, I would allege CCI was a successor, therefore this guarantee inures to the benefit of… of the successor.   And here are the facts that you're all referring to.   Again, the NFA, why… I… suc… successor… why CCI is a successor and not just a (inaudible).  Identity of ownership, Michelle LeBruce, sole owner of both companies, transfers all its customers to CCI, the majority of its assets, which already (inaudible) its employees.  The NFA complaint, which is the (s/l) book, describes the business (inaudible) as the same commission structure (inaudible), the same… the NFA complaint mentions that the individuals involved for these two firms had an extensive history of working for firms charged or sanctioned for sales fraud.  Also, there's an overlap in the registrations, which is also new material.  For instance, LeBruce continued to be a principal at ProTrade until October 27th, but she didn't terminate her principal registration with CCI, so she… she was simultaneously registered in the NFA as a principal of both firms, according to the NFA records.  I mean, that… you know, that… that's something that neither clearing firm seemed concerned about.  Alaron as a bad regulatory history, lots of big firms…

ATTORNEY DAVID:        I object to all of this.  If there… if… if you want to talk about what all these cases are about and you want to relate one of these cases to this case,

now we have a specific case, specific facts.  We're allowed to be in business.  The NFA hasn't shut us down, the Merc hasn't shut us down, CFTC hasn't shut us down.  We're allowed to be in business.  The fact that we've had regulatory problems had… you can… you can look in the books.  Merrill Lynch gets sued ten times every day.  People have a lot of respect for them.

CHAIRMAN:          Mr. Prasnitz, you have the right (inaudible).

ATTORNEY PRASNITZ:    Well, I want to be able to question Alaron's witness as… as to whether they ran into this problem before.  I mean, if… if this problem here of not supervising the guaranteed brokers has occurred before, it's relevant.  I mean, if we look… at this point, it's clearly to judge, but…

CHAIRMAN:          Well, it may be relevant, but I think Mr. David's point is well taken that unless you can show that one of these situations is… is similar or related actually or contextually to this case, then I don't see the point.

ATTORNEY PRASNITZ:    Well, I… the first $200,000 fine related to supervision problems, the exact nature of which I could not tell, but (inaudible).  This is a subject which I will be asking Alaron's witness about, whether the supervision issues are (inaudible).  If it's not so, we're fine, forget it.  But I think it's too early to tell at this point.

CHAIRMAN:          Okay.  So you…

ATTORNEY PRASNITZ:   Right.   Okay.   Then we get to the relationship between ProTrade and ComTrust and then CCI and ComTrust.   And this is an area where, you know, we… we have red flags right now and it will be interesting to hear what ComTrust's witnesses have to say about it.   These two firms were in adjoining suites in the same building.

ATTORNEY SINCLAIR:    Objection.   You don't know that the suites were adjoining. You don't know if they had doors up on one (inaudible).   I don't think that's going to relate to the case.   So they're on the same floor.   (inaudible)   You don't say the suites were adjoining unless you have evidence to support that, which hasn't been submitted.

CHAIRMAN:        Well, this is, I don't think, (inaudible).

ATTORNEY SINCLAIR:    He's got to prove… he's got to prove his allegations.   These are allegations.   (inaudible)

ATTORNEY PRASNITZ:   All right.   I mean, we'll… we'll have to explore whether 601 is next to 608 or whatever.    They were on the same floor.   I believe one is 608… 608. We'll explore just what that (inaudible) was.   ProTrade's website… half of… as you'll see, half of it talks a… the left column talks about ComTrust.   That's all the ComTrust documents.   And then the ComTrust website, it turns us… we just… we don't just clear IB business, we do AML trading, ethics training, regulatory compliance, hiring, training,

lead sources and promotional material.  So one of the areas of inquiry for the conference witness will be, you know, what does that mean, what did they do?  The contract itself, we believe, will show an agency relationship under the standards of within the… the Reed v. Sage case.  Now, one of the points they're going to… one of the offenses is, well, Mr. Bell had another commodity account.  Our response is totally different facts, involved much less month – about $100,000 – there was a coherent trading strategy and, perhaps most importantly, all the people at this other firm are not barred from the industry.  And, you know, in both situations, Mr. Bell was relying on other people to do the trades.  He's not… he's not a commodity trader.  These were discretionary accounts.  So, in conclusion, I think the evidence will show that the Alaron guarantee applies and that there was an agency connection between ProTrade, CCI and (inaudible).

CHAIRMAN:        Thank you, Mr. Prasnitz.  For our purposes it doesn't matter, but in terms of proceeding, how would you prefer to proceed?  Mr. Sinclair, then Mr. David?

ATTORNEY PRASNITZ:    Sinclair (inaudible).

CHAIRMAN:        Mr. Sinclair…

ATTORNEY SINCLAIR:    Frankly, the Claimant has been a little (inaudible).  First of all, these are (inaudible) which is this is the first time that… this had never been discussed back then.  Now, no… if not a single (inaudible), it's evidence.  This would be

a discretionary account agreement or (inaudible) think that those… these accounts were discretionary.  Which, in fact, they are not discretionary.  If he was suggesting they're discretionary, he's wrong because (inaudible) really has required (inaudible).  But let's let the procedure (inaudible).  ComTrust is an independent IB.  They rely on the law as it is stated, as innovators of (inaudible) repeatedly that they do not and are not willing to supervise people over which they don't have control.  As an independent IB, the firm meets its regulatory requirements by (inaudible).  We're not really required (inaudible) by law and it is NFA's job to determine whether or not that requirement has been met.  Not just that (inaudible), they don't even (inaudible) access to the (inaudible) and to financial (inaudible)… and then (inaudible) files, which began to fit.  So it would be NFA who would say we can't do business because they don't have enough capital or for some other reason.  And it's, in this case, which was the (inaudible) since.  They did sign with ProTrade and Corporate (inaudible) trading center.  That's specifically why there is a separate category.  And it's only in the most extraordinary circumstances one can (inaudible) where this is (inaudible).

ATTORNEY PRASNITZ:   I object to this… this .  I mean, he's arguing a law and… and as to when… and… and we disagree with what.  It's… it's legal.  I… um… you know, I… I… I… that's dancing a bit and I think to try to present the context and the structure (inaudible).   That's a real show.  That's ComTrust and ProTrade and ComTrust and Corporate.  (inaudible)  There was no control.  No control has been alleged.  (inaudible) been testified to and one allegation in the complaint that somebody from ComTrust ran over and kept an eye on the business.   (inaudible)   The fact… and they… and

believably that the totality of the contract that Mr. Bell signed is what counts, not just a excerpted portion which specifically has a (inaudible).  It clearly states in the contract it was on a (inaudible) that Mr. Bell has accepted the fact that he's doing business with an independent IB.   Now, the issue as to whether things on ComTrust's website or ProTrade's website… gentlemen, an independent IB does not have its own account agreements.  The account agreement has to be with an FCM.  How else is the customer to get that document?  It's going to be on the web.  Once again, through ProTrade (inaudible) form.  That is the way this business works.  The fact that they decided to put that on their website so that they could help their customers open an account is just basics, not an indication of some sort of an agency relationship.  It was the only way they could open an account.   And if there was going to be an agency relationship required by that, then the law would not be… not be the same where, you know, they would say, (inaudible) account forms and then the little network.   The whole thing is really based on the way of law and the way the rules are set for IB accounts.   The evidence will show that Mr. Bell never complained to ComTrust about anything whatsoever on his account.  Never.  Which (inaudible) disclosed.  Never put them on notice.  Never wrote them a letter.  Never take them (inaudible).  The evidence will also show that, contrary to our filing (inaudible), Mr. Bell had two accounts simultaneously open before he opened the account with ProTrade.  Two accounts.  One account that was a year old and, in fact, we'll learn that the account that he's had the op… had the opportunity before he read the ComTrust agreement to read three other agreements with FCMs.  That was when he first opened his account with (inaudible).  He actually opened it with a company called (s/l) Piker (inaudible) who was clearing Alaron at the

time.  And in July of 2004 the evidence will show he opens an account with Alaron.  In September of 2004 it will show that he transferred his account from Alaron to Visions (inaudible) first.   And then in 2005 in March it will show that he opened yet another account.  So he had two accounts open simultaneously.   He opened another account (inaudible) which also had (inaudible).   And Mr. Bell now had a third set of account documents he signed.  So at the time we came to this ProTrade (inaudible) contract, he had seen evidently three previous sets of documents.   And this was the fourth time around.  So the fact that Mr. Bell may be claiming (inaudible) his experience is certainly not a (inaudible).   And it will be a point in (inaudible) that Mr. Bell had this information from respondents and it was only by accident that respondents found out that Mr. Bell had previous accounts.  We also intend to show that Mr. Bell's net worth was one… at least on these other accounts was shown as $1.6 million and his losses, although substantial, certainly didn't leave him destitute.  And, finally, Mr. Bell approved the trade and continues (inaudible) until September 2007.   And continued to fund the account.  So this agency part of it is (inaudible) because no agency existed.   NFA documents which Mr. Prasnitz has used to put this case forward, were (inaudible) see does not find and they did not find that not just violated that account (inaudible) when… when I'm sure they had (inaudible) account and that ComTrust was not… did not have an agency relationship with ProTrade or Corporate.


CHAIRMAN:          Okay.  Mr… Mr. David, are you ready?

ATTORNEY DAVID:        I am.  I've got my own visual aid and I'm going to… so if you could move back to the side (inaudible).   Hopefully this fits on the table.  I need (inaudible).

MAN:                (inaudible)

ATTORNEY DAVID:        Yeah, I think… (inaudible) the extra one.    All right (inaudible).  I'm just going to put this on the table and go from there.  What I want to highlight, gentlemen, is facts that are, frankly, undisputed.

(OFF THE RECORD)

(BACK ON THE RECORD)

ATTORNEY DAVID:        … the case, you need to pay attention to timing and sequence of events.  We attempt to set forth the documents you already have.  This case starts in June 2005.  That's when the Claimant meets Mr. Goldberg and begins discussing things with Mr. Goldberg, enters into an agreement to open an account with ComTrust where he was introduced by an independent IB at the time called ProTrade. Goldberg was an associated person at the time of ProTrade.  At the time, ProTrade was an IB in June 2005.  It was registered with the NFA as an IB.  Goldberg wasn't what we call an AP, an associated person of ProTrade.  And ProTrade in June of 2005 had absolutely nothing to do with my client, Alaron.  The statement of claim… we made a

statement of claim.  The first complaint about a series of trades that took place between June 16th to July 21st, 2005.  During that period of time Mr. Goldberg, the bad apple here, is an AP of ProTrade and ProTrade has a clearing relationship with… he's an introducing broker of… an independent introducing broker of ComTrust, not Alaron.  At some point in July of 2005 it is apparent that ProTrade desired to initiate a relationship with Alaron.  It submitted to Alaron a guaranteed IB agreement.  Why ProTrade did this I don't know today.  It doesn't make any difference to me today, ProTrade did it.  It was entitled to do it.  Alaron accepted that agreement.  That agreement became effective on July 29, 2005.  July 29, 2005.  Important date.  Even Mr. Prasnitz will agree that's an important date.  On August 1st of 2005 the NFA registration records show that Mr. Goldberg became registered as an associated person of a different IB.  August 1st he became re… becomes registered as an associated person of ComTrust and on August 10th he withdraws as an associated person of ProTrade.


MAN:                    I'm sorry, did you say of ComTrust?


ATTORNEY DAVID:        Not ComTrust.  I am so sorry and I apologize.  (inaudible), it's Corporate Commodities.


MAN:                    Okay.


ATTORNEY DAVID:        My apologies.  So August 10th of 2005 Mr. Goldberg no longer has anything to do with ProTrade.  The next trade after July 21st about which the

Claimant here complains, took place on August 29, 2005.  That trade took place through an IB by the name of Corporate Commodities.  Corporate Commodities had a clearing relationship with, it was an independent IB of ComTrust.  Corporate Commodities has never been an IB affiliated with Alaron.  There is no suggestion to the contrary.  The testimony you will hear is that Alaron does not know, has never known and has never done business with Corporate Commodities.  The account of the Claimant always stayed at ComTrust.  Claimant doesn't know Alaron, never heard of Alaron, didn't talk to anybody at Alaron, wasn't given any Alaron documents, didn't rely on anything that Alaron said or did, did not know Alaron, did not do business with Alaron having anything to do with ProTrade or with Corporate Commodities.  All that happened in between July 29th and August 29th was that the introducing broker who introduced his account to ComTrust changed from ProTrade to Corporate Commodities.  Now, counsel, Claimant… and I'm not getting into a legal argument.  I appreciate the Chairperson's suggestion that we so some briefing and I (inaudible) at the conclusion of the evidence, I look forward to that opportunity.  Counsel talks about a de facto merger.  Gentlemen, the evidence is clear the NFA recognized ProTrade as an IB, it recognized Corporate Commodities as an IB, it let people have dual registration with both.  They each had independent NFA numbers.  They were independent NFA members.  They were absolutely recognized as such by the NFA public record on that list.  (inaudible)  Mr. Bell was (inaudible).  Did somebody do something wrong?  I'm here to dispute that.  In fact, if counsel looks for every deep pocket he can possibly find, (inaudible) in this case, he has gone way too far.  Alaron has nothing to do with Mr. Bell, it has nothing to do with anything that Mr. Goldberg did.  It did no business with ProTrade.  It doesn't even know

Corporate Commodities.  Under the circumstances, there is simply no factual basis on which you can hold Alaron responsible for what occurred, whether it be right, wrong or what have you.  Can't do it (inaudible).  Thank you.

CHAIRMAN:          Thank you, Mr. David.  Do you care, Mr. Prasnitz, (inaudible)?

ATTORNEY PRASNITZ:   Yes.

CHAIRMAN:          (inaudible) right now and then we'll begin.

(OFF THE RECORD)

(BACK ON THE RECORD)

CHAIRMAN:          Fine.  Let's take a very, very short break and we'll (inaudible).

(ALL TALKING AT ONCE/LAUGHTER)

CHAIRMAN:          That's (inaudible) time.

MAN:               I like time.

CHAIRMAN:          Why don't we take a few minutes?

(OFF THE RECORD)

(ON THE RECORD)

CHAIRMAN:        We're ready to begin the evidence in this hearing, hopefully (inaudible) included by all the parties.  So we'll proceed with the Claimant's case.  Mr. Prasnitz, you may call your first witness.

ATTORNEY PRASNITZ:    Thank you.  We call as our first witness Claimant, John Bell. Would you state your name, please?

MR. BELL:          John Bell.

ATTORNEY PRASNITZ:    And how old are you?

MR. BELL:          81.

ATTORNEY PRASNITZ:    When did you turn 81?

MR. BELL:          May 8th, 19… May 8th.

ATTORNEY PRASNITZ:   May 8th.   You were about to say 19… what… what year would you have turned 81?

MR. BELL:           What year?  It was 2007.

ATTORNEY PRASNITZ:   Okay.  Can you tell us what year you graduated from high school?  And, as I'm sure everyone is going to tell you, the idea is not to put you on the spot or anything.  I'm just asking you if you remember.  Do you remember what year you graduated from high school?

MR. BELL:           I can't state the year, no.

ATTORNEY PRASNITZ:   Do you recall the name of your high school?

MR. BELL:           No, I can't.

ATTORNEY PRASNITZ:   Okay.  Do you know what state it was in?

MR. BELL:           It was in Pittsburgh, I think.

ATTORNEY PRASNITZ:   Did you go to college?

MR. BELL:           Yes, I did.

ATTORNEY PRASNITZ:    Where did you go to college?

MR. BELL:            Drexel Institute of Technology.

ATTORNEY PRASNITZ:    You got a degree in engineering?

MR. BELL:            Yes, I did.

ATTORNEY PRASNITZ:    Do you know when that was?

MR. BELL:            I can't think of the date.

ATTORNEY PRASNITZ:    Okay.  And after Drexel, what did you do next?

MR. BELL:            Wor… worked for Container Corporation.

ATTORNEY PRASNITZ:    And where were they located?

MR. BELL:            At times they were located in Carol Stream, Illinois.

ATTORNEY PRASNITZ:    How long did you work for Container Corporation?

MR. BELL:          Three years.

ATTORNEY PRASNITZ:    Three years?

MR. BELL:          Three.

ATTORNEY PRASNITZ:    Do you recall which three years you were at Container Corporation?

MR. BELL:          No, I can't.

ATTORNEY PRASNITZ:    Did you go to Container Corporation directly from college?

MR. BELL:          I had a short period of time with another company.

ATTORNEY PRASNITZ:    Do you remember the name of it?

MR. BELL:          No, I can't.

ATTORNEY PRASNITZ:    Okay.  Did you ever serve in the United States Army?

MR. BELL:          Yes, I did.

ATTORNEY PRASNITZ:    What years were you in the Army?

MR. BELL:            About 1945 to 1948.

ATTORNEY PRASNITZ:    Where were you stationed?

MR. BELL:            I was stationed in France (inaudible).

ATTORNEY PRASNITZ:    This was World War II?

MR. BELL:            Yes, it was.

ATTORNEY PRASNITZ:    And what was your rank in the Army?

MR. BELL:            Private 1st Class.

ATTORNEY PRASNITZ:    The whole time?

MR. BELL:            Mmm hmm.

ATTORNEY PRASNITZ:    Okay.   Now, you worked for… you said you worked for Container Corporation for three years.   And what was your job during those three years?

MR. BELL:        I was… I was leading seven people in building packaging machines.

ATTORNEY PRASNITZ:   Okay.  Now, when did you retire?

MR. BELL:        1960.

ATTORNEY PRASNITZ:   1960?  So you would have retired 47 years ago?

MR. BELL:        (inaudible)

ATTORNEY PRASNITZ:   So you've been retired for 47 years.  And besides your three years at Container Corporation did you work anywhere else?

MR. BELL:        I can't recall.

ATTORNEY PRASNITZ:   All right.  Now, do you remember when you got to know Mr… or… or hearing from a Mr. Goldberg?

MR. BELL:        Yes, I did.

ATTORNEY PRASNITZ:    And tell us what happened.  First of all, do you recall when this was?  Do you recall what year it was?

MR. BELL:            (inaudible)

ATTORNEY PRASNITZ:    Tell us what happened.

MR. BELL:            Well, Mr… Mr. Goldberg got a hold of me and that was (inaudible) and he shared this investment in (s/l) orange juice of his (inaudible).  And I (inaudible) would be (inaudible).

ATTORNEY PRASNITZ:    Did he tell you how much you should invest?

MR. BELL:            No.

ATTORNEY PRASNITZ:    Now, do you recall having other commodity accounts before Mr. Goldberg called you?

MR. BELL:            Yeah.

ATTORNEY PRASNITZ:    Do you understand that you still have a commodity account today?

MR. BELL:            Yes.

ATTORNEY PRASNITZ:    And do you know where that account is?  The name of the company?

MR. BELL:            (inaudible) I think.

ATTORNEY PRASNITZ:    Do you know what that commodity account is invested in? Do you know how much money you have in that account?

MR. BELL:            (inaudible)

ATTORNEY PRASNITZ:    And… but you don't know what type of investments?  Okay.

MR. BELL:            No.

ATTORNEY PRASNITZ:    All right.   Recently, have you done… do you have any trouble with your checkbook management and overdrawing your checking account?

MR. BELL:            Just recently.

ATTORNEY PRASNITZ:    And is your daughter coming to help you out with that?

MR. BELL:          Yeah.

ATTORNEY PRASNITZ:   Okay.  Now, at any time, have you ever kept a commodity trade yourself or you directed someone, I want to buy 100 contracts of orange juice December or were you always relying on other people to… to make the trades where you picked the… picked the contracts?

MR. BELL:          Well, generally I pick the ones I want to pick (inaudible).

ATTORNEY PRASNITZ:   Well, with Mr. Goldberg, did he advise you as to what you should purchase?

MR. BELL:          Absolutely.

ATTORNEY PRASNITZ:   Okay.  Did you ever have trouble communicating with Mr. Goldberg?

MR. BELL:          It was a one… one way communication.

ATTORNEY PRASNITZ:   What do you mean by that?

MR. BELL:          Any time I asked him a question, he'd say, don't do that (inaudible).

ATTORNEY PRASNITZ:     And in the summer of 2005 was your wife hospitalized?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:     Did she have a stroke then?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:     Do you recall that you were spending a lot of time in the hospital in the summer of 2005?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:     And during this period was it difficult to get a hold of Mr. Goldberg?

MR. BELL:          Yes, it was occasionally.

ATTORNEY PRASNITZ:     Now, you were planning on putting about $800,000 in with Mr. Goldberg?

MR. BELL:          I think that's about it.

ATTORNEY PRASNITZ:   How much cash did you have to invest?   Was this most of your liquid money?

MR. BELL:          Yes, it was.

ATTORNEY PRASNITZ:   Now, there's been testimony that you had a net worth of a $1.6 million.  Is that a correct number in terms of your cash?

MR. BELL:          That is correct.  Uh huh.  Yeah.

ATTORNEY PRASNITZ:   All right.  And other than this, was… other than the $800,000 that you put in with Mr. Goldberg, the $90,000 approximately in this other commodity account, do you have any other investments of any sort?

MR. BELL:          Not at that time.

ATTORNEY PRASNITZ:   At this time?  Today?  Do you know?

MR. BELL:          Today I have a few hundred of stock in a investment.

ATTORNEY PRASNITZ:   All right.  A few hundred stocks.  Do you own any mutual funds?

MR. BELL:            No.

ATTORNEY PRASNITZ:    What are you relying on for your current income today?

MR. BELL:            (inaudible)

ATTORNEY PRASNITZ:    How do you pay your bills?

MR. BELL:            I don't get any bills.

ATTORNEY PRASNITZ:    You don't get any bills?

MR. BELL:            No, I do.

ATTORNEY PRASNITZ:    Okay.  And how do you pay when you get an electric bill or a

telephone bill?

MR. BELL:            Yeah.

ATTORNEY PRASNITZ:    How do you pay?  What is…

MR. BELL:            I have a fair amount of money put away.

ATTORNEY PRASNITZ:    Put away?

MR. BELL:             Which I use for some (inaudible).

ATTORNEY PRASNITZ:   I thought you just said you didn't have any other investments.  How… how much money do you have put away?  Do you know?

MR. BELL:             I would say about (inaudible).

ATTORNEY PRASNITZ:    And what is that in, do you know?

MR. BELL:             (inaudible)

ATTORNEY PRASNITZ:    Coins?  What type of coins?

MR. BELL:             Gold coins.  (inaudible)

ATTORNEY PRASNITZ:    Okay.  Is your daughter aware that you have this $500,000 of coins?  Have you told that to her?

MR. BELL:             She's aware of it.

ATTORNEY PRASNITZ:   Okay.  And you have a house.  How much do you… how much is your house worth?

MR. BELL:          (inaudible)

ATTORNEY PRASNITZ:   You have a reverse mortgage on the house or a second mortgage?

MR. BELL:          Yeah.

ATTORNEY PRASNITZ:   Do you under… do you know what a reverse mortgage is?

MR. BELL:          (inaudible)

ATTORNEY PRASNITZ:   When you're planning on taking (inaudible).

MR. BELL:          Yeah.  (inaudible)

ATTORNEY PRASNITZ:   Okay.  So let's go back to how you pay your bills.  What… where do you get… you sell your coins to pay your bills or how do you pay your bills?

MR. BELL:          I don't know.  Gas bills, (inaudible), what (inaudible)?

ATTORNEY PRASNITZ:    Where are these coins located?

MR. BELL:              The coins are located in my house.

ATTORNEY PRASNITZ:    So inside your house you have $500,000 in coins?

MR. BELL:              Not $500,000.

ATTORNEY PRASNITZ:    How much?

MR. BELL:              I'd say about, you know, $300,000.

ATTORNEY PRASNITZ:    $300,000?    So inside your house you have $300,000 in coins?

MR. BELL:              Yeah.

ATTORNEY PRASNITZ:    Is that safe?

MR. BELL:              I have some of it… some of it put away in the bank.

ATTORNEY PRASNITZ:    In the bank?  Well, how safe is it to have $300,000 in coins at your house?

ATTORNEY SINCLAIR:    Mr. Chairman, I (inaudible)…

ATTORNEY PRASNITZ:    All right, we (inaudible).  All right, we (inaudible).  Okay.  Did your wife recently pass away?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:    When was that?

MR. BELL:          It was in June.

ATTORNEY PRASNITZ:    Of what year?

MR. BELL:          (inaudible)

ATTORNEY PRASNITZ:    Now, did you have conversations… you know who that man is over there?

MR. BELL:          Yes, I do.

ATTORNEY PRASNITZ:    Who is that?

MR. BELL:                (inaudible)


ATTORNEY PRASNITZ:    (LAUGHTER)


MR. BELL:                He knows who he is.


(LAUGHTER)


MR. BELL:                I talked to him quite a bit.


ATTORNEY PRASNITZ:    You talked to him quite a bit.  And you… you've talked to him

quite a bit before today, correct?


MR. BELL:                Oh, yeah.


ATTORNEY PRASNITZ:    How many times do you think you've talked to him?


MR. BELL:                Oh, about five or six.


ATTORNEY PRASNITZ:    Five or six times?


MR. BELL:                And (inaudible).

ATTORNEY PRASNITZ:    Right.  He works… you understand he works for ComTrust, right?

MR. BELL:            Right.

ATTORNEY PRASNITZ:    And you've talked to him, in your words, quite a bit before today, right?

MR. BELL:            Right.

ATTORNEY PRASNITZ:    And have you complained to him about what happened to your account?

MR. BELL:            I have (inaudible).

ATTORNEY PRASNITZ:    What did you tell him?

MR. BELL:            I told him he was (inaudible).

ATTORNEY PRASNITZ:    What was the (inaudible)?

MR. BELL:            Any time I asked him a question, he'd say, "Well, I'll talk to you tomorrow."  And I would (inaudible).

ATTORNEY PRASNITZ:   When do you think you first started talking to this man from ComTrust?  How long ago?

MR. BELL:          Oh, boy.  (inaudible)

ATTORNEY PRASNITZ:   More than a year ago?

MR. BELL:          (inaudible)

ATTORNEY PRASNITZ:   More than two years ago?

MR. BELL:          I guess it was (inaudible).  I think it was, yeah.

ATTORNEY PRASNITZ:   And were you talking to him at the same time you were trying to get a hold of Goldberg?

MR. BELL:          Yeah.  If I couldn't get a hold of Goldberg, I mean, (inaudible)

ATTORNEY PRASNITZ:   And why did you decide to call ComTrust?

MR. BELL:          Because I was trying to get some information as to where my money stood.

ATTORNEY PRASNITZ:    Do you know how much money you had left?

MR. BELL:        Not at that time.

ATTORNEY PRASNITZ:    And why did you call ComTrust?

MR. BELL:        Because I know they had an involvement with Goldberg.

ATTORNEY PRASNITZ:    And what was your understanding of their involvement with Goldberg?

MR. BELL:        Because I knew the (s/l) President (inaudible).

ATTORNEY PRASNITZ:    And do you recall why you thought that?

MR. BELL:        No, I can't recall why.

ATTORNEY PRASNITZ:    And why didn't you rather… why didn't you call ComTrust rather than ProTrade?  Do you know who ProTrade is?

MR. BELL:        Well, I know that… well, ProTrade… (inaudible) is… is (inaudible)…

ATTORNEY PRASNITZ:    Who's ProTrade with?

MR. BELL:        I don't know the answer to that question.  See, I just knew that they existed.

ATTORNEY PRASNITZ:    Okay.  How about Corporate Commodity?  Do you know who Corporate Commodities is?

MR. BELL:        No.

ATTORNEY PRASNITZ:    And do you know how you got ComTrust's name?

MR. BELL:        Well, again, I can't think of that right now, but…

ATTORNEY PRASNITZ:    Okay.  All right.  I'm going to ask you some… some questions now about what we've got in Claimant's Exhibit 4.  On the amended statement. of claim, which was tab 1, it says that you gave a total of $793,520 to these firms.  Are you aware of that?

MR. BELL:        (inaudible)

ATTORNEY PRASNITZ:    And were you aware that you got charged $575,932 in commissions?

MR. BELL:          I wasn't aware.

ATTORNEY PRASNITZ:   Did Mr. Goldberg explain to you that most of your money was going to go to pay fees and commissions?

MR. BELL:          (inaudible)

ATTORNEY PRASNITZ:   Let's go on to tab 2, which purports to be the address of ComTrust in (s/l) Aventure, Florida.  It's got an 800 number and a 305 number.  Do you recall ever calling those numbers?

MR. BELL:          (inaudible) I think we called (inaudible).

ATTORNEY PRASNITZ:   Now, all your money… you always sent your money directly to ComTrust, right?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:   And would Mr. Goldberg say that you needed to give more money to ComTrust?

ATTORNEY SINCLAIR:     I… I understand there's a problem there, but these questions are extremely leading and because we understand, as you explained, Mr. Bell has a memory problem, but by leading the witness this way, we really don't get the impression whether Mr. Bell remembers this stuff or not and I think that that's an important factor in this case.  And the leading aspect of this and basically tell him to say yes or no to this thing, doesn't really tell us whether Mr. Bell really (inaudible).

CHAIRMAN:        I'm overruling your objection.  I don't think what he remembers in the questions he's been asked so far is (inaudible).  I think the leading nature of the questions that (inaudible).

ATTORNEY SINCLAIR:     All right.

ATTORNEY PRASNITZ:    All right.  Would you get calls from Mr. Goldberg saying you needed to invest or send more money?

MR. BELL:          If it was (inaudible)

ATTORNEY PRASNITZ:    And do you recall where you would send your money?

MR. BELL:          No.

ATTORNEY PRASNITZ:    Okay.  You can turn to tab 6.  This… this is a copy of your tax return of 2006.

MR. BELL:          Yes.

ATTORNEY PRASNITZ:    And during 2006 you had no wages and only $586 of interest?  Is that… Mr… you un… do you understand that?

MR. BELL:          I understand it.

ATTORNEY PRASNITZ:    All right.  And do you understand that you took out a lot of money from your IRA?

MR. BELL:          Right.

ATTORNEY PRASNITZ:    Do you know why you did that?

MR. BELL:          So I could invest it.

ATTORNEY PRASNITZ:    2006?  Do you know where you put that money?

MR. BELL:          Again, I can't tell you.

ATTORNEY PRASNITZ:    Well, do you know why you would take money out of an IRA and do you know if you… let me ask this.  Did you put it into another IRA?  According to this, you took it out and had to pay tax on it.  Do you know why you'd do that?

MR. BELL:         Again, I can't tell you.

ATTORNEY PRASNITZ:    Let's go on to number 8.  Do you… you know what this tab 8 is?

MR. BELL:         That's the… that's the (inaudible).

ATTORNEY PRASNITZ:    And do you understand the segments?

MR. BELL:         (inaudible)

ATTORNEY PRASNITZ:    And why don't you explain what this means, like a line that's 1110C, 2 long, 2 short, February 07, IMF SMP 1470C PNS.  Okay.  What's that all mean?

MR. BELL:         (inaudible)

ATTORNEY PRASNITZ:    Do you understand what any of these entries mean?

MR. BELL:                (inaudible)


ATTORNEY PRASNITZ:    Do you know what IMM is?


MR. BELL:                I M… no.


ATTORNEY PRASNITZ:    Okay.  Do you know how much money this account was worth at that time looking at this statement?


MR. BELL:                (inaudible)


ATTORNEY PRASNITZ:    Okay.  Do people talk to you before they place these trades or do… or do you just learn about them when you get the statement?


MR. BELL:                I (inaudible)… I need to know how they do it.


ATTORNEY PRASNITZ:    Yeah, but every time a trade is placed, do you get a phone call?


MR. BELL:                No.  Never did.


ATTORNEY PRASNITZ:    Never did.  Okay.  Let's go on to tab 11.  Is that your signature on the ComTrust dis… (inaudible) disclosure statement?

MR. BELL:          Yes, it is.

ATTORNEY PRASNITZ:    And you signed that on or about June 13, 2005?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:    Now, at the time you opened this account you said you had an annual income.  You were retired at that time, right, of 2005?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:    And it said you had an annual income of… first of all who put in these check orders, was it you or was it someone else?

MR. BELL:          Me.

ATTORNEY PRASNITZ:    Okay.  And did you have an… do you recall that you had an annual income of between $25,000 and $50,000?  Some… do you know what… where you… what your income was or where it came from, the $25,000 to $50,000?

MR. BELL:          Again, I can't (inaudible).

ATTORNEY PRASNITZ:    Well, you weren't working at that time, were you?

MR. BELL:          No.

ATTORNEY PRASNITZ:    Do you know if your investments were generating $25,000 to $50,000 in income?

MR. BELL:          I think so.

ATTORNEY PRASNITZ:    You think so.  Okay.  And this says, according to this, your net worth in 2005 was a million to $5 million, right?

MR. BELL:          (inaudible)

ATTORNEY PRASNITZ:    It says $1 million to $5 million.

MR. BELL:          Right.

ATTORNEY PRASNITZ:    And do you know the exact number?

MR. BELL:          No.

P                    Besides… besides your house and the $800,000 you gave to ComTrust, what do you remember having back then… and the $90,000 in this other account?  What do you remember having back then?

MR. BELL:          Can't recall.

ATTORNEY PRASNITZ:    Okay.  So (inaudible) experience, do you see where it says commodity (inaudible) through years of experience?

MR. BELL:          Yeah.

ATTORNEY PRASNITZ:    That's left blank, right?

MR. BELL:          Right.

ATTORNEY PRASNITZ:    And commodity options, you leave that blank, too.

MR. BELL:          Right.

ATTORNEY PRASNITZ:    Do you remember having commodity experience at that time?

MR. BELL:          No, I don't remember.

ATTORNEY PRASNITZ:    Right.  Now, on the next question it says, do you now or ever participate in a commodity firm?  It says no.  Remember that?

MR. BELL:         Yeah.

ATTORNEY PRASNITZ:    Now, do you know when this Vision account was opened?

MR. BELL:         No, I don't remember.

ATTORNEY PRASNITZ:    Do you know if the Vision account was opened before June 2005?

MR. BELL:         I don't think so.

ATTORNEY PRASNITZ:    At the time you opened this, did you fill out these answers to the best of your knowledge?

MR. BELL:         Yeah.

ATTORNEY PRASNITZ:    And you listed that you had 12 years experience in stocks, but nothing in commodities, right?

MR. BELL:            Right.

ATTORNEY PRASNITZ:    How about let's turn to the document that's marked B0045.
Do you know what this document is?

CHAIRMAN:            I'm sorry, what form are you looking at?

ATTORNEY PRASNITZ:    Uh, 45.  At the bottom right.  It's within tab 11.

CHAIRMAN:            Okay.

MR. BELL:            I'm not familiar with it.

ATTORNEY PRASNITZ:    Do you recall seeing this before?

MR. BELL:            I must have because I signed it.  (inaudible)

ATTORNEY PRASNITZ:    Do you… do you understand what this document means?

MR. BELL:            Offhand, no.

ATTORNEY PRASNITZ:    Now, you see this additional risk disclosure, 47?

MR. BELL:          Yeah.

ATTORNEY PRASNITZ:   So when you signed this, really you were retired, right?

MR. BELL:          Yeah.

ATTORNEY PRASNITZ:   And your understanding was that you had no previous futures or options trading experience?   You… it says annual income or net worth less than $25,000.  Did that apply to you at the time?  Do you remember?

MR. BELL:          I don't remember at that time.  I probably said I didn't have an annual income.  Net worth, I think it was $145,000.

ATTORNEY PRASNITZ:   Were you on a fixed income?  Do you know what a fixed income is?

MR. BELL:          Yeah.  I know the only time that I had… I'd been working and had an income where I had something invested in… in other words, (inaudible) system. Otherwise, the main thing I… main thing is estimated.  It could be (inaudible).

ATTORNEY PRASNITZ:   Let's go to tab 50.  This is marked as… this refers to the (inaudible) date of June 16, 2005 (inaudible) ComTrust of $47,000.     There's a

standardized payment.  It says the first check was (inaudible) and is that your handwriting?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:    So (inaudible) money you sent in?

MR. BELL:          I think so.

ATTORNEY SINCLAIR:    Since he had (inaudible) I'm going to object (inaudible).

ATTORNEY PRASNITZ:    I'm sorry, I'm sorry.  In tab 11, page 50, uh…

MAN:              (inaudible)  Yeah.

CHAIRMAN:        Thank you.

ATTORNEY PRASNITZ:    Now this appears a form to ComTrust.  It appears to be dated August 18, 2005, transferring an account to ComTrust.  Do you know what account you were transferring to ComTrust?

CHAIRMAN:        I'm sorry, (inaudible)…

ATTORNEY PRASNITZ:    I'm… I'm going to… I'm on 51 (inaudible).   This appears to be an authorization, document 51, to transfer an account to ComTrust.   Do you know what account you were transferring?

MR. BELL:          No, I didn't (inaudible).

ATTORNEY PRASNITZ:    And now we're going on to 54.  Well, the document 54, same tab 11.  This is a letter from ComTrust, date of February 14, 2006.  And it says, "It has come to our attention that your introducing broker, Corporate Commodities, Inc. may have sent you a letter last month regarding your account.  In the letter the broker stated that they had made arrangements for ComTrust to serve your account.   And while ComTrust acts as the custodian for your (inaudible) position, CCI never made arrangements with ComTrust to service your account."   Do you remember getting this letter?

MR. BELL:          At this time, no I don't remember.

ATTORNEY PRASNITZ:    At the… at the bottom is some handwriting.   Is that your handwriting?

MR. BELL:          That's right.

ATTORNEY PRASNITZ:    So it says NFA and it's got a number to call.  Looks like (s/l) Stolen.  Did you call the NFA at that time?

MR. BELL:          I can't recall, not really.

ATTORNEY PRASNITZ:    So do you know what this note refers to in its… the NFA note?

MR. BELL:          No.

ATTORNEY PRASNITZ:    And then there's another number which seems to say, "Carol Wood, my attorney, gives advice to arbitrators and others."  Do you know what that's about?

MR. BELL:          At this time, no.

ATTORNEY PRASNITZ:    Do you know who Carol Wood is?

MR. BELL:          At this time, no.

ATTORNEY PRASNITZ:    Okay.  All right.  Let's turn to the next, B 55, okay?

MR. BELL:          Yeah.

ATTORNEY PRASNITZ:   This is a letter from Corporate Commodities which says, "We have arranged for your account to be serviced by the clearing firm where your trades have always been held.  If you have any questions, please contact ComTrust."  Now, do you know why Corporate Commodities sent you this let… you… did you have any conversations with anyone about this letter?

MR. BELL:          No.

ATTORNEY PRASNITZ:   You saw the other letter from ComTrust saying they… they knew nothing about this January 11th letter?

MR. BELL:          Right.

ATTORNEY PRASNITZ:   Did you have any conversations as to why Corporate Commodities would tell you your account was going to be handled by ComTrust if it wasn't?  Did you talk about that with anyone?

MR. BELL:          No.

ATTORNEY PRASNITZ:   At the bottom here is someone's address.   It looks like Pembrook Pines, Florida.  Was that your handwriting?

MR. BELL:          Yes, it was.

ATTORNEY PRASNITZ:    Do you know Mr. Gustavas?

MR. BELL:          I can't recall him.

ATTORNEY PRASNITZ:    How about at the top – it says "Call NFA register."  Do you remember what that note was about?

MR. BELL:          No, I can't.

ATTORNEY PRASNITZ:    All right.  Let's go to tab 12, okay?  This is what appears to be a three page statement of you, but it's typed, okay?

MR. BELL:          Mmm hmm.

ATTORNEY PRASNITZ:    Was this prepared with the help of your daughter?

MR. BELL:          I think so, yes.

ATTORNEY PRASNITZ:    Did she type this?

MR. BELL:          Yes, I think so.

ATTORNEY PRASNITZ:    And did she prepare it after talking with you?

MR. BELL:          I think so.

ATTORNEY PRASNITZ:    Okay.  And was this true and accurate, to the best of your knowledge, when you prepared it?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:    And did you prepare this after you realized you had lost your money?

MR. BELL:          Well, I knew I lost a lot of money (inaudible).

ATTORNEY PRASNITZ:    Okay.  So you… you opened your account with ComTrust in June 2005, right?

MR. BELL:          Yeah.

ATTORNEY PRASNITZ:    And you were getting letters from ComTrust in February 2006 from Stuart Maylor, right?

MR. BELL:            Right.

ATTORNEY PRASNITZ:    And by that time you lost… by February 2006 had you lost most of your money?

MR. BELL:            Yes.

ATTORNEY PRASNITZ:    Okay.  This statement, tab 12, seems to have a fax notation on top, April 24, 2006.  Do you see that?

MR. BELL:            Yeah.

ATTORNEY PRASNITZ:    Was this statement prepared by April 24, 2006?  Was it prepared… let me rephrase the question.  Was this statement prepared on or before April 20, 2006?

MR. BELL:            I think it was.  Well, it was before or at the same time.

ATTORNEY PRASNITZ:    Okay.  Do you know who you were faxing this to at the 630 number?

MR. BELL:            I can't recall.

ATTORNEY PRASNITZ:   All right.   Let's look at page 80, the first page of the statement, which is marked (inaudible) number 80.  It says that…

CHAIRMAN:          What tab?  What… what tab?

ATTORNEY PRASNITZ:   This is tab 12, the first page.   Okay.   It says, "With the enclosed… within the enclosed ProTrade futures and options document entitled 'For Our Mutual Protection', which I signed on June 14, 2005, is the statement that your account executive is required to service your needs and in that pursue, (inaudible) and make recommendations to you."  It goes on to say that, "We require that at the time you place the first order for your account, your representative from our Compliance Department may ask you a series of questions and will take answers from you to assure us that you're aware of the nature of the transaction in which you are about to engage (inaudible) involved commission charges, break even point and the other matters (inaudible) your account."   Then you say, "None of this happened.   There was no dialogue with the Compliance Department, nor with the Account Executive, Mr. Mitch Goldberg."  Is that a true statement?

MR. BELL:          Yes, it is.

ATTORNEY PRASNITZ:   And when you say Compliance Department, do you know which firm are you referring to?   The Compliance Department of which firm, do you know?

MR. BELL:          Offhand, I don't.


ATTORNEY PRASNITZ:   Let's go on to the second page, 81, okay?  Look at the first paragraph.  It said, "In early June 2005 I was introduced to Mr. Mitch Goldberg of ProTrade Futures and Options by Louis Davis, III, a friend of his in the same business.  Corporate Commodities, Inc., CCI, took over from ProTrade on August 29, 2005."  Then this says, "On August 22, 2005 John Cianella of ComTrust sent me an email about the transfer of my account to Corporate Commodities, Inc. from ProTrade."  See that?


MR. BELL:          Yeah.


ATTORNEY PRASNITZ:   Do you know why you are here… first of all, do you know why you were getting this email from ComTrust as opposed to say ProTrade or Corporate Commodities?


MR. BELL:          I can't say why, no.


ATTORNEY PRASNITZ:   Do you know how John Ciarnello got your email?


MR. BELL:          No.


(OFF THE RECORD)

(BACK ON THE RECORD)

ATTORNEY PRASNITZ:    Did you have a… did you have email in August of 2005?

MR. BELL:          (inaudible)

ATTORNEY PRASNITZ:    And did you get other emails from ComTrust?

MR. BELL:          I can't be positive.

ATTORNEY PRASNITZ:    But you got this email saying your account was being transferred.   So you got this email from ComTrust saying your account was being transferred.  Did that disturb you?

MR. BELL:          No, it didn't.

ATTORNEY PRASNITZ:    Did you understand that, you know, there was a difference between Corporate Commodities and ProTrade?    Did you understand what the distinction of those terms were?  Did anyone ever explain that to you?

MR. BELL:          (inaudible)

ATTORNEY PRASNITZ:    Did you think something be… other than the name change, did anyone ever discuss with you why this was happening?

MR. BELL:          No.

ATTORNEY PRASNITZ:    Did you ever talk to Goldberg about it?

MR. BELL:          No, because I never got much interaction with Goldberg.

ATTORNEY PRASNITZ:    How about ComTrust?  Did you ever talk to ComTrust about it?

MR. BELL:          No.

ATTORNEY PRASNITZ:    By the way, what… who initiated that first call to ComTrust complaining that you lost your money?  You… you… you said you talked to ComTrust several times about the fact that you lost your money, right?

MR. BELL:          Yeah.

ATTORNEY PRASNITZ:    And what did you… in that first call… first of all, how did you know who to talk to at ComTrust?  How did you know which person to talk to?

MR. BELL:          I think the (inaudible) I went for (inaudible) was the person that talked to me earlier.

ATTORNEY PRASNITZ:    And now when you made your first call to ComTrust, how did you know what name to ask for?

MR. BELL:          I think it was Stuart Maylor because I talked to him earlier.

ATTORNEY PRASNITZ:    When you say you talked to him earlier, how did you know to talk to him that very first time?  How did you get the name Stuart Maylor?

MR. BELL:          (inaudible) and it was something I think (inaudible).  Stuart Maylor called me about providing $10,000…

ATTORNEY PRASNITZ:    Well, I don't want to get into that, but…

MR. BELL:          Okay.

ATTORNEY PRASNITZ:    … I want to get into your first call with Mr. Maylor.  How did you know to call him and ask for him?

MR. BELL:          I think (inaudible).

ATTORNEY PRASNITZ:   And when you called him, you called him to complain about Goldberg, right?

MR. BELL:          I think so.

ATTORNEY PRASNITZ:   And what did you tell him?

MR. BELL:          I said that I wasn't… I wasn't getting any… any information back from Goldberg.  He always said, "I'll tell you tomorrow," and then tomorrow never came.

ATTORNEY PRASNITZ:   Okay.   But you don't remember why you decided to call ComTrust about that as opposed, say, to ProTrade?

MR. BELL:          I can't recall why.

ATTORNEY PRASNITZ:   Did you realize when you first talked to Mr. Maylor that you'd lost all your money?

MR. BELL:          No.

ATTORNEY PRASNITZ:   When did you first realize you'd lost almost $800,000?

MR. BELL:          I can't recall that.  I should remember because it was a nightmare.

ATTORNEY PRASNITZ:   Okay.   Let's take another look at tab… let's go to tab 14 which is this email, okay?   This appears to be an email from John C. Iara to JTBell678@juno.com re transfer, dated August 22, 2005.   Was that your email, JTBell678@juno.com?

MR. BELL:         Yes.

ATTORNEY PRASNITZ:   And was Mr. John C-a-i-r@aol.com the same person you referred to in your statement as the man from ComTrust who told you that… who sent you an email, who says… in your statement you say, "John Ciargalli sent me an email on August 22, 2005"?

MR. BELL:         Right.

ATTORNEY PRASNITZ:    Is this the email you're talking about, August 22, 2005?

MR. BELL:         I think so.

ATTORNEY PRASNITZ:    So it was the first time that you heard about this transfer, but does this refresh your recollection that the transfer you're talking about is a transfer from ProTrade to Corporate Commodity?

MR. BELL:          I think so, yes.

ATTORNEY PRASNITZ:    And  the  request  for  authorization  was  coming  from ComTrust?

MR. BELL:          Yep.

ATTORNEY PRASNITZ:    But do you know why this ComTrust form has no reference to what account is being transferred from where to where?

MR. BELL:          No.

ATTORNEY PRASNITZ:    I mean, this… this form is addressed to ComTrust, right?  Is that… your form says "to ComTrust".

MR. BELL:          Right.

ATTORNEY PRASNITZ:    And it says, "Gentlemen, please transfer immediately all cash balances, open positions and tracking bills to ComTrust," right?

MR. BELL:          Right.

ATTORNEY PRASNITZ:   But isn't it true that there's no… in the written material there's no mention of ProTrade, is there?

MR. BELL:          No.

ATTORNEY PRASNITZ:   And is there any mention of Corporate Commodity?

MR. BELL:          No.

ATTORNEY PRASNITZ:   So do you know why ComTrust is sending you a form addressed to itself answering… asking that we transfer an account when… when there's no mention of where it's coming from or who it's going to?

MR. BELL:          No, I think this case as… as I recall it, I knew I was in trouble with Goldberg and had to (inaudible) just discuss my situation.

ATTORNEY PRASNITZ:   Well, do you think that's why this transfer form came in?

MR. BELL:          I think so.

ATTORNEY PRASNITZ:   All right.  There's a handwritten note here.  This… this email is dated August 22nd, right?  There's a handwritten note.  Is that your handwriting, 18… 1805?

MR. BELL:          Right.

ATTORNEY PRASNITZ:    It says, "Time of transfer from ProTrade to CCI."  Do you see that?

MR. BELL:          Yeah.

ATTORNEY PRASNITZ:    Do you know why it appears to relate to the August 18th transfer when you… when you weren't getting this email for August 22nd?

MR. BELL:          No.

ATTORNEY PRASNITZ:    Did… did any… ComTrust just… did anyone from ComTrust ever explain to you what this form was supposed to do?

MR. BELL:          I don't recall that, no.

ATTORNEY PRASNITZ:    As you sit here today, what… do you… do you know what this form is for?

MR. BELL:          No, I can't… not for any reason right now.  Nope.

ATTORNEY PRASNITZ:    Tab 15, is that the original of the letter from ComTrust?

MR. BELL:          Yes, it is.

ATTORNEY PRASNITZ:    And is tab 16 the original letter from Corporate Commodities, Inc.?

MR. BELL:          Yes, it is.

ATTORNEY PRASNITZ:    Well, we'll just (inaudible).

MR. BELL:          (inaudible)

(LAUGHTER)

MAN:               (inaudible)

CHAIRMAN:          How much time do we have with exhibits?

ATTORNEY PRASNITZ:    Maybe 15 more minutes.

CHAIRMAN:          15.  Okay.  So finish up (inaudible).

ATTORNEY PRASNITZ:    Okay.   (inaudible)   Tab 21, do you know generally what is (inaudible) tab 21?  Do you understand what these are?

MR. BELL:          No, not at this time.

ATTORNEY PRASNITZ:    And on 141 it says, "Introduced by Corporate Commodities, Inc."

MR. BELL:          Mmm hmm.

ATTORNEY PRASNITZ:    Do  you  know  why  it  was  switched  to  Corporate Commodities, Inc. from earlier statements where it was ProTrade Futures?

MR. BELL:          I have no idea, no.

ATTORNEY PRASNITZ:    Did anyone ask you to approve the switch from ProTrade to Corporate Commodities, Inc.?

MR. BELL:          No.

ATTORNEY PRASNITZ:    I believe you testified earlier you weren't aware of any difference between those two firms.

MR. BELL:           True.

ATTORNEY PRASNITZ:   Were the people that you were dealing with the same, uh, after the switch to Corporate Commodities, Inc.?  Were you still… was Mr. Goldberg still the person making trades for you?

MR. BELL:           No.

ATTORNEY PRASNITZ:   No?

MR. BELL:           I don't think so.

ATTORNEY PRASNITZ:   Well, who… who else was making trades for you?

MR. BELL:           I can't recall anybody else.

ATTORNEY PRASNITZ:   So…

MR. BELL:           I think (inaudible).  I couldn't get decent replies from Goldberg.

ATTORNEY PRASNITZ:   Okay.  But as far as you knew, was Goldberg the guy who made all these trades?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:    And that was true at Corporate Commodities, Inc. just like it had been true at ProTrade, is that right?

MR. BELL:          Yes, it was.

ATTORNEY PRASNITZ:    So other than this change in name, was there any change that you were aware of when… connected with the switch at Corporate Commodities?  I mean, you were still dealing with the same person, right, Goldberg?

MR. BELL:          Yes.

ATTORNEY PRASNITZ:    Anything else change that you know of?

MR. BELL:          No.

ATTORNEY PRASNITZ:    Now, there are a whole bunch of trades here, right?  And you're… as I understand it, he made… he picked all these trades, right?  And when you tried to get an explanation, you could not get through.

MR. BELL:          That's true.  It was always, "I'll tell you tomorrow."

ATTORNEY PRASNITZ:    Okay.  And you never called him and say, you know, "Buy 50 March 2006 cotton contracts"?

MR. BELL:          No.

ATTORNEY PRASNITZ:    And you didn't have the ability to… you didn't know that much about it, right?

MR. BELL:          Well, that's true.  Uh huh.

ATTORNEY PRASNITZ:    Have you gotten your $800,000 back?

MR. BELL:          Did I get my… get it back from them?

ATTORNEY PRASNITZ:    You're still… the reason you're here today is that you lost about $800,000, right?

MR. BELL:          Right.

MAN:               Now he remembers.

(LAUGHTER)

CHAIRMAN:          We'll recess some time (inaudible).

MAN:               Well, the only issue is that it's lunchtime out there now, so it might take a little while.

MAN:               Um, were you…

MAN:               That's fine.

MAN:               (inaudible)

MAN:               Yes.

(OFF THE RECORD)

(BACK ON THE RECORD)

CHAIRMAN:          We are separately convened.  We have concluded the Claimant's examination, all with our Claimant, Mr. Bell, and I'll ask the witness to respond.  So, gentlemen, when you are prepared, you may cross-examine.

ATTORNEY DAVID:          I'd like to just ask a question (inaudible).  Mr. Bell, again, my name is Henry David.  I represent Alaron.  Would I be correct that whatever documents

that you had concerning this… this commodities trade with Mr. Goldberg, you gave those documents to your counsel?

MR. BELL:          Yes.

ATTORNEY DAVID:          Yes.  All right.  Now did you, just by chance, did you deal with a (inaudible) as part of this account by the name of John Matthews?

MR. BELL:          I don't recall the name.

ATTORNEY DAVID:          Mr. Prasnitz, do you have the Claimant's exhibit binder in front of you?  If I could ask Mr. Bell just to look first at Claimant's Exhibit 5.  Mr. Bell, I just wanted to confirm in the… the first page of this exhibit, Claimant's Exhibit 5, is that your handwriting, sir?

MR. BELL:          Yes, it is.

ATTORNEY DAVID:          And is the second page also your handwriting?

MR. BELL:          Yes, it is.

ATTORNEY DAVID:          So you were able to calculate from documents that you had the commissions that Mr. Goldberg received?

MR. BELL:          Yes.

ATTORNEY DAVID:          I just have one other document, Mr. Bell, I wanted to ask you about and that is Claimant's Exhibit 20.  You would agree with me, sir, would you not, that that's a page from the website of ProTrade from May 24th of 2006?

MR. BELL:          Yes, it is.

ATTORNEY DAVID:          I have nothing further to ask.

CHAIRMAN:          Mr. Sinclair?

ATTORNEY SINCLAIR:     Mr. Bell, you remember I'm Gary Sinclair and I'm representing ComTrust.  I have some questions to ask you.  The first thing I want to refer to is Respondent's Exhibit 6.

CHAIRMAN:          Respondent's Exhibit 6?

ATTORNEY SINCLAIR:     Yes.

ATTORNEY PRASNITZ:     Respondent ComTrust's Exhibit 6?

ATTORNEY SINCLAIR:    Yes.  I'm sorry.  Mr. Bell, have you ever seen this document?

(TALKING IN BACKGROUND – INAUDIBLE)

MR. BELL:        Yes, I think so.

ATTORNEY SINCLAIR:    You do recall?

MR. BELL:        I think so.

ATTORNEY SINCLAIR:    Okay.  Now, Mr. Bell, how long do you know that you've been suffering from this memory problem?

MR. BELL:        Oh, I couldn't tell you.

ATTORNEY SINCLAIR:    Okay.  Do you know if you were suffering from this memory problem when you had your accounts (inaudible)?

MR. BELL:        I don't think so.

ATTORNEY SINCLAIR:    So you've had to say then, when I asked you the question which was (inaudible) not specifically, but paraphrasing, if you were suffering from any mental condition while your accounts were open, the answer would be no.

MR. BELL:          Right.

ATTORNEY SINCLAIR:    But today you can't remember what happened back then, is that correct?

MR. BELL:          That's correct.

ATTORNEY SINCLAIR:    I'm going to direct you to Respondent's… Respondent ComTrust's Exhibit Book No. 2, which is… I'm referring to Exhibit 10. Okay?

ATTORNEY PRASNITZ:    ComTrust Exhibit Book 2?

ATTORNEY SINCLAIR:    Yes.

ATTORNEY PRASNITZ:    Hold on.

ATTORNEY SINCLAIR:    I'd like to refer you to the first page, which is my number 80. Have you ever seen stock (inaudible) before?

MR. BELL:          I think I have.

ATTORNEY SINCLAIR:     Okay.  So this is the document filled out when you opened your account with Tiger Financial?

MR. BELL:          Let me ask though where… where is Tiger Financial?  I see Vision at the top.

ATTORNEY SINCLAIR:     Um, look at page 82.  10:00.

MR. BELL:          Mmm hmm.

ATTORNEY SINCLAIR:     See Tiger Financial in there?

MR. BELL:          All right.

ATTORNEY SINCLAIR:     Now, did you fill this document out?

MR. BELL:          Yes, I did.

ATTORNEY SINCLAIR:     Okay.  And did you fill it out?  Did anybody help you fill it out…

MR. BELL:          No.

ATTORNEY SINCLAIR:      … to your recollection?  And on this document, let's go down to the section that says financial information.

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:    And it says… there's three figures there.  Do you see the figures to the right where it says $1.5 million?

MR. BELL:          Yep.

ATTORNEY SINCLAIR:    And you wrote that?

MR. BELL:          Yes, I did.

ATTORNEY SINCLAIR:    And that was your net worth at the time?

MR. BELL:          At the time, yeah.

ATTORNEY SINCLAIR:    Now, do you remember when you actually opened your account with Tiger?

MR. BELL:          I can't recall.

ATTORNEY SINCLAIR:    Did you open the account initially with Tiger and Vision?

MR. BELL:    I think so.

ATTORNEY SINCLAIR:    Okay.  Let me refer you in Exhibit 10 to page 155.  Okay.  Got it?  See the statement?  Do you see what it says?  W-R-L-I (inaudible)?  Okay?  Do you see that?

CHAIRMAN:    (inaudible)

ATTORNEY SINCLAIR:    Sorry, it's the… it's… it is dated 9/15.

MR. BELL:    Oh yeah.

ATTORNEY SINCLAIR:    Do you see that?

MR. BELL:    Mmm hmm.

ATTORNEY SINCLAIR:    Okay?

MR. BELL:    Yeah.

ATTORNEY SINCLAIR:    Do you see what it says?

MR. BELL:          Yeah, it's right there.

ATTORNEY SINCLAIR:    So you now… does that help refresh your recollection that this account came over from Alaron?

MR. BELL:          Of course it refreshes my memory.

ATTORNEY SINCLAIR:    So you actually opened the account with Alaron sometime before September 30, 2004, is that right?

ATTORNEY PRASNITZ:   Obj… objection (inaudible) it's necessary.  Um…

CHAIRMAN:          I think the question's (inaudible).  Would you repeat the question.

ATTORNEY SINCLAIR:    I said, is it…

CHAIRMAN:          (inaudible)

ATTORNEY SINCLAIR:    Didn't you have… didn't you open your account with Alaron's prior to September 30, 2004?

MR. BELL:          Well, it says September 15th.

ATTORNEY SINCLAIR:     Right.  It says it was transferred from Alaron that date.

ATTORNEY PRASNITZ:     I'll object to the form of that question.  The word transfer isn't here.  I mean, there's been no testimony by the witness as to whether he understands or not what W-R and (inaudible) X-B-I-T mean.  We've had, you know, suggestion, but we haven't heard it from the witness.

ATTORNEY SINCLAIR:     My question is, Mr. Bell…

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     Do you recall that you opened your account at Alaron originally?

MR. BELL:          Recently.

ATTORNEY SINCLAIR:     No.  2004.  When you opened your account with Tiger, the first set of documents were from Alaron, correct?

MR. BELL:          When you say the first set, obviously, it started off as on 7/27.  And I could talk about 9/15.

ATTORNEY SINCLAIR:     Right.  Well, the 7/27 (inaudible), right?  Is that the date on the statement that you see?

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     Referring back to the account forms, Exhibit 10, page 81, is that your signature on the bottom there?

MR. BELL:          Yes, it is.

ATTORNEY SINCLAIR:     And is that your date?

MR. BELL:          Yes, it is.

ATTORNEY SINCLAIR:     Okay.  So would it be fair to say that you opened your account at Vision on the date shown here, 8/27?

MR. BELL:          I think it makes sense, yes.

ATTORNEY SINCLAIR:     Yes.  But you had transactions that took place before that date, according to this statement, page no. 155, correct?

MR. BELL:          Well, we had something on 7/27 (inaudible)…

ATTORNEY SINCLAIR:    All right.    Okay.    The question is, do you recall originally opening your account with Tiger at Alaron?

ATTORNEY PRASNITZ:    I object to the form of the question.    Opening your account with Tiger at Alaron…

ATTORNEY SINCLAIR:    Okay.  Do you recall opening an account with Tiger in which Alaron was the futures commission merchant prior… in… in July of 2004?

MR. BELL:        I need a little help there.  Are you talking about 2005?

ATTORNEY SINCLAIR:    I'm sorry. A 2004.  2004.

MR. BELL:        Oh.  And what date?

ATTORNEY SINCLAIR:    July.

MR. BELL:        Can you repeat the question?

ATTORNEY SINCLAIR:    Do you recall opening your account with Tiger where Alaron was the futures commissions merchant in July of 2004?

MR. BELL:          Well from this, I got involved on September 15th.

ATTORNEY SINCLAIR:     Right.  Do you see Alaron's name on that statement?

MR. BELL:          Sure.

ATTORNEY SINCLAIR:     Okay.  Did you have any relationship with Alaron?

MR. BELL:          No.

ATTORNEY SINCLAIR:     Okay.  All right.  Now, let's go to Exhibit 11.  Okay.  Do you see this document?

ATTORNEY PRASNITZ:    Turn to page 296?

ATTORNEY SINCLAIR:     Yes, 296.

MR. BELL:          Yes, I remember this document.

ATTORNEY SINCLAIR:     Is that your handwriting?

MR. BELL:          Yes, it is.

ATTORNEY SINCLAIR:    Okay.  And look on that document.  Down there in the middle where it asks you to provide three different numbers, do you see where it says what your total net worth is?  Down on the left-hand side?

MR. BELL:        Yes, I see it.

ATTORNEY SINCLAIR:    Okay.  And what does that say?

MR. BELL:        $1 million.

ATTORNEY SINCLAIR:    Is that a 6… is it $1,600,000.

ATTORNEY PRASNITZ:  Well, which number are you talking about, the liquid net worth or the total net…

ATTORNEY SINCLAIR:    The liquid net worth, yes.  $1,600,000 right?

ATTORNEY PRASNITZ:  Object to the form.  Object (inaudible).

ATTORNEY SINCLAIR:    I'm sorry?

ATTORNEY PRASNITZ:  It says a million.

ATTORNEY SINCLAIR:     Oh, I'm sorry.  I guess I misread it.  It looks like a 6 to me there.  I'm sorry.  (inaudible) I can understand.  Okay.  A million.  Okay.  Did your… did your net worth change by $500,000 between September of 2004 and February of 2005?

MR. BELL:          I believe…

ATTORNEY PRASNITZ:   Uh… Mr. Sinclair, I think there… there's a little inadvertent confusion in the record.  There's two numbers on this document.

ATTORNEY SINCLAIR:     Right.

ATTORNEY PRASNITZ:   One, in fact, is a $1.6 million.

ATTORNEY SINCLAIR:     Right.

ATTORNEY PRASNITZ:   The other one is a million.

ATTORNEY SINCLAIR:     Right.

ATTORNEY PRASNITZ:   And… and I believe you asked the question and got the right answer, but we're looking at the wrong number.

ATTORNEY SINCLAIR:    Okay, I'm sorry.  I asked about the total net worth, I thought. I think I asked the total net…

ATTORNEY PRASNITZ:    You actually asked for both.

ATTORNEY SINCLAIR:    Okay.  Right.  Okay.  So the total net worth is how much?

MR. BELL:            $1,600,000.

ATTORNEY SINCLAIR:    I'm sorry, I… I was looking at (inaudible)…

ATTORNEY PRASNITZ:    Okay.

ATTORNEY SINCLAIR:    And your total… and your liquid net worth is one million?

ATTORNEY PRASNITZ:    One million.

ATTORNEY SINCLAIR:    Okay.  Now, let's go to page 297, to the next page.  And is that your signature?

MR. BELL:            Yes, it is.

ATTORNEY SINCLAIR:    Okay.  And is there anybody else's signature on there?

MR. BELL:          Yes, it is.

ATTORNEY SINCLAIR:    Who's that?

MR. BELL:          That was my wife at the time.

ATTORNEY SINCLAIR:    Okay.  And there's a date, right?

MR. BELL:          Yes, there is.

ATTORNEY SINCLAIR:    Okay.  March 200… March 17, 2005?  Is that right?

MR. BELL:          Yes, it is.

ATTORNEY SINCLAIR:    So you opened your account and I would point to page 258.

You see what it says here down at the bottom?

ATTORNEY PRASNITZ:    Looking at page 258 in Exhibit 10?

ATTORNEY SINCLAIR:    Exhibit 10, the introducing broker.

MR. BELL:          And you asked me what, please?

ATTORNEY SINCLAIR:    Did you open an account with Direct Futures?

ATTORNEY PRASNITZ:    Which… I don't that on Exhibit 10, page 258.

ATTORNEY SINCLAIR:    Not 258?

CHAIRMAN:        It's 291.

ATTORNEY SINCLAIR:    I'm sorry, 291.  I'm sorry.

ATTORNEY PRASNITZ:    (inaudible) the question, please.

ATTORNEY SINCLAIR:    Gentlemen, just as an aside, I have a vision problem (inaudible).

ATTORNEY PRASNITZ:    (inaudible)

ATTORNEY SINCLAIR:    I'm sorry, 298.  You see where it says there…

MR. BELL:        (inaudible)  What's the question?

ATTORNEY SINCLAIR:    Did you open an account… (CELL PHONE RINGING) (inaudible)  Did you open an account with Direct Futures?

ATTORNEY PRASNITZ:    I object.  I mean, aside from this claim that this is approved by Direct and it's with Vision, so (inaudible)…

ATTORNEY SINCLAIR:    (inaudible)

ATTORNEY PRASNITZ:    I can't testify, but I object to…

(ALL TALKING AT ONCE)

ATTORNEY SINCLAIR:    The question was, I mean, did you open an account with Direct Futures?

MR. BELL:          (inaudible) at this point.

ATTORNEY SINCLAIR:    Did you open an account… an account with Direct Futures in March of 2005?

ATTORNEY PRASNITZ:    Well, I still have to say I object for the record because I think Counsel knows that that would be impossible to open an account (inaudible).

CHAIRMAN:          That's fine.

ATTORNEY SINCLAIR:     Did you open an account introduced by Direct Futures where Vision was the futures commission merchant or clearing (inaudible)… future commissions merchant?

MR. BELL:          I'm not sure, but I think so.

ATTORNEY SINCLAIR:     But at the time you did this, you knew what you were doing? Your… your mental status…

MR. BELL:          Yes.

ATTORNEY SINCLAIR:     … as far as you know was fine.

MR. BELL:          Yeah.  As far as I was concerned.

ATTORNEY SINCLAIR:     And… oh, okay.  Well… And your wife's mental condition at the time, was it fine also?

MR. BELL:          Yes.

ATTORNEY SINCLAIR:    And she actually saw these documents, the one you opened for your account with Direct, right?  Direct and Vision?

MR. BELL:           Well, she… she put her signature on it, but how much she studied it and asked questions be…

ATTORNEY SINCLAIR:    Okay.  But you studied it, didn't you?

MR. BELL:           I think so.

ATTORNEY SINCLAIR:    Did you read all the documents that came with it?

MR. BELL:           I don't recall.  (inaudible)

ATTORNEY SINCLAIR:    All right.  Now… now, Mr. Bell, do you recall me asking you at interrogatories to identify whether you had any other accounts other than the account at ComTrust and ProTrade?

MR. BELL:           Could you repeat that again, please?

ATTORNEY SINCLAIR:    In the interrogatories, the documents you already identified you have seen, I asked you if you had any other commodities accounts.

MR. BELL:          At that time, I don't think so.

ATTORNEY SINCLAIR:     At the time you answered the questions?

MR. BELL:          Yes.

ATTORNEY SINCLAIR:     What about at the time you opened your account with ProTrade, did you have any other commodities accounts?

MR. BELL:          No, I don't think so, and the… the tie-in to ProTrade was rather short to my recollection.

ATTORNEY SINCLAIR:     Okay.  Let's go back to Book 2 and go to… take you to, uh… document number, in Exhibit 10, document no. 142.  Do you see what… can you read… does that statement look familiar?

MR. BELL:          Well, they look pretty much the same as the other ones.

ATTORNEY SINCLAIR:     Okay.  Is that your name on the top of the statement?

MR. BELL:          Yes, it is.

ATTORNEY SINCLAIR:     Okay.  And the date on the statement is June 30, 2005?

MR. BELL:          Yes, it is.

ATTORNEY SINCLAIR:     And isn't it true that you had open positions on June of 2…
June of 2005 that date back to April or March of 2005?

MR. BELL:          I don't see where it dates… it goes back to 2005?

ATTORNEY SINCLAIR:     Well, you see the statement on the upper right?  Do you see
the date?

MR. BELL:          Yeah, June 30th.

ATTORNEY SINCLAIR:     What year?

MR. BELL:          2005.

ATTORNEY SINCLAIR:     Okay.  Do you see on… well, let's look at the first date.  Do
you see the first date where it says 6/1/05 on the far left?

MR. BELL:          Yep.

ATTORNEY SINCLAIR:     Okay.  Does it show that there's a balance in the account?

MR. BELL:          Yes.

ATTORNEY SINCLAIR:    Okay.  On June 1, 2005, right?

MR. BELL:          Yep.

ATTORNEY SINCLAIR:    Let's go to…

MR. BELL:          Of the large figure of $35.

ATTORNEY SINCLAIR:    Right.  But you had other positions, right?

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:    Okay.    You opened your account with ProTrade and ComTrust in June of 2005, right?  Not this account, the one you're here complaining about today.  You opened that in June of 2005, correct?  You testified to that, right?

MR. BELL:          Yes, I did.  Yeah.

ATTORNEY SINCLAIR:    Okay.  And here's an account at a different company.

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     Isn't it?  That was open in June of 2005.

MR. BELL:          Right.

ATTORNEY SINCLAIR:     So you did have an account open, at least one, in June of 2005 when you opened your account with ProTrade, correct?

MR. BELL:          Well, I have to find out where it was.  I… you know, I was doing retired financial (inaudible) …

ATTORNEY SINCLAIR:     Correct.

MR. BELL:          … on June 30th.

ATTORNEY SINCLAIR:     Were you also dealing with ProTrade?

MR. BELL:          Tell me where it was so I can go back to it and look at it.

ATTORNEY SINCLAIR:     Well, that's the reason we're here today.

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     Do you remember when you opened that account with ProTrade?

MR. BELL:          No, I don't remember, that's why I asked you to show me where.

ATTORNEY SINCLAIR:     Okay.  Okay.  Let's go to 10… 11 of Claimant's documents. B0040.

MR. BELL:          Right.

ATTORNEY SINCLAIR:     Hmm?

MR. BELL:          Okay.

ATTORNEY SINCLAIR:     Now, do you see this is an account, an existing… and these are the documents for the accounts you opened at ProTrade with ComTrust as the FCM, correct?

MR. BELL:          I don't see anything in… right here saying that I was dealing with ProTrade.

ATTORNEY SINCLAIR:     Go to page B, no. 45.

MR. BELL:          Okay.

ATTORNEY SINCLAIR:     Okay.  Do you see where it says introducing broker?

MR. BELL:          Yes.

ATTORNEY SINCLAIR:     Who's the introducing broker?

MR. BELL:          ProTrade Future… Futures…

ATTORNEY SINCLAIR:     Okay.

MR. BELL:          … Options.

ATTORNEY SINCLAIR:     Now your attorney submitted these documents as documents that were representative of you opening your account in June of 2005 with ProTrade.

ATTORNEY PRASNITZ:     Is that a question?

ATTORNEY SINCLAIR:     The question is, now do you recollect that you had an account with Pro… ProTrade in June of 2005?

ATTORNEY PRASNITZ:    The same objection.   There's no evidence of any account with ProTrade.

ATTORNEY SINCLAIR:    ProTrade as the introducing broker with ComTrust as the FCM.

MR. BELL:          Well, the notification says the introducing broker was ProTrade.

ATTORNEY SINCLAIR:    Right.   And isn't it true that you opened an account with ProTrade as the introducing broker and ComTrust as the FCM in June of 2005?

MR. BELL:          Well, it says down at the… close to the bottom that the four brokerage charges under the commodity purchase are limited to $50… $50.

ATTORNEY SINCLAIR:    Do you see a… a stamp on there, a date stamp?

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:    What's the date?

MR. BELL:          June 22, '05.

ATTORNEY SINCLAIR:     Okay.  And that's your signature, right?

MR. BELL:          Yes, it is.

ATTORNEY SINCLAIR:     Okay.  So would you agree that this is for the account you opened with ProTrade…

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     … as the FCM?

ATTORNEY PRASNITZ:  I object… I object to the… there was no account with ProTrade.

CHAIRMAN:          We can put this…

ATTORNEY SINCLAIR:     Okay.

CHAIRMAN:          We understand that, we really do.

(ALL TALKING AT ONCE)

CHAIRMAN:          For… for the convenience of asking the questions of the witness, I think it's okay.  I mean, it's a… it's a shortcut to get (inaudible).

ATTORNEY SINCLAIR:    I'm not trying to suggest anything else.  I mean…

ATTORNEY PRASNITZ:    Okay.

ATTORNEY SINCLAIR:    But that's (inaudible) and I'm trying to establish this.

ATTORNEY PRASNITZ:    Well, what you're trying to establish is trying to refresh his recollection.

ATTORNEY SINCLAIR:    Exactly.

ATTORNEY PRASNITZ:    You've done it.

ATTORNEY SINCLAIR:    Okay.  So yes… is your answer now yes, that you op… that you opened your account with ProTrade with ComTrust as the FCM in June of 2005?

MR. BELL:          Yes.

ATTORNEY SINCLAIR:     And at the same time you had an account with another introducing broker and an FCM, which I showed you before, right?   I showed you statements.

MR. BELL:         Are you telling me that a person such as myself can't have two?

ATTORNEY SINCLAIR:     No, I'm not.  You can have two.

MR. BELL:         Oh.

ATTORNEY SINCLAIR:     But the question now is, Mr. Bell, why didn't you disclose that information when I asked it in discovery, when I asked if you had any other accounts open at the time that you opened the account with ProTrade and ComTrust?

MR. BELL:         And you're asking what, why didn't I say so?

ATTORNEY SINCLAIR:     Yeah.

MR. BELL:         Well, if you would have pointed it out, I would have gone to it.  But I'm not picking anything out of 2004 and saying this is what happened.

ATTORNEY SINCLAIR:     No, no.  Let… let's go back a bit.

ATTORNEY PRASNITZ:   This was equally noted then.  The point of this is to impeach the witness that he didn't disclose a prior statement?

ATTORNEY SINCLAIR:   Two prior accounts.

ATTORNEY PRASNITZ:   You've done it.

ATTORNEY SINCLAIR:   Okay.  That's fine.  Now, let's go back to that uh… B0045 and it's no. 11 in the Claimant's Exhibits.

MR. BELL:          B0045.

ATTORNEY PRASNITZ:   B0045?

ATTORNEY SINCLAIR:   Yes.  Now you looked at this document just a few minutes ago, right, Mr. Bell?

MR. BELL:          Yes.

ATTORNEY SINCLAIR:   And doesn't this document tell you what commissions you're going to pay?

MR. BELL:          Yes, it does.

ATTORNEY SINCLAIR:    Okay.   And  you  understood  that  at  the  time,  what  your commissions were going to be?

MR. BELL:            Yeah.

ATTORNEY SINCLAIR:    Okay.   And  who  is  telling  you  you're  going  to  pay  these commissions?  Isn't it ProTrade Futures and Options at the top?

MR. BELL:            It would int… introduce you… intro… introducing brokerage… yeah, broker.

ATTORNEY SINCLAIR:    And you knew what that meant, didn't you?

MR. BELL:            Yeah.  Yeah.

ATTORNEY SINCLAIR:    ComTrust  didn't  tell  you  you  were  going  to  pay  these commissions, did they?

MR. BELL:            No.

ATTORNEY SINCLAIR:    Did ComTrust ever recommend any trade to you?

MR. BELL:          I don't recall.


ATTORNEY SINCLAIR:     Did you ever complain to ComTrust about your account prior to the cessation of trading in that account?


MR. BELL:          When I was having trouble with the broker, yes, I think I came to ComTrust.


ATTORNEY SINCLAIR:     Do you remember the date of that?


MR. BELL:          Well, I don't know.


ATTORNEY SINCLAIR:     So you don't remember the date you first talked with Stuart Maylor?


MR. BELL:          Well, it wouldn't have been necessarily that time.


ATTORNEY SINCLAIR:     Okay.


MR. BELL:          Ask Stuart.


ATTORNEY SINCLAIR:     Well, I'm asking you right now.

MR. BELL:          I know you are.

ATTORNEY PRASNITZ:   Is your answer you don't know, Mr. Bell?

MR. BELL:          I don't know.

ATTORNEY PRASNITZ:   Okay.  Thank you.

ATTORNEY SINCLAIR:    Did you talk to anyone else at… at ComTrust, other than Mr. Maylor, about the troubles you were having with… the alleged troubles you were having with Mr. Goldberg during the time your account was open?

ATTORNEY PRASNITZ:   No, I think Mr. Maylor was the one I was talking to.

ATTORNEY SINCLAIR:    But you started talking to him after the trading was done, correct?

ATTORNEY PRASNITZ:   That's when I got into what I felt was residual (inaudible) where Goldberg is.

ATTORNEY SINCLAIR:    Mr. Bell, I'm going to ask you about your conversations in a little bit with Mr. Maylor if you can recall, okay?

MR. BELL:            (inaudible) remember those.


ATTORNEY SINCLAIR:    When you talked to Mr. Maylor, isn't it true that Mr. May…

Maylor directed you to the National Futures Association with your complaint?


MR. BELL:            I don't recall that.


ATTORNEY SINCLAIR:    Did he give you names of people to call?


MR. BELL:            I don't recall that.


ATTORNEY SINCLAIR:    Going to Claimant's Exhibit 16, page 99…


MR. BELL:            Yeah.


ATTORNEY SINCLAIR:    I'm sorry, I… I… my mistake.  Exhibit 15, page… 0058…

098.


MR. BELL:            All right.


ATTORNEY SINCLAIR:    Okay.  Now, here's a letter dated February 14, 2006,

correct?

MR. BELL:          Correct.

ATTORNEY SINCLAIR:     And this is a letter you received from Stuart Maylor.

MR. BELL:          Right.

ATTORNEY SINCLAIR:     Had you talked to Stuart Maylor prior to receiving this letter?

MR. BELL:          Oh, I think I did.

ATTORNEY SINCLAIR:     Okay.  How did you… I mean… okay.  Here are some notes you wrote on this page.

MR. BELL:          All right.

ATTORNEY SINCLAIR:     A telephone number, two telephone numbers.  Right?

MR. BELL:          Right.

ATTORNEY SINCLAIR:     Isn't it true that Stuart Maylor gave you that information so you could call the NFA about your account?

MR. BELL:          I'm not sure, but I wouldn't object to it.

ATTORNEY SINCLAIR:     Do you recollect whether you got it from anybody else?

MR. BELL:          I can't recall.

ATTORNEY SINCLAIR:     Did you call John Broderson at the NFA?

MR. BELL:          I don't have his name down here.

ATTORNEY SINCLAIR:     Okay.  Would you take a look at the last paragraph?  It says if you have any questions about your account, call John Broderson.

MR. BELL:          Right.

ATTORNEY SINCLAIR:     Did you ever call him?

MR. BELL:          I don't think so.

ATTORNEY SINCLAIR:     Mr. Bell, you produced some statements for your Tiger account, is that correct…

MR. BELL:          I think so.

ATTORNEY SINCLAIR:     … in this case?   Have you had those statements in your possession since the day they were dated?

MR. BELL:          I think so.

ATTORNEY SINCLAIR:     Isn't it true, though, that you didn't produce statements of that account when it was requested?

MR. BELL:          Who requested it?

ATTORNEY SINCLAIR:     I did.

MR. BELL:          You did?

ATTORNEY SINCLAIR:     Through your attorney.  Yes, I did a request for documents. I did a request for documents.  I asked for copies of any statements you had with any commodities accounts.  Is there a reason you didn't produce the documents?

MR. BELL:          No reason I can think of.   I don't recall you asking.

ATTORNEY SINCLAIR:     Did Mr. Prasnitz show you my request for documents?

MR. BELL:          How many years ago was that?

ATTORNEY SINCLAIR:     Oh…

MR. BELL:          2004?

ATTORNEY SINCLAIR:     2007… 2006, 2007.  Well, I can tell you the date, actually. The 26th of April, 2007.

MR. BELL:          26th…

ATTORNEY SINCLAIR:     No, that's the an… that's when the answer was received.  So I received the answer and so it was before April of 2007.

MR. BELL:          (inaudible) 2007.  (inaudible) in 2007.  (inaudible) familiar (inaudible).  2007 those statements (inaudible).

ATTORNEY SINCLAIR:     The date… I think it's on the last page in terms of the day you (inaudible) Mr. Prasnitz provided you in April… in April 2007.

ATTORNEY PRASNITZ:     You asked… he's looking back at (inaudible) didn't ask about that.  (inaudible)

ATTORNEY SINCLAIR:    I'll, um… the question is, Mr. Bell, that according to what your… what you've produced in this case, documents that you produced, you produced statements from your account with Tiger Financial and Vision.  The statements were given January 2007 with the statements.  On April… in April of 2007 you gave my disc… when you gave me your discovery responses, you said you had no statements of account.

MR. BELL:          If it said it, that's what it is.

ATTORNEY SINCLAIR:    Okay.  All right.  Mr. Bell, let me now refer you to Respondent ComTrust's Exhibit No. 9.  Mr. Bell, I'm looking now to establish just who did you prepare this statement for?

MR. BELL:          I can't tell you right now.  That was a long time ago.  (inaudible)

ATTORNEY SINCLAIR:    Okay.  In this statement isn't it true that you do not accuse ComTrust of any wrongdoing?

MR. BELL:          I don't see where it said anything like that in this (inaudible) statement.  But…

ATTORNEY SINCLAIR:    And this statement was prepared at a time when your mental condition was still, as far as you knew, okay?

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     So would it be fair to say that this statement would be the best recollection that we have of who you felt was at fault in this case?

MR. BELL:          Well, I think it (inaudible) on one statements from one (inaudible) ba… based on one statement that they…

ATTORNEY SINCLAIR:     Well, this is more than just one statement, Mr. Bell, isn't it? This is… (inaudible).  This is 10, 11 paragraphs, isn't it, sir?

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     Okay.  It's the statement of John Bell.

MR. BELL:          Right.

ATTORNEY SINCLAIR:     Do you believe the statement to be true and accurate?

MR. BELL:          If I wrote it, yes.

ATTORNEY SINCLAIR:     And complete?

MR. BELL:          I think so.

ATTORNEY SINCLAIR:     Mr. Bell, you've cited to me ComTrust in this case?

MR. BELL:          Yeah, right.

ATTORNEY SINCLAIR:     You have an account where the introducing broker was ProTrade and then your introducing broker became ProTrade, correct?

MR. BELL:          (inaudible)

ATTORNEY SINCLAIR:     You remember that.  Do you remember that they… that those were the people you were dealing with?  Mitch Goldberg was with Pro… ProTrade, correct?

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     And… and then was with Corporate?

MR. BELL:          That's where he went, yeah.

ATTORNEY SINCLAIR:     Okay.  And you knew that.

MR. BELL:          Yes, I did.  Yeah.  Afterwards.

ATTORNEY SINCLAIR:     Afterwards?

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     Okay.  After he moved, right?

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:     Okay.  I'm trying to determine, Mr. Bell, what caused you to name ComTrust in your complaint.

MR. BELL:          Where did I do that?

ATTORNEY SINCLAIR:     That's why we're here today.

MR. BELL:          I believe that ComTrust (inaudible) that I know of.

ATTORNEY SINCLAIR:     Okay.  Mr. Bell, is it true that someone suggested to you that you name ComTrust in this matter?

ATTORNEY PRASNITZ:  I object to this.   This is argumentative and begs the attorney/client privilege and it's totally irrelevant since he is a (inaudible).  (inaudible) which was established by (inaudible).

ATTORNEY SINCLAIR:   I asked him who.  I just asked if someone else did.  The question refers…

ATTORNEY PRASNITZ:   Well, no, I mean, I (inaudible)…

ATTORNEY SINCLAIR:   I asked him if someone else did.

ATTORNEY PRASNITZ:   (inaudible)   I'll stipulate I advised him to pursue ComTrust because I think ComTrust is liable.  That's what… and he'll say the same.  I mean, I don't understand this question.

CHAIRMAN:       It's a fair question.  (inaudible).  You can answer the question, Mr. Bell.

MR. BELL:       Yeah.

CHAIRMAN:       Do you want me to repeat it for you?

MR. BELL:       Please.

CHAIRMAN:          I'll let Mr. Sinclair (inaudible).

ATTORNEY SINCLAIR:      Mr. Bell, the question was, did someone suggest to you that you name ComTrust in this case?

MR. BELL:          I don't recall anybody recommending that (inaudible).

ATTORNEY SINCLAIR:      Okay.  Because you testified that ComTrust isn't named in this case, right/

MR. BELL:          Did I say that ComTrust was a name and then…

ATTORNEY SINCLAIR:      Is not named in this case and you had no complaint against ComTrust, isn't that true?

MR. BELL:          That's true.

ATTORNEY SINCLAIR:      Mr. Bell…

MR. BELL:          Yes, sir.

ATTORNEY SINCLAIR:    Could you describe your relationship with Mr. Maylor when you spoke to him on the phone?

MR. BELL:         Stated as it was, as far as I can recall.

ATTORNEY SINCLAIR:    Well, had…

MR. BELL:         Everything was quiet (inaudible).  Mr. Maylor was (inaudible).

ATTORNEY SINCLAIR:    Do you feel that Mr. Maylor did his best to help you out with your situation?

MR. BELL:         I think so.

ATTORNEY SINCLAIR:    Has ComTrust every done anything, to your knowledge, to (inaudible)…

(OFF THE RECORD)

(BACK ON THE RECORD)

ATTORNEY SINCLAIR:    (inaudible)

MR. BELL:          I don't recall ComTrust being involved with my account.

ATTORNEY SINCLAIR:    And that's all I have.  When I was reading (inaudible) at some point and you called and (inaudible) testimony of (inaudible).

MAN:               (inaudible)

ATTORNEY SINCLAIR:    I said I… I'd like to (inaudible) now, but I would like to reserve the right to recall and (inaudible).

CHAIRMAN:          Well, we'll pass that bridge as we get to it.  You certainly have the right to call (inaudible).

ATTORNEY DAVID:       We'd like to re-cross (inaudible).  Do you recall on those forms that we just looked at it said you had a liquid net worth of $1 million.  Do you remember that, right?  And you lost $800,000 through your account at ComTrust, correct?  Mr. Goldberg lost $800,000?

MR. BELL:          He told me, yes.

ATTORNEY DAVID:       That's about 80% of your liquid net worth, correct?

MR. BELL:          (inaudible)

ATTORNEY DAVID:        Now you saw that one account statement for Vision that said you have $35 equity in that account.  Do you remember that $35 number?

ATTORNEY PRASNITZ:   I'm going to object to the characterization.   It doesn't say equity at all, it said cash balance.

ATTORNEY DAVID:        Well, let's just look at… do you remember how much money you had at Vision back in 2004-2005?  Well, let's look at… let's look at a couple of statements.  Let's look at Exhibit 10, page 145.  Do you see that as of May 31, 2005 your net worth trading was $7,000?

MR. BELL:               (inaudible)

ATTORNEY DAVID:        Your total long option market value was $24,000.  See that?

MR. BELL:          Yes.

ATTORNEY DAVID:        Your total short option was $17,000?

MR. BELL:           Right.

ATTORNEY DAVID:        So it's correct in a sense that you have a lot less money with Vision than with Mr. Goldberg, right?

MR. BELL:        Right.

ATTORNEY DAVID:        Now, do you understand what it means to name a Respondent to the case?

MR. BELL:        No.

ATTORNEY DAVID:        All right.  And you weren't involved in the… the legal theories in this case, were you?

MR. BELL:        No.

ATTORNEY DAVID:        You left that to your lawyers, correct?

MR. BELL:        Right.

ATTORNEY DAVID:        You left to them to decide who may or may not be legally responsible for what happened, right?

MR. BELL:        Right.

ATTORNEY DAVID:        No other questions.

CHAIRMAN:        Redirect?

ATTORNEY PRASNITZ:    (inaudible)

CHAIRMAN:        Re-cross (inaudible)

ATTORNEY SINCLAIR:    (inaudible)  Mr. Bell, isn't it true that in February of 2005 you made a deposit into your Tiger Vision account of $5,000?

MR. BELL:        It would depend on (inaudible).

ATTORNEY SINCLAIR:    From this statement, from your lawyer.  (inaudible) statement and…

ATTORNEY PRASNITZ:    Page 169.

ATTORNEY SINCLAIR:    I'm sorry?

ATTORNEY PRASNITZ:    169.

ATTORNEY SINCLAIR:    Thank you.  Is that right, Mr. Bell?

MR. BELL:        I think so.

ATTORNEY SINCLAIR:    And um… I'm going to refer you to Claimant Exhibit 10 and we're 150.  Page 150.

MR. BELL:        Okay.

ATTORNEY SINCLAIR:    It shows $5,000 also.  It's a monthly statement.

MR. BELL:        This says personal check received, $5,000.

ATTORNEY SINCLAIR:    Yeah.  And what about below it on February 10th?

MR. BELL:        February 10, yeah, personal check received, (s/l) Alaron.

ATTORNEY SINCLAIR:    Did you send that?  Did you send that money?

MR. BELL:        Hmm?

ATTORNEY SINCLAIR:    Did you send that money?

MR. BELL:          Did I send it?

ATTORNEY SINCLAIR:    Send it to the firm, to your account.

MR. BELL:          Well, I put it in my account, didn't I?

ATTORNEY SINCLAIR:    Okay.  And let's go to page 138.  The date is…

MR. BELL:          August 31, 2005.

ATTORNEY SINCLAIR:    How much did you put in the account that day?  $4,595?  Is that correct?

MR. BELL:          That should be.

ATTORNEY SINCLAIR:    Okay.  And Mr. Bell, at the same time you were trading with both… well, by that time, I guess it was Corporate Commodities and ComTrust, correct?

MR. BELL:          I didn't say it was (inaudible).  Can we go back (inaudible).

ATTORNEY SINCLAIR:    Oh, well, you want me to show it to you?

MR. BELL:          Yeah.

ATTORNEY SINCLAIR:    Okay.

MR. BELL:        (inaudible)

ATTORNEY SINCLAIR:    That's what I needed to know.

MR. BELL:        Well, you're… well, you're looking up at me, so…

ATTORNEY SINCLAIR:    No, no, no, no.  No.  That's all right.  Let's take a look at the statement that's dated August 31.  It's B0256, Exhibit 21, Claimant's Exhibit.  Okay, you see that?

MR. BELL:        Yeah.

ATTORNEY SINCLAIR:    Okay.  Now this statement was dated one or two days after the statement we just looked at?

MR. BELL:        If you say so.

ATTORNEY SINCLAIR:    Well, take a look.  What date does it say at the statement? It's August 31st and BO256.

MAN:                If you say so.


MR. BELL:           Yeah.  Okay.


ATTORNEY SINCLAIR:     Yeah?


MR. BELL:           Yeah.  August 31.


ATTORNEY SINCLAIR:     And take a look at near the bottom of the page.


MR. BELL:           Yeah.


ATTORNEY SINCLAIR:     Does it show you sent a wire or that a wire was received in your account for $246,000?


MR. BELL:           Right.


ATTORNEY SINCLAIR:     So would it be fair to say you were trading both accounts simultaneously?


MR. BELL:        I don't think it's established doing things simultaneously, no.


ATTORNEY SINCLAIR:     Okay.  And let's go to…

CHAIRMAN:           Mr. Sinclair?

ATTORNEY SINCLAIR:    Yes.

CHAIRMAN:           (inaudible)

MAN:                (inaudible)  The one accusing you is (inaudible).

ATTORNEY SINCLAIR:    And just one more thing.  And isn't it true, sir, that at the same time you were also sending money to the Direct Futures accounts.  Direct Futures Vision account.

MR. BELL:           I'd have to look it up.

ATTORNEY SINCLAIR:    Isn't it true that you were, if you recall, that your broker at Direct Futures Vision account with Mr. Dunley?

MR. BELL:           Gary Cohen.  Because I only used Dunley for a very short period of time.

ATTORNEY SINCLAIR:    But you did use Dunley.

MR. BELL:          Very short period.

ATTORNEY SINCLAIR:    (inaudible)  Mr. Bell, I'd like (inaudible).  Mr. Bell is it correct that in the summer of 2005 you might have been putting $5,000 to $10,000 into Vision, but one wire alone to ComTrust was $246,000?

MR. BELL:          Right.

ATTORNEY SINCLAIR:    No other questions.

CHAIRMAN:        Okay.  Thank you, Mr. Bell, for your testimony.  Call your next witness, Mr. Prasnitz.

ATTORNEY PRASNITZ:    Our next witness is going to be Linda McDonald.  (inaudible) just in terms of (inaudible) if… before I question Mr. Maylor, I have to look… have the contracts before me, ComTrust and (inaudible).   So if those are available of him, otherwise I need to have Mr. David have Mr. Isaacson (inaudible).

ATTORNEY DAVID:        We don't have the document of that.   It's in storage (inaudible) and I can't get it out of storage.  (inaudible)

ATTORNEY PRASNITZ:   You can't… we can't…

ATTORNEY DAVID:        We can't promise it because the person who handles it… as it just so happens, the person who handles introducing our new stuff is (inaudible).

ATTORNEY PRASNITZ:   Well, I just… I'm going to ask that they (inaudible) because it's incredibly (inaudible).

CHAIRMAN:        Let's… let's…

MAN:                I know.  Yeah.

MAN:                (inaudible)

ATTORNEY PRASNITZ:   Based on the unavailability of the contract, I'd like to (inaudible) Mr. Isaacson, the representative.

CHAIRMAN:        You will call him (inaudible) advance notice.

ATTORNEY PRASNITZ:   Right.  Which is what I'm giving right now.

CHAIRMAN:        (inaudible)

ATTORNEY PRASNITZ:   Which is perfect (inaudible).

(ALL TALKING AT ONCE)


ATTORNEY DAVID:          (inaudible) be done in?


ATTORNEY PRASNITZ:   Oh, a half hour or less I can be done.


CHAIRMAN:          Real time or lawyer time?


ATTORNEY PRASNITZ:   Real.


ATTORNEY DAVID:          So if I have him here at 3:15…


ATTORNEY PRASNITZ:   That's fine.


ATTORNEY DAVID:          (inaudible)


CHAIRMAN:          So you're going to call Ms. McDonald next and…


ATTORNEY PRASNITZ:   Right.


CHAIRMAN:          … see (inaudible).


ATTORNEY PRASNITZ:   For 3:15.

CHAIRMAN:          About 3:15?

ATTORNEY PRASNITZ:   Right.

(TALKING IN BACKGROND – INAUDIBLE)

ATTORNEY PRASNITZ:   Probably, uh… (inaudible) 10:45.

CHAIRMAN:          10:45?

ATTORNEY PRASNITZ:   Right, 10:45.

CHAIRMAN:          I am here (inaudible)

ATTORNEY PRASNITZ:   All right.  If you're going to be here to sit down with us (inaudible).  I want to clear up this business about these documents, too, (inaudible). So I'd like to specifically request (inaudible) ask for (inaudible).

(OFF THE RECORD)

(ON THE RECORD)