CHAIRMAN:          Do you solemnly swear or affirm that the testimony you will give in this case will be the truth, the whole truth, and nothing but the truth?

MS. MCDONALD:   Yes, I do.

CHAIRMAN:          Okay.  Would you be seated and tell us your name?

MS. MCDONALD:   My name is Linda McDonald.

CHAIRMAN:          Okay, Mr. Prasnitz, (inaudible)

ATTORNEY PRASNITZ:   Mr. Chair, may I also go ahead and get (inaudible) of some things I've got to give her today?

CHAIRMAN:          Yes, you may.

ATTORNEY PRASNITZ:   Okay.  Where do you currently reside?

MS. MCDONALD:   (inaudible)

CHAIRMAN:          You have to talk up.

MS. MCDONALD:   I reside in Wisconsin.

ATTORNEY PRASNITZ:    And how old are you?

MS. MCDONALD:    55.

ATTORNEY PRASNITZ:    Do you have a college education?

MS. MCDONALD:    High school.

ATTORNEY PRASNITZ:    And what do you currently do?

MS. MCDONALD:    I (inaudible).

ATTORNEY PRASNITZ:    (inaudible)

MS. MCDONALD:    Um, I own video stores there, so I (inaudible) shop (inaudible).

ATTORNEY PRASNITZ:    And are you the daughter of Mr. Bell?

MS. MCDONALD:    Yes, I am.

ATTORNEY PRASNITZ:    Okay.  Calling your attention to the summer of 2005, what, if anything, was occurring with your mother at that time?

MS. MCDONALD:    My mother had a stroke early in July of 2005.

ATTORNEY PRASNITZ:    And so were you and your father spending a lot of time at the hospital?

MS. MCDONALD:    Yes, we uh… she was in the hospital and rehab facilities for about a month and we were back and forth to the hospital every day.

ATTORNEY PRASNITZ:    And during that time period, were you aware if your father was trying to contact Mr. Goldberg?

MS. MCDONALD:    Yes.

ATTORNEY PRASNITZ:    And what do you recall about that?

MS. MCDONALD:    Um, I… I recall that he was frustrated because he was very rarely able to get a hold of Mr. Goldberg and when he did, it seemed the conversations were very short.    And from what I… I gathered from my father, he was not able to get answers to some of the questions he was… he was trying to get answered.

ATTORNEY PRASNITZ:    All right.  And now when did you first learn about the problem that brings us here today?

MS. MCDONALD:   Um, I believe it was in… it was early in November 2005.

ATTORNEY PRASNITZ:   Now what happened at that time?

MS. MCDONALD:   Well, I was visiting my parents and, um, I think maybe my father was… he kind of… had been kind of withdrawing most of the evening said, you know, he had a problem and that he… his words were, "I've lost all my money."

ATTORNEY PRASNITZ:   Was that a surprise to you?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:   And did you ask him what he meant?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:   You want to tell us what… how the conversation went?

MS. MCDONALD:   I don't recall the particulars, other than that one sentence, other than that he mentioned that this Mitchell Goldberg person that he had been attempting to do business with earlier in the summer and that he… all his money was gone.  "I've been… been victimized," he said.  That's the (inaudible).

ATTORNEY PRASNITZ:     All right.  Was that the first time you were aware that he had put all his money into commodities?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:     Were you aware that your father had any expertise in picking trades or making decisions as to what commodity and option contracts to by yourself?

MS. MCDONALD:   (inaudible)

ATTORNEY PRASNITZ:     To your knowledge, did your father ever initiate a trade on his own where he would…

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:     Okay.   So he wasn't doing independent research on commodities?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:    And pri… prior to the events at issue and the Vision account, are you aware of him ever having any experience with commodities prior to the… the time period 2004-2005?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:   Now, your father testified at one point on his direct that he had either $300,000 or $500,000 in gold coins at his house.  Are you aware of any facts to support that?

MS. MCDONALD:    (inaudible)

ATTORNEY PRASNITZ:   Have you observed a change with your father's memory recently?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    What have you observed?

MS. MCDONALD:   He seems to be having difficulty remembering things and… and carrying on (inaudible).

ATTORNEY PRASNITZ:    Is his memory for dates any good?

MS. MCDONALD:   Well, sometimes he is…

ATTORNEY PRASNITZ:   He testified, for instance, that he worked for three years at Container Corporation and that he retired in 1960.  Is that correct?  How long did he actually work for Container Corporation?

MS. MCDONALD:   Well, a number of years.  I'm not exactly sure, but he worked at Container Corporation for my entire childhood.

ATTORNEY PRASNITZ:   So most of his career?

MS. MCDONALD:   Yeah.

ATTORNEY PRASNITZ:   And did he retire in 1960?

MS. MCDONALD:   (inaudible)   Well, I would say probably more 1970 or 75, somewhere in there.

ATTORNEY PRASNITZ:   Okay.  So at the time he opened these accounts in 2005, he had been retired for quite a while, correct?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:   More than 15 years?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:   And what was his income like?  What income did he have in 2005?

MS. MCDONALD:   I can't say I really know for sure.  I… I assume that he was… he was receiving Social Security payments and that he was (inaudible) receiving disbursements from his IRA.  But what the amounts were, I… I have no idea.

ATTORNEY PRASNITZ:   All right.  And his tax return for 2006 shows a $240,000 withdrawal from IR… an IRA.  Do you know where that money went?

MS. MCDONALD:   No, not all of it.  We were trying… trying to look into that right now.

ATTORNEY PRASNITZ:   And are you trying to take over his financial affairs right now?

MS. MCDONALD:   I'm trying to help him quite a bit (inaudible).

ATTORNEY PRASNITZ:   Now, he testified that he is…

ATTORNEY DAVID:        I have to object to the question saying what he testified about.  The reason for having witnesses to question, so… so they don't listen to each other's testimony.  He's perfectly welcome to ask questions about her knowledge, but I don't think it's appropriate in a question to be giving this witness what the testimony of another witness was.

CHAIRMAN:        Well, if it were an issue that really mattered, I think I would agree. But what… what the gist of these questions are… we've heard earlier testimony.  In your opinion, is that correct?  So to that extent, I think leading is all right because it's simply an attempt to get agreement or disagreement with the prior testimony.  If it… but… but in general principle I agree with you and you understand the point here in this process.

ATTORNEY DAVID:        I actually disagree, but I don't think it's worth complaining about.  I… I… I agree with Mr. Chairman's ruling that… that it… that, uh, it doesn't go to the crux of the case.  If he does uh…  You know, I'm not suggesting (inaudible), but I think… I just wanted to hear what this witness' testimony was, not this…

CHAIRMAN:        No.  And what (inaudible)… it's a point well taken because to the extent that we're… we're adding information that isn't in this (inaudible), that's not all that useful.  So let's move forward and (inaudible) say.

ATTORNEY PRASNITZ:    Um, oh yeah.  So like right now have there been issues with your father overdrawing his checking account?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    How much is it overdrawn?

MS. MCDONALD:   Well, now it's not.  It was as much as… as I could tell, as much as $6,000 was overdrawn.

ATTORNEY PRASNITZ:    All right.  And then were you aware that your father still had a commodity account?  That there's a…

MS. MCDONALD:   No.  No.

ATTORNEY PRASNITZ:    When did you first become aware of that?

MS. MCDONALD:   Um, over (inaudible).

ATTORNEY PRASNITZ:    Had he ever discussed that with you before?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:    Did that cause you concern?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    Do you know who's making the trading decisions there, by the way?

MS. MCDONALD:   Um, I assume the broker.

ATTORNEY PRASNITZ:    But does your… does your father…

ATTORNEY SINCLAIR:    It's asked and answered.

MS. MCDONALD:   Well…

ATTORNEY SINCLAIR:    She doesn't know.

MS. MCDONALD:   I think the next questions been asked already.  (inaudible)…

CHAIRMAN:    Well, Ms. McDonald, it… it's not fair of you to assume that, but…

MS. MCDONALD:   Okay.

CHAIRMAN:          … it's just that… go ahead and ask the question, Mr…

ATTORNEY PRASNITZ:    Does your father trade that account with his decisions?

MS. MCDONALD:    As I said, up until the last (inaudible), he didn't even know that account was (inaudible).

ATTORNEY PRASNITZ:    So right now he doesn't really… his mental state right now is he doesn't even realize what's happening on this account, correct?

MS. MCDONALD:    In the account (inaudible).

ATTORNEY PRASNITZ:    All right.    Now, aside from the $800,000 he lost with the account at ComTrust, what other liquid assets does he have that you're aware of?

MS. MCDONALD:    Um… that account you just referred to, the commodities account you referred to.

ATTORNEY PRASNITZ:    Which has about a balance of what?

MS. MCDONALD:    I think around $90,000 or less (inaudible) statement (inaudible).

ATTORNEY PRASNITZ:    And what other liquid assets does he have that you're aware of?

MS. MCDONALD:    Another IRA.

ATTORNEY PRASNITZ:    How much is in that?

MS. MCDONALD:    Probably (s/l) $530 some… 30,000.

ATTORNEY PRASNITZ:    So is it fair to say that he lost about 80% of his money with the ComTrust account?

MS. MCDONALD:    That's good.

ATTORNEY PRASNITZ:    Now, were you aware that your father was having conversations with Mr. Maylor from ComTrust?

MS. MCDONALD:    Yes.

ATTORNEY PRASNITZ:    And do you know how your father came to contact Mr. Maylor?

MS. MCDONALD:    No, I don't.

ATTORNEY PRASNITZ:   We've had testimony about the nature of the relationship between your father and Mr. Maylor.   First of all, how many times do you think they talked?

MS. MCDONALD:   I personally was present at two.  My father told me of several other conversations.

ATTORNEY PRASNITZ:   Was there anything that concerned you about those conversations?

MS. MCDONALD:   Yes.  Given all that had happened, uh… and this was after the I've lost all my money conversation, I was concerned because my father kept referring to Mr. Maylor as a really nice guy and he was there to help me.

ATTORNEY PRASNITZ:   And why did that concern you?

MS. MCDONALD:   Well, aside from the fact that Mr. Goldberg had also been a nice guy, who had been there to help him, it seemed… I looked up ComTrust on the internet and discovered that there seemed to be more of a relationship between (inaudible) than my father was aware of.  I just remember what I saw was…

ATTORNEY PRASNITZ:   So which websites did you look at?

MS. MCDONALD:   I looked at ComTrust.

ATTORNEY PRASNITZ:   And what was it on the ComTrust website that caused you concern?

MS. MCDONALD:   I don't remember everything I saw on there, but the first thing that concerned me was that it appeared to be a brokerage.  As it says on the website, you can, you know, fill in this form here and open up an account with us.   And that concerned me because, you know, my father was… had spoken to Mr. Maylor a few times and… and kind of described them to me as someone who… ComTrust, not just Mr. Maylor… as, it almost sounded, like an accounting firm, you know, the way he was describing it to me.  And it seemed as though the website that I saw, that that wasn't the case.

ATTORNEY PRASNITZ:   And what about the… did you notice an… how the address at ComTrust compared to the address of…

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:   … ProTrade?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    What did you observe?

MS. MCDONALD:    Well, they were the same or extremely close… close by and…

ATTORNEY PRASNITZ:    Were they in the same building?

MS. MCDONALD:    I think so, yes.

ATTORNEY PRASNITZ:    Were they on the same floor?

MS. MCDONALD:    Yes.

ATTORNEY PRASNITZ:    And this was a location in Adventura, Florida?

MS. MCDONALD:    I… that must have been (inaudible).

ATTORNEY PRASNITZ:    Okay.  Did you go to the ProTrade Website, too?

MS. MCDONALD:    No, I didn't, because we were primarily concerned with ComTrust at that time.

ATTORNEY PRASNITZ:    All right.  Well, I… just to be sure on this, let's turn to tab 20 in the Claimant's Exhibit.  (inaudible)  And tab 20 purports to be the web page of ProTrade where it has ComTrust forms listed on the left.  Is this something you saw or not?

MS. MCDONALD:  I don't think so.  Like… like I said, at the time I was looking at ComTrust.

ATTORNEY PRASNITZ:    All right.  So let's turn to tab 17 in Claimant's Exhibit, which appears to be snapshots from the ComTrust website.  Are these the pages you looked at?

MS. MCDONALD:   Yes, I think so.  Right.

ATTORNEY PRASNITZ:    Now, when ComTrust says, "We assist you in many aspects of your business, such as regulatory compliant, ethics," it says taming here, but I assume ethics training.  "Promotional materials, lead sources, hiring, training."  Do you know what that was referring to?

MS. MCDONALD:   No, not really.

ATTORNEY PRASNITZ:    Now, for the history of the company it says, "ComTrust was formed to serve as a vehicle which would be used to do more than just clear IB

business.   ComTrust found a niche in the commodity investment world by not only clearing IB business, but also helping IBs achieve business objectives."   Do you recall that/

MS. MCDONALD:   Yes, (inaudible).

ATTORNEY PRASNITZ:   And did that concern you?

MS. MCDONALD:   That was a red flag.

ATTORNEY PRASNITZ:   Why was that a red flag?

MS. MCDONALD:   Well, uh… it… it involves the… the offer of money to (inaudible) by ComTrust to my father (inaudible).

ATTORNEY PRASNITZ:   Objection.  We can't go…

CHAIRMAN:       One second, hold on.  Hold on.

ATTORNEY DAVID:       We're starting to get into the settlement business now, to the offer of money that was taken (inaudible).   This is the settlement issue, which has already been taken from this case.

CHAIRMAN:          Yeah.  No, I agree with that, but the question was proper and the answer is… is fine.

ATTORNEY DAVID:        Okay.

CHAIRMAN:          (inaudible) and it's in danger of (inaudible) earlier (inaudible).

ATTORNEY PRASNITZ:    So you read this and noted that ComTrust was holding itself out as doing more than just clearing IB business, but helping IBs grow their business, right?

MS. MCDONALD:    Right.

ATTORNEY PRASNITZ:    And one way would be through sales, right?

MS. MCDONALD:    Yes.

ATTORNEY DAVID:        Objection.  He's leading this witness.

CHAIRMAN:          Okay.

ATTORNEY PRASNITZ:    Okay.  Now how about this next page, 102?  Did you see this page?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:   And what did you understand this page to mean where it says transfer to ComTrust?

MS. MCDONALD:   I… to me, at that time, it just meant that ComTrust was something other than what I felt had been explained to my father.

ATTORNEY PRASNITZ:   What did you feel had been explained to your father?

MS. MCDONALD:   I… my understand, from what my father told me, was that ComTrust was (inaudible)…

ATTORNEY DAVID:         I'm objecting.  This is hearsay, but…

CHAIRMAN:         Okay.  Overruled, go ahead.

ATTORNEY PRASNITZ:   So…

MS. MCDONALD:   My… my understanding was that ComTrust, as I said before, was kind of an accounting group (inaudible) and that they were… they were clearing trades. This seemed to indicate to me that there was more to ComTrust than that.

ATTORNEY PRASNITZ:    And where was your father, if you know, getting the idea that ComTrust was an accounting outfit?

(CELL PHONE RINGING)

MAN:                I'm going to shut this off.

MS. MCDONALD:    I believed from his conversations with Mr. Maylor.

ATTORNEY PRASNITZ:    And by looking at the website, did you form a conclusion as to whether ComTrust was more than an accounting outfit?

MS. MCDONALD:    Yes, I assumed that it was.

ATTORNEY DAVID:        Objection again.    There's an assumed and, frankly, Ms. McDonald has not been qualified as an expert witness in this area.

CHAIRMAN:        Well, I don't think she needs to be.  I think the question was what was her understanding of this and it's… it's not, I don't think, all that substantive.  It's her impression…

ATTORNEY DAVID:        Okay.

CHAIRMAN:            … which is fine.

ATTORNEY DAVID:          All right.  Okay.

ATTORNEY PRASNITZ:   Now, prior… okay, let's go to the statement that your father prepared.  Referring to tab 12, okay?  Who requested that this statement be prepared?

MS. MCDONALD:    My father told me it was his email.

ATTORNEY PRASNITZ:   And did you work with your father to prepare this?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    Is it… did you do this… did you do the word processing?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    And did you do it… the… and how did you prepare it?  Just describe the process.

MS. MCDONALD:  Well, actually, my father wrote… you know, handwriting, his chronology of events… events.  I helped edit it for language and whatnot and we faxed

it back and forth to each other.  He made some corrections and what he thought (inaudible) changes.  And he took a couple of weeks (inaudible).  And I believe at that point he faxed it to Mr. Maylor.

ATTORNEY PRASNITZ:    Do you know why Mr. Maylor was asking for a statement?

MS. MCDONALD:    Uh… again, all I can say is that my father told me that Mr. Maylor had said he might be able to help him with a filing of some kind.

ATTORNEY PRASNITZ:    Did he say…

MS. MCDONALD:    But he was not very specific and I…

ATTORNEY PRASNITZ:    Did he say who the filing would be against?

MS. MCDONALD:    No.  No.

ATTORNEY PRASNITZ:    Did your father tell you if Mr. Maylor had issues into directions as to what should go into the statement?

MS. MCDONALD:    Mmm… no, other than just the rest… rest of his recollections as to what happened.

ATTORNEY PRASNITZ:    And so was it your understanding that this statement was to be faxed to Mr. Maylor so that Mr. Maylor could help you with a filing?

MS. MCDONALD:    Yes.

ATTORNEY PRASNITZ:    Now, did it concern you at that point that the very person who was asking for this statement might in fact be your adversary and not alle… in… in a litigious proceeding?

MS. MCDONALD:    Not at that point, no.

ATTORNEY PRASNITZ:    Did it later concern you?

MS. MCDONALD:    Yes.

ATTORNEY PRASNITZ:    And when did… when did that start concerning you?

MS. MCDONALD:    I really don't know.  Um, (LAUGHTER)  When we got the settlement request…

ATTORNEY PRASNITZ:    Well, I don't want to… we can't go into that.

MS. MCDONALD:    I know.  (inaudible)…

ATTORNEY PRASNITZ:    Well, but at a later point it became a concern to you, right?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    So knowing what you do now, would you have… well, whose… was it your father came to you and your father said, "Mr. Maylor wants to help us"?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    And your father said, "Mr. Maylor wants to help us and he needs a statement so he can help us do a filing."

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    And did Mr. Maylor ever help you do a filing?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:    Did Mr. Maylor help you draft your complaint against ProTrade?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:    Did Mr. Maylor help you draft a complaint against Alaron?

MS. MCDONALD:   (inaudible)

ATTORNEY PRASNITZ:   Did Mr. Maylor help you draft a complaint against Mr. Goldberg?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:    Did Mr. Maylor ever suggest you might want to actually sue my own company, ComTrust?  Did he ever suggest that to you?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:    So Mr. Maylor got the statement because he told your father he was going to help your father with a filing, correct?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:    Did he ever offer that help?

MS. MCDONALD:   Not that I'm aware of, no.

ATTORNEY PRASNITZ:   So do you know why Mr. Maylor wanted this statement?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:   And this, by the way, the second page says, "On August 22, 2005 John Chiarmelli of ComTrust sent me an email about the transfer of my account to Corporate Commodities Inc. from ProTrade."  How did you get that information?

MS. MCDONALD:   It was obviously part of the handwritten pages my father gave me.

ATTORNEY PRASNITZ:   Okay.  Now, here is… tab 14 is the actual email.  Did you look at this?

MS. MCDONALD:   You're asking me?

ATTORNEY PRASNITZ:   Yeah, did you ever see this before?

MS. MCDONALD:   Yeah.

ATTORNEY PRASNITZ:   All right.  So you don't know what the purpose of this document was?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:   Let's turn to tab 15.  Were you involved at all with the letter that ComTrust wrote to your father on February 14, 2006?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:   Did you do a background check of ComTrust on the NFA website?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:   Did the NFA talk to you in connection with their investigation and complaint against ProTrade, Mitchell Goldberg and Corporate Commodities?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:   Do know if they talked to your father?

MS. MCDONALD:   I don't know.

ATTORNEY PRASNITZ:   And did anyone ever discuss with you what, if any, difference there was between Corporate Commo… Commodities and ProTrade?

MS. MCDONALD:   The only person was my father who stated that ProTrade had either become Corporate Commodities or had been acquired by Corporate Commodities.  I'm really not sure which.

ATTORNEY PRASNITZ:   All right.   Prior to dealing with… prior to 2005… let me rephrase that.  Prior to your father dealing with Mr. Goldberg in 2005, were you ever aware that Mr. Goldberg had been barred from the industry for four years…

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:   … for a period of four years?   And tab 6 is the income tax return.  I believe your testimony is you're trying to find out what your father did with the $274,000?

MS. MCDONALD:   Yes.

ATTORNEY PRASNITZ:   And the first time you found out about the Vision account was when?

MS. MCDONALD:   (inaudible)

ATTORNEY PRASNITZ:   Did your father ever ask you for help in locating the documents in this case?

MS. MCDONALD:   No.

ATTORNEY PRASNITZ:   No other questions.

ATTORNEY DAVID:       Just a very, very few questions.  Ms. McDonald, my name is Andrew David, I represent Alaron.  Did you look through your father's documents that related to this trading account?

MS. MCDONALD:   No.

ATTORNEY DAVID:       So you don't know what's there and what's not there, right?

MS. MCDONALD:   Not… except, you know, other (inaudible) seen recently, no.

ATTORNEY DAVID:       And you are aware, are you not, ma'am… did… did you read the… the amended statement of claim that Mr. Prasnitz prepared on… on your father's behalf?

MS. MCDONALD:   Yes.

ATTORNEY DAVID:        So you're aware, are you not, ma'am, that Corporate Commodities and ProTrade have different office addresses in different towns?

MS. MCDONALD:  No, I don't… if it says it in, I guess I didn't pay attention to (inaudible).

ATTORNEY DAVID:        So if I show you page 3, paragraphs 7 and 9, paragraph 7 listing ProTrade's address at 191 91st Street in Aventura, Florida, and Corporate Commodities in Pines Boulevard in Pembroke Pines, Florida, you have no reason to believe that that's not accurate, do you?

MS. MCDONALD:   No.

ATTORNEY DAVID:        I have nothing further.

CHAIRMAN:        Mr. Sinclair?

ATTORNEY SINCLAIR:     Ms. McDonald, I'm Gary Sinclair and I represent ComTrust. You said you had some concerns about ComTrust in terms of their relationship with your father.

MS. MCDONALD:   At what point?  I did say I had concerns at some point.

ATTORNEY SINCLAIR:    Okay.  Did you ever contact ComTrust?

MS. MCDONALD:   No.

ATTORNEY SINCLAIR:    Did you ever talk to Mr. Maylor?

MS. MCDONALD:   No.

ATTORNEY SINCLAIR:    Did you ever ask Mr… Mr. Maylor what the purpose was of asking your father for the document?

MS. MCDONALD:   No, because at the point I did have these concerns, I told my father to immediately stop what he was doing and contact an attorney.  It's always been my understanding that when attorneys become involved that contact, then, between the other parties should pretty much cease.

ATTORNEY SINCLAIR:    Where did you get that comment?

MS. MCDONALD:   From working in the insurance business and being involved with claims.

ATTORNEY SINCLAIR:    Do you know for a fact whether Mr. Maylor can or cannot talk to your father after he's retained an attorney?

MS. MCDONALD:   Do I know for a fact?  (inaudible) my attorney.  But I believe he had been asked not to.  (inaudible)  I (inaudible).

ATTORNEY SINCLAIR:    There's no indicated that I contacted your father, is there?

MS. MCDONALD:   I have no idea right now.

ATTORNEY SINCLAIR:    You're not… you have no experience in commodities, right/

MS. MCDONALD:   (inaudible)

ATTORNEY SINCLAIR:    So you don't know whether the information you saw on this site means any of the things that you assumed, do you?

MS. MCDONALD:   I know it… I… I… I know that it meant that ComTrust was a little bit more than an accounting firm, yes.

ATTORNEY SINCLAIR:    But you don't know what the relationship was vs. ProTrade and Corporate, do you?

MS. MCDONALD:   No, I don't.

ATTORNEY SINCLAIR:     Okay.

MS. MCDONALD:   Which is why I stopped things.

ATTORNEY SINCLAIR:     Okay.  And are you aware that FCMs can fill… can provide one function for certain firms and brokers and a different functions for another bunch of those brokers?

MS. MCDONALD:   (inaudible)

ATTORNEY SINCLAIR:     So at the… at the time of November 2005 when your father told you about losing the money in the account, were you aware that your father had… had another active account?  Did you know he had another active account?

MS. MCDONALD:   No.

ATTORNEY SINCLAIR:     Were you aware that he had recently finished trading that account?

MS. MCDONALD:   No.

ATTORNEY SINCLAIR:     Did your father tell you that he had told Mr. Maylor that his problem was with Mr. Goldberg?

MS. MCDONALD:   Excuse me.  Would you repeat that?

ATTORNEY SINCLAIR:     Where… did your father tell you that he had told Mr. Maylor that his problem was with Mitchell Goldberg?

MS. MCDONALD:   Not that I'm aware of that, no.  That specific…

ATTORNEY SINCLAIR:     But did he mention Mitchell Goldberg?

MS. MCDONALD:   (inaudible)

ATTORNEY SINCLAIR:     And there was no indication that when your father drafted this handwritten statement that he was being coached by anybody, is that true?

MS. MCDONALD:   Yes.

ATTORNEY SINCLAIR:     That's all I have.

CHAIRMAN:        Anything else, Mr. Prasnitz?

ATTORNEY PRASNITZ:     Nope.  Fine.

CHAIRMAN:          Uh, (inaudible).

MAN:              If we can have one minute for Counsel…

CHAIRMAN:          Is there any intention, Mr. Sinclair, or Mr. David, to recall Ms. McDonald in your case in chief?  No.  Is there any objection to her remaining in the hearing room now that her testimony is complete?

ATTORNEY DAVID:        No, sir.

ATTORNEY SINCLAIR:     No.

CHAIRMAN:          All right.  Then you may stay if you wish.

MAN:              (inaudible)

CHAIRMAN:          It's an open invitation, not a mandate.

(LAUGHTER)

CHAIRMAN:          If you wish to stay, you may.  If not, you may excuse yourself.

MS. MCDONALD:    I'll (inaudible).


CHAIRMAN:    We'll take five minutes before we… Mr. Prasnitz calls his witness.


ATTORNEY PRASNITZ:    Thank you.


(OFF THE RECORD)


(ON THE RECORD)


CHAIRMAN:    And an expert (inaudible) Mr. Isaacson.  Mr. Isaacson, you can stay right where you are to testify and (inaudible).


MAN:    He was not (inaudible).


CHAIRMAN:    Well, Mr. (inaudible) had a formal (inaudible).  Can you stand up for (inaudible), raise your right hand?  Do you solemnly swear or affirm that the testimony you're about to give in this case is the truth, the whole truth and nothing but the truth, so help you God?


MR. ISAACSON:    (inaudible)

(LAUGHTER)

CHAIRMAN:          And you may stay right there.  I would just ask that you keep your voice up so that we can clearly hear.  We have a choice.  We can do the hearing (inaudible) between or we can have (inaudible).

MAN:                     Oh, (inaudible)

CHAIRMAN:          But you're fine as long as you raise your voice.  Thank you very much.  Mr. Prasnitz, go ahead.

ATTORNEY PRASNITZ:    Can you state your name, please?

MR. ISAACSON:     Barry Isaacson.

ATTORNEY PRASNITZ:    And you're employed by Alaron?

MR. ISAACSON:     Correct.

ATTORNEY PRASNITZ:    What's your position at Alaron?

MR. ISAACSON:     Executive Vice President.

ATTORNEY PRASNITZ:   How long have you been (inaudible)?

(RECORDER SEEMS TO GO OFF AND BACK ON)

ATTORNEY PRASNITZ:   Has Alaron ever been involved in fines paid to regulatory agencies (inaudible) actions and entries of brokers?

MR. ISAACSON:   I… I do not re… I don't recall, I mean, as far as (inaudible) and brokers is concerned.

ATTORNEY PRASNITZ:   Okay.  Al… Alaron's (inaudible) FTC regulations cases?

ATTORNEY DAVID:         Objection.

CHAIRMAN:         (inaudible)

MAN:               (inaudible)

ATTORNEY PRASNITZ:   Mr. Isaacson, in the 18 years that you've been with Alaron, you've already testified that you're not aware of (inaudible).

MR. ISAACSON:   Yes.

CHAIRMAN:          I think (inaudible) that you're aware of in such cases.  You're not bringing (inaudible) attention, rather (inaudible).

ATTORNEY PRASNITZ:   All right.  Let me ask…

CHAIRMAN:          Counselor… excuse me.  (inaudible) made a case.  I thought the question was disciplinary actions, not declarations.  And I'm not sure…

ATTORNEY PRASNITZ:    (inaudible)

CHAIRMAN:          Oh, okay.  (inaudible)

(TALKING BY MULTIPLE PARTIES THAT IS INAUDIBLE)

ATTORNEY PRASNITZ:    All right.  This is a situ… well, let me ask this question.  What policy, if any, does Alaron have about entering into guarantee agreements with people who have… do not clear through Alaron?  Is that other policy on that subject?

MR. ISAACSON:     We typically refer to the NFA registration as one of the item that is looked at as far as entering into IB agreements.

ATTORNEY PRASNITZ:   Uh huh.  (inaudible)

MR. ISAACSON:    That if the NFA views them as a registered entity and registered with the NFA, that is typically one of the items that… that we would look at.

ATTORNEY PRASNITZ:    But here's my question.  Why would Alaron answer… agree to guarantee someone who is not clearing trades for them?

ATTORNEY DAVID:        I… I… with all due respect, I'd object to the form of the question.  No one's clearing trades through you before you enter into the IB agreement.  If the question is, why do you… why do you keep them?

CHAIRMAN:        Well, the question was a little awkward, but do you understand the question?  So I… so you're not really not going to rephrase that.

MR. ISAACSON:    I… I believe I understand.   I mean, prior to entering an IBM agreement, there are no trades.  Upon entering it, the assumption is that there are going to be trades declared and business is going to be forthright after that point.

ATTORNEY PRASNITZ:    All right.  Now, if Alaron enters into a guarantee agreement with an introducing broker and the introducing broker doesn't clear any trades with Alaron, does it make sense for Alaron to guarantee the acts of that broker?

MR. ISAACSON:    Depending upon the circumstances.

ATTORNEY PRASNITZ:     Well, why would we have constantly gone to guarantee and have done the final (inaudible) for the acts of an introducing broker we don't have any business catch with?  What… what… what possible upside can there be there?

ATTORNEY DAVID:        I object to the form of the question because he now misstates again (inaudible).

CHAIRMAN:        Again, we'll… (inaudible)  But could… could we try to focus more specifically on…

ATTORNEY PRASNITZ:     Right.  Right.  But I just…

CHAIRMAN:        There might be an issue in this…

ATTORNEY PRASNITZ:     All right, all right.  Look, but just let me… let me ask you, would you agree that for Alaron to have a guarantee agreement with an introducing broker who does not do business with it is a source of potential liability for Alaron?  If… if you're guaranteeing that this person is not going to violate the commodity laws and… and you're not even doing business with them?

ATTORNEY DAVID:        Now I have to object because he's asking this witness (inaudible).

(ALL TALKING AT ONCE)

ATTORNEY DAVID:        But it's…

ATTORNEY PRASNITZ:   (inaudible) that is that your testimony, as every witness' testimony, is limited to what they know.  Do not… do not (inaudible) yes or do anything else.  If you have an answer to this question, we'd like to hear it.

MR. ISAACSON:     Okay.  Are you rephrasing the question?

ATTORNEY PRASNITZ:   Yeah.  You're a business person, right?  (inaudible)

MR. ISAACSON:     Correct.

ATTORNEY PRASNITZ:   Can you identify any business reason why Alaron would enter into a guarantee agreement with an introducing broker and then not do business with the introducing broker and then claim the guarantee in effect?

MR. ISAACSON:     Yes.  I believe the potential for a relationship to develop… it is certainly out there.

ATTORNEY PRASNITZ:   So with respect… is there any policy that Alaron has about how long it's going to leave open a guarantee before it terminates it if no business comes out of it?

MR. ISAACSON:     No.

ATTORNEY PRASNITZ:   Has this happened in other situations besides the present situation?

MR. ISAACSON:     Not that I'm aware of.

ATTORNEY PRASNITZ:   Is this the only time you're aware of in your 18 years at Alaron where Alaron has entered into a guarantee agreement with an introducing broker and then zero trades would clear through Alaron?

MR. ISAACSON:     I'm not… I don't know that.

ATTORNEY PRASNITZ:   But you're not aware of any other situation where this happened, right?

MR. ISAACSON:     Not offhand, no.

ATTORNEY PRASNITZ:   And who signed this agreement for Alaron?

MR. ISAACSON:     That was myself.

ATTORNEY PRASNITZ:   Tell us how this agreement came to be signed.   It's signed by ProTrade on July 8th.   Well, just tell us about all your contacts with ProTrade.   How… how did this agreement come to be signed?

CHAIRMAN:        Sorry for interrupting.

ATTORNEY PRASNITZ:   Yeah.

CHAIRMAN:        Just for the record, would you identify the Exhibit that he's looking at?

ATTORNEY PRASNITZ:   Oh, sure.   We're talking about Alaron Trading Corporation here in Exhibit 1 (inaudible).

CHAIRMAN:        So the (inaudible) finding the Alaron (inaudible)…

ATTORNEY PRASNITZ:   The Alaron Trading Corporation.

CHAIRMAN:        Okay.   Thank you.

(MULTIPLE PEOPLE TALKING IN BACKGROUND – INAUDIBLE)

ATTORNEY PRASNITZ:    Mr. Isaacson, do you have the exhibit?

MR. ISAACSON:    Yes, I do.

ATTORNEY PRASNITZ:    Okay.  All right.  So how did… describe how this agreement came to be?

MR. ISAACSON:    It was submitted through my Compliance Department, checked for approval, I reviewed the business terms and then subsequently signed it.

ATTORNEY PRASNITZ:    Did you have any conversations with anyone from ProTrade at any time?

MR. ISAACSON:    No, I did not.

ATTORNEY PRASNITZ:    How many introducing broker agreements do you think… guarantees Alaron had outstanding in July 2005?

MR. ISAACSON:    Uh… (inaudible)  Guess, approximately 50.

ATTORNEY PRASNITZ:    50?  And you said it went through Compliance first?

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:     And what would Compliance do?

MR. ISAACSON:     Check the um… the nature of the agreement, the background chart, check to see that they are properly registered and sign off if they're comfortable having a relationship.

ATTORNEY PRASNITZ:     Did Alaron do a background check on Mitchell Goldberg, who is an associated person of Pro Trade?

MR. ISAACSON:     Not that I'm aware of.

ATTORNEY PRASNITZ:     Did Alaron do a background check on any of the individuals connected with ProTrade?

MR. ISAACSON:     I… I do not know that.

ATTORNEY PRASNITZ:     Do you know if that's part of your… part of the procedure?

MR. ISAACSON:     It um… it currently is, yes.

ATTORNEY PRASNITZ:    It currently is?

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:    And when did that procedure go into effect?

MR. ISAACSON:     I do not know.

ATTORNEY PRASNITZ:    Did Alaron look at who the owner was of ProTrade?

MR. ISAACSON:     I don't know that.

ATTORNEY PRASNITZ:    Now, according to the NFA BCC complaint that was filed against ProTrade and Alaron, it says, "The individuals involved…"  I'm sorry, I meant ProTrade and Corporate Commodities.  It says, "The individuals involved in ProTrade and CCI have an extensive history of working for firms that were charged and sanctioned for sales fraud."  It says (inaudible) and Goldberg were all IBs at Concord Trading, Goldberg was also an AP at Porter Smith, FSG International, American Futures Group, Harrington Financial Group, LeBruce, Matthews, Leon and Bass, and (inaudible) Trading Group in addition to Leon, LaBruce and… Leon LaBruce and (inaudible) and also worked at Presidential, Matthews, Leon and Vascor (inaudible) Federal Trading Corporation.  Before you signed this agreement with ProTrade, did you… did your company look at any of this?

MR. ISAACSON:     I don't know.  I…

ATTORNEY PRASNITZ:    As I understand it, your testimony is today that would be part of the procedure?

MR. ISAACSON:     Well, I know typically that the… the NFA is what is used as, I guess, one of the thresholds or benchmarks that we would see at the NFA.  They've kicked people out of the industry and they've allowed people to be temporarily out of the industry and if they are registered with the NFA, typically that's one of the indications that it's good for us.

ATTORNEY PRASNITZ:    And as I understand it, today you're doing more due diligence on people when you enter into guarantees with them back in 2005?

MR. ISAACSON:     No.

ATTORNEY PRASNITZ:    No?  But I thought you said you now would check…

MR. ISAACSON:     I didn't say we didn't check.

ATTORNEY PRASNITZ:    Oh.  So you don't know what happened in 2005 in terms of checking (inaudible).

MR. ISAACSON:     That is correct.

ATTORNEY PRASNITZ:     Okay.  So you thought it was okay to sign a… to guarantee a company where you never talked to anyone?

MR. ISAACSON:     We had representatives (inaudible).

ATTORNEY PRASNITZ:     Who were the representatives?

MR. ISAACSON:     Dan Lazarus, John Hafner.

ATTORNEY PRASNITZ:     Did these representatives personally go to ProTrade's place of business?

MR. ISAACSON:     No.  No, they did not.

ATTORNEY PRASNITZ:     Do you know what due diligence, if any, they conducted on ProTrade?

MR. ISAACSON:     No, I don't.

ATTORNEY PRASNITZ:    (inaudible)    And did… did Alaron split commissions with ProTrade?

MR. ISAACSON:    There were no commissions.

ATTORNEY PRASNITZ:    Okay.  So how did… how did Alaron char… well, under the agreement, were there… under this agreement, how was Alaron going to be compensated?

MR. ISAACSON:    Had business been generated, we would have charged a fee for a trade.

ATTORNEY PRASNITZ:    And what was that fee have been?

MR. ISAACSON:    I don't have it in front of me.

ATTORNEY PRASNITZ:    Would that have… would you have split commissions with ProTrade if a… if business had degenerated?

MR. ISAACSON:    A portion of the commissions would have remained with Alaron.

ATTORNEY PRASNITZ:    And do you know what portion?

MR. ISAACSON:     No, I don't.     Like I say, without them opening an account or generating business, it's… I don't know what they would have charged, so I… I don't know the answer to that.

ATTORNEY PRASNITZ:     So… well, doesn't this agreement… does this agreement indicate how Alaron was going to be compensated?

MR. ISAACSON:     If there is a Schedule A attached to it.  I don't see the Schedule A.

ATTORNEY PRASNITZ:     So is that because it was tendered an incomplete agreement missing a Schedule A?

MR. ISAACSON:     It could just be a complete agreement.

ATTORNEY PRASNITZ:     But should there be a Schedule A?

A:                    Yes.

ATTORNEY PRASNITZ:     Why is there no Schedule A?

A:                    I don't… I don't know.

ATTORNEY PRASNITZ:     So we're not looking at the whole agreement, are we?

A:                 That is correct.

ATTORNEY PRASNITZ:   And if we had the Schedule A... well, I request (inaudible) Schedule A.

ATTORNEY DAVID:       We have Schedule A.  We've had it.  We've introduced it. Here's everything that we have.

ATTORNEY PRASNITZ:   All right.   So there's no way to tell what percent of this (inaudible) because we have no Schedule A, right?

MR. ISAACSON:    No, we don't know what rate ProTrade would have charged the customer either, so...

ATTORNEY PRASNITZ:   What would... what would your Schedule A typically, uh... what did... what would that say?  What would Schedule A say?

MR. ISAACSON:    It would say what the IB was going to be charged on a per trade basis.

ATTORNEY PRASNITZ:   Would it have what the IB was going to charge the customer?

MR. ISAACSON:     No.

ATTORNEY PRASNITZ:   And how would you decide how much to charge the IB per trade?

MR. ISAACSON:     There's many factors that go into that.

ATTORNEY PRASNITZ:   So did Schedule A ever exist or not?

MR. ISAACSON:     I do not know.

ATTORNEY PRASNITZ:   So you don't know what the fee arrangement was going to be with… with ProTrade, correct?

MR. ISAACSON:     That's correct.

ATTORNEY PRASNITZ:   And when did you decide… why did you wait until October 13, 2005 to tell the NFA that (inaudible) was terminated?

MR. ISAACSON:     I know no answer to that, I'm speculating that it was because there was no business that was being conducted and three months was… approximately three months was probably considered a adequate time for business to come our way.

ATTORNEY PRASNITZ:   Did anyone from Alaron call ProTrade and say, hey, what's going on?   You signed an introducing agreement, you signed a guarantee, nothings happening.

MR. ISAACSON:    I don't know.

ATTORNEY PRASNITZ:   You don't know?  But this is the first time in your 18 years with the business that you're aware of this occurring, that you entered into a guarantee for three months and then nothing happens, right?

MR. ISAACSON:    I'm… I'm not sure I follow you.

ATTORNEY PRASNITZ:   Can you tell me any other time in your 18 years in the company where this type of situation has been tolerated?

MR. ISAACSON:    No.

ATTORNEY PRASNITZ:   So it's a little odd, right?   Because it's the only time it's happened in 18 years.

MR. ISAACSON:    That I'm aware of.

ATTORNEY PRASNITZ:    And did you look into why?  No?  Now before you entered into this guarantee and introducing broker agreement with Alaron… I mean, with ProTrade… did you… did your company look into whether ProTrade was clearing with some other firm?

MR. ISAACSON:    I don't know.

ATTORNEY PRASNITZ:    Was that a matter… was that information you could have gotten from the NFA?

MR. ISAACSON:    I… I don't believe so.

ATTORNEY PRASNITZ:    So you don't think that, on the NFA website, ProTrade was (inaudible) its clearing (inaudible)?

MR. ISAACSON:    I don't believe so.

ATTORNEY PRASNITZ:    So as far as you know, there was no way to learn that?

MR. ISAACSON:    No.

ATTORNEY PRASNITZ:    Would it have caused you to ask questions if you saw, first of all, that… well, would it have caused you to ask questions after the guarantee if you saw

ProTrade was still clearing with ComTrust?   Would you wonder… would… would that cause you… would that cause you concern?

MR. ISAACSON:      No, not necessarily.

ATTORNEY PRASNITZ:    But it wouldn't cause you concern if you had guaranteed a firm that was continuing to clear trades with another firm and… and doing no business with the other firm?

MR. ISAACSON:      I can't answer that.

ATTORNEY PRASNITZ:    Fair enough.   Now, I want to ask you some questions based on the CFTC opinion in the Reed vs. Sands case, where the CFT discusses what powers the FCM had over the IB.   And I want your understanding of whether you had these powers over ProTrade.   Number one, under your guarantee agreement with ProTrade, did you have the power to obtain documents relating to ProTrade, its affiliated persons and registration status?

MR. ISAACSON:      Yes, I believe so.

ATTORNEY PRASNITZ:    Number two, under your agreement with ProTrade did you have the power to inspect and audit ProTrade books, records and facilities?

MR. ISAACSON:    I believe so.

ATTORNEY PRASNITZ:    Number three, did you have the power to review logs of conversations that might have been taped with ProTrade's customers and receive copies of the tapes?

MR. ISAACSON:    I believe so.

ATTORNEY PRASNITZ:    Now, with respect to ProTrade's obligations under the agreement, was ProTrade required to comply with Alaron's policies and rules?

MR. ISAACSON:    Yes.

ATTORNEY PRASNITZ:    Was ProTrade required to refrain from making any statement inconsistent with Alaron's account rate related documents?

MR. ISAACSON:    Yes.

ATTORNEY PRASNITZ:    Did ProTrade have a duty to report to you any complaint it received and to cooperate with you in investigating, evaluating and resolving the complaint?

MR. ISAACSON:    If they had accounts.

ATTORNEY PRASNITZ:   Did ProTrade have a duty to collect on margin calls which you issued?

MR. ISAACSON:     If there'd been margin calls.

ATTORNEY PRASNITZ:   And had there been debit balances, would ProTrade have been responsible to have payment of them.

MR. ISAACSON:     Had there been any.

ATTORNEY PRASNITZ:   And was ProTrade responsible to indemnify you for claims that would arise from introducing those?

MR. ISAACSON:     Had there been any.

ATTORNEY PRASNITZ:   Did you agree to provide, in addition to clearing of back office services to ProTrade, did you agree to provide customer agreements, and market and research reports?

MR. ISAACSON:     Most likely.

ATTORNEY PRASNITZ:   And did you agree on to supply manuals and forms that would be used in the day-to-day business of Pro-Train?

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:   And did you agree to pro… provide customer leads?

MR. ISAACSON:     Not that I'm aware of, but…

ATTORNEY PRASNITZ:   So except for that last exception, your understanding of your agreement with ProTrade is it's just like the CFT described the… the FCM introducing broker agreement in this… in this case.

ATTORNEY DAVID:        I object and… and the date speaks for itself.

CHAIRMAN:        You know, I think that's well taken.   I… I think it's okay to (inaudible).

ATTORNEY DAVID:        Okay.

ATTORNEY PRASNITZ:   Okay.   Okay.   Now, let me… let's turn to page 7 of the agreement.

CHAIRMAN:          (inaudible)

ATTORNEY PRASNITZ:   Uh, yeah.   Paragraph 15B.   By the way, you're… you're in charge of getting signatures on all introducing broker agreements?

MR. ISAACSON:     Mmm hmm.

ATTORNEY PRASNITZ:   So let… let… you signed this agreement, right?

MR. ISAACSON:     That's right.

ATTORNEY PRASNITZ:   And you've signed hundreds of such agreements?

MR. ISAACSON:     I don't know about hundreds, but…

ATTORNEY PRASNITZ:   Many.

MR. ISAACSON:      … several.

ATTORNEY PRASNITZ:   And you understand… have you read these agreements before you sign them?

MR. ISAACSON:     Not every one.

ATTORNEY PRASNITZ:    Okay.  So you're familiar with the terms.  Is it part of your duty to have a working knowledge of what these agreements require for both parties?

MR. ISAACSON:     As an in-house counsel, yes, I have to.

ATTORNEY PRASNITZ:    Okay.  And are… are these agreements negotiated or just like standard language infused in every agreement?

MR. ISAACSON:     Both.

ATTORNEY PRASNITZ:    Both?  Are you aware of any nonstandard clauses in this agreement?

MR. ISAACSON:     No.

ATTORNEY PRASNITZ:    Okay.  Let's turn to 15B on page 7, the first sentence.  It says, "As provided herein, this agreement shall be binding upon and inure to the benefits of the parties hereto."  The parties hereto were Alaron and ProTrade, correct?

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:    And then it continues, "And their respective successors and assigns."  Correct?

MR. ISAACSON:    That's what it says, yes.

ATTORNEY PRASNITZ:    Would you agree that if there was a successor to ProTrade that before this agreement was terminated, this a… this agreement would inure to the benefits of the successor?

ATTORNEY DAVID:    Is that your final question (inaudible)?  I'm just asking as a lay person to understand.

CHAIRMAN:    With all due respect, a lay person's understanding is irrelevant. And your… your objection is noted.  It's Alaron's document and is any information on this (inaudible)?

MR. ISAACSON:    No, I don't.

ATTORNEY PRASNITZ:    So as you sit here today, and you've signed many of these agreements, right?  Do you have any understanding at all what that sentence means?

MR. ISAACSON:    No, I don't.

ATTORNEY PRASNITZ:    Do you know what a successor is?

MR. ISAACSON:    I could figure that out.

ATTORNEY PRASNITZ:    Let's go on to page 10, which is the CFTC-4.   Is that your signature?

MR. ISAACSON:    Yes, it is.

ATTORNEY PRASNITZ:    Okay.   Okay.   By the way, do you ever talk to Summer (inaudible)?

MR. ISAACSON:    No, I do not.

ATTORNEY PRASNITZ:    All right.   This is… is this a standard form the way the CFTC prescribes the language?

MR. ISAACSON:    I believe so.

ATTORNEY PRASNITZ:    So the CFTC dictates how this agreement is written, correct?

MR. ISAACSON:    I… I don't know the specific on.

ATTORNEY PRASNITZ:    But if it says CFTC41 and (inaudible), looks likes either ID or 1D Part B, do you know what that means at the top there, CFTC-4?

MR. ISAACSON:    I know the CFTC-4.

ATTORNEY PRASNITZ:    Okay.  So is this… is this a form (inaudible)…

MR. ISAACSON:    I don't know if this…

ATTORNEY DAVID:    We'll stipulate that it's a form generated by the CFTC.

ATTORNEY PRASNITZ:    Okay.  Now… now, I take it you've signed a number of these guarantees before?

MR. ISAACSON:    That is correct.

ATTORNEY PRASNITZ:    All right.   Calling your attention to, I think, the second paragraph which begins with the words "this guarantee agreement" – it's about 12, 13 lines down.  So it's "This guarantee agreement shall be enforceable regardless of the subsequent incorporation, merger, consolidation of either the futures commission merchant or the introducing broker or any change in the composition, nature, personnel or location of the futures commission merchant or the introducing broker.  Do you know what that… let's… do you know what that means?

ATTORNEY DAVID:        Same objection.  (inaudible)


CHAIRMAN:        Yeah, noted.  Same… go ahead, Mr. Isaacson, if you know.


MR. ISAACSON:    No, I… I don't.


ATTORNEY PRASNITZ:   And how about the final two sentences?   "This guarantee agreement is binding and is and shall remain in full force and effect unless terminated in accordance with the rules, regulations or orders (inaudible) by the Commission with respect to such terminations.  Termination of this agreement will not affect the liability of a future commission merchant with respect to obligations to the introducing broker occurring on or before the date this agreement was terminated."  Do… do you see that language?


MR. ISAACSON:    Yes, I do.


ATTORNEY PRASNITZ:   And do you… do you agree that this agreement was terminated on October 13, 2005?


MR. ISAACSON:    Yes.

ATTORNEY PRASNITZ:    So you agree that from… you agree that up until October 13, 2005 this agreement was in full force and this guarantee was in place… place and effect.

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:    Now, are you aware in this agreement of any provision that limits the guarantee to what ProTrade does through Alaron, right?  Let me rephrase the question.  Are you aware of any provision in this agreement which says we're only going to guarantee ProTrade complies with the commodity laws in connection with trades cleared through Alaron?  Are you aware of any language to that effect?

ATTORNEY DAVID:        I object to the form of the question.  Counsel is now asking this witness to give a legal interpret of whole terms of this document.  I am prepared to make an argument (inaudible) the case about that very issue.  This was a lay witness and his interpretation of the document as a whole is, with all due respect to Mr. Isaacson, not relevant to the panel's determination as to its legal meaning.

CHAIRMAN:        I believe your objection is correct, but I actually heard the question a little bit differently.   And if… and if I'm wrong about this, you can tell me because that's… I think the question asked, Mr. Isaacson, can point to anywhere in the document, that there… where there was a section infused with this (inaudible).

ATTORNEY DAVID:    That's the same thing he's asking… asking now.   He's asking for Mr. Isaacson to serve as a lawyer in interpreting the document.

CHAIRMAN:        (inaudible) that because he isn't a lawyer and his opinion wouldn't develop the points.   So to that sense, your objection is sustained.   But I heard the question differently.   Go ahead and ask the question.

ATTORNEY DAVID:    Okay.   Well…

ATTORNEY PRASNITZ:   It's just… just asking, as a lay person, not as a lawyer, are you aware of anything in this agreement that deals with a situation of whether the guarantee applies just to trades with Alaron?

MR. ISAACSON:    No, I'm not.

ATTORNEY PRASNITZ:    Okay.   Now, under… on page 2 of the agreement, let's go to the section Obligations of Introducing Broker.   You're looking at 3A.   It says, "IB shall have the responsibility for diligently supervising the opening of accounts or the entry of orders in accounts and for assuring that transactions and order… orders meet downstream in accordance with all applicable laws of the rules of CFTC, any contract market or self-regulatory organization of Alaron.   What, if anything, does Alaron do… or what, if anything, did Alaron do to see if ProTrade was doing that?

MR. ISAACSON:    We had (inaudible)…

ATTORNEY DAVID:        Mr. Chair, I'm going to object to the question and the line of questioning.  He is (inaudible) but he's asking questions about Alaron's supervision and in counsel's opening statement, he said that this is about Alaron's guarantee and about Alaron's guarantee applying to a company as to which there was a de facto merger.  So it's a guarantee case.  That's what counsel said.  That's what his argument was.  Now we're talking about supervision.  This isn't… as to Alaron, at least, this isn't a case about supervision.  What they did or didn't do about supervision is not relevant to their guarantee.

ATTORNEY PRASNITZ:    Could I… I mean, counsel is trying to impose a stricter standard than entered into (inaudible) pre-trial.  This case doesn't (inaudible) the supervision (inaudible) guarantee.  The trading standards, if you look at the… at a guide to customer and arbitrations, it says that all the statement of claim has to do is present a general idea of what the case is about.  So they… they're try… they're trying to impose a more stringent standard than we… than we had on our final pre-trial.  This does involve supervision because if there's no supervisory structure, that's known.

CHAIRMAN:        Well, you're both right.  I think Mr. David is exercising his… his charge, which is check the record of his client and you're finding (inaudible) more (inaudible) after you (inaudible).    And the questions that you're asking now are concerning language in this guarantee, which is an issue.  (inaudible) but I think the

point of the hearing is not to conduct discovery, the point of the hearing is to present evidence on points that are germane and get resolution on that.  So you're both right. We have different definitions of where the boundaries are.  Since I get to decide what, the way the boundaries are and what you can ask, you're entitled to ask questions about this time.  If you stray too far from that, then probably everyone gets the same (inaudible).

ATTORNEY PRASNITZ:    Gentlemen, let me… let me rephrase the question.    Did Alaron have any structure in place to see that paragraph 3A was complied with?

MR. ISAACSON:    On submitted contracts or accounts coming upon… from the IB, we review the accounts and the contracts.

ATTORNEY PRASNITZ:    Okay.  Did Alaron have any structure in place to determine whether an IB had been replaced by a successor?

MR. ISAACSON:    No.

ATTORNEY PRASNITZ:    Did Alaron have any structure in place to determine whether there had been a merger of an IB?

MR. ISAACSON:    Uh, no, not that I'm aware of.

ATTORNEY PRASNITZ:    Did I… did Alaron have any structure in place to determine whether there had been any consolidation involving an IB?

MR. ISAACSON:    No.

ATTORNEY PRASNITZ:    Did Alaron have any… do any monitoring to determine whether there is a chance in composition, nature, personnel or location of the IB?

MR. ISAACSON:    No.

ATTORNEY PRASNITZ:    So with respect to the language in CFTC Form 1F4, which says the guarantee shall be enforceable regardless of the subsequent, incorporation, merger, consolidation, change in composition, nature, personnel or location of the IB, Alaron wasn't monitoring that situation at all, correct?

MR. ISAACSON:    There is annual audit.  But this…

ATTORNEY PRASNITZ:    Let me… let me…

MR. ISAACSON:    … IB did not…

ATTORNEY PRASNITZ:    Let me ask you this question.  Did…

(ALL TALKING AT ONCE)

CHAIRMAN:          Right.  Yeah.  Okay.  Okay, that's… go ahead, Mr. Isaacson.

ATTORNEY DAVID:          Yeah, he had more to say, please.

MR. ISAACSON:     I mean, we… typically we annually audit GIBs.  This particular GIB had not had… not been around long enough, hadn't opened any accounts, didn't place any trades.   The meeting was terminated, therefore there was no annual audit performed on this IB.

ATTORNEY PRASNITZ:     Okay.  Now, according to the NFA… well, according to… like your counsel said in opening statement, on his opening statement, ProTrade transferred all of its business accounts, etc., to Corporate Commodities in early August 2005.

ATTORNEY DAVID:          Objection.  I never made such a statement.  I have no such knowledge.

ATTORNEY PRASNITZ:     All right.  Well, let me rephrase the question.  According to the NFA complaint, in or around July 2005 ProTrade transferred all of its customers and the majority of its employees and assets to CCI, which was also solely owned by LeBruce.   So my question is, why would Aaron maintain this agreement in place

through October if in July ProTrade had transferred all of its assets, employees and assets to Corporate Commodities?

ATTORNEY DAVID:         Mr. Chairman, (inaudible) obscenely (inaudible) and counsel knows it.  I'm sorry he thinks it's funny.  But the mere fact that the NFA has said this in a complaint… there's nothing ever proving it.  He has no proof of it otherwise.  So he now, because he can't prove the point, an essential point to his case, he wants to ask a question and say to this witness, assume that's true, so that the panel will assume it's true, why did you do something?  In other words, he wants to ask the question what color pajamas were you wearing last night when you beat up your wife?  Well, he has to prove the (s/l) predicate first.  And you can't do it by assuming something in the NFA complaint.  That's just not right and it's not fair.  He has a burden of proof here and he can't do it by relying on the allegations of an NFA Business Conduct Committee complaint.  It's just not right.

CHAIRMAN:         I… you know, there's no… I don't… I don't think it's necessary for counsel to raise his voice and, you know… and I think that objection is kind of… it's just off the point.  I can rephrase the question because counsel himself talked about registration and Mr. Goldberg switching over to Corporate Commodities.  I can rephrase the question to say assuming.  But I'm… I'm trying more objections here than I would if I was in trial court just…

ATTORNEY DAVID:        Well, there… there should be nothing inferred or brought into (inaudible).  My objection simply…

CHAIRMAN:        Right.

ATTORNEY DAVID:        … (inaudible)

CHAIRMAN:        Right.  The point here is to maintain the meaning of the hearing, which is uniform resolution by getting the evidence (inaudible) the issues.  Not all evidence presented here is needed to fairly decide the issues.  But until we get to the end, which sometimes happens (inaudible) out.  So I think technically the objection is correct because it assumes that's (inaudible).  But I think you can ask it, so if you'll accept the amendment and assume the following, then Mr. Isaacson can answer the question based on what he knows.

ATTORNEY DAVID:        Okay.  All right.

ATTORNEY PRASNITZ:    Assuming that the NFA was correct when it said that in July 2005 ProTrade transferred its customers, employees and assets to Corporate Commodities, Inc., why did Alaron wait three months until October 13, 2005 to terminate the agreement?

MR. ISAACSON:    Because there was no customer base and there was no base that was coming through.

ATTORNEY PRASNITZ:    All right.  Let me ask this question.  When did you become aware that… when, if ever, did you become aware that ProTrade had transferred its customers, employees and assets to Corporate Commodities?

ATTORNEY DAVID:        Again, I object because it assumes that that happened.

CHAIRMAN:        Well, that question is properly asked.  He asked when, if ever, he became aware.

MR. ISAACSON:    I don't know.

ATTORNEY PRASNITZ:    So have you ever become aware of that happening?

MR. ISAACSON:    No, I don't know.

ATTORNEY PRASNITZ:    So, as you sit here today… until… so as you sit here today, you don't know whether ProTrade transferred its customers, employees and assets to Corporate Commodities?

MR. ISAACSON:    Correct.

ATTORNEY PRASNITZ:    Is that something you check on with your IBs or not?

MR. ISAACSON:    There were no assets as far as I was aware of.  No customers…

ATTORNEY PRASNITZ:    No…

MR. ISAACSON:    … no agreements.  So I don't have an answer to that.

ATTORNEY PRASNITZ:    There were no customers at ProTrade?

MR. ISAACSON:    Not at all as far as I was concerned.

ATTORNEY PRASNITZ:    Well, you know there… there was at least one – Mr. Bell – right?

MR. ISAACSON:    Not with my… not with Alaron.

ATTORNEY PRASNITZ:    Well, I don't understand why you say there were no customers at ProTrade.

MR. ISAACSON:    We had no customer agreements introduced to us by ProTrade.

ATTORNEY PRASNITZ:   And is this something that would concern you that one of your guaranteed IBs had transferred away all of its customers, employees and assets?

MR. ISAACSON:     I wasn't aware of that.

ATTORNEY PRASNITZ:   But is it something… in the normal course of business, is it important… would that be an important fact for you?

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:   And if you became aware of that fact, would it have immediately terminated the guarantee?

MR. ISAACSON:     Not necessarily.

ATTORNEY PRASNITZ:   So would you maintain a guarantee, even if the IB had transferred away all of its employees and assets?

ATTORNEY DAVID:       Objection.  He's now asking a hypothetical question.

CHAIRMAN:       (inaudible) we understand this is hypothetical because he doesn't have that knowledge, so go ahead and answer the question, if you can, Mr. Isaacson.

MR. ISAACSON:     Without knowing other circumstances, I can't answer that.

ATTORNEY PRASNITZ:    What would the business reason be to maintain… let me ask this question.  Are you aware of situations where there has been a de facto merger or consolidation between one of your IBs and a new IB and you kept a guarantee agreement in effect?

MR. ISAACSON:     I don't… that I don't know.

ATTORNEY PRASNITZ:    So you don't have any policy or practice one way or the other about what happens if there's a de facto merger involving one of the IBs.

MR. ISAACSON:     Right.

ATTORNEY PRASNITZ:    And having a guarantee with someone who doesn't do business with you is not a… not a business concern as to possible exposure for the acts of someone where you're getting no benefits?

MR. ISAACSON:     It's not uncommon for an IB to start up and not turn in any business.

ATTORNEY PRASNITZ:   What about a situation like this where the IB is doing business, but with… in some other clearing… to another clearing and yet you have the guarantee?  Is that…

ATTORNEY DAVID:       Oh, objection to the form of the question because it now assumes a fact that's definitely not in evidence, which is the IB at that point is doing business and I don't know that.  I truly don't know that.  He doesn't know that.  I don't know what business ProTrade was doing after July 29th.

CHAIRMAN:       The question began with the words what if.  (inaudible)

ATTORNEY PRASNITZ:   Are you aware of any situation where Alaron maintained a guarantee with an IB who was not clearing with Alaron, but was clearing with another firm?

MR. ISAACSON:     No, I'm not.

ATTORNEY PRASNITZ:    Is there any business reason for Alaron to do that?

MR. ISAACSON:      Potentially.

ATTORNEY PRASNITZ:   Which would be?

MR. ISAACSON:     I don't know, but I… I just don't have the answer to that, but I can't say no there's not.

ATTORNEY PRASNITZ:   I mean, wouldn't it concern you to be guaranteeing someone who was clearing through another firm and not clearing through you?   I mean, why should you… why should Alaron be responsible for what's happening with another firm?

MR. ISAACSON:     We're not responsible.

ATTORNEY PRASNITZ:   Well, if you don't terminate the guarantee, wouldn't you be responsible?

ATTORNEY DAVID:       That… now it is a legal (inaudible).

(ALL TALKING AT ONCE)

ATTORNEY PRASNITZ:   So as I understand it, you are making this guarantee, nothing happened.  October 2005… by October 2005 did you check into what ProTrade was doing?

MR. ISAACSON:     I did not.

ATTORNEY PRASNITZ:   Did anyone in your firm check?

MR. ISAACSON:    I do not know.

ATTORNEY PRASNITZ:    Did anyone call ProTrade and say, hey, what's going on, you signed a guarantee and you didn't send us a single piece of business?

MR. ISAACSON:    I don't know.

ATTORNEY PRASNITZ:    Isn't that something that would normally happen within a week or tow of a guarantee?

MR. ISAACSON:    No.

ATTORNEY PRASNITZ:    What's the typical… is there… typically, when someone enters… when an introducing broker (inaudible) with a guarantee with you, how soon do you… do they start clearing trades with you?  Right away?

MR. ISAACSON:    Some immediately, some take longer.  There's not a…

ATTORNEY PRASNITZ:    There's no… what's the average?

MR. ISAACSON:     Depending upon the status of that IB, start-up, you know, an existing IB, it could take six months, could take three months, could take an hour, could take a year.  I mean, there's… I don't know what…

ATTORNEY PRASNITZ:   Okay.  So would existing IBs who are clearing… who are already in business, isn't it true that within a matter of a week or two you expect to see trades (inaudible)…

MR. ISAACSON:     Possibly.

ATTORNEY PRASNITZ:   Okay.  By the way, do you know why ProTrade came to you for a guarantee?

MR. ISAACSON:     No, I don't.

ATTORNEY PRASNITZ:   Were you awa… are you aware if they had failed the new capital requirements of the NFA?

MR. ISAACSON:     No, I'm not.

ATTORNEY PRASNITZ:   Is that something you would look at?

MR. ISAACSON:     Not for a guaranteed IB.

ATTORNEY PRASNITZ:   When you sign a guarantee agreement, do you do any inquiry into the net worth of the IB?

MR. ISAACSON:     The… yes.  I mean, it's in the… it's on the application.

ATTORNEY PRASNITZ:    So do… that's… do you know if that's been produced?

MR. ISAACSON:     I don't know.

ATTORNEY PRASNITZ:   Do you know what the net worth of ProTrade was at this time?

MR. ISAACSON:     No, I do not.

ATTORNEY PRASNITZ:    So… so aside from seeing that the IB… well, you're entering into a guarantee agreement.  You understand the guarantee agreement means you're responsible for any fraud that might be committed by guaranteed IB.  Do you understand that…

ATTORNEY DAVID:        I again… (inaudible)

ATTORNEY PRASNITZ:    … as a layperson?

CHAIRMAN:          Sustained.

ATTORNEY PRASNITZ:    His understanding.

CHAIRMAN:          Sustained.

ATTORNEY PRASNITZ:    Thank you.

ATTORNEY DAVID:          (inaudible)

ATTORNEY PRASNITZ:    Well, you… you understand that a guarantee imposes risks on Alaron from a business standpoint?

MR. ISAACSON:     As it pertains to the agreement that we have with the… that they introduced to us.

ATTORNEY PRASNITZ: Yes.   Right.   So you understand that when you sign a guarantee you're taking on certain duties and responsibilities, is that correct?

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:    And you understand that you are now responsible for the person you're guaranteeing, correct?

MR. ISAACSON:    No.

ATTORNEY PRASNITZ:    No?  So when you have a guaranteed IB, are you not… do you not become liable for any (inaudible) of the IB?  Do you understand that?

MR. ISAACSON:    No, we don't.

CHAIRMAN:    (inaudible)

MR. ISAACSON:    No, we don't.

ATTORNEY PRASNITZ:    So you signed a guarantee of an IBM.  Are you ware that if that IB does something wrong, violates the Commodity Exchange Act, that Alaron is responsible?

ATTORNEY DAVID:    I object for the record.  Same reasons I've been through.

CHAIRMAN:    All right.  (inaudible).

MAN:    These are crazy questions.

CHAIRMAN:          (inaudible)


ATTORNEY PRASNITZ:   Are you not aware that when you enter into a guarantee agreement with an IB if the IB engages in a… in something wrongful and wrong that Alaron, because of the guarantee, is liable?  Are you ware of that?


MR. ISAACSON:    As it pertains to introduced business.  I mean, if… if the IB is robbing a convenience store, the IB is misrepresenting outside of the accounts that are introduced or business that's transacted through us, I don't know how we can.


ATTORNEY PRASNITZ:   All right.  And please show me where the agreement is that would limit, that it doesn't apply… I think I asked you question before, but didn't you agree before that there is no limit in the agreement which says it doesn't apply or say trades appear through another form?


ATTORNEY DAVID:        Mr. Chair, I'm… I'm happy to provide the law and…


CHAIRMAN:        No, that's not necessary.  I think Mr. Prasnitz, you're pushing the envelope over the edge here.  But I think the issue here is one of extension based on… an argument based on extension based on the facts.  In other words, I don't think we need to take this and read…

ATTORNEY PRASNITZ:    All right.   Let me just back up a second and we'll just… I mean, I think my original question was, you're aware that when you enter into a guarantee you take on certain risks.  You…

ATTORNEY DAVID:         Asked and answered.

ATTORNEY PRASNITZ:    You know what?  I think that's in a sense correct?

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:    All right.  And because your… your firm is going to be taking on a risk what, if anything, do you do to check out the IB besides seeing they're registered in the NFA?

MR. ISAACSON:     We review the introduced business, we review the activity that has come through that particular IB.  We… we review details of that IB.  And none of this took place with ProTrade.

ATTORNEY PRASNITZ:    And all of that happens after the fact of the guarantee agreement, doesn't it?

MR. ISAACSON:     After business is being transacted.

ATTORNEY PRASNITZ:    Right.    So my question is, before you sign an agreement where you agree to guarantee an IB, what, if anything, do you do to check out who you're guaranteeing?

MR. ISAACSON:    We verify that they're properly registered with the NFA.

ATTORNEY PRASNITZ:    And that's it?

MR. ISAACSON:    Yes.

ATTORNEY PRASNITZ:    And do you check their regulatory listing in the NFA?

MR. ISAACSON:    I… yes, it's looked at.

ATTORNEY PRASNITZ:    And so…

MR. ISAACSON:    Yes.

ATTORNEY PRASNITZ:    …if… if would you have concerns about entering into a guarantee with a firm that had just been barred for four years and was now coming out of that suspension?

ATTORNEY DAVID:    Objection.  (inaudible)

CHAIRMAN:          (inaudible)

ATTORNEY PRASNITZ:    If… if you knew that, would that concern you?

MR. ISAACSON:      I can't… I don't know.

ATTORNEY PRASNITZ:    So as I understand it, before signing the guarantee, the only thing you didn't receive, if I'm… (inaudible), is that right?

MR. ISAACSON:      That's one of the things that's done.

ATTORNEY PRASNITZ:    What else is?

MR. ISAACSON:      Review the application.  You look at the business terms.  I mean, there's… there's… it's not just that.

ATTORNEY PRASNITZ:    What else is it then?

MR. ISAACSON:      We look at, like I said, the terms of the business.  We look at, um, the potential of the business.  I mean, it's a business decision and we look at the factors that we have at our disposal.

ATTORNEY PRASNITZ:    And what did you do with ProTrade?

MR. ISAACSON:    I don't recall.

ATTORNEY PRASNITZ:    Is there any way we can review it now?

MR. ISAACSON:    No.

ATTORNEY PRASNITZ:    No?    So as you sit here today, neither you nor anyone else… else in your firm, for instance, would know what type of business ProTrade had been doing with ComTrust.

MR. ISAACSON:    I do not know.

ATTORNEY PRASNITZ:    Do you look at any of the promotional materials of the IB?

MR. ISAACSON:    Yes.

ATTORNEY PRASNITZ:    Did that happen with Alaron?

MR. ISAACSON:    I do not know.

ATTORNEY PRASNITZ:    I mean, with ProTrade?

MR. ISAACSON:    I do not know.

ATTORNEY PRASNITZ:    Do you look at the customer, uh… the type… do you do any inquiry as to the type of customers they might have had with ComTrust?

MR. ISAACSON:    We look at the customers that they have with us.

ATTORNEY PRASNITZ:    But before you sign the guarantee (inaudible), do you check out who their customer base is?

MR. ISAACSON:    No.

ATTORNEY PRASNITZ:    So if all their customer base was retired people, you wouldn't know… you wouldn't un… you wouldn't know?

MR. ISAACSON:    If they weren't customers of ours, then we would not know that.  We review our customers, not other firms' customers.

ATTORNEY PRASNITZ:    Do you do any criminal background checks on the principles of your IBs?

MR. ISAACSON:    I don't know.

ATTORNEY PRASNITZ:   So basically you signed this agreement not knowing too much about ProTrade, correct?

MR. ISAACSON:     Knowing that they were registered with the NFA.

ATTORNEY PRASNITZ:   That's right.  That's about it, right?  That's about it?

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:   When you signed it, that's what you knew.

MR. ISAACSON:     Yes.

ATTORNEY PRASNITZ:   No other questions.

CHAIRMAN:         Mr. Sinclair?

ATTORNEY SINCLAIR:    No questions.

CHAIRMAN:         (inaudible)

ATTORNEY SINCLAIR:    (inaudible)  I did everything in my cross (inaudible).

ATTORNEY DAVID:          I… I'm just going to ask him a couple of clarifying questions now.  I may call him again during my own case.  But just to clarify… were you, in 2005, the Compliance Officer for Alaron?

MR. ISAACSON:     No, I was not.

ATTORNEY DAVID:          Did Alaron have a Compliance Officer at the time?

MR. ISAACSON:     Yes.

ATTORNEY DAVID:          Is that individual today… that same individual who was the Compliance Officer in 2005, does he continue to be an employee of Alaron?

MR. ISAACSON:     No, he's not.

ATTORNEY DAVID:          Counsel asked you about de factor mergers.  Do you know what a de factor merger is?

MR. ISAACSON:     No, I do not.

ATTORNEY DAVID:          Have you ever gone on the NFA registration site?

MR. ISAACSON:    Yes, I have.

ATTORNEY DAVID:        I'm going to show you Claimant's Exhibit 4, for identification. It has registration information starting on the third page – it's got B0032 on the bottom – of an individual by the name of Mitchell Brad Goldberg.  Do you know this individual?

MR. ISAACSON:    No, I don't.

ATTORNEY DAVID:        Have you ever spoken to this individual?

MR. ISAACSON:    No, I have not.

ATTORNEY DAVID:        Let me direct you to the second page of this three page document on Mr. Goldberg.  And I'm going to point out the section, about two-thirds of the way down, on ProTrade Futures and Options.  Do you see that?

MR. ISAACSON:    Yes.

CHAIRMAN:        Would you show me where you're…  (inaudible)

ATTORNEY DAVID:        It's… it… the page is B0033.  And it's about… the names of the firms don't dots in front of them.  All of the actions do.  So if you go about two-thirds of the way down the page, you'll see ProTrade Futures and Options doesn't have dot.

CHAIRMAN:          Oh yeah.  Thank you.

ATTORNEY DAVID:          Okay?  Do you see that, sir?

MR. ISAACSON:    Yes.

ATTORNEY DAVID:          Did Mitchell Brad Goldberg become registered as an associated person by the NFA with ProTrade in February of 2005?

MR. ISAACSON:    Yes.

ATTORNEY DAVID:          Did the NFA in February of 2005, based on information available on its website, approve Mr. Goldberg to serve in the capacity of an associated person of an introducing broker?

MR. ISAACSON:    Yes.

ATTORNEY DAVID:          Did Mr. Goldberg withdraw from any affiliation with ProTrade?

MR. ISAACSON:    Yes.

ATTORNEY DAVID:          On what date did that withdrawal take effect?

MR. ISAACSON:     August 10th.

ATTORNEY DAVID:          That was 12 days, was it not, sir, after Alaron signed the guaranteed IB agreement with ProTrade?

MR. ISAACSON:     Yes.

ATTORNEY DAVID:          And did Mr… I'm now going to find Corporate Commodities. It's about a third of the way down that page.  Did Mr. Goldberg become an associated person of Corporate Commodities in August of 2005?

MR. ISAACSON:     Yes.

ATTORNEY DAVID:          On what date, sir?

MR. ISAACSON:     August 1st.

ATTORNEY DAVID:          And did he remain an associated person of Corporate Commodities until the end of the year?

MR. ISAACSON:     Yes.

ATTORNEY DAVID:    Has Alaron ever done business with Corporate Commodities?

MR. ISAACSON:    No.

ATTORNEY DAVID:    'Til Alaron got involved in this arbitration proceeding, had you ever heard of Corporate Commodities?

MR. ISAACSON:    No, I had not.

ATTORNEY DAVID:    Do you know anything about Corporate Commodities?

MR. ISAACSON:    No, I don't.

ATTORNEY DAVID:    From the time that ProTrade… ProTrade's guaranteed IB agreement became effective until the time that it was terminated, did ProTrade introduce a single account to Alaron?

MR. ISAACSON:    No.

ATTORNEY DAVID:    Did Alaron earn a penny off of any trades from ProTrade's customers?

MR. ISAACSON:     No.

ATTORNEY DAVID:     Did any trades of any Corporate Commodities customers ever get cleared through Alaron?

MR. ISAACSON:     No.

ATTORNEY DAVID:     Has Alaron ever been subject to a business conduct complaint from the NFA or a complaint from the CFTC or any other regulator with respect to ProTrade?

MR. ISAACSON:     No.

ATTORNEY DAVID:     Let me show you a complaint that the NFA Business Conduct Committee filed on or about August 29th of 2006.  It's Claimant's Exhibit 3. Alaron wasn't named in that case, was it, sir?

MR. ISAACSON:     No.

ATTORNEY DAVID:     Was Alaron consulted with respect to this case?

MR. ISAACSON:     No.

ATTORNEY DAVID:        One moment.    Have there been other situations where Alaron has executed an IB agreement and the IB has not begun to introduce business to Alaron within a week or two of the execution of that agreement?

MR. ISAACSON:    Yes.

ATTORNEY DAVID:        And if someone hasn't introduced business in a week or two, has Alaron automatically turned around and terminated that IB?

MR. ISAACSON:    No.

ATTORNEY DAVID:        Is there a reason in this instance that you waited three months?

MR. ISAACSON:    Not that I'm aware of.

ATTORNEY DAVID:        At the time that Alaron executed this guaranteed IB agreement, July 29th of 2005, was it your understanding that ProTrade was registered with the NFA as an introducing broker?

MR. ISAACSON:    Yes.

ATTORNEY DAVID:        Let me direct your attention again to Claimant's Exhibit 4 for identification.

(OFF THE RECORD)

(END OF CD 5)