06-ARB-61
Disk 6

ATTORNEY SINCLAIR:        And I'm looking at what I think is, if I counted correctly, the

eleventh page.  It says ProTrade on the top.  Everybody got that one?


JUDGE:        (INAUDIBLE).  Which tab of F--?


ATTORNEY SINCLAIR:        It's your Tab F-4.


JUDGE:        Alright.


ATTORNEY SINCLAIR:        Thank you.  Mr. Isaacson, looking at this page from the

NFA website, on what date was Pro – did ProTrade become registered as an introducing

broker qualified to do business by the NFA?


MR. ISAACSON:        February 7th, 2005.


ATTORNEY SINCLAIR:        And for how long did it remain qualified as an introducing

broker by the NFA?


MR. ISAACSON:        October 27th of '06.


ATTORNEY SINCLAIR:        So, just so that I have this right, it's February of '05 to

October of '06, correct?


MR. ISAACSON:        Yes.

ATTORNEY SINCLAIR:        Now let's look at the very first page.  No, take that back.
Second page of Exhibit 4.

MR. ISAACSON:        Page 31?

ATTORNEY SINCLAIR:        It's 31 on the bottom, exactly.  Sorry, I should had taken
the Bates (INAUDIBLE) the last one.  The registration dates for Corporate Commodities.
When did Corporate Commodities become registered as an IB and qualified to do
business?

MR. ISAACSON:        July 11th, 2005.

ATTORNEY SINCLAIR:        And for how long is it registered to do business?

MR. ISAACSON:        I don't see one – or on this page (INAUDIBLE).

JUDGE:        Speak up a little bit, please.

MR. ISAACSON:        I don't know what their current status is.  It looks like it became
approved on July 11th of 2005.

ATTORNEY SINCLAIR:        And this page that we're looking at, looks like Counsel
Prosnitz printed it on August 17th of 2006.  So looks like they were still registered to do
business in August of 2006?

MR. ISAACSON:        Yes.

ATTORNEY SINCLAIR:        Would it be fair to say, sir, that both Corporate

Commodities, Inc. and ProTrade were each registered as introducing brokers by the

NFA for at least the period July 2005 through August 2006?

MR. ISAACSON:        Yes.

ATTORNEY SINCLAIR:        May I have a moment to look at my notes?

JUDGE:        Sure.

ATTORNEY SINCLAIR:        Thank you.

(End Disk 6, Track #1.  Begin Track #2)

ATTORNEY PROSNITZ:        Series of small questions.  Let me direct your attention to

the guarantee agreement, which is Alaron's Exhibit 1.  You signed it – what day – on

what day did you sign this agreement?

MALE:        (INAUDIBLE)

ATTORNEY PROSNITZ:        The very last page.

MR. ISAACSON:        July 29th.

ATTORNEY PROSNITZ:      On what day does this agreement reflect that it became effective?

MR. ISAACSON:      July 29th.

ATTORNEY PROSNITZ:      Did Alaron have any intention for this agreement to become effective on any date prior to the date that you executed it?

MR. ISAACSON:      No.

ATTORNEY PROSNITZ:      That's all I have.

ATTORNEY SINCLAIR:      Just a few follow up.  On the agreement itself, the very first line of the agreement says that it's made and entered into as of the 8th day of July of 2005.  What does that mean?

MR. ISAACSON:      That's when I believe that they had filled it out.  And then the effective date on the end of it is when.

ATTORNEY SINCLAIR:      Is the effective date usually different than what's the day it's entered into and made?

MR. ISAACSON:      It very well could be.

ATTORNEY SINCLAIR:       And now you've got this, the agreement itself, we don't know when it was signed, right?  There's no date on page 8, right?  You know you signed CFTC-4 on July 29th, correct?

MR. ISAACSON:       Yes.

ATTORNEY SINCLAIR:       But how do we know when you signed page 8?  There's no date on that page, is there?

MR. ISAACSON:       That is correct.

ATTORNEY SINCLAIR:       Now, is it correct that you do not know when ProTrade stopped active business operations?

MR. ISAACSON:       That is correct.

ATTORNEY SINCLAIR:       And is it also correct that you do not know when Corporate Commodities, Inc. was a successor to ProTrade?

MR. ISAACSON:       That is also correct.

ATTORNEY SINCLAIR:       Okay.  And you do not have a reason as to why the guarantee was left open for three months?

MR. ISAACSON:       Correct.

ATTORNEY SINCLAIR:          (INAUDIBLE) questioning.  That's your signature on page 8?

MR. ISAACSON:          Yes.

ATTORNEY SINCLAIR:          Did you sign it at the same time as you signed page 10?

MR. ISAACSON:          Most likely.

ATTORNEY SINCLAIR:          Nothing further.

JUDGE:          Okay.  Thank you, Mr. Isaacson, for your testimony.  We appreciate the fact that you came here today to do that.  What are some options available?  Mr. Prosnitz, what would you like to do?

ATTORNEY PROSNITZ:          I'd like to start with Mr. Maylor (INAUDIBLE).  But I'm up a little earlier now.  He's not going to--.

JUDGE:          Before we take a break, tell me what you anticipate your witness is (INAUDIBLE)?

ATTORNEY PROSNITZ:          (INAUDIBLE) Mr. Maylor, our expert, I think that's it (INAUDIBLE).

ATTORNEY SINCLAIR:          Basically, Mr. Maylor (INAUDIBLE) questions (INAUDIBLE).

JUDGE:        Mr. (INAUDIBLE)?

MALE:        I would – I mean, I can conceive something coming up that I may have to (INAUDIBLE).  But other than that, I don't see (INAUDIBLE).

JUDGE:        (INAUDIBLE)

(End Disk 6, Track #2.  Begin Track #3.)

JUDGE:        In your absence, we were talking about seeing if we determine some of the logistics of it.  It seems to me that if we were certain of the fact that Mr. Maylor will be testifying tomorrow, since that is the inevitable conclusion (INAUDIBLE), I think there's a need (INAUDIBLE) time to help us to (INAUDIBLE).  We want to (INAUDIBLE) the parties, without suggesting to them what they should do.  And the option always remains, the parties in their case (INAUDIBLE) to call witnesses out of sequence, to avoid them having to testify more than once.  That is designed not only for the convenience of the lawyers, which I'm all in favor of, but also the convenience of the parties, that if someone needs to be somewhere at the time, they could be called one time, be called out of order, and some latitude is given.  (INAUDIBLE) mixed up.  I offer that only as a means to try and expeditiously handle – my thinking, the Respondent's witnesses, so that they don't have (INAUDIBLE).

ATTORNEY SINCLAIR:        (INAUDIBLE).

JUDGE:        Yeah, sure.

ATTORNEY SINCLAIR:        Maybe I should have Mr. Maylor testify after Mr. Prosnitz's (INAUDIBLE).

JUDGE:        Yeah.

ATTORNEY SINCLAIR:        He's going to be done with his case anyway.  Although--.

JUDGE:        And even that being--.

ATTORNEY SINCLAIR:        Yeah, (INAUDIBLE).

JUDGE:        --defense.  But all I'm saying is that that's okay.  I'm not suggesting it.  I'm saying it's allowable, if that becomes more convenient for the parties and the witnesses, all are expeditious.  Now, having said that, I think we will finish and take the testimony today (INAUDIBLE).  The first issue I want to point out is on (INAUDIBLE) on the documents (INAUDIBLE).  So what I would like to know with specificity is what those documents are (INAUDIBLE).  And then I'd like to know when they were first questioned and what response was made to that (INAUDIBLE), if in fact they were (INAUDIBLE).  The specific documents are – there was a No. 14 at our request, which was served on September 15th, 2006.  It was asking for a con – all contracts between ComTrust and introducing brokers ProTrust (INAUDIBLE) without any (INAUDIBLE).

ATTORNEY SINCLAIR:        You mean ProTrade.

JUDGE:          ProTrade, (INAUDIBLE).  And that's (INAUDIBLE) as I understand it,

there was one contract between ComTrust and ProTrade and one between ComTrust

and Corporate Commodities that we're asking for.  I offered (INAUDIBLE) the break who

wants to stipulate that this is a form of the contract that they have the form of the

contract is, at point of time was stipulated (INAUDIBLE).  It is not crucial to me that they

dig out of archives the one that actually has the signatures.  They'll stipulate as to

(INAUDIBLE) contract (INAUDIBLE).  I would guess (INAUDIBLE) the Alaron--.


MALE:          Well, no, (INAUDIBLE).


ATTORNEY SINCLAIR:        We'll do what we can to get that (INAUDIBLE) things.

(INAUDIBLE).


JUDGE:          So you'll let us know in the morning how this is going to (INAUDIBLE).

Do we have any witness-specific issues tomorrow in terms of the schedules or anything

else (INAUDIBLE)?


ATTORNEY SINCLAIR:        The only thing that I have in this, and with Mr. Maylor,

probably have (INAUDIBLE).


JUDGE:          I'm way beyond making promises to people about maintaining their

schedule.  (INAUDIBLE).


ATTORNEY SINCLAIR:        Yeah.  I have – I mean (INAUDIBLE).

JUDGE:        Okay.  I have not heard anything that indicates to me that can't be done tomorrow.  (INAUDIBLE) once we get going (INAUDIBLE).  Why don't we reconvene at 9:00 tomorrow morning (INAUDIBLE).

ATTORNEY SINCLAIR:        Just one real quick thing.  In terms of closing arguments, I don't know whether you want to hear them tomorrow or whether you (INAUDIBLE) closing arguments.  I will say that at about 5:30 last night, I got a binder from Mr. Prosnitz with a dozen cases.  I would prefer not to stay up all night tonight reading those cases and researching them, having their arguing the law tomorrow.  I don't think it's right to have to do so, having not gotten them until last night  So my preference is, I'm happy to do closing argument tomorrow, if we get the chance to, in fact, in terms of facts. But in terms of the law, rather than arguing tomorrow, I would appreciate the opportunity to submit, to the extent that you haven't directed a verdict before that, closing (INAUDIBLE).

JUDGE:        And this is an issue that we have not discussed yet as a panel (INAUDIBLE) we have not had an opportunity to talk about this yet.  I would suggest to you (INAUDIBLE) the lawyers to give some thought to the idea of what's here on the briefing.  Talk among yourselves, if you will, and then let us know what your thinking is. We will not be guided one bit by what you (INAUDIBLE).

ATTORNEY SINCLAIR:        I'm happy to do written closing arguments, you know, combined with the brief (INAUDIBLE) oral arguments, if that's anyone's.  But I am totally open to--.

JUDGE:        Why don't you (INAUDIBLE) among yourselves before we brainstorm on some of the – I'm not much for putting parties through unnecessary work.  If we can accomplish this with low impact, final argument, I state that I'm all in favor of that.  But the sense of the idea of the panel, we'll be exposed to some of these legal arguments in the context that these facts reference time.  So it's not realistic that we'll be able to absorb all of this orally, without some guidance from the lawyers as to what we ought to be looking at and reading in our deliberations.

ATTORNEY SINCLAIR:        Well, could we all agree as lawyers that we do oral closing facts and we submit briefs on the legal issues?  I think--.

JUDGE:        (INAUDIBLE-speaking simultaneously).

ATTORNEY SINCLAIR:        --I think it's frankly the least expensive for our client is to do a closing argument of facts.  Writing takes an enormous amount of time and it's very costly to the client.  But I think, as you just suggested, briefs on the legal issues would probably be very useful to everybody.

JUDGE:        And that needs to be balanced.  I do not want to delay the resolution of this case.  (INAUDIBLE) lots of (INAUDIBLE).

ATTORNEY SINCLAIR:        I'd say, you know, we each submit a brief.  And we can reply (INAUDIBLE) can.

JUDGE:        You don't need our input on this.  Why don't you talk it out, what you can agree to.  We'll be guided some--.

ATTORNEY SINCLAIR:     Great.  There was one other thing.  You're having your expert come in?

ATTORNEY PROSNITZ:     Yes.

ATTORNEY SINCLAIR:     At 9:00?

ATTORNEY PROSNITZ:     Yes.

ATTORNEY SINCLAIR:     Okay.  Or maybe we'll just go to his expert first, then hear Mr. Maylor, and that will put everything (INAUDIBLE).

JUDGE:     I mean, I personally hope that we'll be done by lunch (INAUDIBLE).

ATTORNEY SINCLAIR:     Does that sound okay?

JUDGE:     (INAUDIBLE).

ATTORNEY SINCLAIR:     I'm looking, your calendar, I need more time--.

(End Disk 6, Track #3.  Begin Track #4.)

JUDGE:     Good morning, ladies and gentlemen.  I think I'm getting the appropriate signal that we're ready to begin.  For the record, this is day two of the arbitration proceedings between Mr. John Bell and ProTrade Futures and Options, a (INAUDIBLE)

Article 61.  We recessed yesterday afternoon and the conclusion, the testimony being offered by Mr. Prosnitz on behalf of the Claimant can (INAUDIBLE).

ATTORNEY PROSNITZ:     Can I ask if you were able to find (INAUDIBLE)?

ATTORNEY SINCLAIR:     What's that?

ATTORNEY PROSNITZ:     You found the contract?

ATTORNEY SINCLAIR:     I found the form.

ATTORNEY PROSNITZ:     Okay.

ATTORNEY SINCLAIR:     (INAUDIBLE).

ATTORNEY PROSNITZ:     Alright.  And then I'd just like to note for the record--.

FEMALE:     (INAUDIBLE) still there?  No, (INAUDIBLE).

ATTORNEY PROSNITZ:     --with me is my co-counsel, Jim (INAUDIBLE).

JUDGE:     (INAUDIBLE).  Alright.  If you want to name your next witness, I'll swear--.

ATTORNEY PROSNITZ:     Sure.  Our next witness is Professor Nauser Balsar.

JUDGE:          Sir, would you stand up and raise your right hand, please?  Do you solemnly swear or affirm that the testimony you're about to give in this matter is the truth, the whole truth, and nothing but the truth, so help you God?

PROFESSOR BALSAR:       I do.

JUDGE:          Good.  Thank you very much.  Be seated.  Could you keep your voice up, please, so that we can hear you?

ATTORNEY PROSNITZ:      Professor, can you describe your educational background?

PROFESSOR BALSAR:       I got Ph.D. in finance from Columbia University (INAUDIBLE).

ATTORNEY PROSNITZ:      Prior to getting that, what was your training?

PROFESSOR BALSAR:       I got an MBA (INAUDIBLE).

ATTORNEY PROSNITZ:      Did you get a bachelor's degree in India?

PROFESSOR BALSAR:       I did.

ATTORNEY PROSNITZ:      And what was the area that you got that in?

PROFESSOR BALSAR:       (INAUDIBLE).

ATTORNEY PROSNITZ:     Can you briefly describe your employment history?

PROFESSOR BALSAR:     (INAUDIBLE)  I basically (INAUDIBLE).

ATTORNEY PROSNITZ:     And tell us what books you've published, if any.

PROFESSOR BALSAR:     I have just one book.  It's called <u>Money Management</u>
<u>Strategies (INAUDIBLE)</u>.

ATTORNEY PROSNITZ:     And how many articles have you had published?

PROFESSOR BALSAR:     Fourteen (INAUDIBLE).

ATTORNEY PROSNITZ:     You've got to talk louder.  No one can hear you.

FEMALE:     (laughter)

PROFESSOR BALSAR:     (INAUDIBLE) fourteen (INAUDIBLE).

ATTORNEY PROSNITZ:     Alright.  Let's turn to Claimant's Exhibit 22.  This first page
purports to be your resume.  Is that what we're looking at?

PROFESSOR BALSAR:     Yes.

ATTORNEY PROSNITZ:     By the way, what – how long have you been teaching at
Northeastern?

PROFESSOR BALSAR:        For the last 20 years.

ATTORNEY PROSNITZ:      Are you a tenured professor there?

PROFESSOR BALSAR:        I'm a tenured full professor.

ATTORNEY PROSNITZ:      And what are the subjects you have taught?

PROFESSOR BALSAR:        I teach investments and annuities, corporate finance, and international finance.

ATTORNEY PROSNITZ:      And do you personally have experience also in futures and options trading?

PROFESSOR BALSAR:        I do.

ATTORNEY PROSNITZ:      Tell us about that.

PROFESSOR BALSAR:        I've traded.  I own (INAUDIBLE) bought myself a CBA license (INAUDIBLE).

ATTORNEY PROSNITZ:      Alright.  How long did you trade on your own account?

PROFESSOR BALSAR:        (INAUDIBLE) I think between three and five years.

ATTORNEY PROSNITZ:     And what were you trading?

PROFESSOR BALSAR:     Mutuals, such as S&P, (INAUDIBLE) and options (INAUDIBLE).

ATTORNEY PROSNITZ:     Alright.  And do you ever talk with people about their trading?

PROFESSOR BALSAR:     I do.  I do a lot of consulting with banks and hedge funds (INAUDIBLE) trading systems (INAUDIBLE).

ATTORNEY PROSNITZ:     Who are some of the banks you've consulted with?

PROFESSOR BALSAR:     (INAUDIBLE) Bank (INAUDIBLE) Hedge Fund (INAUDIBLE) Bank.

ATTORNEY PROSNITZ:     Do you consult with wealthy individuals, too, about trading?

PROFESSOR BALSAR:     (INAUDIBLE).

ATTORNEY PROSNITZ:     No.  Okay.  Now, on page 2 is the list of your 14 articles, correct?

PROFESSOR BALSAR:     (INAUDIBLE) 13--.

ATTORNEY PROSNITZ:     Oh, 13, I'm sorry.

PROFESSOR BALSAR:     (INAUDIBLE).

ATTORNEY PROSNITZ:     (INAUDIBLE).  And tell us, well you've gone through these articles, tell us, you know, the subject areas which you write about.

PROFESSOR BALSAR:     Generally, in the investment area.  (INAUDIBLE) how people (INAUDIBLE).

ATTORNEY PROSNITZ:     Alright.  And I see No. 7 is "Trust Your Broker:  Suitable Modern Portfolio Theory in Expert Witnesses."  What's that one about?

PROFESSOR BALSAR:     That was an article I (INAUDIBLE) so it's talking about (INAUDIBLE) issues (INAUDIBLE) portfolios (INAUDIBLE).

ATTORNEY PROSNITZ:     How about valuing options?  You've written about that subject?

PROFESSOR BALSAR:     Yes.

ATTORNEY PROSNITZ:     Momentum strategies, you wrote about that?

PROFESSOR BALSAR:     That was for stock market, yes.

ATTORNEY PROSNITZ:    So you've had a lot of occasion to observe the markets and trading of futures, correct?

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    And you've also served as an expert witness about 13 times, correct?

PROFESSOR BALSAR:    That's correct.

ATTORNEY PROSNITZ:    Has there been any proceeding where you were found to be unqualified to testify?

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    And today, you are going to be speaking about analysis you'd done on Mr. Bell's account, subjects concerning the volume of trading relative to the market and related issues, correct?

PROFESSOR BALSAR:    Yes.

ATTORNEY PROSNITZ:    And you're also going to testify a little bit about some public documents you observed on the NFA website concerning future commissioned purchase, correct?

PROFESSOR BALSAR:    Yes.

ATTORNEY PROSNITZ:    (INAUDIBLE).

ATTORNEY SINCLAIR:    (INAUDIBLE.)

JUDGE:    Alright.

ATTORNEY SINCLAIR:    Have you ever testified in any hearing involving

(INAUDIBLE)?

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY SINCLAIR:    In the article on modern portfolio theory, is that an article

about securities?

PROFESSOR BALSAR:    (INAUDIBLE).

JUDGE:    Go ahead (INAUDIBLE).

ATTORNEY SINCLAIR:    May I just – well, Professor Balsar, do you have expertise

in the area of commodities regulation?

PROFESSOR BALSAR:    No.

ATTORNEY SINCLAIR:    You don't teach in that area?

PROFESSOR BALSAR:      No.

ATTORNEY SINCLAIR:      You don't have any special knowledge just because you were a CTA about regulation and regulatory types of matters, do you, sir?

PROFESSOR BALSAR:      I do not.

ATTORNEY SINCLAIR:      Your expertise is in the area of trading, is that correct?

PROFESSOR BALSAR:      That is correct.

ATTORNEY SINCLAIR:      Mr. Chairman, I don't know what this expert is going to testify about.  But I got – we ended at the end of Mr. Prosnitz's explanation, it may have something to do with more than trading.  And if we get there, I do have an objection to (INAUDIBLE).

JUDGE:      Alright.  I'm--.

JUDGE #2:      Excuse me.  I have a question for the witness.  I see from your C.V. that you've testified, in your 13 cases, you've always testified or been retained by the plaintiff or the claimant?

PROFESSOR BALSAR:      Except for the last one.

JUDGE #2:      Except for the last one.  I just wanted to – except for the last one, were you ever retained by the defendant or respondent, other than this last case?

PROFESSOR BALSAR:          No, I (INAUDIBLE).

JUDGE #2:     Thank you.

JUDGE:          Let's deal with some of the side bar commentary that's going on, on the Respondent's side here.  It's my understanding, Mr. Prosnitz, the professor was being offered primarily as (INAUDIBLE) witness, is that right?

ATTORNEY PROSNITZ:       Right.  But he is going to talk about public documents and the NFA website.  He's not going to offer an opinion on them, but he's going to say (INAUDIBLE).

JUDGE:          Okay.  And that's probably allowable because expert witnesses can rely on just about anything they want in support of their testimony, subject to cross-examination.  But I'm prepared to indicate for the record that the professor is qualified to testify on the issue of damages.  I don't think there's any question about that, so we're going to allow him to proceed.  And if he has documents that he has reviewed in support of that or anything else, of course that's subject to cross-examination and/or objection at the appropriate time.  But I think we can proceed on the basis of (INAUDIBLE).  So excuse me for (INAUDIBLE).

ATTORNEY PROSNITZ:       Sure.  Alright.  So let's turn to the next page in your report, which is marked Table 1.  Did you prepare this?

PROFESSOR BALSAR:          Yes, I prepared it.

ATTORNEY PROSNITZ:          And tell us how you – what information you used to prepare this.

PROFESSOR BALSAR:          I looked at all the (INAUDIBLE) every single transaction (INAUDIBLE) that's Table 1.  I also listed (INAUDIBLE) every single transaction.  And I've indicated at the right-hand side (INAUDIBLE) commission and fees (INAUDIBLE) and you will notice that the percentage of fees and commissions is generally in excess of 70 percent.  Sometimes it can be 85, 90 percent.  The average of the entire (INAUDIBLE) the last date of (INAUDIBLE) and that is 72.57 percent (INAUDIBLE), so.

ATTORNEY PROSNITZ:          So you were working with the original account records to prepare Table 1?

PROFESSOR BALSAR:          Yes.

ATTORNEY PROSNITZ:          And how many hours did it take you to prepare your report?

PROFESSOR BALSAR:          (INAUDIBLE).

ATTORNEY PROSNITZ:          I didn't ask you, but you are being compensated for your testimony?  You've been paid?

PROFESSOR BALSAR:          Yes.

ATTORNEY PROSNITZ:     And how much have you been paid by Mr. Kopecki (INAUDIBLE)?

PROFESSOR BALSAR:     From Mr. Kopecki, I believe (INAUDIBLE) dollars.  That was (INAUDIBLE) that was to prepare the tables.  (INAUDIBLE) analyze all the documents.  Provide (INAUDIBLE).

ATTORNEY PROSNITZ:     So you charged us a flat fee, you're telling?  $4,500 correct?

PROFESSOR BALSAR:     Yes.

ATTORNEY PROSNITZ:     Okay.  So in your experience, you said 72-1/2 percent is very high for fees and commissions?

PROFESSOR BALSAR:     Yes.

ATTORNEY PROSNITZ:     What would, from your experience, a normal percentage be?

PROFESSOR BALSAR:     (INAUDIBLE) be about 20, 25 percent.

ATTORNEY PROSNITZ:     So the fees and commissions charged here were perhaps three times normal?

PROFESSOR BALSAR:          Especially for transactions used to determine the (INAUDIBLE).

ATTORNEY PROSNITZ:          Okay.  Was there any coherent trading strategy?

PROFESSOR BALSAR:          It started out in June of 2005, with options (INAUDIBLE). From here, Mr. Goldberg (INAUDIBLE) sent Mr. Bell a lot of literature on (INAUDIBLE) go up.  So the first (INAUDIBLE), yes, it will (INAUDIBLE) ProTrade (INAUDIBLE).

ATTORNEY PROSNITZ:          So assuming--.

ATTORNEY SINCLAIR:          Excuse me.  I'm sorry to interrupt.  But it appears that there were documents that miss – that our expert received and we didn't get.

JUDGE:          Did you ask for them?

ATTORNEY SINCLAIR:          Yes, absolutely.

JUDGE:          Well, first of all--.

ATTORNEY PROSNITZ:          Are there particular documents you have?

PROFESSOR BALSAR:          All (INAUDIBLE).

ATTORNEY PROSNITZ:          What about – this is--?

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY PROSNITZ:        And where did you get these from?

PROFESSOR BALSAR:        Right from Mr. Kopecki (INAUDIBLE).

ATTORNEY PROSNITZ:        I thought those were introduced.

ATTORNEY SINCLAIR:        No, they weren't put in as yet.  What is that?  Now he's basing his opinion on documents that were never produced.

JUDGE:        Well, wait a minute--.

ATTORNEY SINCLAIR:        And that's his--.

JUDGE:        --because that's an unfair--.

ATTORNEY PROSNITZ:        You know--.

JUDGE:        Hold on.  Certainly in Illinois, and under the federal system, experts can rely on virtually anything to base their opinion.  Disclosed and non-disclosed information, okay?  That's – if the information is requested, it is required to be produced.  And if it hasn't been produced, you're allowed to have an opportunity to look at it.

ATTORNEY SINCLAIR:          That's not my point.  My point that in discovery, we asked for all communications between Mr. Bell and all the respondents.  And I didn't get that. That's my point.  And another situation--.

MALE:          I have no problem (INAUDIBLE) whatever I had, I got from ComTrust basically, not from Mr. Bell.

MALE:          Right, so--.

ATTORNEY PROSNITZ:          (INAUDIBLE) state for the record at this point that the--.

ATTORNEY SINCLAIR:          I'm sorry, from ComTrust?

MALE:          From whoever it was that would be (INAUDIBLE) that Mr. Bell had contact (INAUDIBLE).

JUDGE:          Mr. Bell was talking to – was it ProTrade that he was talking to?  And they were trying to work out his claim?

ATTORNEY SINCLAIR:          It was ProTrade.

ATTORNEY SINCLAIR:          The only documents I have ever seen from them (INAUDIBLE).

ATTORNEY PROSNITZ:          These documents may have been produced by ComTrust. And before we have these--.

ATTORNEY SINCLAIR:        I'm just--.

ATTORNEY PROSNITZ:        Excuse me.  Before we have these wild accusations, I think we ought to be sure that we all have the facts.  And it's not even the main basis of his testimony.  But for all we know, these were traced by respondents, perhaps ProTrade.

JUDGE:        Okay.  Well, some are (INAUDIBLE).  First of all, let's have one person (INAUDIBLE).  Mr. Sinclair certainly is entitled to see those documents, okay?  Whether or not it has any impact in a real sense on the (INAUDIBLE) that the professor may give is another issue, which we need not cross until we hear the testimony.  But insofar as those documents are necessary, be it for cross-examination purposes or any other, certainly the respondents are entitled to them  So we'll continue with the professor's testimony.  And then we can decide – we are bound to decide whether or not the objections to any of it should be sustained.

ATTORNEY SINCLAIR:        Mr. Ferrin, I want to make – I don't want to take half an hour to sort through my file to see where these came from.  But based on what Mr. Kopecki has just told me, it's quite possible these came from ProTrade and were not – it's quite possible these documents did not come from Mr. Bell.  So we have to sort this one out.

JUDGE:        Okay, fine.  It's not completely responsive to Mr. Sinclair's objection (INAUDIBLE) partially responsive but not, at any rate (INAUDIBLE).  Nevertheless, let's

continue with the professor's testimony.  At the conclusion of the testimony, we'll sort out what's – what your plans are.

ATTORNEY PROSNITZ:        And Professor, isn't it true that these documents really are not important to your testimony?  What's important is the gist of what you understood Mr. Goldberg to be telling Mr. Bell about orange juice and (INAUDIBLE), right?

PROFESSOR BALSAR:        It just points out that (INAUDIBLE).

ATTORNEY PROSNITZ:        Alright.  But--.

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY PROSNITZ:        --But forgetting about these documents, putting these documents aside, what is your understanding of the gist of how Mr. Goldberg hooked Mr. Bell into trading commodities?

ATTORNEY SINCLAIR:        I'm going to object--.

ATTORNEY PROSNITZ:        Orange juice--.

ATTORNEY SINCLAIR:        --to this as hearsay.

JUDGE:        Overruled.  I'm sorry, the expert can rely upon anything to testify, including (INAUDIBLE) covered.

ATTORNEY SINCLAIR:        By whom?

JUDGE:        By the Claimant.

ATTORNEY SINCLAIR:        And (INAUDIBLE) how much you were told by the Claimant?

ATTORNEY PROSNITZ:        Well, in fact, you know, Mr. Chairman, I object to the (INAUDIBLE).  Mr. Sinclair cannot sua sponte ask questions of the witness.

JUDGE:        That is true.  That is true.

ATTORNEY SINCLAIR:        Could I ask a (INAUDIBLE) question  Where this information came from?  It came from Mr. Bell?

ATTORNEY PROSNITZ:        What Mr. Sinclair is doing, with all due respect, is interfering with--.

JUDGE:        What he's doing is cross-examining the witness before his turn.

ATTORNEY PROSNITZ:        Right.

JUDGE:        So we apologize to you.  The objection has been overruled.  Go ahead, okay.  Go ahead.

ATTORNEY PROSNITZ:      Let me ask (INAUDIBLE).  Professor, what is your understanding of what Mr. Bell was told by Mr. Goldberg concerning (INAUDIBLE) and orange juice prior to the trading in September?

PROFESSOR BALSAR:      He was told that (INAUDIBLE) my exact words because I (INAUDIBLE) here is that (INAUDIBLE).  And therefore, (INAUDIBLE) go and buy outright all the (INAUDIBLE).  But instead of that, I see (INAUDIBLE) calendars that (INAUDIBLE), which is (INAUDIBLE) immediately exercise margin loss for (INAUDIBLE), commissions and fees has separate issues.  But he went ahead and did something that was absolutely (INAUDIBLE) through these documents (INAUDIBLE).

ATTORNEY PROSNITZ:      But you'd characterize it as market neutral?

PROFESSOR BALSAR:      Market neutral (INAUDIBLE), yes.

ATTORNEY PROSNITZ:      Okay.  How much was lost as a result of that?

PROFESSOR BALSAR:      (INAUDIBLE) were exercise (INAUDIBLE) futures (INAUDIBLE) on the futures lost (INAUDIBLE) commissions and fees on these two spread carries, amounted to in the first case $31,000, and in the second case $25,000 (INAUDIBLE) fees and commissions (INAUDIBLE).

ATTORNEY PROSNITZ:      And did you see the commission and fee structure that Mr. Bell was being charged?

PROFESSOR BALSAR:        I did.  That was in one of ComTrust's (INAUDIBLE).  It said somewhere that the option commission is roughly $200 (INAUDIBLE).

ATTORNEY PROSNITZ:      And what is your view of that fee?

PROFESSOR BALSAR:        Well, according to my opinion, it's pretty high.  But it was agreed to between ComTrust (INAUDIBLE).

ATTORNEY PROSNITZ:      And have you seen fees that high before?

PROFESSOR BALSAR:        I have never seen such (INAUDIBLE).

ATTORNEY PROSNITZ:      Okay.  Was there any way that Mr. Bell could make money on this account, given the fee and commission structure?

PROFESSOR BALSAR:        In my opinion, no.

ATTORNEY PROSNITZ:      What else did – what other things did you observe about the trading on the account?

PROFESSOR BALSAR:        (INAUDIBLE) be able to (INAUDIBLE) if you look at trade cluster 4 and trade cluster 6 in Table 2.  Table 2.

ATTORNEY SINCLAIR:       What page?

ATTORNEY PROSNITZ:      This is Table 2.  It's--.

PROFESSOR BALSAR:    The second page of Table 2.  You can see trade cluster 4, 5, and 6 on (INAUDIBLE) I'm referring to trade clusters 4 and 6.  Those are (INAUDIBLE), put on in a group-wide futures, options on (INAUDIBLE), futures and options on natural gas futures.  What struck me here is the magnitude, the size of these trades.  (INAUDIBLE), for example, cluster 4, he has traded 320 plus 660 plus 330 options (INAUDIBLE) 31, 2005.  That is a total of 1,320 options for a single (INAUDIBLE).  I went to the New York Mercantile Exchange website and checked the historical daily volume (INAUDIBLE).  The average daily trading volume for 2005 was 58,670 options per day.  This is 1,320 options, which that is 2.25 percent of the daily trading volume.  He's a major market player.  Go down to trade cluster 6--.

ATTORNEY PROSNITZ:    Just let me follow up on that point for a second.  So you're saying that Mr. Bell was a major market player in what?  In what--?

PROFESSOR BALSAR:    (INAUDIBLE) options.  Options in August 2005.  August 31, 2005.

ATTORNEY PROSNITZ:    Do you think that was suitable for an 80-year-old retired person on a fixed income to be a major market player in crude oil?

ATTORNEY SINCLAIR:    I'm going to object to that only from the standpoint it calls for a legal conclusion.  And this witness has not been qualified--.

ATTORNEY PROSNITZ:          Actually, he has been qualified as an expert in investments.  He teaches a course on investments.  So if he can't – he's testified 13 times (INAUDIBLE).

JUDGE:          I'm going to allow the testimony, but we're right on the margin.

ATTORNEY PROSNITZ:          Right, right, right.

JUDGE:          So let's get back on--.

ATTORNEY SINCLAIR:          And one other thing I'd like to say, his testimony has been in securities.  And suitabilities in securities is totally different from the suitability (INAUDIBLE).

JUDGE:          I'm going to allow the testimony.  We're out in the margin.  Let's get back into it.

ATTORNEY PROSNITZ:          What else?  Okay.  We talked--.

PROFESSOR BALSAR:          So you look at trade cluster 6--.

ATTORNEY PROSNITZ:          Yes.

PROFESSOR BALSAR:          For natural gas.

ATTORNEY PROSNITZ:          Yes.

PROFESSOR BALSAR:     (INAUDIBLE) neutral market (INAUDIBLE) he traded 350 plus 700 plus 350, which is 1,400 options.  Commission:  $140,000.  Just commission.  Fees are another seventy-four thousand (INAUDIBLE).  Finally, these commissions are at the rate of $100 an option (INAUDIBLE) not the $200 per option (INAUDIBLE) we have (INAUDIBLE) now, gone down from (INAUDIBLE) to one hundred.

ATTORNEY PROSNITZ:     Does that change your overall opinion about whether 72 percent is commissions?

PROFESSOR BALSAR:     No, it doesn't.

ATTORNEY PROSNITZ:     But I mean, I – is it correct that if they'd followed the commission structure, commissions would have been even higher?

PROFESSOR BALSAR:     Would have been much higher, yes.  Would have been higher.  But anyway, going back to trade cluster 6, leaving aside the big commissions and fees, he has traded 350 plus 700 plus 350, which is a total of 1,400 options (INAUDIBLE).  Again, the same website (INAUDIBLE) has changed.  The average daily trading volume for natural gas in 2005 was 36,527.  Only 36,527 options in a day.  Which means this contract on this particular day, 09-14-2005, is roughly 4 percent of the total market volume.  So he's a major, major player.

ATTORNEY PROSNITZ:     So if – in which market?

PROFESSOR BALSAR:     In the natural gas options market.

ATTORNEY PROSNITZ:         So if Mr. Bell is a major player in the entire natural gas market, would it be logical to infer that these trades would be significant in terms of the trading volume of ComTrust?

PROFESSOR BALSAR:         Yes.

ATTORNEY PROSNITZ:         And explain that.

PROFESSOR BALSAR:         This is subject (INAUDIBLE) volume.  It should immediately send out a red flag somewhere that we have (INAUDIBLE).

ATTORNEY PROSNITZ:         Right.

PROFESSOR BALSAR:         Let us try to check it from the background (INAUDIBLE).

ATTORNEY PROSNITZ:         Alright.  So I want to make a listing here of red flags for ComTrust.  Could we say red flag #1 is Mr. Bell is a major market player in the entire market?

PROFESSOR BALSAR:         (INAUDIBLE).

ATTORNEY PROSNITZ:         Bell, (s/l wager), market player for what, crude oil?

PROFESSOR BALSAR:         (INAUDIBLE).

ATTORNEY PROSNITZ:    What about the commissions?  You think the commissions were a red flag?

PROFESSOR BALSAR:    Yes.

ATTORNEY PROSNITZ:    Give us some examples of commissions that you think are red flags.

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    Talk louder, we can't hear you.

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    How about for the commiss – the large commissions?

PROFESSOR BALSAR:    The commission on that date itself was $132,000 (INAUDIBLE).

ATTORNEY PROSNITZ:    So it just – we have one – for one commission alone $132,000?

PROFESSOR BALSAR:    Yes.

ATTORNEY PROSNITZ:    And what--?

PROFESSOR BALSAR:        Two weeks later, we have another commission of
$140,000.

ATTORNEY PROSNITZ:        So we have two commissions alone of about $270,000?

PROFESSOR BALSAR:        And if you add the fees, that exceeds $400,000
(INAUDIBLE).

ATTORNEY PROSNITZ:        Have you ever seen anything like this before, Professor?

PROFESSOR BALSAR:        I have not.

ATTORNEY PROSNITZ:        Have you ever seen commissions and fees of $400,000 on
just two trades, two trade clusters?

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY PROSNITZ:        Alright.  What else could you – what else did you observe
in the account in terms of whether any of these contracts expired?

PROFESSOR BALSAR:        Well, these (INAUDIBLE) that we put on, for example,
(INAUDIBLE) gave just a form for crude oil options.  He's allowed them to expire
worthless, on 11-16-2005.  Except for one offsetting trade for all the options, the rest of
the (INAUDIBLE) are allowed to expire worthless.

ATTORNEY PROSNITZ:        What does that mean exactly?

PROFESSOR BALSAR:    That means you realize nothing for these options.  All the commissions – the commission, by the way, was (INAUDIBLE) fee for long-term.  $400 round (INAUDIBLE) charges it at the time of placing the trade and he would charge nothing at the back end, when he offset (INAUDIBLE).  But in most of the cases, he's never offset the trade.  So he never bothered to realize anything for these options.  And therefore, the entire (INAUDIBLE) they're lost.

ATTORNEY PROSNITZ:    So are you saying that he had no econom – Mr. Goldberg had no incentive to get a commission by doing an offsetting position?

PROFESSOR BALSAR:    (INAUDIBLE) what I'm saying is (INAUDIBLE) probably made some (INAUDIBLE).

ATTORNEY PROSNITZ:    So he made his money up front and then let the--.

PROFESSOR BALSAR:    Option expire.

ATTORNEY PROSNITZ:    --expire worthless?

PROFESSOR BALSAR:    Yes.

ATTORNEY PROSNITZ:    And what's the alternative to letting an option expire worthless?

PROFESSOR BALSAR:        You sell it.  You (INAUDIBLE) realize some money.  Some (INAUDIBLE).

ATTORNEY PROSNITZ:        Can you give us an example of what happens when –of how an option expires worthless and what could be done to prevent that?

PROFESSOR BALSAR:        Take a look at the same page.  If you look at (INAUDIBLE) look at cluster 6, that's--.

ATTORNEY PROSNITZ:        Take us through one trade, please.

PROFESSOR BALSAR:        Take a look at one trade only.

ATTORNEY PROSNITZ:        Alright.

PROFESSOR BALSAR:        Now, I'm then looking 2005, cluster 6.  He has offset out of the 1,400 options, he has offset, he sells one in January of '06, natural gas, 12.24, at a price of $2.62.  He realizes $26,2(INAUDIBLE).

ATTORNEY PROSNITZ:        What was the original trade there?

PROFESSOR BALSAR:        He had bought on 09-30 in 2005, he had bought 350 of these calls.  Two months prior to that, he had just bought 350 natural gas (INAUDIBLE) calls at 1.2(INAUDIBLE).

ATTORNEY PROSNITZ:    What does that mean, (INAUDIBLE) 350 January '06 natural gas (INAUDIBLE)?  In layman's terms, what does that mean?

PROFESSOR BALSAR:    That means he had the right to purchase natural gas futures at a price of (INAUDIBLE).

ATTORNEY PROSNITZ:    And that would be valuable if--.

PROFESSOR BALSAR:    The--.

ATTORNEY PROSNITZ:    Wait a second.  That would be worth exercising if the price was above $12.20?

PROFESSOR BALSAR:    If futures went above $12.20 (INAUDIBLE)--.

ATTORNEY PROSNITZ:    And how much did that purchase cost him?

PROFESSOR BALSAR:    The purchase of 350 options cost him $5,355,000.

ATTORNEY PROSNITZ:    So he paid $5,355,000, with a possible privilege of buying at $12.20, correct?

PROFESSOR BALSAR:    Yes.

ATTORNEY PROSNITZ:    And are you – and now explain how an offset would work.

PROFESSOR BALSAR:          He had bought (INAUDIBLE) you offset (INAUDIBLE) by selling at a future time, before expiration date, preferably at a higher price (INAUDIBLE) so you make a profit.  That's exactly what he's done here.

ATTORNEY PROSNITZ:       But he only did that with?

PROFESSOR BALSAR:          For one of--.

ATTORNEY PROSNITZ:       One of the three--.

PROFESSOR BALSAR:          One of the 350.

ATTORNEY PROSNITZ:       So he let 349 of the contracts expire, correct?

PROFESSOR BALSAR:          That is – yes, expire worthless.

ATTORNEY PROSNITZ:       And even if the price is not moving in your favor, do you cut your losses if you take an offsetting position?

PROFESSOR BALSAR:          Yes.

ATTORNEY PROSNITZ:       Okay.

PROFESSOR BALSAR:          When it is not moving in your favor, you could have cut your losses.  By this particular (INAUDIBLE) offset one at 2.62, here he made a profit on

that trade. He bought, the premium paid per year was 1.33 and he offset it, he got 2.62, he's realized a small profit actually.

ATTORNEY PROSNITZ:    So can you explain any reason in your own mind why he would take a profit on one of the 350 contracts but choose to not take a profit on the other 349?

PROFESSOR BALSAR:    Probably the only thing I can guess, I cannot read Mr. Goldberg's mind, but the only thing I can guess is that the market was not – it's a thinly played market. And he could only sell one, there was no buyer for the rest. He has a huge (INAUDIBLE).

ATTORNEY PROSNITZ:    But he still--.

PROFESSOR BALSAR:    Because the option (INAUDIBLE).

ATTORNEY PROSNITZ:    But then he did absolutely nothing for more than two months, right, and let the rest expire worthless?

PROFESSOR BALSAR:    They expired on 12-28. The rest of them all expired worthless.

ATTORNEY PROSNITZ:    And once again, even if the market had been moving against him, would it have been reasonable to take an offsetting position?

PROFESSOR BALSAR:    Yes.

ATTORNEY PROSNITZ:    So as a result of this, how much did he lose total in trading

fees and commissions on this particular cluster?


PROFESSOR BALSAR:    In commissions and trading fees put together is $314,546.


ATTORNEY PROSNITZ:    So he lost $213,000 as a result of buying 350 contracts

and only offsetting one?


PROFESSOR BALSAR:    (INAUDIBLE) 350 plus 700 plus 350, 1,400.


ATTORNEY PROSNITZ:    Okay.  But then only offsetting--.


PROFESSOR BALSAR:    Six.


ATTORNEY PROSNITZ:    --six.


PROFESSOR BALSAR:    Six is what he offset.  And the rest of them, 1,394 were

allowed to go worthless.


ATTORNEY PROSNITZ:    And how would you char – in your professional opinion, is

that negligent or reckless?


PROFESSOR BALSAR:    That is very reckless.


ATTORNEY PROSNITZ:    It's basic – alright.  And are there other examples of that?

PROFESSOR BALSAR:          (INAUDIBLE).

ATTORNEY PROSNITZ:          Alright.  So--.

PROFESSOR BALSAR:          He's done the same thing over and over again
(INAUDIBLE).

ATTORNEY PROSNITZ:          Alright.  So what's your own (INAUDIBLE) as to how this
account was traded?

PROFESSOR BALSAR:          In my opinion, it was basically generate the maximum
commissions and fees, with no regard to the customer at all.  The customer
(INAUDIBLE) I don't think (INAUDIBLE).  I don't know who, anyone who was supervising
this (INAUDIBLE).

ATTORNEY PROSNITZ:          Alright.  Now, we were talking about red flags.  You said
large commissions would have – that's relative – large commissions in terms of absolute
dollars, correct?

PROFESSOR BALSAR:          Absolute dollars.

ATTORNEY PROSNITZ:          How about commissions in terms of relative to the size of
the transactions, as a percentage of the total?

PROFESSOR BALSAR:          That is 72.57 percent (INAUDIBLE).

ATTORNEY PROSNITZ:     Now, did you see a particular additional risk disclosure signed for Mr. Bell?

PROFESSOR BALSAR:     Yes, I did.

ATTORNEY PROSNITZ:     And that's on ComTrust stationery?

PROFESSOR BALSAR:     Yes, ComTrust stationery.

ATTORNEY PROSNITZ:     And this says that--?

PROFESSOR BALSAR:     It says--.

MALE:          (INAUDIBLE.)

ATTORNEY PROSNITZ:     It's in Tab 11.  It's B-00(INAUDIBLE)7.  And what does this document tell ComTrust, as you understand it?  First of all, it's a ComTrust document, correct?

PROFESSOR BALSAR:     Yes.  It says customer name, John Bell.  Dated 06-18-2005.  For customers that meet any of the following conditions (INAUDIBLE)--.

ATTORNEY PROSNITZ:     Alright.  And we know that Mr. Bell is retired, correct?

PROFESSOR BALSAR:     He says that (INAUDIBLE) the form.

ATTORNEY PROSNITZ:    Alright.  So ComTrust was on notice that he was retired, correct?

PROFESSOR BALSAR:    Yes.

ATTORNEY PROSNITZ:    And--.

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    He left – he left--.

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    So it turns out that he did have an account.  But as far as ComTrust knew--.

PROFESSOR BALSAR:    It was no.

ATTORNEY PROSNITZ:    It was a no.  And they also knew that since he was retired, he would be on a fixed income, he had no regular salary, correct?

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    So are these additional red flags, the risk disclosure?

PROFESSOR BALSAR:          Yes.

ATTORNEY PROSNITZ:          Which is retired.  Fixed income.

PROFESSOR BALSAR:          No previous futures (INAUDIBLE).

ATTORNEY PROSNITZ:          As far as they were concerned.  Well, I'll just leave that out because (INAUDIBLE) benefit of the doubt, since it turns out that he did have some. Given the fact that Mr. Bell was a major market player in crude oil and natural gas and had signed a risk disclosure that he was retired, do you think ComTrust should have done any inquiry about this account?

ATTORNEY SINCLAIR:          Objection.

JUDGE:          (INAUDIBLE).

PROFESSOR BALSAR:          I do not know (INAUDIBLE) the magnitude of commissions and fees of this magnitude, relative to the account balance, Table 4, the account balances in the hundreds, or more than 2,000, that should raise a lot of red flags.

ATTORNEY PROSNITZ:          Now, how about whether or not this was a discretionary account?  Do you understand that discretionary accounts require written authorization, correct?

PROFESSOR BALSAR:          Yes.

ATTORNEY PROSNITZ:        And given the magnitude of this trading, do you think ComTrust should have verified whether this was discretionary or nondiscretionary?

PROFESSOR BALSAR:        Again, I don't know (INAUDIBLE) but I did not find anything in my analysis (INAUDIBLE).

ATTORNEY PROSNITZ:        So this is no discretionary authority, right?

PROFESSOR BALSAR:        Yes, (INAUDIBLE).

ATTORNEY PROSNITZ:        So we have an odd situation where a retired individual is a major market player.  There's no discretionary authority on file, right?

PROFESSOR BALSAR:        Yes, (INAUDIBLE).

ATTORNEY PROSNITZ:        And does that raise a red flag in your opinion?

PROFESSOR BALSAR:        Given the size of the trades, yes.

ATTORNEY PROSNITZ:        So we come back to the size of the trades, right?  That's a major, major red flag in your view?

PROFESSOR BALSAR:        Well, (INAUDIBLE) say one thing.  Most of these (INAUDIBLE) at the end of it, there was a huge negative balance (INAUDIBLE) so immediately Mr. Bell (INAUDIBLE) so he had to transfer an additional 32,000 (INAUDIBLE).

ATTORNEY PROSNITZ:       Okay.  So another factor is he was getting margin calls, right?

PROFESSOR BALSAR:       Yes.

ATTORNEY PROSNITZ:       And tell us what those margin call – and that's something, the margin calls had come from ComTrust, right?

PROFESSOR BALSAR:       Yes.

ATTORNEY PROSNITZ:       And this would be another red flag, would it not?

PROFESSOR BALSAR:       It shows that the account is running negative (INAUDIBLE).

ATTORNEY PROSNITZ:       And how much were those margin calls?

PROFESSOR BALSAR:       On August 31st, 2005, $346,000 was wired transferred to the account.  That (INAUDIBLE).

ATTORNEY PROSNITZ:       What other margin calls?

PROFESSOR BALSAR:       On September 14th (INAUDIBLE) his account balance was negative $49, 318, so he wire transferred $50,000 the next day, the same day.

ATTORNEY PROSNITZ:        Are those the two big ones?

PROFESSOR BALSAR:        The two big ones.  There are many more.

ATTORNEY PROSNITZ:        Well, there's another one for $43,000?

PROFESSOR BALSAR:        There's another one for $43,300 on 09-27-2005 because the account was running negative $(INAUDIBLE).  Then we have a wire transfer on 01-26-2006 for $156,000 because the account was negative (INAUDIBLE).

ATTORNEY PROSNITZ:        Now, Mr. Bell started this account with how much money, what was his initial deposit?

PROFESSOR BALSAR:        His initial deposit was small, $27,000.

ATTORNEY PROSNITZ:        Alright.  Now, do you think it should have raised a red flag to ComTrust that here's a retired individual starting an account with $27,000 and they let the account go into debit to the tune of about $246,000, then $249,000, then $43,000, then $156,000?

PROFESSOR BALSAR:        It should have.

ATTORNEY PROSNITZ:        So--.

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY PROSNITZ:      Right, right.  So it strikes you as odd that they let the account go into such a major debit position without doing some further inquiry as to what was happening?

PROFESSOR BALSAR:      Without any due diligence (INAUDIBLE).

ATTORNEY PROSNITZ:      Are these – then is the level of these margin calls large relative to the initial deposit?

PROFESSOR BALSAR:      Very large.

ATTORNEY PROSNITZ:      Okay.  How about did you notice any credits to this account?

PROFESSOR BALSAR:      That's another interesting point.  He gets commission reversals and fee reversals from time to time in the account.

ATTORNEY PROSNITZ:      What did those total?

PROFESSOR BALSAR:      Commission reversals, $18,165.  And fee reversals total $40,172.

ATTORNEY PROSNITZ:      So we're getting credits of $40,000?

PROFESSOR BALSAR:      In the account.

ATTORNEY PROSNITZ:        And do we know what that's about?

PROFESSOR BALSAR:        The (INAUDIBLE).

ATTORNEY PROSNITZ:        Does that strike you as odd also?

PROFESSOR BALSAR:        Because (INAUDIBLE).

ATTORNEY PROSNITZ:        Okay.  Now, you looked at – you also analyzed the other
accounts, the other commodity accounts that Mr. Bell had at other firms like Vision,
right?

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY PROSNITZ:        First – oh, I'm sorry, before we leave ComTrust, what was
the ending debit balance in this account?  Do you have that number?

PROFESSOR BALSAR:        (INAUDIBLE) $75.

ATTORNEY PROSNITZ:        Okay.  So when all is said and done, at the end of this
trading, there was a $75,000 debit balance or not?

PROFESSOR BALSAR:        $75.

ATTORNEY PROSNITZ:        Oh, just $75.  Before that, was there a debit balance?  Can
you look at the last monthly account statements?

PROFESSOR BALSAR:        There's a debit balance of minus $156, $152 day before.

ATTORNEY PROSNITZ:        Right.

PROFESSOR BALSAR:        And on January the 31st--.

ATTORNEY PROSNITZ:        And did a wire transfer come in after that?

PROFESSOR BALSAR:        He wire transferred $153,000.

ATTORNEY PROSNITZ:        Right.

PROFESSOR BALSAR:        Yes.  And he cleared out (INAUDIBLE).  After that – I'm sorry, he wire transferred $156,002 on 01-26.

ATTORNEY PROSNITZ:        Okay.

PROFESSOR BALSAR:        Then he's left with negative $150 end of February--.

ATTORNEY PROSNITZ:        Negative $150?

PROFESSOR BALSAR:        And then negative $75 (INAUDIBLE).

ATTORNEY PROSNITZ:        Alright.  So how much did Mr. Bell lose overall?

PROFESSOR BALSAR:     Overall?  That was in Table 2, that is Table 2, $793,000 – Table 3 actually--.

ATTORNEY PROSNITZ:     How much is that?

PROFESSOR BALSAR:     $793,595.

ATTORNEY PROSNITZ:     $793,595?

PROFESSOR BALSAR:     Yes.

ATTORNEY PROSNITZ:     Okay.

PROFESSOR BALSAR:     (INAUDIBLE) is 58 percent of (INAUDIBLE).

ATTORNEY PROSNITZ:     Alright.

PROFESSOR BALSAR:     Four hundred sixty thousand (INAUDIBLE).

ATTORNEY PROSNITZ:     How much?

PROFESSOR BALSAR:     $460,096 (INAUDIBLE).

ATTORNEY PROSNITZ:     Alright.  And did you also do an analysis of how much Mr. Bell lost between July 29, 2005 and October 13, 2005?

PROFESSOR BALSAR:          I did it upon your request, yes.

ATTORNEY PROSNITZ:         And how much was that amount?

PROFESSOR BALSAR:          That amount was $552,790.

ATTORNEY PROSNITZ:         $552,790?

PROFESSOR BALSAR:          Yes.

ATTORNEY PROSNITZ:         Okay.  Alright.  So Mr. Bell lost close to $800,000 total in this account and about $550 during the time period I just mentioned?

PROFESSOR BALSAR:          Yes.

ATTORNEY PROSNITZ:         Alright.  Now, did you have occasion to analyze the other accounts?

PROFESSOR BALSAR:          I did.

ATTORNEY PROSNITZ:         First of all, we just heard that he put in a total of $800,000 into the ComTrust account.  How much did he put into the other accounts?  Have you added that up?

PROFESSOR BALSAR:        (INAUDIBLE) two accounts.  And the sum total of (INAUDIBLE) $28,000.  The other one he has deposited $103,655.  So the total for both of them, $131,655.

ATTORNEY PROSNITZ:      (INAUDIBLE)?

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY PROSNITZ:      Do you have extra copies of this?

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY PROSNITZ:      Alright.  We'll make copies.  You just have the one?  We'll make copies.  Okay.  So the total is $131,000.  How would you compare – first of all, how did these other two accounts compare to the ComTrust account in terms of fees and commissions?

PROFESSOR BALSAR:        The commissions are much lower in this account.  I'll tell you the exact amount, which is $95 (INAUDIBLE).  And the total amount of commission between 2004 and 2007 in the (INAUDIBLE) total amount of commissions $59,375.  Total amount of paid fees, $11,865.  His commission altogether was $71,240 over a four year period.

ATTORNEY PROSNITZ:      And how does that percentage (INAUDIBLE)?  Of all the money (INAUDIBLE)?

PROFESSOR BALSAR:     $71,000 (INAUDIBLE).

ATTORNEY PROSNITZ:     Alright.

PROFESSOR BALSAR:     Out (INAUDIBLE).

ATTORNEY PROSNITZ:     Alright.  Well--

PROFESSOR BALSAR:     (INAUDIBLE) seems to me the percent of the money he deposited.

ATTORNEY PROSNITZ:     Of the money he deposited.  But what about the overall trade volume, you haven't done that?

PROFESSOR BALSAR:     (INAUDIBLE).

ATTORNEY PROSNITZ:     I see you have (INAUDIBLE).

PROFESSOR BALSAR:     These are (INAUDIBLE).

ATTORNEY PROSNITZ:     Okay.  What about trading strategy in that account?  How was that?

PROFESSOR BALSAR:     There was a big difference.  In those other accounts, his trading base, small sizes.  There's one contract 500.  The largest I saw was the 31 (INAUDIBLE).

ATTORNEY PROSNITZ:    As opposed to 1,400 contracts with ComTrust?

PROFESSOR BALSAR:    That's a big difference.

ATTORNEY PROSNITZ:    Was he ever a major market player at these other two

places?

PROFESSOR BALSAR:    Very small one.

ATTORNEY PROSNITZ:    Did they let hundreds of thousands of dollars of contracts

expire worthless at the other two accounts?

PROFESSOR BALSAR:    I did an analysis of that.  And there were just about

(INAUDIBLE) they allowed eight contracts to expire worthless (INAUDIBLE).

ATTORNEY PROSNITZ:    So if we compare what happened at ComTrust versus

what happened at these other two places, would you characterize it as apples versus

oranges?

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    Did you see any evidence of recklessness on these other

two accounts?

PROFESSOR BALSAR:    They lost money also.

ATTORNEY PROSNITZ:       Uh-huh.

PROFESSOR BALSAR:       Both these accounts had lost money.  But it's not due to (INAUDIBLE).

ATTORNEY PROSNITZ:       Alright.  Now I want to show you some documents from the NFA.

MALE:          (INAUDIBLE).  Are these exhibits?

ATTORNEY PROSNITZ:       (INAUDIBLE).

JUDGE:       Do you have only one (INAUDIBLE)?

ATTORNEY SINCLAIR:       I don't (INAUDIBLE) this is certainly (INAUDIBLE) a surprise.  (INAUDIBLE) exhibits.

ATTORNEY PROSNITZ:       I'm not saying we'd introduce them.  Plus these are certain NFA rules.  So if he's claiming that his client is surprised by NFA rules--.

ATTORNEY SINCLAIR:       (INAUDIBLE).

JUDGE:       I don't believe that's what he said, Mr. Prosnitz

ATTORNEY PROSNITZ:       Alright.

JUDGE:        What (INAUDIBLE)?

ATTORNEY PROSNITZ:        I want to call his attention to the financial requirements of what an FCM is supposed to do in terms of reconciling accounts on a daily basis and ask him if that's consistent with his conclusion that drew these red flags that give that – if they did all this, should they have noticed the volume traded?

ATTORNEY SINCLAIR:        I'll withdraw my objection.

JUDGE:        Okay.

ATTORNEY PROSNITZ:        Let's--.

ATTORNEY SINCLAIR:        (INAUDIBLE).

ATTORNEY PROSNITZ:        Alright.  So let's--.

ATTORNEY SINCLAIR:        (INAUDIBLE).

ATTORNEY PROSNITZ:        Okay.  So let's turn to the self-examination checklist, June 2005.

ATTORNEY SINCLAIR:        That's (INAUDIBLE) on the cell.  (phone ringing.)  I'm so sorry.

ATTORNEY PROSNITZ:     Page 14, please.

JUDGE:     I'm sorry, one more time (INAUDIBLE).

ATTORNEY PROSNITZ:     It's the supplemental examination checklist.  And it's page 14 of it, halfway down.

JUDGE:     Okay.  Thank you.

ATTORNEY PROSNITZ:     Alright.  Professor, these are checklists of financial items that FCMs are supposed to do?

PROFESSOR BALSAR:     Yes.

ATTORNEY PROSNITZ:     Now, if ComTrust had done all these things, do you think they would have noticed the volume of trading from Mr. Bell?

PROFESSOR BALSAR:     (INAUDIBLE).

ATTORNEY PROSNITZ:     Well (INAUDIBLE).

ATTORNEY SINCLAIR:     (INAUDIBLE) refer to the specific items (INAUDIBLE).

JUDGE:     I think that's (INAUDIBLE).  Well, first of all, (INAUDIBLE), sustained.

(End Disk 6, Track #4.  Begin Track #5.)

PROFESSOR BALSAR:    You look in (INAUDIBLE) the new positions (INAUDIBLE) of clients (INAUDIBLE).

ATTORNEY PROSNITZ:    Alright.  But – okay.  And even without this checklist, your common sense to you is that if someone's a major market player, the FCM should notice it?

PROFESSOR BALSAR:    Sure.

(End Disk 6, Track #5.  Begin Track #6.)

(No discussion occurs in Track #6.  End Disk 6.)

AAA/cmy