06-ARB-61
Disk 7

ATTORNEY PROSNITZ:    Okay.  Professor, were you licensed as a commodity trading advisor?

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    Alright.  And by virtue of being licensed as a CTA, did you have to go through suitability training?

PROFESSOR BALSAR:    I passed the exam (INAUDIBLE).

ATTORNEY PROSNITZ:    And were you trained in suitability at all?

PROFESSOR BALSAR:    I was not.

ATTORNEY PROSNITZ:    So you don't recall the exam covering that subject?

PROFESSOR BALSAR:    That was a long time ago.

ATTORNEY PROSNITZ:    Alright.  Let's turn to Claimant's Exhibit 12, the statement of Mr. Bell, the second page.  Okay.  Now, calling – first of all, is it your understanding that this is a statement that Mr. Bell prepared at the request of ComTrust?  Do you know?

PROFESSOR BALSAR:    I don't know that.  I know it was like (INAUDIBLE) Mr. Bell.

1

ATTORNEY PROSNITZ:        Alright.  And could you read the second – the first two sentences in the second paragraph that say – starts with "Beginning on June 16th."

PROFESSOR BALSAR:        Beginning on June 16th, 2005, I (INAUDIBLE) Goldberg and ProTrade, via ComTrust, (INAUDIBLE).  They have spoken with me about the investment potential (INAUDIBLE) how the industry of (INAUDIBLE).

ATTORNEY PROSNITZ:        Okay.  So what did you understand that to me in terms of what Mr. Goldberg was recommending?

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY PROSNITZ:        He thought the price was going to go up and there's nothing at all in the actual phrase consistent with that, is there?

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY PROSNITZ:        Neutral (INAUDIBLE)?  No other questions.

CHAIRMAN:   (INAUDIBLE).

ATTORNEY SINCLAIR:        Professor, I just have just a couple of questions for you.  I got to admit to being a little confused here.  I think you testified that between July 29th and October 13th, the losses in this account were $552,000?

PROFESSOR BALSAR:    Yes.

ATTORNEY SINCLAIR:    That was your testimony?

PROFESSOR BALSAR:    Yes.

ATTORNEY SINCLAIR:    Okay.  So were those just on trades that were initiated and completed in that period of time?

PROFESSOR BALSAR:    Those were trades initiated.

ATTORNEY SINCLAIR:    Those were trades that were initiated.  Those trades were still open, were they not, sir?

PROFESSOR BALSAR:    Yes, they were open.

ATTORNEY SINCLAIR:    Okay.  So if those trades were open, Professor, they still had a possibility of profiting, didn't they?

PROFESSOR BALSAR:    That's not the way it worked out--.

ATTORNEY SINCLAIR:    I didn't ask you the way it worked out.  I asked you whether at the time, as of October 13th, whether they had the possibility of profiting?

PROFESSOR BALSAR:    (INAUDIBLE) some of them actually (INAUDIBLE) goes out before October 13th.  And those were the big losses (INAUDIBLE).

ATTORNEY SINCLAIR:          What were the trades that were closed out by – that were initiated after July 29th and closed out by October 13th that resulted in losses?

PROFESSOR BALSAR:          Okay.  Take a look at Table 2.

ATTORNEY SINCLAIR:          I'm right there for you.

PROFESSOR BALSAR:          Page 2.  You open the (INAUDIBLE).  He bought on 08-31-2005, he bought 230.  December 5 (INAUDIBLE) 4.82 (INAUDIBLE).

ATTORNEY SINCLAIR:          Correct.

PROFESSOR BALSAR:          On 09-04, 10-07-2005, (INAUDIBLE) 13, he offset by selling 40 of those (INAUDIBLE) 162.  That was a realized loss of $4.19, which is $4,100 times 4 (INAUDIBLE).  That is $167,600 realized loss on that one trade.

ATTORNEY SINCLAIR:          Okay.  Now, let me ask you this.

CHAIRMAN:   Wait, I don't think he's finished his answer.  I understood the question to be whether there – have you finished your answer, sir, as to other--?

ATTORNEY SINCLAIR:          I apologize.

PROFESSOR BALSAR:          (INAUDIBLE).  There is another one on the next page. Cluster 7.  He bought on 09-23-05, he bought 50 March '06 option calls – I'm sorry, on

the third line, buy 50 March '06 option 64 calls at 170.  He sold on 10-10, which is prior to 10-13, he sold 50 margins, 64, but he called them one point (INAUDIBLE).  That is (INAUDIBLE).

ATTORNEY SINCLAIR:        Okay.  Thank you.

PROFESSOR BALSAR:        One sixty (INAUDIBLE).  Those are the two I can spot (INAUDIBLE).

ATTORNEY SINCLAIR:        Please, take your time.  Just I want you to tell us all of them.

PROFESSOR BALSAR:        And the commissions that are charged because that last – the moment the trade was initiated (INAUDIBLE) between July and October, all the commissions that were charged to the account, where there is only a charge when the trade was initiated.  There is no charge for commissions and fees on the reversal side.

ATTORNEY SINCLAIR:        So a round term commission, right?

PROFESSOR BALSAR:        At the time the trade was initiated, (INAUDIBLE) the account (INAUDIBLE).

ATTORNEY SINCLAIR:        Okay.  Now--.

PROFESSOR BALSAR:        So let us add that up.  Can I do that?

ATTORNEY SINCLAIR:        Sir, I asked you a question about closed and completed trades, have I not?

PROFESSOR BALSAR:        There are only two.

ATTORNEY SINCLAIR:        Okay.  And you pointed out, and I'm going to go back to trade cluster 4 for a minute--.

PROFESSOR BALSAR:        Yes.

ATTORNEY SINCLAIR:        That was a spread, right?  He bought some positions, he sold some positions.  And then he – when he offset some of the positions that he sold, he did that at a loss, did he not, sir?

PROFESSOR BALSAR:        You're getting it wrong.  He offset some positions that he had bought--.

ATTORNEY SINCLAIR:        Oh, excuse me, I apologize, you're absolutely right.  Now--.

PROFESSOR BALSAR:        He didn't do anything with what he had sold (INAUDIBLE).

ATTORNEY SINCLAIR:        Okay.  If I look at the fact that he had sold those calls at (INAUDIBLE), and when he did that offset position, the price seems to have gone down a lot, right?

PROFESSOR BALSAR:        Yes.

ATTORNEY SINCLAIR:        Would it be fair to assume, Professor, that the price of the options he had sold had gone down and there was a profit in those options that he was still short?

PROFESSOR BALSAR:        It's fair to assume, yes.

ATTORNEY SINCLAIR:        It was just upon realized profit?

PROFESSOR BALSAR:        That is true.

ATTORNEY SINCLAIR:        Professor, is there anything in any of your papers here that has analyzed what the unrealized profit or loss was in any of these positions that were initiated on or after July 29th, as of October 13th, 2005?

PROFESSOR BALSAR:        No, I have not done that.  But could you please take a look at cluster 6?

ATTORNEY SINCLAIR:        I'm done with my questions.  Thank you.

PROFESSOR BALSAR:        Well, because it's--.

ATTORNEY SINCLAIR:        I'm done with my questions.  Thank you.

CHAIRMAN:   That's fine.   That's fine.   Thank you, Professor.   You've answered his questions.  (INAUDIBLE)?

MALE:          Professor, you indicated that after there were some charges in the $200 per (INAUDIBLE)--.

PROFESSOR BALSAR:          Yes.

MALE:          And then that was reduced to $100, correct?

PROFESSOR BALSAR:          (INAUDIBLE).

MALE:          And isn't that close to the $95 that the others were charging?

PROFESSOR BALSAR:          (INAUDIBLE).

MALE:          Let me ask you this question, Professor.  Wouldn't you agree that it is to the benefit of a broker to liquidate a position at a loss so that there was equity in the account to allow him to put on yet another trade to (INAUDIBLE)?

PROFESSOR BALSAR:          (INAUDIBLE).

MALE:          Okay.  So the fact that these expired worthless was not necessarily for the benefit of the broker, was it?

PROFESSOR BALSAR:          (INAUDIBLE).

MALE:          Was it?

PROFESSOR BALSAR:        No.

MALE:        Because if he had liquidated positions with half the money left, he could have put on another position, right?  He could have--.

PROFESSOR BALSAR:        (INAUDIBLE-speaking simultaneously.)--.

MALE:        --crafted another position.  And maybe made money, maybe -(INAUDIBLE) multiple times.  So he could have earned a lot more commissions than he did, right?

PROFESSOR BALSAR:        (INAUDIBLE).

MALE:        Well, right.  But you were the one who was saying that the only reason he let these positions on was to earn commissions.

PROFESSOR BALSAR:        He made more commissions when he let them expire (INAUDIBLE).

MALE:        Right.

PROFESSOR BALSAR:        (INAUDIBLE).

MALE:        And it was in equity for him to earn more commissions?

PROFESSOR BALSAR:       What he would have done, could have done (INAUDIBLE) issue.

MALE:       Okay.  Well, now you would think the fact that the margin calls were made promptly would cause ComTrust, for instance, to be concerned about the account?

PROFESSOR BALSAR:       Not promptly or (INAUDIBLE), that doesn't bother me.  The magnitude of margin calls and the frequency with which he's making margin calls, the amounts involved are substantial, $200,000-plus.  And he's getting this every two weeks, it seems.  August 31st, September 14th.  That definitely in my mind should have raised a lot of red flags.

MALE:       Okay.  Let me ask you this.  Could we take a short break?  Because Mr. Miller has contacted (INAUDIBLE).  Oh, let me ask this question first.  You have what the trade was.  Do you have what the open interest was in the natural gas?

PROFESSOR BALSAR:       (INAUDIBLE).

MALE:       So really, the size of the – if you make a trade and then you don't make another trade for two weeks, and if the open interest is substantially higher, that may not make him a major player per se.  I mean, the major player aspect is based really on open interest, isn't it?

PROFESSOR BALSAR:       It is based on the volume.  It was significantly--.

MALE:       Then the open interest isn't important?

PROFESSOR BALSAR:    That affects the liquidity of the (INAUDIBLE).  But volume is also (INAUDIBLE) effect on it.

MALE:    Right.  But the number of positions you own--.

PROFESSOR BALSAR:    (INAUDIBLE)--.

MALE:    --versus – well, it would really show whether you're a major market player?

PROFESSOR BALSAR:    Plus volume.  (INAUDIBLE)--.

MALE:    And not the open interest?

PROFESSOR BALSAR:    Open interest shows liquidity.

MALE:    It shows how many players there are, how many contracts are open, right?

PROFESSOR BALSAR:    Yes, (INAUDIBLE).

MALE:    You talked about liquidity.  Let's talk about again, the (INAUDIBLE) clearly liquid, wasn't it?

ATTORNEY PROSNITZ:    Objection.  Lack of foundation.

MALE:          The markets were liquid--.

CHAIRMAN:   Which markets are we talking about?

MALE:          The markets that you're analyzing.  Let's talk about the natural gas.

PROFESSOR BALSAR:      I doubt (INAUDIBLE) because he was only able to offset one position on 10-18.  But why couldn't he offset the other 349?

MALE:          At a particular price.

PROFESSOR BALSAR:      At a particular price, which was the profit (INAUDIBLE) from.

MALE:          Right.  But you don't know, right?

PROFESSOR BALSAR:      So that leads me to believe it wasn't too liquid at that time.

MALE:          So you're speculating?

PROFESSOR BALSAR:      I'm speculating.

MALE:          Could we have just a very – because this is (INAUDIBLE), just five minutes?

(End of Disk 7, Track #1.  Begin Track #2.)

ATTORNEY SINCLAIR:          Now--.

CHAIRMAN:    (INAUDIBLE) the record--.

FEMALE:        She said she's--.

CHAIRMAN:    Thank you.  Sorry.  You may proceed.

ATTORNEY SINCLAIR:          Now, you have reviewed the statements, right?

PROFESSOR BALSAR:          (INAUDIBLE).

ATTORNEY SINCLAIR:          So Mr. (INAUDIBLE)'s position is there, isn't that correct?

PROFESSOR BALSAR:          (INAUDIBLE).

ATTORNEY SINCLAIR:          You knew what his positions were and you got--?

PROFESSOR BALSAR:          Got the statements.

ATTORNEY SINCLAIR:          You got the statements.

PROFESSOR BALSAR:          (INAUDIBLE).

ATTORNEY SINCLAIR:    Right.  And he sent money?

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY SINCLAIR:    Now, we've talked about the possibility that the trades were – it was a nondiscretionary account, right?

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY SINCLAIR:    And you said rather repeatedly (INAUDIBLE) and that leads you to believe that Mr. Bell had (INAUDIBLE) trades?

PROFESSOR BALSAR:    (INAUDIBLE).

ATTORNEY SINCLAIR:    Would it be fair for ComTrust to assume that if money was being received to move the margin calls that the customer was – had no problem with it?

ATTORNEY PROSNITZ:    Object to asking the witness to speculate as to what ComTrust (INAUDIBLE).

CHAIRMAN:  Overruled.  I think it's a fair question.  Go ahead.  Let him finish the question first.  But where it was going I think is fair.

ATTORNEY SINCLAIR:    I mean, is it reasonable to suggest that ComTrust, having received the margin calls promptly, that that would not raise a red flag?  The money was being paid.

PROFESSOR BALSAR:      I don't know (INAUDIBLE) Mr. Bell's recourse in making these--.

ATTORNEY SINCLAIR:      That wasn't my question.  But he paid the money?

PROFESSOR BALSAR:      He paid.

ATTORNEY SINCLAIR:      Now, your analysis, you analyzed that the other accounts, commissions represented about how much of the equities, 60-some odd percent?

PROFESSOR BALSAR:      Of the amount deposited in the accounts.

ATTORNEY SINCLAIR:      Right.

PROFESSOR BALSAR:      (INAUDIBLE) 3,000.  Commissions (INAUDIBLE) thousand (INAUDIBLE) 65 percent, yes.

ATTORNEY SINCLAIR:      Okay.  And in this account, we know it was bigger.  And what was the percentage of commissions?

PROFESSOR BALSAR:      (INAUDIBLE).

ATTORNEY SINCLAIR:      I don't think that was your testimony--.

PROFESSOR BALSAR:      That is not what I (INAUDIBLE) comparing answers with (INAUDIBLE).  I'm saying the commissions were 72.57 percent of the amount charged to the account.

ATTORNEY SINCLAIR:      Okay.

PROFESSOR BALSAR:      In the other case, I do not know what was charged to the account because I didn't have (INAUDIBLE) to do that (INAUDIBLE).

ATTORNEY SINCLAIR:      Okay.  Well, you knew how much Mr. Bell lost?

PROFESSOR BALSAR:      I knew that he lost close to $800,000.

ATTORNEY SINCLAIR:      Okay.  And the commissions represented how much?

PROFESSOR BALSAR:      Seventy-five percent of that.

ATTORNEY SINCLAIR:      Okay.  So the commissions were somewhat higher, but still in a range not that outrageous in terms of the other account?

PROFESSOR BALSAR:      The account was much smaller.   But we have the magnitude (INAUDIBLE)--.

ATTORNEY SINCLAIR:      That's not the question.  It's the percentage.  Well, I don't know if this is a problem (INAUDIBLE).  You realize that ComTrust was the clearing (INAUDIBLE) and that ProTrade was an independent introducing broker?

PROFESSOR BALSAR:        Yes.

ATTORNEY SINCLAIR:        And that Corporate was an independent introducing broker?

PROFESSOR BALSAR:        Yes.

ATTORNEY SINCLAIR:        And you stated that ProTrade was the one who set the commissions, not ComTrust.  You referred to a document.

PROFESSOR BALSAR:        (INAUDIBLE) I don't know (INAUDIBLE) whether it was Corporate or ComTrust, I actually don't know (INAUDIBLE)--.

ATTORNEY SINCLAIR:        Well, let's take a look at it.  (INAUDIBLE) B-45 in Exhibit 11.  (INAUDIBLE) B-45.  Okay.  (INAUDIBLE) on this?

PROFESSOR BALSAR:        Yes.

ATTORNEY SINCLAIR:        From ProTrade?

PROFESSOR BALSAR:        It doesn't say (INAUDIBLE).

ATTORNEY SINCLAIR:        Introducing broker?

PROFESSOR BALSAR:        (INAUDIBLE) introducing broker, okay, (INAUDIBLE).

ATTORNEY SINCLAIR:          The only name on this form is ProTrade, is that correct?

PROFESSOR BALSAR:          It names the introducing broker, yes.

ATTORNEY SINCLAIR:          Okay.

PROFESSOR BALSAR:          Who generated this, I do not know.

ATTORNEY SINCLAIR:          Well, of course you – but ComTrust's name isn't on this form, is it?

PROFESSOR BALSAR:          Not on this form, (INAUDIBLE).

ATTORNEY SINCLAIR:          Are you familiar with a form called the Commodity Futures Trading Commission (INAUDIBLE) in Special Accounts?  Form No. (INAUDIBLE)02.

PROFESSOR BALSAR:          (INAUDIBLE).

ATTORNEY SINCLAIR:          No further questions.

CHAIRMAN:   Anything further, (INAUDIBLE)?

ATTORNEY PROSNITZ:          Yes.   Now, you were trying to tell Mr. David something which he didn't want to hear.  You were trying to tell him how much was charged in fees

and commissions between July 29th and October 13, '05.  Have you had an opportunity to calculate that?

PROFESSOR BALSAR:    I had calculated that on the break.  Commissions and fees between July 29th and October 13th works out to (INAUDIBLE).

ATTORNEY PROSNITZ:    $483---.

PROFESSOR BALSAR:    110.

ATTORNEY PROSNITZ:    That's fees and commissions?

PROFESSOR BALSAR:    Yes.

ATTORNEY PROSNITZ:    Well, how about realized losses for that period?

PROFESSOR BALSAR:    There's one realized loss on 10-07-05 pertaining to trade cluster 4 (INAUDIBLE).  And that loss, realized loss is $167,600.

ATTORNEY PROSNITZ:    That's a loss?

PROFESSOR BALSAR:    That's a loss.

ATTORNEY PROSNITZ:    Realized loss?

PROFESSOR BALSAR:        That's a realized profit which (INAUDIBLE) October 10th of 2005, sold 15 March '06 (INAUDIBLE) for a profit of $15,000.

ATTORNEY PROSNITZ:        So that would be an offset?

PROFESSOR BALSAR:        That's an offset.

ATTORNEY PROSNITZ:        Well, so overall let's add up these numbers and tell us what the total is.

PROFESSOR BALSAR:        $625,610.

ATTORNEY PROSNITZ:        And that occurred during the time period of July 29th to October 13th, 2005, correct?

PROFESSOR BALSAR:        Yes.

ATTORNEY PROSNITZ:        Alright.  Now, you were asked various questions by Mr. Sinclair about the commission structure, you know, whether the $100 wasn't that bad, etc.  Does any of that change your overall view as to whether the commissions and fees here were appropriate with respect to the total charged?

PROFESSOR BALSAR:        The point is the $100, besides this being (INAUDIBLE) and that's my personal view, (INAUDIBLE) ComTrust charged them, ProTrade charged (INAUDIBLE) but comparing one batch to another.

ATTORNEY PROSNITZ:    Right.  And what is the total fees and commissions that are charged here?

PROFESSOR BALSAR:    For the other fund?

ATTORNEY PROSNITZ:    No, for the whole – for the ComTrust account.

CHAIRMAN:    (INAUDIBLE) corporate accounts?  I'm sorry, (INAUDIBLE).

ATTORNEY SINCLAIR:    It's already in the record.    He said that ComTrust (INAUDIBLE).

ATTORNEY PROSNITZ:    At ComTrust, (INAUDIBLE) it's a ComTrust account.  There's no account at ProTrade.  There's no account at Corporate Commodities.

ATTORNEY SINCLAIR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    What was the total commissions charged at the ComTrust account?

PROFESSOR BALSAR:    It's in Table 2.  Total amount charged, (INAUDIBLE) end of Table 2, total amount charged in commissions and fees is $575,933.

ATTORNEY PROSNITZ:    The total lost?

PROFESSOR BALSAR:    Its $795,000.

ATTORNEY PROSNITZ:     Seven what?

PROFESSOR BALSAR:     $793,500.

ATTORNEY PROSNITZ:     And in your view, is $575,933 a reasonable amount of fees and commissions?

PROFESSOR BALSAR:     That is way too high.

ATTORNEY PROSNITZ:     Alright.   Now, you also wanted to say something about cluster 6, which Mr. David didn't want to hear about from you (INAUDIBLE) cluster 6. Tell us what you were going to say.

PROFESSOR BALSAR:     The point being (INAUDIBLE) pointed out was in cluster 4, he said there's an unrealized profit for getting the (INAUDIBLE) crude oil calls that were sold at 540 and (INAUDIBLE) trading volume for short-selling of these calls results in an unrealized profit, that is true.  But the flip side is in cluster 6, where he sold 700 natural gas calls (INAUDIBLE) of (INAUDIBLE) dollars, subsequent to some of these were offset among (INAUDIBLE) at a price of 2.63.   So the price had gone up (INAUDIBLE) considerably and he was left with a huge unrealized loss.  So if we talk about unrealized gains in cluster 4, you should also consider the unrealized loss in cluster 6.   That was the point that I was trying to make but he (INAUDIBLE).

ATTORNEY PROSNITZ:     No other questions.

ATTORNEY DAVID:  May I, please?  You know, I'm going to come over to this chart for a minute, because I'd like to look at these numbers.  So, Professor, you told us during your direct, right, that the losses were $550, that's what you estimate?  You said the losses were $550,000, from your direct testimony this morning?

ATTORNEY PROSNITZ:      Wait, wait.  First of all, I--.

ATTORNEY DAVID:  Wait, wait a second.

ATTORNEY PROSNITZ:      First, I think Mr. David should tone his voice down.  He's kind of shouting at the witness.  But my objection to the question what time period are we talking about?  Are we talking about the period July 29th, '05 to October 13th, '05?

ATTORNEY DAVID:  Yeah.  And I'm not shouting at the witness.  (INAUDIBLE) what shouting is.  I'm not shouting (INAUDIBLE).  I think this is an interesting discussion and I appreciate that.  Professor--.

CHAIRMAN:  Let me deal (INAUDIBLE) Mr. David is referring to the Professor's testimony (INAUDIBLE), number one.  (INAUDIBLE)

ATTORNEY DAVID:  Yes.

CHAIRMAN:  But just so – but during a specific time period, not the overall loss. (INAUDIBLE).

ATTORNEY DAVID:  So you set the loss during that time period, July 29th through October 13th, was $550, right?  Now, you've looked at some elements.  You've looked at fees and commissions, realized losses and gains during that period, and you said the loss was $635,610, right?

PROFESSOR BALSAR:        (INAUDIBLE).

ATTORNEY DAVID:  So doesn't that mean that the market came back in favor of the Claimant between October 13th and whenever these positions were closed out, so that his actual loss was somewhat less, right?

PROFESSOR BALSAR:        (INAUDIBLE) what date?

ATTORNEY DAVID:  Well, I don't know what date, sir, because you told me the actual loss was $550.  Then you told me it's $635.

PROFESSOR BALSAR:        (INAUDIBLE) I don't remember if it was $550 for one date (INAUDIBLE).

ATTORNEY DAVID:  Oh, alright.   Well, let me ask you this question, Professor.  Historical prices on a daily basis are available, are they not?

PROFESSOR BALSAR:        Yes.

ATTORNEY DAVID:  You could have, if you had wanted to, gotten those historical prices and determined the actual, unrealized gains and losses, as well as the realized gains and losses as of October 13th, 2005, correct?

PROFESSOR BALSAR:        Correct.

ATTORNEY DAVID:  You did not do that, sir, is that right?

PROFESSOR BALSAR:        That is correct.

ATTORNEY DAVID:  Is it correct, sir, that this panel does not know today what the actual realized and unrealized losses were in this account as of October 13th, 2005?

PROFESSOR BALSAR:        Not true.  They know the realized losses.  They do not know the unrealized losses.

ATTORNEY DAVID:  They don't know the unrealized gains either, do they, sir?

PROFESSOR BALSAR:        They don't.  But the unrealized losses far outweigh the unrealized gains.  I can bet my last dollar on that.

ATTORNEY DAVID:  I see.  Can you tell me what the specific amount is right now?

PROFESSOR BALSAR:        I can bet my entire life savings on that statement.

ATTORNEY DAVID:  I didn't ask you that, sir.  I asked you a very specific question--.

PROFESSOR BALSAR:        Okay.--

ATTORNEY DAVID:   Sir, sir, please, I'm really asking a very specific question.

PROFESSOR BALSAR:        Listen to me.

ATTORNEY DAVID:   No, no, no.  I get to ask the questions.  It's m question, sir.

CHAIRMAN:   Mr. David--.

ATTORNEY DAVID:   Can you tell--.

CHAIRMAN:    Mr. David, please be seated.

ATTORNEY DAVID:   Thank you.

PROFESSOR BALSAR:        (INAUDIBLE) you to talk to me standing up.

CHAIRMAN:   Alright.  Now, ask the question.

ATTORNEY DAVID:   My question, sir, is can you tell us what the specific dollar amount of realized and unrealized gains and losses are, as of the specific date October 13th, 2005?  The specific dollar amount, sir?

PROFESSOR BALSAR:      I do not know that but I would calculate it and I bet my last dollar it would be a huge number.  I would do that because you are forcing me to do it now.

CHAIRMAN:   The answer is no.

ATTORNEY DAVID:   Thank you.  I have nothing further.

CHAIRMAN:   Anything else, Mr. Sinclair?

ATTORNEY SINCLAIR:      No further (INAUDIBLE).

CHAIRMAN:  Mr. (INAUDIBLE) very thin area.   (INAUDIBLE) allow redirect on (INAUDIBLE).  I say that because we (INAUDIBLE), okay.  If we (INAUDIBLE).

MALE:       That's it.

CHAIRMAN:   (INAUDIBLE).

ATTORNEY PROSNITZ:      I tell you (INAUDIBLE) I'm sorry.

(INAUDIBLE-multiple parties speaking simultaneously.)

ATTORNEY DAVID:   And I guess state it t the panel that I thought (INAUDIBLE).

CHAIRMAN:   (INAUDIBLE).  Let's just say--.

ATTORNEY DAVID:   (INAUDIBLE), alright, but I'll keep the (INAUDIBLE).

CHAIRMAN:   Okay.  Alright.

ATTORNEY DAVID:   Unless (INAUDIBLE)—.

ATTORNEY SINCLAIR:      And I do want to at least object to the statement that Mr. Bell's losses (INAUDIBLE) still a trade.

CHAIRMAN:   Mr. Sinclair, that objection (INAUDIBLE).

ATTORNEY PROSNITZ:      Alright.  Alright.  So first, I just want to focus on what – on this time period (INAUDIBLE) it's clear this $483,110 is fees and commission paid, right?

PROFESSOR BALSAR:      Right.

ATTORNEY PROSNITZ:      Alright.  This – you've looked at realized loss and realized gain for the period, correct?

PROFESSOR BALSAR:      Yes.

ATTORNEY PROSNITZ:      And the realized loss far exceeds the realized gain?

PROFESSOR BALSAR:      Right.

ATTORNEY PROSNITZ:     And if that $550,000 figure that we talked about (INAUDIBLE), that referred to transactions initiated during this period, right?

PROFESSOR BALSAR:     (INAUDIBLE).

ATTORNEY PROSNITZ:     So the one calculation that you did not perform was what, if anything, had been liquidated as of October 13th, right?

PROFESSOR BALSAR:     Right.

ATTORNEY PROSNITZ:     But given what you know about the overall movement of the account, do you feel there's any chance they would have – that if everything was liquidated on October 13th, he would have made (INAUDIBLE) this fees and commissions, that the profits would have outweighed that?

PROFESSOR BALSAR:     (INAUDIBLE).

ATTORNEY PROSNITZ:     No other questions.

ATTORNEY SINCLAIR:     (INAUDIBLE).

CHAIRMAN:   Thank you, Professor.  You may be excused.  Thank you for coming here today (INAUDIBLE).

(End Disk 7, Track #2.  Begin Track #3.)

CHAIRMAN:   I'm going to ask you this, Mr. Maylor.   Okay.   Mr. Maylor, you can stay right there.   You've already been sworn in under oath.   You may (INAUDIBLE).

ATTORNEY PROSNITZ:        Alright.   Can you state your name, please?

STUART MAYLOR:     Stuart Maylor.

ATTORNEY PROSNITZ:        And what is your current employment?

STUART MAYLOR:     (INAUDIBLE) ComTrust.

ATTORNEY PROSNITZ:        What's your current employment?

STUART MAYLOR:     I'm currently employed by ComTrust (INAUDIBLE).

ATTORNEY PROSNITZ:        Do you have any other current employment?   What's your other employment?

STUART MAYLOR:     (INAUDIBLE).

ATTORNEY PROSNITZ:        I can't hear you.   What's your (INAUDIBLE)?

STUART MAYLOR:     I'm a director and owner of another two introducing brokers.

ATTORNEY PROSNITZ:        Another two introducing brokers?

STUART MAYLOR:   Two additional positions that I hold.   One is with an introducing broker, (INAUDIBLE) Commodity.  One is a vendor introducing (INAUDIBLE).

ATTORNEY PROSNITZ:      Okay.  So you are current – your position with ComTrust is director?  Do you have (INAUDIBLE) position at ComTrust?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:      Do you own stock in ComTrust?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:      How much?

STUART MAYLOR:    Ten percent.

ATTORNEY PROSNITZ:      What?

STUART MAYLOR:    Ten percent.

ATTORNEY PROSNITZ:      Ten percent?   And ComTrust is a future commission – future clearinghouse, right?

STUART MAYLOR:    It's a futures commission (INAUDIBLE).

ATTORNEY PROSNITZ:      Future Commission (INAUDIBLE), FCM, correct?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:      And you also have current positions with introducing brokers?

STUART MAYLOR:    As I stated before, yes.

ATTORNEY PROSNITZ:      And who are those introducing brokers?

STUART MAYLOR:    The person (INAUDIBLE).

ATTORNEY PROSNITZ:      What's your position with Universal Commodity?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:      And where does Universal Commodity do business?

STUART MAYLOR:    In Aventura, at the same location as ComTrust.

ATTORNEY PROSNITZ:      So this introducing broker is in the same office suite as ComTrust?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:    And  do  you  own  a  ownership  interest  in  Universal Commodity?

STUART MAYLOR:    An owner only.

ATTORNEY PROSNITZ:    Excuse  me?

STUART MAYLOR:    An owner only.  I'm not involved in the day-to-day--.

ATTORNEY PROSNITZ:    Alright.  And how much--?

STUART MAYLOR:    (INAUDIBLE-speaking simultaneously.)

ATTORNEY PROSNITZ:    --I thought you said you were president?

STUART MAYLOR:    I am.

ATTORNEY PROSNITZ:    Okay.  So you are an officer?

STUART MAYLOR:    I am.

ATTORNEY PROSNITZ:    What percent do you own of Universal Commodity?

STUART MAYLOR:    100 percent.

ATTORNEY PROSNITZ:    How much?

STUART MAYLOR:     100 percent.

ATTORNEY PROSNITZ:     And what's the name of the other introducing broker you're connected with?

STUART MAYLOR:     Stuart Financial Group.

ATTORNEY PROSNITZ:     And what's our position with Stuart Financial?

STUART MAYLOR:     I'm a principal (INAUDIBLE) and I'm the president.

ATTORNEY PROSNITZ:     You are the president?

STUART MAYLOR:     Principal AP and president.

ATTORNEY PROSNITZ:     And president.  And you own an ownership interest in that?

STUART MAYLOR:     100 percent.

ATTORNEY PROSNITZ:     100 percent.  And that's an IB?

STUART MAYLOR:     That's correct.

ATTORNEY PROSNITZ:     And what's the location of Stuart Financial Group.

STUART MAYLOR:    That is the same location.

ATTORNEY PROSNITZ:    Same address as ComTrust?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:    Have either Universal Commodity or Stuart Financial been subject to any NFA complaints?

STUART MAYLOR:    Universal Commodity has but not during my tenure.

ATTORNEY PROSNITZ:    When did you get involved with Universal Commodity?

STUART MAYLOR:    In a – in what capacity?

ATTORNEY PROSNITZ:    In any capacity?

STUART MAYLOR:    Around 1993, I was a broker there for a short period of time but I'm not sure of my exact dates.

ATTORNEY PROSNITZ:    Alright.  When did--?

STUART MAYLOR:    '93, '94, but that's all on the National Futures Association basic information (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:    Had Universal Commodity had NFA problems prior to 1993?

STUART MAYLOR:   No, I – again, I (INAUDIBLE) as an associate person around 1993.

ATTORNEY PROSNITZ:    When did they have their NFA problems?

STUART MAYLOR:   I am not sure of the date but it was after that.

ATTORNEY PROSNITZ:    Did they involve you in any way?

STUART MAYLOR:   No, they did not.

ATTORNEY PROSNITZ:    How about Stuart Financial, (INAUDIBLE) an NFA record?

STUART MAYLOR:   (INAUDIBLE) they're not regulatory (INAUDIBLE).

ATTORNEY PROSNITZ:    Any other complaints?

STUART MAYLOR:   There's no regulatory complaints--.

ATTORNEY PROSNITZ:    Alright.

STUART MAYLOR:   --or any complaints--.

ATTORNEY PROSNITZ:    Alright.    And what's the connection, if any, between Universal Commodity and ComTrust?

STUART MAYLOR:    As an independent introducing broker.

ATTORNEY PROSNITZ:    Does it send 100 percent of its business to ComTrust?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:    And how about Stuart Financial?

STUART MAYLOR:    It is currently not doing business.

ATTORNEY PROSNITZ:    Alright.    How many associated persons does ComTrust have?

STUART MAYLOR:    One.

ATTORNEY PROSNITZ:    Just one, and that's you?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:    So during the relevant time period, 2005, how many did it have?

STUART MAYLOR:    It may have had two at the time.

ATTORNEY PROSNITZ:        Two--.

STUART MAYLOR:     Tim Redding being the president.

ATTORNEY PROSNITZ:        Who?

STUART MAYLOR:     Timothy Redding being the president.

ATTORNEY PROSNITZ:        So you were the only assoc – other than the two of you, were there any employees?

STUART MAYLOR:     Yes, there were.

ATTORNEY PROSNITZ:        How many employees were there?

STUART MAYLOR:     Less than 20.

ATTORNEY PROSNITZ:        Less than 20.

STUART MAYLOR:     Maybe 20, 15 to 20.

ATTORNEY PROSNITZ:        Who was in charge of processing customer orders?

STUART MAYLOR:     I'm not sure what you mean by processing.

ATTORNEY PROSNITZ:    Well, who placed trades?

STUART MAYLOR:    The IB's.

ATTORNEY PROSNITZ:    Who at ComTrust was in charge of clearing the trades?

STUART MAYLOR:    I'm not sure I understand the question.

ATTORNEY PROSNITZ:    Who physically – you would get an order – describe how – first of all, describe how an order would come in from an IB and how it flowed through ComTrust.

STUART MAYLOR:    That would be easier for me to explain.  Introducing brokers have clearing agreements with ComTrust.  Some are guaranteed agreements and some are independent agreements.  Depending on whether it's an independent agreement or a guaranteed agreement, there will be differences in how orders will be processed.

ATTORNEY PROSNITZ:    Let's talk about independent.

STUART MAYLOR:    In the case of independent orders, we are instructed by the IB, independent IB, to place trades based on their particular orders.  So they will call our trading desk, and they would place an order that way.

ATTORNEY PROSNITZ:    And then what did – how many people were at the trading desk?

STUART MAYLOR:    At that time, I would say anywhere between three to five people.

CHAIRMAN:    Excuse me a second, but what time are we talking about?

ATTORNEY PROSNITZ:    I want all these questions to be about the same time period as the Bell account, so June 2005 to February '06.

CHAIRMAN:    Does that change your answer in any way, is that what (INAUDIBLE-speaking simultaneously)--?

STUART MAYLOR:    (INAUDIBLE).

CHAIRMAN:    Thank you.  I appreciate it.

ATTORNEY PROSNITZ:    Alright.  So you had three to five people at the trading desk?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:    So they would get a call from an IB, correct?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:    And then what would they do?

STUART MAYLOR:   They would basically be given a set of instructions, buying 500, whatever it might be, buying 1, whatever it might be, (INAUDIBLE) market.

ATTORNEY PROSNITZ:    And how would they place that order?

STUART MAYLOR:   They would stamp – time stamp the trade.   They would time stamp the trade and then they would be – get there within a prescribed time, in contact for the exchange where we have our relationships and place the order with the floor broker (INAUDIBLE-speaking simultaneously.)--.

ATTORNEY PROSNITZ:    So there – they would first, they will fill out an order ticket based on the phone conversation they were having, is that what would happen?

STUART MAYLOR:    Yeah, an order ticket, it would be a trade ticket.

ATTORNEY PROSNITZ:    They'd fill out a trade ticket based on the phone conversation.  And then they'd time stamp--.

STUART MAYLOR:    Based on the instructions.

ATTORNEY PROSNITZ:    Well, which came over the telephone from the IB, as you were describing it?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:     Okay.  So then they'd time stamp the – you said it was an order confirmation?

STUART MAYLOR:     It's a trade ticket.

ATTORNEY PROSNITZ:     Trade ticket.  They'd time stamp the trade ticket and then what do they do?

STUART MAYLOR:     As I said, they call the floor.

ATTORNEY PROSNITZ:     On the phone?

STUART MAYLOR:     That is correct.  And speak with the clerk or the floor broker, depending on the (INAUDIBLE), they might enter it electronically, depending on the market that's being traded, depending on the relationship at that time.  I can't recall exactly what trades might have been placed electronically and what trades might have been placed telephonically.

ATTORNEY PROSNITZ:     For Mr. Bell's account, were orders placed telephonically or electronically, you don't recall?

STUART MAYLOR:     Again, I think it would be very safe, either, or, or both.

ATTORNEY PROSNITZ:     Okay.  And did the trading department generate a report at the end of the day showing all trades they placed?

STUART MAYLOR:   The trading department wouldn't generate a report, we outsourced that.

ATTORNEY PROSNITZ:       Did you get a daily – who did you outsource it to?

STUART MAYLOR:   Ralph & Nolan.

ATTORNEY PROSNITZ:       Ralph & Nolan.  So did you get a daily trading report?

STUART MAYLOR:   We generate a – they generate a report on the activity for that day.

ATTORNEY PROSNITZ:       Okay.  And is that something you would have reviewed?

STUART MAYLOR:   For purposes of margin and (INAUDIBLE) departments, yes.

ATTORNEY PROSNITZ:       So every day, you would see a written report of trading, correct?

STUART MAYLOR:   Every day, if I would look at the bottom line, if I would focus on the trades, I would focus on wherever we were from a capital standpoint.

ATTORNEY PROSNITZ:       And how many trades a day was ComTrust making?  How many contracts a day was ComTrust processing during this period?

STUART MAYLOR:   It varied, I have no idea.  Any given day, I could not tell.

ATTORNEY PROSNITZ:     Could you give us an average?

STUART MAYLOR:    I can't.

ATTORNEY PROSNITZ:     Well, we know that on some days, Mr. Bell bought 1,400 contracts, right?  How did that compare to the total line of business for the day?

STUART MAYLOR:    Considering there were, and at the time I can't tell you who the introducing broker is, on any given day the numbers could be skewed where one IB may do more business than another IB.  It's hard to tell at the end of the day where it's broken down to, whether it would have been at ProTrade or Corporate Commodity, (INAUDIBLE), or Universal Commodity, or any one of the other IB's.

ATTORNEY PROSNITZ:     Well, if Mr. Bell was, we heard our expert testify, was a major market player for the entire country, wasn't he a major player in terms of the daily trading activity at ComTrust?

STUART MAYLOR:    Well, I'm not sure if he was a major player in the country, within all due respect.  I do understand that based on the volume on that given day, your expert witness deemed him to be perhaps a 2 percent or more participant on that given day. But those are not criteria, if you look at the analyzed trading activity for ComTrust.

ATTORNEY PROSNITZ:     Okay.  But my question is, if he was 2 percent of the trading volume in the entire country, wasn't he a huge portion of the daily activity of ComTrust?  That's the question I'd like you to focus on.

ATTORNEY SINCLAIR:     I'd like some clarification.   Two percent of not all the trading in the country, two percent of the particular contract.

ATTORNEY PROSNITZ:     Right, right.

STUART MAYLOR:    And furthermore, if I may--.

ATTORNEY PROSNITZ:     I'd like you to answer my question, sir.  Do I need to repeat it?  My question is--.

STUART MAYLOR:    Yes, please do.

ATTORNEY PROSNITZ:     Okay.   Are you telling this panel that Mr. Bell was not a major trader in terms of the daily activity at your firm?

STUART MAYLOR:    He was not considered, according to the CFTC, a major trader, with the exception of on two occasions.

ATTORNEY PROSNITZ:     What was the daily volume that you'd process at your firm?  How – well, let me ask you this, sir.  What benchmarks do you use to monitor your daily trading activity?  Contacts?  Dollars?  What benchmarks do you use?

STUART MAYLOR:    Basically, we take a look at the amount of money that we have on hand versus the number of transactions that had taken place in terms of our – in terms

of our minimum margin requirements or our minimum capital requirements, based on (INAUDIBLE).

ATTORNEY PROSNITZ:        And the volume is measured how, in dollars?

STUART MAYLOR:    Volume is not measured as much as a ratio.    And I do have a CFO who looks at that.    There's also a principal at ComTrust and he monitors that.    I've not had – I haven't reviewed those numbers as diligently as he has for ComTrust as a whole to make sure that those numbers are in check.    And if we're not in check, we are required to inform the NFA that there are early warning issues that we're concerned about.    And if we don't bring it to their attention, they certainly will.

ATTORNEY PROSNITZ:        Let me ask – let me try to put it in simple terms.    If I run a McDonald's, I keep track of how many hamburgers I sell.    On a daily basis, what did you keep track of?

STUART MAYLOR:    I did not get involved with anything other than what I told you. You're asking me to answer your question differently.    I focus on the line every day.    I take a look and see how many positions were generated and if there's enough money there to cover it.    And if not, what we need to do to make sure that there is enough money to cover it.    That is my focus.

ATTORNEY PROSNITZ:        So I don't think you answered my question.    So the question, sir, is what benchmarks did you have to measure your daily trade?    Was it dollars?    Was it contracts?    What was it?    How did your firm measure how much business it did every day?

STUART MAYLOR:    I didn't measure how much business we did every day--.

ATTORNEY PROSNITZ:      Trades that you placed.

STUART MAYLOR:    They were based on transactions.

ATTORNEY PROSNITZ:      And how did you measure the transactions?

STUART MAYLOR:    Well, there is an equity run that basically shows transactions.  And I'm certain that the CFO perhaps looked at that.

ATTORNEY PROSNITZ:      Is that a dollar number?

STUART MAYLOR:    It's a combination.  I believe it is a dollar number, total dollars that are generated, yes.

ATTORNEY PROSNITZ:      So, for instance, on August 31, 2005, Mr. Bell bought 330 crude oil calls.  How would that compare with your overall daily volume for that day?

STUART MAYLOR:    I can't answer that because I don't look at a particular account nor do I look at a particular IB.  I just look at a comprehensive number which would give me what that business for that day was.

ATTORNEY PROSNITZ:      ComTrust is a small firm in the industry, isn't it?

STUART MAYLOR:    Yeah.

ATTORNEY PROSNITZ:    Your net capital is about $1 million, right?

STUART MAYLOR:    More or less.

ATTORNEY PROSNITZ:    So your daily trading activity is in a different sphere than say a Bear Stearns, correct?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    So Mr. Bell's activity was a lot for your small firm, right?

STUART MAYLOR:    Not necessarily.

ATTORNEY PROSNITZ:    Okay.  But what I'm trying to get at is the benchmarks. What was your daily activity?  I still don't think you've explained, you know, how did you measure your daily activity?

STUART MAYLOR:    With every answer that I--.

ATTORNEY PROSNITZ:    Well, you haven't told me a dollar number.  So as you sit here today, there's no way you can say what your trading volume on a certain – I mean, on the New York Stock – the New York Stock Exchange could come up with a volume, right?

STUART MAYLOR:     I suppose so.

ATTORNEY PROSNITZ:     Can you come up with a volume number for your firm?

STUART MAYLOR:     I cannot.

ATTORNEY PROSNITZ:     You cannot.  And why is that?

STUART MAYLOR:     I don't have that number.  That's not--.

ATTORNEY PROSNITZ:     So you have no way of describing to me or this panel how much business you did in a day?  You can only talk in these – I mean, you cannot give us a dollar term, an average, you cannot give us a contract, number of contracts?  You cannot describe the volume – you cannot quantify the volume of business you would do on average during this time?

STUART MAYLOR:     I'm not sure what you're talking about.    Volumes based on commissions that introducing brokers generate?  Or are you talking about contracts that have been purchased?  Are you talking about fees that have gone to the exchanges?--

ATTORNEY PROSNITZ:     Let's talk about each one of those.

STUART MAYLOR:     I don't have those numbers in front of me--.

ATTORNEY PROSNITZ:     But you are one of the two AP's at this firm, right?

STUART MAYLOR:    I'm the only AP.

ATTORNEY PROSNITZ:    You're the only AP.  Can you give me some idea, just some idea-.

STUART MAYLOR:    You asked me--.

ATTORNEY PROSNITZ:    Wait a – let me finish my question.  Sir, can you give me some idea of the number of contracts that you were buying and selling for customers on a daily basis in 2005?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    Can you tell me whether it's less than 100?  Can you give us some estimate, to the near--?

STUART MAYLOR:    Less than 100 what, contracts?

ATTORNEY PROSNITZ:    Contracts, yes.  Some estimate.

STUART MAYLOR:    Our business is very cyclical.  And because it's cyclical, on any given day we could have 100 contracts or we could have 5,000 contracts.

ATTORNEY PROSNITZ:    Alright.  Let's go back to Mr. Bell.  So the range, we've narrowed it down to 100 to 5--.

STUART MAYLOR:    I'm throwing numbers out.  I'm not saying that they would be 100 or 5,000.  I could be anywhere, you know, I don't have numbers.  I'm not prepared to answer.

ATTORNEY PROSNITZ:    Well, I'd like you to, you know, how about just rounding to the nearest 5,000.

STUART MAYLOR:    It wouldn't be accurate.

ATTORNEY PROSNITZ:    The nearest 50,000?

STUART MAYLOR:    It wouldn't be 50,000.

MALE:    I got some--(INAUDIBLE).

ATTORNEY PROSNITZ:    Well, no, Mr. Prosnitz, let's be fair about this.  Okay.  This is information (INAUDIBLE).  I think he's doing the best he can.  I think your point here is how does Mr. Bell's trading compare as to the overall trading at your firm.

ATTORNEY PROSNITZ:    I think the numbers that he's given, he's not – he should be able to give us some idea of how much volume his firm does and he's given us absolutely no answer.

CHAIRMAN:    I can't presume that he knows it.  I mean, you can continue to ask him these questions, but I can't presume that he--.

ATTORNEY PROSNITZ:        Alright.  So--.

CHAIRMAN:    --has the information in front of him.

ATTORNEY PROSNITZ:        --So with return – with respect to the number of contracts, you don't know?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:        What about dollar volumes?    Do you know the dollar volume?

STUART MAYLOR:    In terms of averages, no.

ATTORNEY PROSNITZ:        Can you estimate how much business your firm did every day in terms of dollars?

STUART MAYLOR:    I (INAUDIBLE) got the same answer.  And the answer is--.

ATTORNEY PROSNITZ:        Alright.  Let me go back to--.

STUART MAYLOR:    --no, I can't.

ATTORNEY PROSNITZ:        --this.  What – how do you monitor the daily performance of your firm?  What numbers do you look at?

STUART MAYLOR:   In terms of revenue?   In terms of what aspect?   I focus a lot on compliance.   So my main concern is not the dollars.   My main concern – I have a CFO who does that.   He's a principal of the firm, as well.   You didn't ask me about positions.

ATTORNEY PROSNITZ:     Do you monitor how your firm – do you monitor how your firm is doing on a monthly basis?

STUART MAYLOR:   More or less.   I get numbers from--.

ATTORNEY PROSNITZ:     (INAUDIBLE-speaking simultaneously.)--.

STUART MAYLOR:   --I get numbers from my CFO who tell me based on a 1-FR that is reported more or less what we have done for that given month.

ATTORNEY PROSNITZ:     And what number are you focusing on?

STUART MAYLOR:   Total of business.

ATTORNEY PROSNITZ:     And what does total business mean?

STUART MAYLOR:   1-FR produces a figure of how much is kept at different banks, different clearing firms.   There's a formula that determines, I'm not familiar exactly with the formula, but it determines what costs are incurred and what our approved expenses are, to come up with a bottom line number as to whether we're above or below net capital, and how much we're above or below net capital.

ATTORNEY PROSNITZ:    So if you focus – if you're running a (INAUDIBLE), every month you figure out whether you made or lost money, do you do that on a monthly basis to figure out whether your firm has made or lost money?

STUART MAYLOR:    I don't do that.

ATTORNEY PROSNITZ:    So that's not something you monitor?

STUART MAYLOR:    That is something that is brought to my attention but it is not part of my procedures.  That's not--.

ATTORNEY PROSNITZ:    Is it brought to your attention on a regular basis?

STUART MAYLOR:    On a monthly basis, I know whether we have made money or lost money, that is correct.  That's what I know.

ATTORNEY PROSNITZ:    And what's – and what's the average monthly volume that you were doing in 2005, can you answer that question?

STUART MAYLOR:    I can't answer that question.

ATTORNEY PROSNITZ:    So I guess as you sit here today, when Mr. Bell buys 333 crude oil contracts on October 31, 2005, you cannot tell the panel what percent of your overall volume that was for the day, right?

STUART MAYLOR:    That's correct.

ATTORNEY PROSNITZ:        And when he buys or sells 100 March contracts, you have

no idea how that relates to the overall business, right?

STUART MAYLOR:    That is also correct.

ATTORNEY PROSNITZ:        And when he – so what about do you keep track of margin

calls?

STUART MAYLOR:    I don't.

ATTORNEY PROSNITZ:        Does somebody in your firm keep track of margin calls?

STUART MAYLOR:    Absolutely.

ATTORNEY PROSNITZ:        And when Mr. Bell gets a $240,000 margin call, isn't that a

significant margin call for a firm of your size?

STUART MAYLOR:    Not necessarily.

ATTORNEY PROSNITZ:        So your testimony, it may not be significant?

STUART MAYLOR:    I'll answer it this way.  In my day, we've had margin calls that were

over $1 million.

ATTORNEY PROSNITZ:    Mr. Maylor, why aren't you calling Mr. Bell after this case was filed?

STUART MAYLOR:    I recall I kept on calling him after the case was filed.  I believe I was returning his phone calls.

ATTORNEY PROSNITZ:    So you talked to him about five times in the year?

STUART MAYLOR:    I spoke with him 16 times.

ATTORNEY PROSNITZ:    Sixteen times?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:    And you requested that he give you a statement because you were going to help him, is that right?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:    And what did you tell him you were going to do?  You were going to help him file an NFA action?

STUART MAYLOR:    Is that a yes or no question?

ATTORNEY PROSNITZ:    Yes.

STUART MAYLOR:    Can you define what "help" is, please?

ATTORNEY PROSNITZ:    Sir, why did you – okay, first of all, are you--.

STUART MAYLOR:    That's an open-ended question.  I can answer--.

ATTORNEY PROSNITZ:    No, sir, are you – first of all, you talked to him many times after this case was filed, even though Mr. Kopecki requested that those communications cease, correct?

STUART MAYLOR:    That is not correct.

ATTORNEY PROSNITZ:    Alright.  And wasn't it clear to you when you were talking with Mr. Bell that he was a retired individual who did not have full mental capacity at that time?

STUART MAYLOR:    That is not correct.

ATTORNEY PROSNITZ:    And you told him you needed a statement, right?

STUART MAYLOR:    That is not correct.

ATTORNEY PROSNITZ:    You asked him for a statement, correct?

STUART MAYLOR:    That is not correct.

ATTORNEY PROSNITZ:        You did not ask him for a statement?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:        Did you request he provide you with a statement?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:        Okay.    So you would acknowledge you requested a statement from him.    And what did you tell him as to – what did you say when you requested the statement?    What were your words to him?

STUART MAYLOR:    (INAUDIBLE) Mr. Bell had contacted me after his account ceased from trading.    He contacted me because he received a $156,000 bill.    He wanted to know about that.    I told him that it was a responsibility of his to meet that margin call, at which point in time he spoke with me about his concerns with Mitchell Goldberg and his inability to get a hold of the firm, at which point in time I said I don't know what I can do to help, but there are avenues for him to explore.    One of those avenues was the National Futures Association.    I'm the one who spoke with him on the day where you see the name Nicole and a phone number on that sheet.    I had directed him to John Broderson.    I had sent a letter to him and to other customers because we were concerned that because ProTrade or Corporate was no longer doing business with us that there were concerns they might have that we could not address.    And we directed them to the NFA.    I had contacted through counsel the NFA and Mr. Broderson had specifically said, "Please have them call us directly," to him.    And that's what prompted that correspondence to customers.    At that point in time, Mr. Bell and I engaged I some

conversation.  I actually did feel badly for him.  And I had told him that the best way for him to direct this properly would be to put his thoughts down on paper.  I had asked him if he had any concerns with ComTrust.  He said, "Absolutely not.  You've been very helpful and I appreciate you taking the time."  I then asked him to put down a chronology of the things that took place from the beginning that would help him organize his thoughts, so that he could present it properly to Mr. Broderson or to Nicole, to anyone at the NFA.  I, in fact, sent him a set of documents for NFA arbitration, which is where I believe he got these documents from initially, if he didn't get them from you, as (INAUDIBLE).  At that point in time, he asked me if it would be okay for him to send me a document.  And so at that time, I did request, yes.

ATTORNEY PROSNITZ:      And how did you request, you said, "Send me the statement"?

STUART MAYLOR:   No, I never told him the format.  I just told him to write down chronologically what took place the best he could, so that it would formulate for a complaint, if that's what he chose to do, in his mind something that would be helpful for him.

ATTORNEY PROSNITZ:      Did you feel that you had a conflict of interest in talking to him, since you worked for an FCM that under cases such as <u>Reid v. Hayes</u> might have responsibility for the broker?  I mean, did you feel any conflict at all in talking to Mr. Bell?

STUART MAYLOR:   None.

ATTORNEY PROSNITZ:    None, okay.  And what did you tell him you were going to do with the statement?

STUART MAYLOR:    I didn't tell him I was going to do anything with the statement.

ATTORNEY PROSNITZ:    Why did you request it?

STUART MAYLOR:    He asked me if I would review it.

ATTORNEY PROSNITZ:    So you helped him write it?

STUART MAYLOR:    Absolutely not.  You asked me if I requested it.  I guess it's semantics.  But the point is that he said, "Can I send it to you so you can see it?"  And I said, "Sure, send it to me."

ATTORNEY PROSNITZ:    Did you tell him you were going to do anything with it?  No?

STUART MAYLOR:    Not in the sense that I would file a complaint for him.

ATTORNEY PROSNITZ:    Well, in any sense did you tell him what you were going to do with the statement?

STUART MAYLOR:    Other than review it with him and look at it per his request, absolutely not.

ATTORNEY PROSNITZ:        Absolutely not?

STUART MAYLOR:    Not.

ATTORNEY PROSNITZ:        Alright.  So you asked him for a statement but you didn't give him any explanation what you planned to do with it, correct?

ATTORNEY SINCLAIR:        Objection.    The answer wasn't that he asked for the statement.  Mr. Bell wanted to send it to him.  That's the testimony.

CHAIRMAN:    (INAUDIBLE).

ATTORNEY PROSNITZ:        Alright.    So you requested the statement, to use your words?

STUART MAYLOR:    Well, it was a play on words, but I'm going to say yes because I had the last – the way it went down was I said, "Yeah, sure, send it to me," so I guess I don't want to – under oath I'm going to say I requested it.

ATTORNEY PROSNITZ:        Alright.  And what did you do with the statement when you got it?

STUART MAYLOR:    Looked at it.  Called him up.  And I said, "I think you got it down. This is what you need to do.  Contact NFA."

ATTORNEY PROSNITZ:        So did you tell him--?

STUART MAYLOR:    (INAUDIBLE) proceed with that.

ATTORNEY PROSNITZ:        Did you tell him you thought he had a good case?

STUART MAYLOR:    I never really passed judgment.  I did feel sorry for his losses.

ATTORNEY PROSNITZ:        Well, you were encouraging him to file an NFA arbitration, weren't you?

STUART MAYLOR:    He felt that he had exhausted his resources.  And I pointed him in the direction of the regulatory body, yes.

ATTORNEY PROSNITZ:        Did you feel this $575,932 in commissions was reasonable?

STUART MAYLOR:    For ProTrade to charge?

ATTORNEY PROSNITZ:        (INAUDIBLE-speaking simultaneously.)

STUART MAYLOR:    (INAUDIBLE) follow ProTrade instructions, Mr. Bell's instructions.

ATTORNEY PROSNITZ:        So the amount of commissions that ProTrade charged was of no interest or concern to you?

STUART MAYLOR:    That is absolutely correct.

ATTORNEY PROSNITZ:       So if Pro--?

(End of Disk 7, Track #3.  Begin Track #4.)

ATTORNEY PROSNITZ:       --we're going to charge you 99 cents out of every dollar in commissions, that would be okay with ComTrust?

STUART MAYLOR:  That wouldn't be okay if they could not afford to pay us our clearing fee but if that's what they wanted to charge, there have been times where there have been no commissions charged to customers--.

ATTORNEY PROSNITZ:       So--.

STUART MAYLOR:    --other than (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:       So you don't see any problem with a 99 percent commission?

STUART MAYLOR:    I don't analyze or supervise commissions.

ATTORNEY PROSNITZ:       How much did ComTrust make from Mr. Bell?

STUART MAYLOR:    I don't know.

ATTORNEY PROSNITZ:       What was ComTrust's--?

STUART MAYLOR:    Excuse me, let me answer that.  We didn't make any money from Mr. Bell.

ATTORNEY PROSNITZ:    How much did ComTrust make relating to the trading in Mr. Bell's account?

STUART MAYLOR:    I don't have an analysis of that.  I only know what we charged ProTrade.  And based on what ProTrade pays us, I'm not sure what percentage would have come from Mr. Bell's account or from another customer's--.

ATTORNEY PROSNITZ:    What was your deal with ProTrade?

STUART MAYLOR:    Bas--.

ATTORNEY PROSNITZ:    --(INAUDIBLE) Bell?

STUART MAYLOR:    Basically, I'm not sure of the exact number because that end was not my area.  Speaking of counsel (INAUDIBLE) asked me that question (INAUDIBLE) I answer it.  I want to say more or less $17 was a clearing cost, of which fees to the exchanges, NFA charges 2 cents on a (s/l half return) basis, it's a nominal fee, they charge that.  And that is what is debited from that total $17 fee.  The rest, or $19, whatever the number is.  And the rest goes to cover our operating.  If at the end of the day there's something left, it's profit.

ATTORNEY PROSNITZ:      So if the total fees and commissions charged were $100 by ProTrade, ComTrust paid $17?

STUART MAYLOR:    Our clearing arrangement with an IB has nothing to do with the fee rider that is presented to the customer.  It is a separate agreement, a separate charge.

ATTORNEY PROSNITZ:      You charge a flat fee.  Did you get a percentage of any commissions charged--?

STUART MAYLOR:    Absolutely not.

ATTORNEY PROSNITZ:      You charged flat fees?

STUART MAYLOR:    That is correct.

CHAIRMAN:    You know, I wasn't clear about the $17, is that a (INAUDIBLE)?

STUART MAYLOR:    It's a (s/l round check) (INAUDIBLE).

CHAIRMAN:    (INAUDIBLE).

STUART MAYLOR:    It's consistent with the opening of a position as discussed here, yes.  It wouldn't be fair to say it's (INAUDIBLE), so it would include both (INAUDIBLE), yes.  So if a clearing (INAUDIBLE) say that if it was $5 to clear on a half-turn basis and it was $10 round turn, that would come out of the (INAUDIBLE).  If there was no – so it would be on a half-turn basis, yes.

ATTORNEY PROSNITZ:     You've never performed any calculation of how much you got concerning Mr. Bell's account?

STUART MAYLOR:   I have not.

ATTORNEY PROSNITZ:     So you don't know if that number is--?

STUART MAYLOR:   Other than what you have put together, I have not.

ATTORNEY PROSNITZ:     Alright.   So you don't know if it was $100, $200, $1,000, you have no idea, correct?

STUART MAYLOR:   Of what?

ATTORNEY PROSNITZ:     How much you made in connection with his account.

STUART MAYLOR:   You say "you made" or how much we collected from ProTrade (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:     How much you collected from ProTrade.

STUART MAYLOR:   I have no calculations--.

ATTORNEY PROSNITZ:     No calculations--.

STUART MAYLOR:   --of what we collected from ProTrade because we have not collected anything from (INAUDIBLE).

ATTORNEY PROSNITZ:    Your office is lo – during 2005, where was ComTrust located?

STUART MAYLOR:   At the address it has always been located, in Aventura.

ATTORNEY PROSNITZ:    And what's that address?

STUART MAYLOR:   7999 (INAUDIBLE) 191st Street, Aventura, Suite 601, 33180.

ATTORNEY PROSNITZ:    Suite 601.  And you had, in 2005, how many people were working there total?

STUART MAYLOR:   (INAUDIBLE) somewhere between 15 to 20--.

ATTORNEY PROSNITZ:    15 to 20.  How many square feet did your office occupy, you have any idea?

STUART MAYLOR:   Somewhere around 2,000.

ATTORNEY PROSNITZ:    Okay.  And where was ProTrade?

STUART MAYLOR:   ProTrade was at the exact same address in that building, it's a 9-story building.  They were in Suite 608.

ATTORNEY PROSNITZ:    And where was suite – that's the same floor as you, right?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:    And where was ProTrade Suite 608, how far was that from Suite 601?

STUART MAYLOR:    Well, there's an elevator that separates the two.

ATTORNEY PROSNITZ:    So within 20 feet?

STUART MAYLOR:    I would say it would be the – not quite the equivalent of the offices, the National Futures Association, between the elevators, (INAUDIBLE) both--.

ATTORNEY PROSNITZ:    The length of the elevator (INAUDIBLE-speaking simultaneously)--.

STUART MAYLOR:    No, it's not an el – there's a hallway there.  I'm going to say, estimate, there's a hallway.  When you come out of our office, there's a hallway that goes vertically.  There are other offices.  And there's an area where there are three elevators.  And there's another hallway.  And then there's a door.

ATTORNEY PROSNITZ:    Talking 50 feet, maybe?

STUART MAYLOR:    Maybe.

ATTORNEY PROSNITZ:     And how many (INAUDIBLE) did ProTrade?

STUART MAYLOR:    I have no idea.

ATTORNEY PROSNITZ:     How many employees did you see at ProTrade?

STUART MAYLOR:    Rarely would I go, so I don't know.

ATTORNEY PROSNITZ:     Tell me the name of every person you know at ProTrade in 2005.  By first name is enough.

STUART MAYLOR:   Well, Mitchell Goldberg.   And again, between ProTrade and Corporate, I'm not sure, because some (INAUDIBLE).   There was Michelle O'Bruce.

ATTORNEY PROSNITZ:     Do you know Mr. Matthews?

STUART MAYLOR:   There was a Mr. Matthews.  I don't know who he is, the name is familiar because you brought it up.   That name is familiar for another regulatory (INAUDIBLE).

ATTORNEY PROSNITZ:     So did you know Adam Leon?

STUART MAYLOR:    I knew (INAUDIBLE).

(End of Disk #7.)

AAA/cmy