06-ARB-61
Disk 8

ATTORNEY PROSNITZ:   How about Donnetta Vass, do you know her?

STUART MAYLOR:   Who?

ATTORNEY PROSNITZ:   Donnetta, D-o-n-n-e-t-t-a, Vass, V-a-s-s?

STUART MAYLOR:   No.

ATTORNEY PROSNITZ:   So in total, did ProTrade have about five or six associated persons?

STUART MAYLOR:   I can't answer that question.

ATTORNEY PROSNITZ:   How big a firm was ProTrade?  How many employees did you – how many people did you – how many different people did you observe going in and out of their office?

STUART MAYLOR:   I didn't observe any, other than maybe if I passed them by the elevator or (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:   ProTrade was a small firm, wasn't it?

STUART MAYLOR:   We're all relatively small firms, depending (INAUDIBLE).

ATTORNEY PROSNITZ:    Okay.  And how long have you known Mitchell Goldberg?

STUART MAYLOR:    Oh, how long do I know him, how long have I known him?

ATTORNEY PROSNITZ:    Yes.

STUART MAYLOR:    Before his involvement at that firm?  I don't even think I met him before then.  And I never really engaged in conversation with him when he was there, other than hello, goodbye, you know, acknowledgment.

ATTORNEY PROSNITZ:    But you knew who he was, right?

STUART MAYLOR:    I knew who he was, yes.

ATTORNEY PROSNITZ:    And how about Michelle – did you ever – so did you ever have – other than saying hello or goodbye to Mr. Goldberg, did you ever talk to Mr. Goldberg?

STUART MAYLOR:    Other than superficial conversation, no.

ATTORNEY PROSNITZ:    How about Michelle O'Bruce, do you (INAUDIBLE)?

STUART MAYLOR:    (INAUDIBLE).  Very rarely.  I wasn't even involved in the agreement that was done (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:    How did ProTrade come to do business with ComTrust?

STUART MAYLOR:    I'm not sure how actually.  I know that John Charmell engaged in a relationship with him.  I certainly wasn't familiar with him.  He's a director of the (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:    Who moved onto the sixth floor first, you or ProTrade?

STUART MAYLOR:    We did.

ATTORNEY PROSNITZ:    How did – did you have – did ComTrust have anything to do with ProTrade moving in there?

STUART MAYLOR:    I believe that ComTrust may have had something to do with it, because we were situated in that building.

ATTORNEY PROSNITZ:    So was ComTrust doing business with ProTrade and let ProTrade know there was office space available essentially next door?

STUART MAYLOR:    I don't believe it happened that way.

ATTORNEY PROSNITZ:    So how did ProTrade come to be 50 feet from ComTrust?

STUART MAYLOR:    There was space available across the hall and they took it.

ATTORNEY PROSNITZ:    And had you been doing business with ProTrade before then?

STUART MAYLOR:    I don't think so.  I'm not sure.

ATTORNEY PROSNITZ:        So I'm not sure.  You think ComTrust may have (INAUDIBLE) ProTrade in that space?

STUART MAYLOR:    May have what?

ATTORNEY PROSNITZ:        (INAUDIBLE) ProTrade with the space?

STUART MAYLOR:    (INAUDIBLE)--.

ATTORNEY PROSNITZ:        Introduced them to the space?

STUART MAYLOR:    I'm not sure.  I'm not sure how that may have happened.  I can't really honestly answer that.

ATTORNEY PROSNITZ:        Are any of the people at ComTrust social friends with people at ProTrade?

STUART MAYLOR:    I can't answer that.  I can tell you that I'm not.

ATTORNEY PROSNITZ:        And who is the other – you're the only associated person, right?

STUART MAYLOR:    At this time.

ATTORNEY PROSNITZ:    And who was the other one back in--?

STUART MAYLOR:    Timothy Redding.

ATTORNEY PROSNITZ:    Redding?

STUART MAYLOR:    R-e-d-d-i-n-g.

ATTORNEY PROSNITZ:    Was he a social friend with anyone at ProTrade?

STUART MAYLOR:    I can't say but I would venture to say no.

ATTORNEY PROSNITZ:    And did – do you know, did ComTrust clear all trades for ProTrade?

STUART MAYLOR:    I don't know.  (INAUDIBLE) an independent IB and I don't know (INAUDIBLE).

ATTORNEY PROSNITZ:    Alright.  So you never had lunch with anyone from ProTrade?

STUART MAYLOR:    That's correct.

ATTORNEY PROSNITZ:    Okay.  Were you aware of Mr. Goldberg's prior regulatory history when you started dealing with ProTrade?

STUART MAYLOR:     None other than the fact that he may have had some complaints.

ATTORNEY PROSNITZ:         Well, did you know that he had been barred from the industry for four years?

STUART MAYLOR:     No, I did not.

ATTORNEY PROSNITZ:         Was it your practice to look at NFA records at all on people you were doing business with?

STUART MAYLOR:     NFA records pertaining to what?

ATTORNEY PROSNITZ:         Whether they – they're – their disciplinary records?

STUART MAYLOR:     No.  Basically, what I did is I'd take a look at the pool of people that are on the NFA site that are people to be registered.  And as far as I'm concerned, as far as my participation with the clients, if they're an independent IB and NFA seems that they're deemed register-able, I'm not going to second guess NFA.

ATTORNEY PROSNITZ:         Do you know if ProTrade was having problems meeting its minimum net capital requirements in 2005?

STUART MAYLOR:     No.

ATTORNEY PROSNITZ:    Do you know – when did you first become aware that ProTrade had signed a guarantee agreement with Alaron?

STUART MAYLOR:    When it was included in the complaint with Mr. (s/l Alaron).

ATTORNEY PROSNITZ:    So you never knew that ProTrade had entered into this agreement prior to this case?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:    Does it seem strange to you that ProTrade had a guarantee agreement with another FCM while they were clearing trades with you?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    Has that ever occurred before?

STUART MAYLOR:    Not to my knowledge.

ATTORNEY PROSNITZ:    Do you know Michelle O'Bruce?

STUART MAYLOR:    I've met her.

ATTORNEY PROSNITZ:    And you understand she's the owner of ProTrade, right?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:     You understand that she's also the owner of Corporate

Commodities, right?


STUART MAYLOR:    I understood that that was her relationship with both firms, yes.


ATTORNEY PROSNITZ:     Okay.  Did the sign on – did the sign – in July of 2005, did

the sign on the door change from ProTrade to Corporate Commodities, Inc.?


STUART MAYLOR:    It may have.


ATTORNEY PROSNITZ:     Okay.  Did Corporate Commodities, Inc. then take over the

suite that ProTrade had?


STUART MAYLOR:    I'm not sure.  I know that they moved to Pembroke Pines at some

point and I'm not quite sure of the timeline.


ATTORNEY PROSNITZ:     Did they move prior to February of 2006?


STUART MAYLOR:    I don't know.


ATTORNEY PROSNITZ:     So your – so during the time period of the account activity

in Mr. Bell's account, Corporate Commodity, Inc. may have been right in your building on

the sixth floor, too?


STUART MAYLOR:    I really--.

ATTORNEY PROSNITZ:        You don't know?

STUART MAYLOR:    --(INAUDIBLE-speaking simultaneously) I don't know.  But I can – I may--.

CHAIRMAN:    No, there's no question pending.

ATTORNEY PROSNITZ:        When did you become aware of the change from ProTrade to Corporate Commodity and that name change?

ATTORNEY SINCLAIR:        I object to the form of the question.

ATTORNEY PROSNITZ:        (INAUDIBLE).

CHAIRMAN:    (INAUDIBLE).

ATTORNEY SINCLAIR:        I can (INAUDIBLE), sure.  I have a problem.  There was a letter that was brought to our attention to that (INAUDIBLE).

ATTORNEY PROSNITZ:        So what about, you had to know – someone in your firm had to know back in July 2005 because the name of the introducing broker on the ComTrust statements changed from ProTrade to Corporate Commodity, correct, for Mr. Bell?

STUART MAYLOR:    That's not exactly the way it works.

ATTORNEY PROSNITZ:      Did the name on ComTrust's statements from the introducing broker change in August 2005?

STUART MAYLOR:    They may have.

ATTORNEY PROSNITZ:      Okay.  And what procedure, if any, did ComTrust have concerning that name change?

STUART MAYLOR:    As an FCM, it's not required to denote anything.  The account number remained the same.  Whether it was a ProTrade or whether it was at Corporate.

ATTORNEY PROSNITZ:      Did you sign a new agreement with Corporate Commodity or did you just continue to use the ProTrade agreement?

STUART MAYLOR:    I wouldn't have signed either of them.  But there were separate agreements because they were separate entities.

ATTORNEY PROSNITZ:      And do you know the date of the second agreement?

STUART MAYLOR:    I do not.

ATTORNEY PROSNITZ:      So you don't know when that second agreement was signed, correct?

STUART MAYLOR:    Offhand, I do not.

ATTORNEY PROSNITZ:      Okay.  And that's something you can't get because your compliance guy is on a (s/l cruise ship) right now?

STUART MAYLOR:    My compliance guy is not (INAUDIBLE) I'm the compliance guy.

ATTORNEY PROSNITZ:      You're the – you're in charge of compliance?

STUART MAYLOR:    (INAUDIBLE-speaking simultaneously.)--

ATTORNEY PROSNITZ:      You're in charge of compliance?

STUART MAYLOR:    I am.

ATTORNEY PROSNITZ:      Okay.  Then why are you unable to give us the signed copy of – where is the – where are those signed agreements right now?

STUART MAYLOR:    Those are (INAUDIBLE) in storage.

ATTORNEY PROSNITZ:      And (INAUDIBLE)?

STUART MAYLOR:    It is in a storage facility about 15 miles away from our office.

ATTORNEY PROSNITZ:      Why can't we simply make a phone call and ask for those documents?

STUART MAYLOR:    Someone would have to physically get in their car, go through the boxes, and (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:    Okay.  You don't have your boxes organized?

STUART MAYLOR:    I didn't say that.  I said someone would have to go in their car and go to the storage facility and do that.  And you (INAUDIBLE) came up with some sort of (INAUDIBLE) documents.

ATTORNEY PROSNITZ:    Did you – during this proceeding, did you ever make a request for those documents or not?

STUART MAYLOR:    Yes, I'm sure (INAUDIBLE).

ATTORNEY PROSNITZ:    At the storage facility?

STUART MAYLOR:    No, I didn't ask for the storage facility--.

ATTORNEY PROSNITZ:    So how far – how do – what did you do to try to get the documents?

STUART MAYLOR:    Made a phone call to see if they were in the office and was told that they were in the storage. And I told (INAUDIBLE).

ATTORNEY PROSNITZ:    You're in charge of compliance at your firm?

STUART MAYLOR:    I am.

ATTORNEY PROSNITZ:        So I take it you're familiar with FCM regulatory--?

STUART MAYLOR:    I am.

ATTORNEY PROSNITZ:        --requirements.  And you're familiar with NFA regulatory requirements?

STUART MAYLOR:    I am.

ATTORNEY PROSNITZ:        Alright.  So I'd like you to turn to this set of documents entitled "NFA Regulatory Requirements.'

CHAIRMAN:    Mr. Prosnitz, this is what you gave us this morning?

ATTORNEY PROSNITZ:        Yes.

CHAIRMAN:    Are you going to ask, because you (INAUDIBLE).  Let's get some (INAUDIBLE) can call upon this exhibit, if you like.

ATTORNEY PROSNITZ:        Sure.

CHAIRMAN:    (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:        Let's call it (INAUDIBLE).

ATTORNEY SINCLAIR:        And just for the record, I'm going to make an objection that this should have been (INAUDIBLE) along with their exhibits and this is sort of a surprise.

CHAIRMAN:   I understand (INAUDIBLE).

ATTORNEY SINCLAIR:        Well--.

CHAIRMAN:   I'm going to accept the exhibit for the use--.

ATTORNEY DAVID(?):        I would ask you, before you make that decision, to wait until you hear the testimony, number one.  I don't know what's about to go on.  If he's going to try to turn this individual into an expert witness.  I have a real problem with that, because that was certainly never contemplated or disclosed to us.  If he's going to do it with this document makes it even worse.  I don't want to presuppose.  I just ask you to reserve your judgment as to whether this becomes an official part of the record that you can consider during your deliberations until after we've heard this.

CHAIRMAN:   Mr. David, if we don't mark it as an exhibit, we would never be able to tell in the record what it is.

ATTORNEY DAVID:   I'm not objecting it to be marked.  I'm just objecting to its being accepted as an – into the record as, you know, an admitted exhibit.

CHAIRMAN:   I don't think Mr. Prosnitz has even gotten to that point yet.  But I do think we need to mark it.  And I do think it's proper that he refer to it when he's questioning the witness.  We'll decide what it's going to be used for.

ATTORNEY DAVID:   Thank you.

CHAIRMAN:   I'm sorry Mr. Prosnitz.  (INAUDIBLE) 24 you said?

ATTORNEY PROSNITZ:      Yes.

CHAIRMAN:   (INAUDIBLE).

ATTORNEY PROSNITZ:      Okay.  Let's turn to page 11, which – these are excerpts, so that's the third page.  It's got page number 11 at the bottom.

ATTORNEY SINCLAIR:      I'm sorry, could you repeat that?

ATTORNEY PROSNITZ:      Page 11 is the page number.  It's the third page into the document because these are excerpts.  Okay.  You see the paragraph called "discretionary accounts"?

STUART MAYLOR:   Yes.

ATTORNEY PROSNITZ:      What – you understand that a discretionary account requires written authority from the customer, correct?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:    And Mr. Bell's account had no written discretionary authority, correct?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    What steps, if any, did you, as head of compliance, take to see whether or not this account was being handled on a discretionary basis?

STUART MAYLOR:    I don't.  Basically look at it from the standpoint of if there's no discretion, then you default to the nondiscretionary (INAUDIBLE).

ATTORNEY PROSNITZ:    So you do not have any supervisory procedures or compliance with respect to accounts to make sure that discretionary account forms are signed, if needed, and (INAUDIBLE) that to the IB?

STUART MAYLOR:    I do not supervise independent IB's.

ATTORNEY PROSNITZ:    So if there is large trading activity, numerous contracts in an account, and there's no discretionary authority, is that a red flag for you or not?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    But you knew, did you not by your forms, that Mr. Bell was retired, correct?  Because he signed that additional disclosure.

STUART MAYLOR:    Actually – excuse me.  Actually, he did not sign that form.

ATTORNEY PROSNITZ:    He didn't sign it?

STUART MAYLOR:    No.

ATTORNEY PROSNITZ:    Okay.  Let's look at it.  Was that based on your personal knowledge, by the way?

STUART MAYLOR:    It's based on (INAUDIBLE).

ATTORNEY PROSNITZ:    Which you have knowledge, correct?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:    And I'd appreciate it if there not be any conversation between the witness and counsel before he answers a question.

ATTORNEY SINCLAIR:    (INAUDIBLE) to us.

ATTORNEY PROSNITZ:    There was--.

ATTORNEY SINCLAIR:    (INAUDIBLE).

STUART MAYLOR:    (INAUDIBLE).

CHAIRMAN:    It's fine.  It's just – it's improper in the context of (INAUDIBLE).

ATTORNEY PROSNITZ:        Okay.  Let's go to B-47.

MALE:            (INAUDIBLE).

ATTORNEY PROSNITZ:        I'm sorry, it's Tab 11, B-47.  Okay.  This is a ComTrust document, correct?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:        This was in the ComTrust file, right?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:        And your correct that Mr. Bell did not sign this, the account representative signed it, correct?

STUART MAYLOR:    (INAUDIBLE) initials, yes.

ATTORNEY PROSNITZ:        Okay.  And this was in your file.  So ComTrust was on notice that Mr. Bell was retired, correct?

STUART MAYLOR:    Not necessarily.

ATTORNEY PROSNITZ:       ComTrust had him sign an account agreement, where he – on the questionnaire he checked, doesn't it say that he was retired?  Let's look at his opening account--.

STUART MAYLOR:    It does say that.

ATTORNEY PROSNITZ:       Alright.  So you did know he was retired, right?  ComTrust – you were in charge of compliance.  And the records at your company indicated that he was retired, right?

STUART MAYLOR:    That's correct.

ATTORNEY PROSNITZ:       And your company also knew the volume of contracts he was placing because you did the – you executed the trades, right?

STUART MAYLOR:    ComTrust executed the trades based on instructions given to our trading department by--.

ATTORNEY PROSNITZ:       You knew – you were aware--.

STUART MAYLOR:    I'm trying to answer the question.

ATTORNEY PROSNITZ:       --ComTrust was aware on a daily basis of what was occurring in this account, correct?

STUART MAYLOR:    We had access to that information, yes.

ATTORNEY PROSNITZ:     And you knew this was the account of a retired person, correct?

STUART MAYLOR:   Well, I guess yes.

ATTORNEY PROSNITZ:     What do you mean you guess so?  Okay.

MALE:          (INAUDIBLE).

ATTORNEY PROSNITZ:     Alright.  And you knew he was getting margin calls of $240,000.  Another $240,000.  Right?

STUART MAYLOR:    I understood that they were being met.

ATTORNEY PROSNITZ:     Alright.  Did it raise a red flag for you that a retired customer was getting margin calls of this magnitude and having trades of this magnitude in his account?

STUART MAYLOR:   No.

ATTORNEY PROSNITZ:     Did it raise a red flag for you that his net worth was $1 – you knew his net worth was – well, firstly, you knew his annual income was under – was $25,000 to $50,000, correct?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:    And as far as you knew, this man had no commodity futures experience?  He didn't – he told you he had no experience, right?

STUART MAYLOR:    That's also correct.

ATTORNEY PROSNITZ:    So did it concern you that a retired person with no commodity experience was getting margin calls of $250,000 and was having trades placed of this magnitude?

STUART MAYLOR:    Not with (INAUDIBLE) he had disclosed.

ATTORNEY PROSNITZ:    What were you – what were you just looking at?  The opening account form?

STUART MAYLOR:    The same document.

ATTORNEY PROSNITZ:    Right, right.  And so you did – there were not any red flags for you in terms of whether this was a discretionary account or not?

STUART MAYLOR:    It's clearly not a discretionary account.

ATTORNEY PROSNITZ:    Did – have you ever had any situations where – at your firm where an account was handled in a discretionary manner, even though it was not a discretionary account?

STUART MAYLOR:    Not that I knew of.

ATTORNEY PROSNITZ:        Do you – as head of compliance, do you undertake any supervision to make sure that accounts that are discretionary are properly documented?

ATTORNEY SINCLAIR:        That's been asked and answered.

MALE:        (INAUDIBLE) that's ridiculous.

STUART MAYLOR:    We denote to know each account that is discretionary with a D.

ATTORNEY PROSNITZ:        Alright.  Let's go on to page 14 of--.

CHAIRMAN:    We're back (INAUDIBLE)?

ATTORNEY PROSNITZ:        Well, actually I'm not (INAUDIBLE) with 24.  (INAUDIBLE) due diligence check of guaranteed IB's?

STUART MAYLOR:    Page 14.

ATTORNEY PROSNITZ:        Page 14.

STUART MAYLOR:    I'm sorry, I'm looking at the actual bullet.

ATTORNEY PROSNITZ:        Due diligence of--?

ATTORNEY SINCLAIR:        (INAUDIBLE).

ATTORNEY PROSNITZ:        Page 14.

STUART MAYLOR:    14.

ATTORNEY SINCLAIR:        (INAUDIBLE).

STUART MAYLOR:    I mean, I'm aware of it, page 14 (INAUDIBLE).

MALE:        (INAUDIBLE).

ATTORNEY PROSNITZ:        Okay.  It says due diligence check of guaranteed IB's.  Are you familiar with this regulation?

STUART MAYLOR:    As it pertains to ProTrade or Corporate--?

ATTORNEY PROSNITZ:        As it pertains to you as an FCM that does business on the guaranteed IB's.

STUART MAYLOR:    Applies, yes.

ATTORNEY PROSNITZ:        And so you're aware that the NFA says that guarantor FCM's must do a due diligence inquiry before entering into a guarantee agreement?  Is that your understanding of the rule?

STUART MAYLOR:     That's my understanding.  That's a different part of their checklist.

ATTORNEY PROSNITZ:     Is it your understanding that the due diligence review should include a check to ensure that the IB is properly registered?

STUART MAYLOR:     As far as (INAUDIBLE)?

ATTORNEY PROSNITZ:     Yes.

STUART MAYLOR:     I'm not quite sure if this is a rule or this is a checklist.  This is a general supervision type of document (INAUDIBLE) on page 13 that precedes it.  And these are guidelines, they're not rules.

ATTORNEY PROSNITZ:     Well--.

STUART MAYLOR:     So I can't really--.

ATTORNEY PROSNITZ:     Alright.  Look at the front page of this document.  What does that say?

STUART MAYLOR:     NFA regulatory requirements.

ATTORNEY PROSNITZ:     Is it your understanding that an FCM is supposed to follow NFA regulatory requirements?

STUART MAYLOR:     Yes.

ATTORNEY PROSNITZ:     And look at the table of contents.  You see – which is page 1.  It says general regulatory requirements?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:     And is it your understanding that an FCM is supposed to follow general regulatory requirements?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:     Okay.  And on page 12, it refers to ethics training, that requires that all AP's and individuals registered as an FCM, IB, CPO, CTA, FB (INAUDIBLE) receive ethics training?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:     And isn't it true that you provide ethnics training not only to people at ComTrust, but you provide ethnics training to introducing brokers?

STUART MAYLOR:    No.

ATTORNEY PROSNITZ:     Could you then turn to Claimant's Exhibit 17?  Call your attention to the first page, sir.

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:      If you're – if you do not provide ethics training to introducing brokers, why does your website state, "We don't just clear IB business.  We assist you in many aspects of your business, such as business development and marketing, regulatory compliance, AML training, ethics training, promotional material, lead sources, hiring, and training"?

STUART MAYLOR:    That would apply towards the guaranteed IB's only.

ATTORNEY PROSNITZ:      Okay.  But that – but your website doesn't say that, does it?

STUART MAYLOR:    It doesn't say all the words.

ATTORNEY PROSNITZ:      And how about – what's AML training?

STUART MAYLOR:    Anti-money laundering.

ATTORNEY PROSNITZ:      Oh.  Let's go back--.

STUART MAYLOR:    Can I answer your first question?  We do not provide training to our IB's.

ATTORNEY PROSNITZ:      I thought you  just said you provide training to your guaranteed IB's?

STUART MAYLOR:     This is available to guaranteed IB's but we don't offer them to IB's, other than my pointing them in the right direction--.

ATTORNEY PROSNITZ:        Alright.  So--.

STUART MAYLOR:     --(INAUDIBLE-speaking simultaneously.)

ATTORNEY PROSNITZ:        --So you say on your website that you assist them with ethics training, but you don't really do any ethics training, is that correct?

STUART MAYLOR:     We don't do ethics training.

ATTORNEY PROSNITZ:        Alright.  You just say you're going to assist them but you don't really do any ethics--?

STUART MAYLOR:     Provide them – we give them the providers.

ATTORNEY PROSNITZ:        Alright.  Let's--.

STUART MAYLOR:     We point them in the direction of the providers that are available.

ATTORNEY PROSNITZ:        Alright.  Let's go back to Exhibit 24, page 13, general supervision.  It says, "NFA Compliance Rule 2-9 places a continuing responsibility on every member to diligently supervise its employees and agents in all aspects of their future activities."  Are you aware of Compliance Rule 2-9?

STUART MAYLOR:    Sure.

ATTORNEY PROSNITZ:        And then let's turn to page 14 again, we'll look at the due diligence of guaranteed IB's.  The due diligence section says that, "The guarantor FCM must do a due diligence inquiry before entering into a guaranty agreement.  The due diligence review must include a check to ensure that the IB is properly registered."

ATTORNEY SINCLAIR:        I'd like to make an objection now to this line of questioning. There's nothing been established that either ProTrade or Corporate would guarantee IB's of ComTrust.  For him to have to answer questions regarding what guaranteed IB's do is really irrelevant to the case against ComTrust.  They are not the – there's no record, there's no allegation that either Corporate or ProTrade were guaranteed by ComTrust.

CHAIRMAN:    Mr. Prosnitz?

ATTORNEY PROSNITZ:        Yeah, I recognize that.  But we have a compliance individual here and an FCM.  And I'm not – I realize this doesn't relate to ComTrust, but it relates to Alaron.  And I should be able to ask this witness, you know, questions that relate to the arbitration.

CHAIRMAN:    Okay.  But--.

ATTORNEY DAVID:    Well, if I might, so now we're taking a lay witness, who has been called as a lay witness, showing him the document that wasn't shared with us, and later use that document to convert a lay witness into his expert witness, never disclosed as an

expert witness.  There comes a point that if he was an expert on the area, he should have identified the expert.  Should have given us a little advice of the area the expert was going to testify to, we can prepare for it.  He's shooting from the hip.

CHAIRMAN:   Well, Mr. David, hold on.  I think you're extrapolating what are (INAUDIBLE) here a little bit further (INAUDIBLE).  Is any of this disputed?  It's not disputed that Corporate and ProTrade were not guaranteed IB's.  I don't think that's disputed in the case.  I think (INAUDIBLE) in agreement they are not.  I don't think it's disputed that Mr. Maylor is a compliance officer with some degree of experience.  I don't think those are disputed issues.  Nor do I think it's disputed that these are--.

ATTORNEY DAVID:   Then let's just put the regulatory guidelines into the record (INAUDIBLE).

CHAIRMAN:   (INAUDIBLE) to begin with.  But I (INAUDIBLE) an objection.

ATTORNEY DAVID:   Let's just do it and move on because this is just a--.

CHAIRMAN:   So you're withdrawing your objections?

ATTORNEY DAVID:   I withdraw my objection.

CHAIRMAN:   Alright.  Then (INAUDIBLE)--.

ATTORNEY SINCLAIR:        (INAUDIBLE) ask the questions--.

CHAIRMAN:     (INAUDIBLE).

MALE:             (INAUDIBLE).

ATTORNEY PROSNITZ:     Okay.  So just do you agree that the NFA regulatory requirement is that the FCM due diligence review should include inquiries concerning the disciplinary history of the IB and the disciplinary employment history of the IB's principals and AP's, do you agree with that?

STUART MAYLOR:     (INAUDIBLE).

ATTORNEY PROSNITZ:     And that's your practice?

STUART MAYLOR:     Yes and no.  They use the word "should."  It doesn't say "must." So, you know, there is the discretion there.  And in our case, we do.

ATTORNEY PROSNITZ:     Okay.  You were here yesterday, right?

STUART MAYLOR:     In our case, we do.

ATTORNEY PROSNITZ:     Okay.  Your case, you do.  But you were here yesterday when you heard Mr. Isaacson from Alaron testify, correct?

STUART MAYLOR:     Correct.

ATTORNEY PROSNITZ:        And he testified that all Alaron did before it signs a guarantee with ProTrade was check that ProTrade was registered, do you recall--?

ATTORNEY DAVID:   You know, I now object to that.

CHAIRMAN:    Yeah, I think we will sustain that.

ATTORNEY DAVID:   Thank you.

CHAIRMAN:    (INAUDIBLE) to a compare and contrast situation (INAUDIBLE).

ATTORNEY PROSNITZ:        Alright.  But you agree that this is an NFA regulation as to what an FCM should do before it signs a guarantee agreement, correct?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:        Let's go on to the supplemental checklist for FCMs, page 14.

MALE:        That would be 14 (INAUDIBLE) section.

ATTORNEY PROSNITZ:        Correct.

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:    You're on the supplemental checklist for FCMs, financial checklist?

STUART MAYLOR:    I am.

ATTORNEY PROSNITZ:    Okay.  Towards the middle of the page, it says that one thing that should be checked is to review positions in the firm's trading account to determine their effect on the firm's compliance with minimum capital requirements?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:    Now, would Mr. Bell's trades have been positions in the firm's trading account?

STUART MAYLOR:    Of course.

ATTORNEY PROSNITZ:    Okay.  And so you were to review if Mr. Bell's positions in the – in ComTrust trading account to determine their effect on the firm's compliance with minimum capital requirements, correct?

STUART MAYLOR:    No.

ATTORNEY PROSNITZ:    No?  So even though this – can you explain that, please?  Because this supplemental checklist--.

STUART MAYLOR:    If you want me to, I'll explain it.

ATTORNEY PROSNITZ:        Alright.

STUART MAYLOR:    It says review positions in the firm's trading account to determine their effect on the firm's compliance with minimum capital requirements.  In other words, the way I interpreted that and the way we interpreted it at ComTrust is that if there's an activity in the overall aggregate account and if at the end of that particular day, the trades that were placed in that aggregate account were such where it did not put our firm in any minimum capital requirement issue or concern, we were complying with this particular review.

ATTORNEY PROSNITZ:        So you didn't review individual positions?

STUART MAYLOR:    We do not micromanage individual positions.

ATTORNEY PROSNITZ:        So you – when it says review positions, you interpreted that to mean review (INAUDIBLE) of all positions?

STUART MAYLOR:    Well, I believe that's the intent of this (INAUDIBLE).

CHAIRMAN:    Excuse me, can I ask one question, (INAUDIBLE)?  When you use the word "aggregate," (INAUDIBLE) IB's total number account?  What does "aggregate" (INAUDIBLE)?

STUART MAYLOR:    Okay.  The NFA holds ComTrust to a bottom line capital requirement, which encompasses all business that's introduced to ComTrust.  It doesn't

break it down on individual IB's.  And so for my term of using aggregate, it's a compilation of everything that's introduced to the firm.

CHAIRMAN:   Thank you.  (INAUDIBLE).

ATTORNEY PROSNITZ:      So on a daily basis, you're looking at aggregate positions, right?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:      And what – how are those – how – describe how the aggregate position is measured.  Dollars?

STUART MAYLOR:    It's based on what our net cap number needs to be.  Based on our open trade equity and net liquidity.  And there is a report that is generated that shows whether we're there, close to it, below it, or above it.  I don't recall any time we were ever below it during the time we've been in business.

ATTORNEY PROSNITZ:      What's open trade equity?

STUART MAYLOR:    Open trade equity is exactly – open trade equity would be the value of the total open positions at a given time.

ATTORNEY PROSNITZ:      What's net liquidity?

STUART MAYLOR:    Net liquidity would be the difference between what is held in a particular account, plus or minus cash on any given day.

ATTORNEY PROSNITZ:      Does this net liquidity refer to all customers or you measure net liquid – you measure net liquidity in the aggregate or for individual accounts?

STUART MAYLOR:    I only focus on the aggregate.

ATTORNEY PROSNITZ:      The aggregate.  You said it's the difference between what is held in the account and cash, plus or minus cash?

STUART MAYLOR:    I may be off on the actual computation.  But net liquidity is obviously the net number.  And it's based on total value of positions on any given day.  If there's a debit in the account, that was subtracted from that.  If there is cash in the account, that is added to it.

ATTORNEY PROSNITZ:      So is it a measure of the value of the account, plus, you know, whatever is positive (INAUDIBLE) relative to how much cash is in the account?

STUART MAYLOR:    Not necessarily.

ATTORNEY PROSNITZ:      What – I understood you to say net liquidity is kind of a measure of cash in the account relative to the size of the positions, is that--?

STUART MAYLOR:    No.

ATTORNEY PROSNITZ:        Okay.  What is it, can you explain it?

STUART MAYLOR:    Net liquidity is a bottom line number.  The – for example, if there

were $10,000 in a segregated cash account and there were open positions of $200,000,

then the net liquidity would be $200,000 on that given day, plus the $10,000, it would be

$210,000.

ATTORNEY PROSNITZ:        Okay.  Now, did Mr. Bell's large positions, sometimes

1,400 contracts, have an effect on open trade equity or net liquidity for ComTrust?

STUART MAYLOR:    It may have on a given day.

ATTORNEY PROSNITZ:        And did it have a significant amount?

STUART MAYLOR:    Not brought to my attention.

ATTORNEY PROSNITZ:        So during the entire – let me ask you this question.  As

head of compliance during the entire time from July 2005 to February 2006, were you

ever aware of the magnitude of trading in Mr. Bell's account?

STUART MAYLOR:    No.

ATTORNEY PROSNITZ:        So no one ever called to your attention the number of

contracts?

STUART MAYLOR:    The only thing that was brought to my attention was something that your expert witness commented on, which I'm prepared to comment on when it – counsel asks me questions.

ATTORNEY PROSNITZ:    How about the margin calls of hundreds of thousands of dollars?  Did – were you aware that there were these margin calls on Mr. Bell's account during the time?

STUART MAYLOR:    Actually, I was not, the CFO was.  He contacted the IB.  And the IB basically said that Mr. Bell wasn't funding the account that day or the next day and that--.

ATTORNEY PROSNITZ:    Was – that $240,000 margin call was not met, then you have to come up with the money, right?

STUART MAYLOR:    No.

ATTORNEY PROSNITZ:    No?  What happens if a margin call is not met?

STUART MAYLOR:    We have a right to liquidate positions if we choose to.  Or if we wanted to, we would extend credit to that IB or account.

ATTORNEY PROSNITZ:    And if a customer doesn't meet the margin call, who becomes responsible for paying the money?

STUART MAYLOR:    The IB.

ATTORNEY PROSNITZ:      The IB.  And here, the net capital requirement for IB's at that time was what?

STUART MAYLOR:    Depending on the (INAUDIBLE), associated persons it varied.

ATTORNEY PROSNITZ:      Well, for ProTrade that was about $35,000.

STUART MAYLOR:    I'm not sure what the net requirements were at the time.  They didn't – they're higher now.

ATTORNEY PROSNITZ:      As head of compliance, did it concern you whether or not your independent broker, ProTrade, which had a $35,000 to $40,000 net capital, could meet – be responsible for a $240,000 margin call?

STUART MAYLOR:    It would be customary that in the event that there was a debit balance that commissions that were due that firm based on the agreement we had with them were withheld as a form of security.

ATTORNEY PROSNITZ:      Did you have $240,000 in security available?

STUART MAYLOR:    We do now (INAUDIBLE).

ATTORNEY PROSNITZ:      So did any – so this subject of these margin calls was never called to your attention?

STUART MAYLOR:    No.

ATTORNEY PROSNITZ:        And for a firm of your size, these are large margin calls, right?

STUART MAYLOR:    We run a risk every day that we can be upside down, that's part of the risk that we take.

ATTORNEY PROSNITZ:        But that's not my question.  My question is, were these large margin calls for ComTrust--?

STUART MAYLOR:    As I mentioned earlier, we've had them in excess of $1 million, so it's relative.

ATTORNEY PROSNITZ:        Well, what's your average margin call?

STUART MAYLOR:    We rarely have margin calls.  This is not really considered a margin call per se.  It's just an amount that needed to fund the account to bring it up to where it needs to be.  Mr. Bell was not trading futures where margin calls per se would be required.  It was that there was a debit balance in the account and it basically is referred to as a margin call because there's a debit in the account.

ATTORNEY PROSNITZ:        He wasn't trading futures?

STUART MAYLOR:    He was not trading futures.  He was trading – he was buying and selling options.  If he was trading futures, it was due to the fact that maybe some were

exercised and therefore they may have reverted to the futures of a contract but the nature of the amount (INAUDIBLE) options traded.

ATTORNEY PROSNITZ:      So your firm rarely issues margin calls?

STUART MAYLOR:    They're termed margin calls.  They're termed margin calls when there's a debit due, it defaults to a margin.

ATTORNEY PROSNITZ:      But I thought--.

STUART MAYLOR:    It doesn't delineate why it's--.

ATTORNEY PROSNITZ:      Did I understand you correctly when you said your firm rarely issues margin calls?

STUART MAYLOR:    In the context of futures trading, where a position may go against a particular person, it happens but it's not something that happens all the time.

ATTORNEY PROSNITZ:      And these were margin calls, weren't they, to Mr. Bell?

STUART MAYLOR:    They were debit balances that were required.

ATTORNEY PROSNITZ:      So they were not margin calls?

STUART MAYLOR:    Technically speaking, the would be margins.

ATTORNEY PROSNITZ:    And so technically speaking, they're margin calls?

STUART MAYLOR:    Mmm-hmm.

ATTORNEY PROSNITZ:    And technically speaking, they're $240,000 margin calls that a firm which rarely has none of that (INAUDIBLE-speaking simultaneously)--.

STUART MAYLOR:    That's not what I said.

ATTORNEY PROSNITZ:    --none of that concerned you?

STUART MAYLOR:    That's not what I said, sir.

ATTORNEY PROSNITZ:    None of this concerned you?

STUART MAYLOR:    That's not what I said.

ATTORNEY PROSNITZ:    Now, you agree that Mr. Bell was a customer of ComTrust (INAUDIBLE) customer (INAUDIBLE) ComTrust, right?

STUART MAYLOR:    That's correct.

ATTORNEY PROSNITZ:    And you agree that under that agreement, ComTrust had certain duties to Mr. Bell, correct?

STUART MAYLOR:    Yes, we did.

ATTORNEY PROSNITZ:    Including complying with applicable NFA regulations, correct?

STUART MAYLOR:    If that applied, correct.

ATTORNEY PROSNITZ:    Let's go on to page 15, supervision.  This says that, on the FCM supplemental checklist, that the FCM should provide adequate risk disclosure to customers purchasing deep out of the money options.  Mr. Bell was a customer, correct?  You just said he was a customer, right?

STUART MAYLOR:    (INAUDIBLE-speaking simultaneously.)

ATTORNEY PROSNITZ:    Did he purchase deep out of the money options?

STUART MAYLOR:    He may have.

ATTORNEY PROSNITZ:    Did you take any steps, this is a supplemental checklist for FCMs, to provide him adequate risk disclosure on those deep out of the money options?

STUART MAYLOR:    As an independent IB, we did not act – as an independent IB, ProTrade and Corporate Commodities (INAUDIBLE), we're naming two firms that Mr. Bell was at (INAUDIBLE) provided them with documentation to support that.

ATTORNEY PROSNITZ:    Okay.  But what we're looking at here is the NFA supplemental checklist for FCMs.  It's not a checklist for IB's, right?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:        And my question is, did ComTrust, as an FCM, comply with this NFA regulatory requirement?  If you know.

STUART MAYLOR:    Can I take a moment to look at my documents, please?

(End Disk 8, Track #1.  Begin Track #2.)

MALE:            (INAUDIBLE).

(End Disk 8, Track #2.  Begin Track #3.)

MALE:            (INAUDIBLE).

STUART MAYLOR:    Page number 7.

ATTORNEY PROSNITZ:        Well, you're referring to something that's not signed, right?  It's not signed by Mr. Bell, is it?

STUART MAYLOR:    I'm referring to something that is required to be disclosed but is not required to be signed.

ATTORNEY PROSNITZ:        Alright.  Wait a second.  But you're looking at blank ComTrust account documents, right?

ATTORNEY SINCLAIR:        What was your question?  Can you please rephrase your

question?


ATTORNEY PROSNITZ:        Yeah.  My question was, did you provide adequate risk

disclosure to Mr. Bell concerning deep out of the money options?


STUART MAYLOR:     The answer is yes.


ATTORNEY PROSNITZ:        And the document you're referring to is not signed by Mr.

Bell, correct?


STUART MAYLOR:     That isn't, so correct.


ATTORNEY PROSNITZ:        Alright.  Is there anything signed by Mr. Bell to corroborate

your testimony?


STUART MAYLOR:     The question that you asked was whether or not we provided him

with a disclosure and we did.  The answer is that he did not sign the document.


ATTORNEY PROSNITZ:        You're pointing to blank form documents.  How in the world

can we know, I mean, this was never signed by Mr. Bell.  Exhibit 22 is blank signature

pages, correct?  There are no signatures on Exhibit 22, sir, correct?


ATTORNEY SINCLAIR:        I'm going to object to this on the grounds that this page

doesn't require a signature.

CHAIRMAN:    That's true.  The question, I thought, was a little broader (INAUDIBLE) referring (INAUDIBLE) 23.

ATTORNEY PROSNITZ:      Are we talking about--?

CHAIRMAN:   23.

ATTORNEY PROSNITZ:      23, okay.  23, sir, is not signed.  It's a blank form.  It's not signed on 14.  It's not signed on 15.  It's blank on 16.  It's blank on 18.  It's blank on 19.  Correct?  Well, it's all blanks on those signature pages, correct?

STUART MAYLOR:    They are not signature pages and that's' correct.

ATTORNEY PROSNITZ:      What do you mean they're not signature pages?  They are signature pages but no one's signature is on it, is that correct, sir?

STUART MAYLOR:    That is not correct.

ATTORNEY PROSNITZ:      I'm looking at--.

STUART MAYLOR:    (INAUDIBLE) pages, that's correct.  Those are our signature pages.  The other ones are not signature pages.

ATTORNEY PROSNITZ:      And these signature pages are blank, correct?  There – no one signed them, correct?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:       The agreement you're referring to, the documents you're referring to--.

STUART MAYLOR:    I have a document that has signatures, sir.

ATTORNEY PROSNITZ:       I thought you referred to Exhibit 23, right?

STUART MAYLOR:    I'm referring to the – your question.  And if you can rephrase the question, restate the question, I'll be happy to answer it and then you can go along with your line of questioning.  Please restate the question for me.

ATTORNEY PROSNITZ:       Alright.  I've exhausted my questions on No. 23.  I think this would be a good (INAUDIBLE).

CHAIRMAN:    I don't have a problem with that.  Let's talk a little bit about the future.

ATTORNEY SINCLAIR:       Yes.

ATTORNEY PROSNITZ:       First of all, (INAUDIBLE) that you will get some opportunity to discuss (INAUDIBLE).

ATTORNEY DAVID:   Well, we did.  And unfortunately, we didn't reach an agreement.  I have told (INAUDIBLE) closing concerning factual arguments and (INAUDIBLE) lengthy

arguments of the law.  Mr. Prosnitz did not wish to do that.  Mr. Sinclair was going to do it but Mr. Prosnitz was not, so--.

CHAIRMAN:    (INAUDIBLE) get an opportunity--.

ATTORNEY DAVID:   Correct.

CHAIRMAN:    Alright.  Just let me ask a few more questions (INAUDIBLE).  I mean, I refer to this, I hope you did (INAUDIBLE) ask Mr. Prosnitz how much longer he thought he would be (INAUDIBLE).  Assuming that's the case, Mr. Sinclair (INAUDIBLE) expect you will be (INAUDIBLE)?  I won't hold you to it (INAUDIBLE).

ATTORNEY SINCLAIR:        An hour, I'm thinking.

CHAIRMAN:    Mr. (INAUDIBLE)?

MALE:        I can't imagine (INAUDIBLE).

CHAIRMAN:    Mr. Prosnitz, (INAUDIBLE) Mr. Sinclair (INAUDIBLE)?

ATTORNEY SINCLAIR:        I was just (INAUDIBLE) call Mr. Maylor.  I may call (INAUDIBLE).

CHAIRMAN:    (INAUDIBLE).

ATTORNEY PROSNITZ:      I have no intention but I can assure (INAUDIBLE) ask for a directed verdict at the conclusion of the direct testimony.

CHAIRMAN:   Based on where we are at the moment, as things can change, I see virtually no opportunity to have closing arguments in this case (INAUDIBLE).  So what do you think about not (INAUDIBLE)?  I (INAUDIBLE) plan on reconvening (INAUDIBLE).

MALE:        Mr. Chairman, (INAUDIBLE) my only concern is that we have closing arguments (INAUDIBLE) but I will (INAUDIBLE-speaking simultaneously)--.

CHAIRMAN:   (INAUDIBLE-speaking simultaneously) see if we can't arrive at a solution (INAUDIBLE).

(End of Disk 8, Track #3.  Begin Track #4.)

CHAIRMAN:   --Mr. Sinclair?

ATTORNEY SINCLAIR:       (INAUDIBLE) Mr. Maylor has to leave (INAUDIBLE).

CHAIRMAN:   (INAUDIBLE).

(End of Disk 8.)

AAA/cmy