06-ARB-61
Disk 9

CHAIRMAN:   We can resume on the record.  This is the resumption of the hearing

between Mr. John Bell and ProTrade (s/l Intelligence).  We've recessed (INAUDIBLE)

recess, the Claimant's counsel interrogating Mr. Maylor (INAUDIBLE) resume.  While we

were in our recess, the panel has had an opportunity to give some further thought to

(INAUDIBLE) that confront us.  And without ruling, which (INAUDIBLE) capable of doing

and (INAUDIBLE) prepared to do, we will offer the following guidance.  We – collectively,

we (INAUDIBLE) hearing the complete presentation of all the evidence far surpasses the

value of argument (INAUDIBLE) have time for both, that would be the best of all worlds.

But the evidence is much more important to us completing.  Receipt of the evidence is

even more important to us that argument.  So we are willing to allow the (INAUDIBLE)

play itself out a little bit longer before we get (INAUDIBLE) ultimate decision.  And we

certainly have the most (INAUDIBLE) cutting off receipt of evidence for the sake of

hearing argument.  So let's proceed now with – with I guess (INAUDIBLE).


ATTORNEY SINCLAIR:       Can I deal with a housekeeping matter?


CHAIRMAN:   Sure.


ATTORNEY SINCLAIR:       I had the opportunity over the lunch hour to take a look at

Exhibit 24.  And it's not only duplicative in certain respects, in that the same pages are in

there twice, so if you look at that second page 14, that was part of the supplemental

checklist.  And you go about four pages beyond that, you'll see a document called "self-

examination checklist."

CHAIRMAN:   Right.


ATTORNEY SINCLAIR:       Title page.  And then that page 14 appears again.  And then if you go all the way to the back, there's more stuff.  There's a document called "independent IB reporting requirements."  There's a 1222-06 and something about NFA Compliance Rule 2-9.  And then seven pages of disciplined firms.  And then a case summary of the case against Alaron that I note that Mr. Prosnitz has just been itching to tell you about.  It has nothing to do with this case and you haven't allowed him to do it, so he's attached it to the back of this document instead.  None of this other stuff needs to be in here.  None of it has to do with what it was offered for, which is NFA regulatory requirements.  So if we can just cut it off at an appropriate place, ditch the rest of the pages from this exhibit, unless I have something way more than you guys do.


ATTORNEY PROSNITZ:       Mr. Chairman, those documents are in there on purpose because I do want to get to them.  But if you want to separate them, that's fine.  But I certainly – I plan to ask this witness about them.  If you want to just make this exhibit stop at the end of the fourth guarantee, and make this one after the independent IB reporting on a separate exhibit where they can trade suggestions as I ask questions, that's, you know--.


CHAIRMAN:   Yeah, let's do that.


ATTORNEY SINCLAIR:       That's fine.

CHAIRMAN:   That's a very sensible (INAUDIBLE).  So let's make the previously marked Exhibit 24, up to the chart about independent IB reporting, let's make that the completion of Exhibit 24.  And then we'll see where we go with this.

ATTORNEY SINCLAIR:       (s/l Paranoid.)

CHAIRMAN:   Thank you, Mr. Prosnitz.  And you can go ahead.

ATTORNEY PROSNITZ:       Okay.  Thank you.

ATTORNEY SINCLAIR:       I'm sorry, I'm just trying to get this straight.

CHAIRMAN:   Okay.

ATTORNEY SINCLAIR:       Page 4.  Then page 23.  Is there a page 24?

FEMALE:       No.

CHAIRMAN:   No, there's a 23 and then there's a guarantee agreement.

ATTORNEY SINCLAIR:       Right.

CHAIRMAN:   And then there's a little chart.

ATTORNEY SINCLAIR:       Okay.  And then – oh, yes, I see that.

CHAIRMAN:    And that's the end of Exhibit 24.

ATTORNEY SINCLAIR:         Okay.

ATTORNEY PROSNITZ:         Mr. Maylor, have you ever been named as a defendant or respondent in any security issue commodity regulatory matter?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:         When was that?

STUART MAYLOR:    That would have been (INAUDIBLE).

CHAIRMAN:    (INAUDIBLE) hear the answer (INAUDIBLE).

ATTORNEY PROSNITZ:         What did that involve?

STUART MAYLOR:    (INAUDIBLE) question.

ATTORNEY PROSNITZ:         Have you ever been involved as a defendant or respondent in any regulatory matter involving securities, futures, commodities, of that sort?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:         What was that matter?

STUART MAYLOR:    To the best of my recollection, in 1982 I was recently out of

college, and I had a part-time job.  There was a situation having to do with a – coal

contracts that were not yet identified as registered contracts in any of the exchanges.

And apparently, there was a claim filed at one time that was not properly served to me.

And so I was on reparation (INAUDIBLE) had been vacated.

ATTORNEY PROSNITZ:      Who was the party bringing that claim?  The CFTC or a

private party?

STUART MAYLOR:    It was a private party claim.  It was a reparation, so it would have

been the CFTC.  And the administrative law judge (s/l Joel Maley) vacated the order.

That was in 1982, 3--.

ATTORNEY PROSNITZ:      Alright--.

STUART MAYLOR:    (INAUDIBLE-speaking simultaneously) 20-some odd years ago.

ATTORNEY PROSNITZ:      Alright.  Besides the 1982 matter, have you ever been

named in any – as a respondent in any action brought by any government, full regulatory

agency of any type?

STUART MAYLOR:    (INAUDIBLE).  And from a regulatory standpoint brought against

me, at the same time there may have been because of the failure to provide me with the

proper service, since I've been a securities broker since 1984 in stocks, (INAUDIBLE)

there was an issue in the State of Florida that once they learned of what was happening

at the reparation level from the CFTC, they asked me to produce documents to support what happened in that 1982 situation. It had to do with disclosure of a previous complaint that I allegedly failed to disclose. And was innocent because I didn't know. And that was vacated. But that is – that was also a CFTC matter in the State of Florida, the matter pertaining to that same issue.

ATTORNEY PROSNITZ:    The allegation, there was sale of unregistered securities?

STUART MAYLOR:    That was the allegation at the time.

ATTORNEY PROSNITZ:    Alright. And you're saying those were all vacated, okay.

STUART MAYLOR:    Absolutely.

ATTORNEY PROSNITZ:    Okay. Okay. Other than those two proceedings, have you ever been identified in any other action?

STUART MAYLOR:    (INAUDIBLE-speaking simultaneously) two, I don't recall the dates, but I can certainly, you know, look at my – some basic registration with NFA. Since 1984, since I've been registered as a stockbroker, as well – or registered, I've never had a complaint of any sort, either as a supervisor or as a registered representative. In commodities, there was a – an arbitration claim against me, where – would you like the circumstances of the case?

ATTORNEY PROSNITZ:    Those are private arbitration claims?

STUART MAYLOR:    It's my (INAUDIBLE) I don't know if it was private or not.

ATTORNEY SINCLAIR:        (INAUDIBLE) private.

ATTORNEY PROSNITZ:       Private, already brought – an individual brought it?  And the NFA--.

STUART MAYLOR:    No, it wasn't – NFA has never brought an action against me.

ATTORNEY SINCLAIR:        (INAUDIBLE-speaking simultaneously.)

ATTORNEY PROSNITZ:       Alright.  I may ask you for--.

STUART MAYLOR:    Excuse me.  I have never had a regulatory action brought against me.

ATTORNEY PROSNITZ:       Are you sure?  No governmental authority--?

STUART MAYLOR:    Are you talking to me personally or ComTrust?

ATTORNEY PROSNITZ:       I'm talking about Stuart A. Maylor.  Has any governmental agency anywhere ever named you as a defendant?

STUART MAYLOR:    None that I can think of.  And if I'm over-sighting this, it's an oversight.  If you refresh my memory, I--.

ATTORNEY PROSNITZ:    How about – I believe your testimony this morning was that there were problems in Universal, a unit of (INAUDIBLE).

STUART MAYLOR:    Universal Commodity (INAUDIBLE)?  I've never been named in a Universal Commodity Corporation regulatory claim, sir.

ATTORNEY PROSNITZ:    Universal, okay.  How about the Saskatchewan Securities Commission, did they bring an action against you?

STUART MAYLOR:    They didn't bring an action against me.  What they basically did was a solicitation took place in Saskatchewan.  A person called up a firm I was affiliated with.  It was unsolicited.  They requested some information.  And I proceeded to provide them with account documents, per their request, it was not solicited, it came out of the clear blue.  The next thing I knew, they were phoning people all over the country, specifically in south Florida.  And they alleged that I should not have sent them materials because they were in Saskatchewan and I was unaware.  And that matter had never been pursued.  It was basically no action was ever brought.  There was never a response given.  It was just one of those things that's out there in Internet-land for people to explore, to Google my name.

ATTORNEY PROSNITZ:    Okay.  So you're saying with respect to this Canadian matter, what was the underlying allegation?  Are you saying no proceeding was ever brought?

STUART MAYLOR:    That's correct.

ATTORNEY PROSNITZ:        And it's just out there in Google-land, you said?

STUART MAYLOR:    That's exactly what it is.

ATTORNEY PROSNITZ:        And you were never named a respondent, correct?

STUART MAYLOR:    I'm – my name is there.  But I was never served with any documents.

ATTORNEY PROSNITZ:        Okay.  So this is just gossip on the Internet, as far as you're concerned, right?

STUART MAYLOR:    It's defamatory, as far as I'm concerned.  And it's not accurate. But unfortunately, you can't remove these things--.

ATTORNEY PROSNITZ:        It's defamatory gossip by whom?

STUART MAYLOR:    Saskatchewan only, not – has nothing to do with U.S. Securities or NFA or CFTC regulation that would – counsel at the time was not Mr. Sinclair.  And counsel has since passed away.  And his advice was, you know, it's not even worthy of a response.  And that's basically what happened.

ATTORNEY PROSNITZ:        Okay.  But I just want to be clear.  You say no action derived, right?

STUART MAYLOR:    I never received anything--.

ATTORNEY PROSNITZ:     No, alright--.

STUART MAYLOR:    --including, other than knowing that that does exist--.

ATTORNEY PROSNITZ:     Right.  Alright--.

STUART MAYLOR:    --on the Internet.

ATTORNEY PROSNITZ:     --I'd like to mark as Claimant's Exhibit 24 the--.

CHAIRMAN:   This is 24.

ATTORNEY PROSNITZ:     Oh, I'm sorry, 25, what purports to be an order from the Saskatchewan Securities Commission (INAUDIBLE).

ATTORNEY SINCLAIR:     My objection still stands.

CHAIRMAN:   (INAUDIBLE).

ATTORNEY SINCLAIR:     Yet again, I'll ask the question (INAUDIBLE).

ATTORNEY PROSNITZ:     This is cross-examination, rebuttal.  I just did it in response to his testimony this morning, that he was not involved in any (INAUDIBLE).  This is cross-examination.  It--.

ATTORNEY SINCLAIR:        It is not cross-examination.

CHAIRMAN:    It's not – it is cross-examination.

ATTORNEY PROSNITZ:        Cross-examination.

ATTORNEY SINCLAIR:        No, no, no.  He called him as his witness.  This is direct examination.

CHAIRMAN:    As an adverse witness.

ATTORNEY SINCLAIR:        I'm sorry?

CHAIRMAN:    As an adverse witness.  This is an impeachment (INAUDIBLE), okay?

ATTORNEY SINCLAIR:        Alright.  I understand.

CHAIRMAN:    I understand why it's being offered.  It's not substantive evidence.

ATTORNEY PROSNITZ:        Right, right.  Could you – (INAUDIBLE) say I shouldn't be ashamed?  If you have something to say, sir, say it.

STUART MAYLOR:    I'm mumbling under my breath.  It wasn't intended for you to hear. If you want me to restate it--.

ATTORNEY PROSNITZ:        Well, let me just ask you a simple question.

STUART MAYLOR:    (INAUDIBLE-speaking simultaneously.)

ATTORNEY PROSNITZ:        Is the Stuart A. Maylor there the same as you or mine is?

So you – okay.  No?

ATTORNEY SINCLAIR:        No, no other question.

CHAIRMAN:    You can keep that document.

ATTORNEY SINCLAIR:        (INAUDIBLE).

MALE:          (INAUDIBLE).

ATTORNEY SINCLAIR:        (INAUDIBLE).

CHAIRMAN:    Mr. Prosnitz, you're passing notes.

ATTORNEY PROSNITZ:        No, no, I'm just (s/l leaving) this document.

CHAIRMAN:    Okay.  (INAUDIBLE).

ATTORNEY PROSNITZ:        Okay.  Let's – okay.  I do want to mark as our next exhibit,

which I guess will be 26, a copy of the ComTrust clearing agreement which was

produced (INAUDIBLE).

CHAIRMAN:   This is a document that Mr. Sinclair handed you (INAUDIBLE-speaking simultaneously.)--?

ATTORNEY PROSNITZ:      Right, right.

CHAIRMAN:   Okay.

MALE:         (INAUDIBLE).

CHAIRMAN:   Thank you.

ATTORNEY PROSNITZ:      This will be 26.  Okay.  Sir, is Exhibit 26 your standard clearing agreement with introducing brokers?

STUART MAYLOR:    It appears to be (INAUDIBLE).

ATTORNEY PROSNITZ:      And you're familiar with this document?

STUART MAYLOR:    For the most part, yes.

ATTORNEY PROSNITZ:      Okay.  And in this document, do you have the power to obtain documents from your independent introducing brokers?

STUART MAYLOR:    That's correct.

ATTORNEY PROSNITZ:      Do you have the power to inspect and audit their records?

STUART MAYLOR:    Certain records, yes.

ATTORNEY PROSNITZ:       Do you have the power to review logs of any conversations they may have taped with customers?

STUART MAYLOR:    (INAUDIBLE).

CHAIRMAN:    (INAUDIBLE).

ATTORNEY PROSNITZ:       Oh, I'm sorry.

CHAIRMAN:    Probably (INAUDIBLE).  So let's (INAUDIBLE).  Could you repeat the question for Mr. Maylor (INAUDIBLE)?

ATTORNEY PROSNITZ:       Sure.  Did you have the power to review any conversations that the IB might have taped with customers?

STUART MAYLOR:    No, actually.

ATTORNEY PROSNITZ:       Okay.

STUART MAYLOR:    Could you rephrase those first questions because (INAUDIBLE), is that possible?

ATTORNEY PROSNITZ:       (INAUDIBLE-speaking simultaneously.)

STUART MAYLOR:    (INAUDIBLE-speaking simultaneously.)

ATTORNEY PROSNITZ:        I would like to ask you, is the IB required to have (INAUDIBLE) agreements that complied with ComTrust's policies?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:        Is the IB required to refrain from making any statement inconsistent with your account documents?

STUART MAYLOR:    The IB is supposed to follow the rules that govern our industry. And we do not have a supervisory role, other than putting them on notice that these are things that they should do.

ATTORNEY PROSNITZ:        Is the IB required to report to you any complaint they receive?

STUART MAYLOR:    We ask that they do that, yes.

ATTORNEY PROSNITZ:        That's part of the agreement, isn't it?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:        Is the IB to collect on margin calls you issue?

STUART MAYLOR:    They are.

ATTORNEY PROSNITZ:        Is the IB to pay customer debit balances if needed?

STUART MAYLOR:    If needed.

ATTORNEY PROSNITZ:        And is the IB to indemnify you for claims arising from (INAUDIBLE) accounts?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:        And is it your recollection that the agreement you entered into with ProTrade and Corporate Commodities was similar in form to what we've marked as Claimant's Exhibit 26?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:        And you agree to give the IB a daily account status report of trade confirmations, (INAUDIBLE), account balances, commission charges, and margin call information on account equity (INAUDIBLE) these customers, correct?

STUART MAYLOR:    (INAUDIBLE) futures (INAUDIBLE).

ATTORNEY PROSNITZ:        And the IB is responsible for the account documents but you prepare the – their ComTrust account documents which you prepare, right?

STUART MAYLOR:    No account documents are in (INAUDIBLE) to my knowledge.

ATTORNEY PROSNITZ:        And do you take any steps to verify that your account documents are filled out accurately?

STUART MAYLOR:    Well, we review accounts that were submitted to us.

ATTORNEY PROSNITZ:        Right.  So if they're blanks, like on the Bell account, there's just a blank instead of a zero or a number of years in commodity trading (s/l experience), do you take it face value what's on the document or do you ever – do you ever conduct any due diligence on it?

STUART MAYLOR:    We actually do take it at face value, for the most part, unless it's an extenuating circumstance.  If there is an age that's not there or if there's a position that's not there (INAUDIBLE) perhaps contact the individual (INAUDIBLE).

ATTORNEY PROSNITZ:        Okay.  Now, Mr. – you said earlier this morning that you were paid from ProTrade, right, not Mr. Bell?

STUART MAYLOR:    I said I was – ComTrust was paid from ProTrade.

ATTORNEY PROSNITZ:        ProTrade, ProTrade.  But all the checks were addressed to ComTrust, right?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:     So in the initial incidents, all of Mr. Bell's checks were payable to ComTrust, correct?  Is that correct?

STUART MAYLOR:    Futures Commission Merchants is the only entity that's allowed to receive funds from a customer who's not an introducing broker (INAUDIBLE).

ATTORNEY PROSNITZ:     Okay.  And how is it that Mr. Bell ended up with margin calls of $240,000 when he had opened his accounts with $27,000?  How – was there any limit placed on what could be traded in the account?

STUART MAYLOR:    We do not determine suitability of commodities and therefore it's up to the independent IB to determine suitability, if at all.

ATTORNEY PROSNITZ:     But do you have any requirements for how much cash must be posted relative to the size of the trade?

STUART MAYLOR:    Generally speaking, we do not.  We rely on the introducing broker to make sure that there are no debit balances that are extended beyond a reasonable timeframe.

ATTORNEY PROSNITZ:     So do you have any – someone opens an account with $25 - $27,000, do you have any rules as to whether they can (INAUDIBLE) the dollars in (INAUDIBLE)?

STUART MAYLOR:    In the case of Mr. Bell, we would (INAUDIBLE) between – up to $5 million on his (INAUDIBLE).

ATTORNEY PROSNITZ:        But that's – my question is, do you have any rules?

STUART MAYLOR:    They're my own rules.

ATTORNEY PROSNITZ:        Okay.  There are no rules.  So – alright.  And you understood that the IB was not to allow any discretionary trading without power of attorney authorization?

STUART MAYLOR:    Of course.

ATTORNEY PROSNITZ:        Was it your understanding that all the trades in Mr. Bell's account were issued by Mr. Bell?

STUART MAYLOR:    I really didn't know whether he initiated them or whether he authorized them.  I just know that they were presented to ComTrust via the introducing broker (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:        But you say there's--.

STUART MAYLOR:    --(INAUDIBLE-speaking simultaneously) can I answer your question?  I also understand that Mr. Bell had made good on each trade, which led me to believe he was involved in the decision making or he wouldn't have made payments.

ATTORNEY PROSNITZ:        So as you sit here today, is it your belief that this account was traded in a discretionary manner?

STUART MAYLOR:     Absolutely not.

ATTORNEY PROSNITZ:     So it's your belief that each and every one of these trades was discussed with Mr. Bell in advance?

STUART MAYLOR:     Since nothing has been shown to the contrary and since Mr. Bell had never contacted ComTrust, on the bottom of every statement was a phone number to contact if there were discrepancies, since there's never been a phone call, I have no reason to believe that Mr. Bell was not involved in some capacity in authorizing these trades, including (INAUDIBLE).

ATTORNEY PROSNITZ:     Have you ever been aware of any other retired 81-year-olds trading – doing trading of this magnitude on a direct basis?  Have you ever--?

STUART MAYLOR:     I believe that there are a number of retired individuals who are trading on these (INAUDIBLE) high (INAUDIBLE), yes.  81 years old, I'm not quite sure. We don't discriminate against people who are suitable in terms of their own determination who are 80 years old.

ATTORNEY PROSNITZ:     And as you sit here today, do you believe the commissions and fees charged on this account were reasonable?

STUART MAYLOR:     It's not our determination.  It was ProTrade's instructions to debit the account based on Mr. Bell's authorizations.

ATTORNEY PROSNITZ:     So you have no view on that subject?

STUART MAYLOR:    It's not relevant, what my view is.

ATTORNEY PROSNITZ:     Okay.  And then in paragraph 6 of your agreement, it says that ComTrust may make available to independent IB's certain voice and data communication facilities, including but not limited to computer, electronic, and satellite-based communication facilities and systems.  Did you do that for ProTrade or Corporate Commodities, Inc.?

STUART MAYLOR:    We did not provide them with – (INAUDIBLE) in whole or in part. So we did not provide them with any facilities or systems per se.  They may have ventured into an agreement with a quote system or they may have utilized a fax number or some other communication devices that may have been in place prior to them coming into that facility.  But as far as making it available to them as a rule or if it happened, it was a convenience or--.

ATTORNEY PROSNITZ:     I believe you said you're currently president and 100 percent owner of Universal Commodity Corporation.  When did you become president?

STUART MAYLOR:    I want to say 2003.

ATTORNEY PROSNITZ:     2003.  And when did you become 100 percent owner?

STUART MAYLOR:    2003.

ATTORNEY PROSNITZ:        And before that, you were an associated person at Universal Commodity?

STUART MAYLOR:    I had been years before that, was affiliated with--.

ATTORNEY PROSNITZ:        Starting in 1993?

STUART MAYLOR:    I believe I testified to that earlier, yes.

ATTORNEY PROSNITZ:        Okay.  And Mr., is it Ciarmella, C-i-a-r-m-e-l-l-a.

STUART MAYLOR:    Ciarmella.

ATTORNEY PROSNITZ:        Ciarmella.  He – what's his connection with – what was his connection with ComTrust in 2005?

STUART MAYLOR:    Director.

ATTORNEY PROSNITZ:        Director.  And he was also connected with Universal Commodity Corporation, correct?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:        What was his position with Universal Commodity Corporation?

STUART MAYLOR:    Back at the time, I'm not sure what his title was.  Something to the tune of like an IB coordinator.

ATTORNEY PROSNITZ:     IB coordinator?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:     Okay.  And is it correct that Universal Commodity Corporation and Mr. Ciarmella were named in an NFA regulatory action involving failure to supervise?

STUART MAYLOR:    That's correct.

ATTORNEY PROSNITZ:     And is it correct that Universal Commodity Corporation paid a $200,000 fine?

STUART MAYLOR:    (INAUDIBLE) I was at (INAUDIBLE).

ATTORNEY PROSNITZ:     And is it correct that Mr. Ciarmella, who was a director of ComTrust in 2005, was named individually in that NFA regulatory action, for failure to supervise?

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:        Now, let's turn to what we had taken out of Claimant's

Exhibit 24.  Just for convenience, I mean, (INAUDIBLE) probably going to object,

because I'd like to tentatively mark this as Claimant's Exhibit No. (INAUDIBLE).

CHAIRMAN:    (INAUDIBLE) so we're going to mark them 27 for identification.

ATTORNEY SINCLAIR:        Starting with this page?

CHAIRMAN:    Actually, it starts with this page.

ATTORNEY SINCLAIR:        This one (INAUDIBLE).

CHAIRMAN:    (INAUDIBLE) begins with this enhanced supervision telemarketing page.

ATTORNEY PROSNITZ:        You testified earlier you're in charge of compliance at

ComTrust.  What's your understanding of NFA Compliance Rule 2-9?

CHAIRMAN:    I'm sorry, Mr. Maylor, do you have these documents?

STUART MAYLOR:    Yeah, now I do, thank you very much.

ATTORNEY PROSNITZ:        Is 2-9 the general supervision rule of the NFA?

STUART MAYLOR:    (INAUDIBLE).  2-9 goes beyond supervision, as well.  But for this

purposes, the answer is yes.

ATTORNEY PROSNITZ:    Okay.  And is it correct that there are now NFA rules that if you're dealing with – if a firm has associated people with it, who have a history of being with prior firms that were disciplined by the NFA, that there are more rigid rules that apply to the current firm?

STUART MAYLOR:    NFA has imposed enhanced supervision for firms that have been what we call 2-9 firms (INAUDIBLE)--.

ATTORNEY PROSNITZ:    Alright.  And the next page here is a list of firms that have been disciplined for sales practice (INAUDIBLE), correct?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:    And it now includes Corporate Commodities, Inc. as of March 8th, 2007.  And ProTrade Futures and Options as of March 8th, 2007, correct?

STUART MAYLOR:    Is that during the time we (INAUDIBLE) account with ComTrust?

ATTORNEY PROSNITZ:    That's not my question.  My question is whether ProTrade and Alaron – I mean, I'm sorry, whether ProTrade and Corporate Commodities are now on this list?

ATTORNEY SINCLAIR:    I'm going to object to this line of questioning because it's not Mr. Maylor's job to verify the NFA documents, which is basically what he's asking him to do.  Mr. Maylor wasn't involved in the case.  And now he's trying to use Mr.

Maylor to somehow bring these documents into evidence.  And he's not the proper party to--.

ATTORNEY PROSNITZ:      I'm not asking, I'm just – I'm not asking him to verify the NFA documents.

ATTORNEY SINCLAIR:      You're asking him to--.

ATTORNEY PROSNITZ:      I'll rephrase the question.  I'll rephrase the question.  Are you aware, sir, that Corporate Commodities, Inc. and ProTrade Future Options are now barred from business, based on an NFA complaint that involves Mr. Bell, are you aware of that now?

STUART MAYLOR:    No, I'm not.

ATTORNEY PROSNITZ:      That was not – never brought to your attention prior to my question?

STUART MAYLOR:    Your question is pertaining to Mr. Bell?

ATTORNEY PROSNITZ:      Right.

STUART MAYLOR:    I don't believe there's anything that states it has to do with Mr. Bell.  I believe it has to do with a generalization.  But Mr. Bell was never incorporated in that particular decision, to my knowledge.

ATTORNEY PROSNITZ:        Okay.  So--.

STUART MAYLOR:    It's something you've been saying.

ATTORNEY PROSNITZ:        Mr. Bell – so your understanding is Mr. Bell was not involved, correct?

STUART MAYLOR:    My understanding is that Mr. Bell is not a party to the NFA complaint against any of those firms.

ATTORNEY PROSNITZ:        But what happened to Mr. Bell was part of the NFA complaint, is it not?

ATTORNEY SINCLAIR:        Again, Mr. Maylor is not the person--.

CHAIRMAN:    Well, actually I think he answered the question when he said no--.

ATTORNEY PROSNITZ:        Alright, alright.--

ATTORNEY SINCLAIR:        (INAUDIBLE-speaking simultaneously)

CHAIRMAN:    (INAUDIBLE) the question again.

ATTORNEY PROSNITZ:        Let's go on to – let's turn to Claimant's Exhibit Binder No. 3.  This is a business conduct committee complaint filed on August 29, 2006.  The respondents include ProTrade Futures and Options, Corporate Commodities, Inc.,

Summer (INAUDIBLE), John Matthews, Mitchell Goldberg, Adam Leon, and Donnetta Vass.  Did you continue to deal with Clear Trades or either ProTrade or Corporate Commodities after this complaint was filed?

STUART MAYLOR:    No, not to my knowledge.

ATTORNEY PROSNITZ:        When did you stop dealing with Corporate Commodities, Inc.?

STUART MAYLOR:    Offhand, I (INAUDIBLE).

ATTORNEY PROSNITZ:        Was it in 2006?

STUART MAYLOR:    Again, offhand I don't have documents to (INAUDIBLE).

ATTORNEY PROSNITZ:        Why did you stop dealing with Corporate Commodities, Inc.?

STUART MAYLOR:    I believe they elected to not do business with us.

ATTORNEY PROSNITZ:        Okay.  Now, if you could turn to paragraph 31, which is B0011.

STUART MAYLOR:    Which paragraph, I'm sorry?

ATTORNEY PROSNITZ:        Paragraph 31.

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:        Now, that directly relates to misleading and deceptive statements during (s/l solicitations) of John Bell.  So--.

STUART MAYLOR:    At the time this complaint was – I'm sorry.

ATTORNEY PROSNITZ:        I believe you testified that you didn't think the NFA matter had anything to do with Mr. Bell.  Are you willing to admit now that it does?

STUART MAYLOR:    Well, considering the fact that we were no longer doing business with them, I've never even read this complaint because it did not pertain to us in any fashion.

ATTORNEY PROSNITZ:        But I thought you testified about three minutes ago that Bell had nothing to do with the NFA action--.

STUART MAYLOR:    To my knowledge, it did not.  I stand corrected.

ATTORNEY PROSNITZ:        (INAUDIBLE-speaking simultaneously.)  Now you see that you were wrong, right?  How about paragraph 32?  That the actions of the AP of ProTrade and Commodities towards Bell constituted cheating, fraud, and deception, do you now--?

STUART MAYLOR:    This is the first time I've seen this.

ATTORNEY PROSNITZ:        Alright.  And how about the allegations of paragraph 33 concerning Mr. Bell?

STUART MAYLOR:    What is your question?

ATTORNEY PROSNITZ:        So until I just showed you this document, you were not aware of the fact that the NFA action leading to the suspension and barring of ProTrade, Corporate Commodities, Inc., and Mitchell Goldberg was related to Mr. Bell?

STUART MAYLOR:    Under oath, yes.

ATTORNEY PROSNITZ:        Did you know Mitchell Goldberg had been barred from the industry before today?  I mean, before you came in here today--?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:        --were you aware that he was barred from the industry?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:        And you were aware that he was barred by reason of an order in 2007?  I'm not talking about the 1999 bar.  Are you aware that in 2007, the NFA permanently barred Mr. Goldberg from the industry?

STUART MAYLOR:    What I heard was that Mr. Goldberg has done a Houdini act and disappeared and he has not been able to be found and he has not responded.  And that's all I know about Mr. Goldberg in terms of these actions and allegations against him.

ATTORNEY PROSNITZ:      I'm not asking you about whether Mr. Goldberg disappeared or not.  I'm asking were you aware that the NFA permanently barred him from the industry?

STUART MAYLOR:    I believe I heard that he was, yeah.

ATTORNEY PROSNITZ:      And did you know that one of the reasons he was permanently barred from the industry involves what happened when he was at ProTrade and Corporate Commodities?

STUART MAYLOR:    Not until today.

ATTORNEY PROSNITZ:      And when you heard that he was permanently barred from the industry, did you have any conversations with anyone as to whether or not it involved Mr. Bell?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:      So did you have – until – did you have any understanding of Mr. Goldberg being barred from the industry had anything to do with what happened to John Bell?

STUART MAYLOR:     That's the third time you've asked me that.  I said no.

ATTORNEY PROSNITZ:        Okay.  Are you trying to – you say he performed a

disappearing act.  So, I mean, do you have any belief as to whether these allegations

are true or false?  Are you suggesting now that – do you have any belief as to whether

the allegations by the NFA against Mr. Goldberg are true or false?

STUART MAYLOR:     Once I learned through Mr. Bell that there was an issue with

trading and I read his statement that he submitted to me ultimately by my request, I

learned that there was some issues with Mr. Goldberg.

ATTORNEY PROSNITZ:        Do you think Mr. Goldberg did anything wrong in the action

of Mr. Bell's account?

STUART MAYLOR:     I would say that based on the testimony today, he may have, yes.

ATTORNEY PROSNITZ:        And what would that be?

STUART MAYLOR:     The only thing that I feel may have been done incorrectly,

assuming Mr. Bell did not authorize trades, which has not really been established, was

that your expert witness stated that the trades that were recommended or the trades that

were put into the account were marginally if ever capable of turning a profit.

ATTORNEY PROSNITZ:        Now, when you look – you see this list of firms that have

been disciplined for sales practice fraud--.

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:        --my question is, were you aware that prior to being associated with ProTrade, Mr. Goldberg was associated with American Futures Corporation – American Futures Group, Inc., Harrington Financial Corp., Concord Trading Group, Inc., FSG International, Inc., Porter, Smith & Cohee, Inc., all of which are on this list of disciplined firms, did you know that?

STUART MAYLOR:    I did not know that because it is not nor has it ever been our responsibility to do background checks on employees of other IB's, especially those that are independent.  But more importantly, what would be important is that they are registered properly with the NFA.

ATTORNEY PROSNITZ:        Okay.  And finally, I want to turn to the last five pages of the document, concerning Alaron Trading.  Were you aware that Alaron Trading was fined $200,000 by the NFA in a failure to supervise case?

ATTORNEY SINCLAIR:        I object to the form of the question.  I ask that it be withdrawn.  I ask the panel ignore all of this.  This witness is not Alaron's employee. He's not competent to testify about Alaron.  The document doesn't say failure to supervise.  He is making that up.  And this is all unfortunately the same thing we did yesterday.  The panel came to a particular conclusion.  Now he's trying to back door. And I apologize for sounding excited about this.  But (INAUDIBLE).

ATTORNEY PROSNITZ:        Mr. (INAUDIBLE) to respond briefly.  Yesterday we talked

that we shouldn't go into the regulatory history of Alaron, unless it was somehow

connected with this case.  So I'm not going into most – this particular case, however, I'm

not making up failure to supervise.  The document says "failure to diligently supervise, a

violation of NFA Compliance Rule 2-9," a $200,000 fine.  The panel ordered new

financial officer, new general counsel, because of failure to supervise case.  Our

allegation here is this is also a failure to supervise.  And the panel can take it for what it's

worth.  But given the broad standard, I mean, there are no rules of evidence in

arbitration.  And (INAUDIBLE), the panel can decide what weight to give to it, obviously.

But it's a $200,000 fine in a prior failure to supervise case.  You know, this involved

employees.  If the panel doesn't think that this involves, you know, totally different, you

know, there's nothing on the face of it that suggests that it's not relevant.


CHAIRMAN:   The cart is a little bit in front of the horse.  And I believe (INAUDIBLE) to

ask whether or not he was aware of this.


ATTORNEY PROSNITZ:        Right.


CHAIRMAN:    I'm going to allow him to consider the question.


ATTORNEY PROSNITZ:        Are you aware of it?


STUART MAYLOR:    No.


ATTORNEY PROSNITZ:        Okay.  (INAUDIBLE).

CHAIRMAN:   (INAUDIBLE).

ATTORNEY PROSNITZ:      Alright.  I think I might have five minutes.  Except for one or two – I have one or two questions that might take five minutes.

(End of Disk #9, Track #1.)

CHAIRMAN:   Go ahead, Mr. Prosnitz.

ATTORNEY PROSNITZ:      Alright.  I want to show you a letter that Ala – well, it's really Alaron's response to the complaint in this case.  It's a letter to Susan Day at the NFA, dated August 31, 2006.  And Alaron's answer says, this is on page 2, is Alaron's belief that ComTrust, Inc. accepted an account or accounts from Mitch Goldberg and ProTrade without performing the minimum due diligence determined that it was, in fact, doing business with a person and a firm that were registered with the Commodity Futures Trading Commission and members of the National Futures Association.  This simple check on the NFA's website would have shown that ProTrade was guaranteed by Alaron.  That knowledge would have kept any reputable firm in the futures business from accepting Mr. Bell's account.  Do you agree or disagree with what Alaron said in its response (INAUDIBLE)?

STUART MAYLOR:   I'm not familiar with it, other than through something counsel had told me a long time ago.  And quite frankly, I can't speak on behalf of Alaron's opinion, but I can certainly tell you that it is not our responsibility to check whether an independent IB is entering into any other agreement with any other FCM, guaranteed or otherwise, as long as they don't have an independent agreement that's with us that has

not been terminated and it's still active.  IB's have a right to clear through more than one FCM.  And they have a right to perhaps change their status with them and its guarantee. It's not our practice or our responsibility or duty to do that in all due respect to Alaron's (INAUDIBLE).

ATTORNEY PROSNITZ:     And so when Alaron says the knowledge that ProTrade was guaranteed by Alaron would have kept any reputable firm in the futures business from accepting Mr. Bell's account, do you agree with that?

STUART MAYLOR:    It's their opinion.  It's not a question of whether I agree or not agree.  It's--.

ATTORNEY PROSNITZ:     Well, their opinion seems to be that your firm is not reputable for accepting this business.  Do you agree with that?

STUART MAYLOR:    I don't think that's what that said.

ATTORNEY PROSNITZ:     Well, let me show you (INAUDIBLE).  Starts with "that knowledge," right here.

STUART MAYLOR:    I still disagree with the statement that we have a duty to do that.  I don't want to say anything derogatory about Alaron because I don't know Alaron's business model, but I can certainly tell you that if that is something that they do, then that's fine.  But the fact that we don't do it doesn't make us reputable or not reputable.  It was not a requirements and if it does not impose that upon us, then we don't do it.

ATTORNEY PROSNITZ:      Okay.  Just briefly, I want to look at a couple of exhibits, Claimant's Exhibit Binder.  Alright.  I'll stop.

CHAIRMAN:   Okay.  (INAUDIBLE)?

ATTORNEY DAVID:   I don't have any questions to ask of this witness.  I believe counsel is finished with presentation of his case.  (INAUDIBLE) for a very short (INAUDIBLE).

CHAIRMAN:   (INAUDIBLE) because now Mr. Sinclair may, if he wishes, ask questions of the witness, based on Mr. Prosnitz's (INAUDIBLE).

ATTORNEY SINCLAIR:      (INAUDIBLE) some questions.  Let's go to Claimant's Exhibit 26.  It's the (INAUDIBLE).  Alright.

STUART MAYLOR:   (INAUDIBLE).

ATTORNEY SINCLAIR:      Well, let's start out with item – page 10, item 9.  Isn't it true this agreement says that the IIB is solely responsible for commissions being charged?

STUART MAYLOR:   Yes.

ATTORNEY SINCLAIR:      And I t says that ComTrust can collect commissions?

STUART MAYLOR:   Right.

ATTORNEY SINCLAIR:        (INAUDIBLE).  Number 10.  Isn't it true that (INAUDIBLE)
introducing broker has the right to do business with whomever FCM?

STUART MAYLOR:    Correct.

ATTORNEY SINCLAIR:        Number 12, termination.  Isn't it true that either party has a
right to terminate this agreement within 30 days?

STUART MAYLOR:    Yes.

ATTORNEY SINCLAIR:        Under this agreement, is ComTrust responsible for
supervising an IIB?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Are they responsible for supervising any of the AP's
(INAUDIBLE)?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Does this agreement require ComTrust to provide leads to
the IIB?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Did ComTrust provide leads to ProTrade?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        And did they provide leads to CCI?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:        Did ComTrust provide recommendations, trade

recommendations, to ProTrade?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Did it provide trade recommendations to CCI?

STUART MAYLOR:    We don't make recommendations to any (INAUDIBLE) that's why I

can say (INAUDIBLE).

ATTORNEY SINCLAIR:        Did you ever provide a compliance manual to ProTrade?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Did you ever provide a compliance manual to CCI?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:      Did you ever authorize anybody at ProTrade to hold themselves out as a representative of ComTrust?

STUART MAYLOR:   No.

ATTORNEY SINCLAIR:      And to your knowledge, would anybody at CCI (INAUDIBLE) CCI?

STUART MAYLOR:   Yes, meaning no.  Is that clear?

ATTORNEY SINCLAIR:      Yes.

STUART MAYLOR:   Sorry.

ATTORNEY SINCLAIR:      You heard all the testimony here.  Has anybody made an allegation that anybody at ProTrade held him or herself out as a representative of ComTrust?

STUART MAYLOR:   (INAUDIBLE).

ATTORNEY SINCLAIR:      And did anybody here provide any testimony that anybody at CCI held themselves out to be a representative of ComTrust?

STUART MAYLOR:   (INAUDIBLE).

ATTORNEY SINCLAIR:        Now, one thing we haven't touched on and I think is very important is what's different, what has changed (INAUDIBLE) how long has he been registered (INAUDIBLE), to the best of your (INAUDIBLE)?

STUART MAYLOR:    It would be (INAUDIBLE).

ATTORNEY SINCLAIR:        Has anything changed as to the way the relationship between IIB's and FCM's must work in that 20 year period?

STUART MAYLOR:    Yes.

ATTORNEY SINCLAIR:        And could you tell the panel?

STUART MAYLOR:    I'm not sure of the exact date, but very soon thereafter 09-11, Congress, the government introduced the Patriot Act, which required financial institutions to look at customers and the flow of funds in and out of an account a little bit more carefully, in the sense that it's going to and from the right places and coming from the right places.

ATTORNEY SINCLAIR:        And what do you remember, what can you recall, what was the – why did they do this?

STUART MAYLOR:    To give us more work?  I would say that they did that to make sure that there was no money laundering and that there wasn't any monies being funneled towards the terrorists or putting our country in danger in any capacity.

ATTORNEY SINCLAIR:        Okay.  And did NFA include IIB's in the revolution of financial institutions when it came to (INAUDIBLE) money laundering?

STUART MAYLOR:    To some extent, yes.

ATTORNEY SINCLAIR:        So they required them to work closely with you on anti-money laundering matters?

STUART MAYLOR:    They allowed us to – they allowed an IB to rely upon the FCM to certain – on certain procedures that may have been done at the FCM level, if requested.

ATTORNEY SINCLAIR:        Okay.  And isn't it true that the FCM was required to work with other financial institutions in this process?

STUART MAYLOR:    Yes.

ATTORNEY SINCLAIR:        And are they required – isn't it actually a violation of the law (INAUDIBLE) from what you've learned from (INAUDIBLE), to not diligently do this?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:        So is it fair to say that the relationship between IIB's and FCM's has changed substantially since 09-11?

STUART MAYLOR:    As it pertains to this, yes.

ATTORNEY SINCLAIR:       Okay.  Now, part of this didn't require you to do any sort of supervision of a customer who did not have (INAUDIBLE), correct?

STUART MAYLOR:    Correct.

ATTORNEY SINCLAIR:       Now, (INAUDIBLE) says that checks (INAUDIBLE) conferenced.  Would you please do a little more explaining why ComTrust got the checks?

STUART MAYLOR:    I may have said that inadvertently before, but (INAUDIBLE).  It is required that all funds, all funds that are going into a trading account be made out to be payable to the FCM as one transacts for the customer for that IB.  And it would be a violation if any of the checks were issued directly to an introducing broker.  So it would have been customary for funds to be paid to your (INAUDIBLE).

ATTORNEY SINCLAIR:       That's (INAUDIBLE).  Whether it's an IIB or a GIB, correct?

STUART MAYLOR:    Correct.

ATTORNEY SINCLAIR:       To the best of your knowledge, did you ever receive any communication from NFA in a complaint against ProTrade?

STUART MAYLOR:    No.

CHAIRMAN:    I'm sorry, Mr. Sinclair.  We missed just the last four or five words--.

ATTORNEY SINCLAIR:        I'm sorry.

CHAIRMAN:    Repeat it again (INAUDIBLE).

ATTORNEY SINCLAIR:        My question was, did you ever receive any communication from – directly from NFA on a complaint against ProTrade?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:        And the complaint against CCI, did you ever receive any complaint (INAUDIBLE)?

STUART MAYLOR:    This particular (INAUDIBLE)?

ATTORNEY SINCLAIR:        Yes.

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Did you ever receive any communication from NFA in a complaint against Mitch Goldberg's (INAUDIBLE)?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Did any (INAUDIBLE) complaint?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        (INAUDIBLE) ComTrust (INAUDIBLE)?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Was John Trimelli in this complaint?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Was Tim Redding in this complaint?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Was your CFO named in this complaint?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Did you have any ownership interest at all in ProTrade?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Did you have any ownership interest in CCI?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        Did ComTrust have an ownership interest in ProTrade?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:        Did ComTrust have an ownership interest in CCI?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:        Did ComTrust provide any money to CCI, in terms of

meeting its end capital requirement?

STUART MAYLOR:    (INAUDIBLE).

MALE:          (INAUDIBLE) ProTrade (INAUDIBLE).

ATTORNEY SINCLAIR:        Now, when orders come to the order desk, and you

(INAUDIBLE) an order, does it have a (INAUDIBLE) it?

STUART MAYLOR:    Yes.

ATTORNEY SINCLAIR:        And the people at the order desk don't know who's

account it is, agreed?

STUART MAYLOR:    I would say yes, I agree.

ATTORNEY SINCLAIR:     So the only way ComTrust would know which customer it received orders from, at least initially, they would have to look at every single customer on the run, isn't that correct?

STUART MAYLOR:   Yes.

ATTORNEY SINCLAIR:     And the people at the order desk are first, is that correct?

STUART MAYLOR:   Right.

ATTORNEY SINCLAIR:     Mr. Bell never complained to you about the trades in his account (INAUDIBLE), is that correct?

STUART MAYLOR:   Correct.

ATTORNEY SINCLAIR:     He never called you and said, "This trade is not my trade," did he?

STUART MAYLOR:   No.

ATTORNEY SINCLAIR:     To your knowledge, he never called anyone at ComTrust and said, "This trade is not your trade," did he?

STUART MAYLOR:   No.

ATTORNEY SINCLAIR:        So again, just to reiterate, you have never been the subject

of an (INAUDIBLE) or an NFA disciplinary complaint, is that correct?

STUART MAYLOR:    I'm confused with the terms that are being asked of me.  A

regulatory--.

ATTORNEY SINCLAIR:        A regulatory complaint by NFA.

STUART MAYLOR:    By NFA, no.

ATTORNEY SINCLAIR:        The only claim against you I seem to see was vacated, is

that correct?

STUART MAYLOR:    No.  There was another CFTC reparation claim that--.

ATTORNEY SINCLAIR:        Not reparation, I'm talking regulatory claim.  Have you ever

been – has the CFTC ever brought a disciplinary case against you?

STUART MAYLOR:    Not even in 1982, that was a reparation.

ATTORNEY SINCLAIR:        Right.  It wasn't a disciplinary case.

STUART MAYLOR:    There's never been a disciplinary, other than the Saskatchewan

mumbo-jumbo kind of thing--.

ATTORNEY SINCLAIR:        And that has nothing to do with futures?

STUART MAYLOR:    It alleged – it allegedly does.  But it has nothing to do with anything other than someone contacting me and me sending out documents to them.

ATTORNEY SINCLAIR:        You never made a solicitation?

STUART MAYLOR:    According to them, I did.  They called me and I sent some paperwork out.  And that was enough for them to feel that I was not registered in that particular province to send the documents, so that was the only thing.  But they never opened--.

ATTORNEY SINCLAIR:        To the best of your knowledge (INAUDIBLE) – to the best of your knowledge, do different provinces in Canada have different rules regarding dealing in commodities?

STUART MAYLOR:    I believe so.

ATTORNEY SINCLAIR:        Okay.  I'm going to (INAUDIBLE) cross-examination (INAUDIBLE).

CHAIRMAN:    (INAUDIBLE).

ATTORNEY PROSNITZ:        Just one or two questions.  Calling your attention to what Alaron sent in its response, Alaron at the end on page 3 of its response--.

ATTORNEY SINCLAIR:          I'm going to object to that.  That wasn't part of my cross-examination.  If he's going to redirect, I don't think (INAUDIBLE) reference (INAUDIBLE).

CHAIRMAN:    I mean, technically that's right.

ATTORNEY SINCLAIR:          (INAUDIBLE-speaking simultaneously.)

CHAIRMAN:    (INAUDIBLE-speaking simultaneously.)

ATTORNEY PROSNITZ:          Do you agree or disagree with this statement?  Alaron believes that Sumner Moe, Michelle O'Bruce, and Mitchell Goldberg conspired with individuals at ComTrust to prevent Alaron from ensuring that proper controls were in place to protect Mr. Bell's account from the alleged abuse.  Do you agree or disagree that individuals in ComTrust conspired with individuals of ProTrade?

STUART MAYLOR:    I disagree.

ATTORNEY PROSNITZ:          Did Alaron ever discuss this with you?  This charge of conspiracy?

STUART MAYLOR:    There was some correspondence through counsel.  And that's where it was – that's where it ended.

CHAIRMAN:    (INAUDIBLE).  Counsel, do you have any more evidence?

ATTORNEY PROSNITZ:          Well, I'd move for the admission of all our exhibits.

CHAIRMAN:   I think I made pretty careful notes of the exhibits that you (INAUDIBLE). I'm not sure you used (INAUDIBLE).

ATTORNEY PROSNITZ:      Well, to the extent something is a matter of an NFA website or a matter of public record, I move for its admission.  Otherwise, (INAUDIBLE).

MALE:       Well, someone would say that the NFA (INAUDIBLE).

ATTORNEY SINCLAIR:      I don't have a problem with something that's printed off the Internet.  That's--.

CHAIRMAN:   Well, there shouldn't be a problem with that.

MALE:       (INAUDIBLE).

CHAIRMAN:   And I think if we could – all of the other exhibits you used, we've discussed.

ATTORNEY PROSNITZ:      Okay.  Alright.

ATTORNEY DAVID:   This 27 has (INAUDIBLE) last piece about Alaron regulatory (INAUDIBLE) is not offered (INAUDIBLE).

CHAIRMAN:   26 (INAUDIBLE) specimens (INAUDIBLE) that would be (INAUDIBLE). Alright.  So Claimant (INAUDIBLE).  So--.

ATTORNEY SINCLAIR:          We--.

CHAIRMAN:   Hold on.

ATTORNEY SINCLAIR:          Yeah.

CHAIRMAN:   (INAUDIBLE), you know, it's (INAUDIBLE) I don't think it's appropriate until all the respondent's (INAUDIBLE).

ATTORNEY DAVID:   Directed verdict at the close of Claimant's case?

CHAIRMAN:   (INAUDIBLE).

ATTORNEY DAVID:   Yeah.  That's exactly what I was hoping to do.  And I'm going to make this (INAUDIBLE) I'm going to make this very brief.  Two bases for my motion, the second of which I didn't even realize I had until today.  The first one is simple.  The claim against Alaron is based on the guarantee.  The GIB was ProTrade.  We know that after the GIB agreement became effective on July 29th, there was no more trading through ProTrade.  The trading that took place were in a period when the guaranteed introducing broker agreement was in effect.  The period July 29th through October 13th took place not through ProTrade, but through Corporate Commodities.  So Claimant has attempted to bridge that problem by alleging that Corporate Commodities is a de facto merger partner, to use Mr. Prosnitz's words, or successor of ProTrade.  The obligation was (INAUDIBLE) before with (INAUDIBLE).

CHAIRMAN:   Okay.

ATTORNEY DAVID:   In fact, there is no proof of that whatsoever.  There was no witness called who offered any testimony.  There were no documents entered that proved that in any way, shape, or form.  There is no proof in this record whatsoever on the issue.  There is no proof hence that Alaron can be held liable.  The second basis for my motion, the Claimant has a second burden.  Even if he could establish liability, which it cannot, it has to prove damages.  The Claimant doesn't just have to prove that he was damaged.  He has to prove his damages with a reasonable certainty.  The only witness that Claimant called to go to the damages was the professor who testified this morning.  And the professor who testified this morning expressly testified that there were – he gave us the number of $550,000, I think it was $552.  He said that was the damages he calculated.  And then asked him about that calculation.  And he said that was his calculation about the end results of trades that were made between the relevant time period, that were I gather initiated during the relevant time period.  He told us in response to my cross-examination, apologize if I got a little excited (INAUDIBLE), he told us that had he wanted to, that information was publicly available that he could have calculated the actual amount of the Claimant's loss, realized and unrealized trades, as of October 13th.  That Claimant's account, in fact, included unrealized gains that he hadn't taken into account.  There may have been gains.  There may have been losses.  We don't know.  The fact of the matter is it was Claimant's obligation to prove damages.  And having failed to do so, having failed to establish a reasonable basis, they don't have the documents (INAUDIBLE) to which you can calculate damages.  Even if Alaron (INAUDIBLE) and it's not, they haven't met that burden either, but even if it were, they haven't met that burden.  For those reasons do I urge you, and I know it's a most

unusual case, but this is one of those cases, I urge you right now to dismiss these claims

against Alaron.  There is no reason for Alaron to be in this room today.


CHAIRMAN:    Do you want to respond?


MALE:          Yes, I do.  But could I (INAUDIBLE)?


CHAIRMAN:    Sure.


(End of Disk 9, Track #2.  Begin Track #3.)


(No conversation recorded on Disk 9, Track #3.  End Disk 9)


AAA/cmy