06-ARB-61
Disk 10

CHAIRMAN:    --(INAUDIBLE) in which the respondent (INAUDIBLE).


ATTORNEY PROSNITZ:      Alright.  I'll try to respond briefly.  (INAUDIBLE) into mock

arbitration but was hired to take all this (INAUDIBLE) which is why I must and we have

briefs at the end of the case (INAUDIBLE) all the issues that we have addressed.  But

briefly, the argument or the claim against Alaron, the problems arise (INAUDIBLE) which

Alaron agree with, paragraph 15B says, "Agreement inures to successors."  And this is

not an issue of successor liability (INAUDIBLE).  In successor liability, you're trying to

show that the successor has a liability.  We're not trying to show that.  We're trying to

show that the successor has a benefit from the guarantee agreement.  So the question

then becomes was CCI the successor in the NFA records or ProTrade Corporate

Commodities show 100 percent identity of ownership.  Michelle O'Bruce was 100

percent owner of ProTrade and Corporate Commodities.  And the NFA complaint also

alleges that there was a transfer of employees.  Certainly, this account was transferred.

The NFA complaint alleges transfer of most employees, most accounts.  There was no

change from, as far as Mr. Bell was concerned, the introducing broker just changed.  So

what applies here we submit is a broad definition of successor, broader than you get in

successor liability cases.  And even there, continuity of ownership is the key element.

There's a New York law to that effect, Cargo Cartner, 352 F.3rd 41.  Guarantee case,

which is right on the – I'd like to call your attention to this man over at (s/l Cartman).  Just

give you the cite.  853 F.2nd 1540.  This involved the guarantee, almost identical in

language to the one we have here.  It says the scope and meaning of the guarantee are

unambiguous.  The guarantee language specifies, "The provision of this agreement shall

extent and inure to the benefit of seller and successors and assigns."  And it says, "State

courts have found this term to be unambiguous and have recognized its plain meaning. Guarantor promises to guarantee the debts of successors and the guaranteed party." Similar to what's happening here. Guarantor, Alaron, promises to guarantee debts, or actually in this case liabilities, of the successor of the guaranteed party, the guaranteed party being ProTrade, CCI being a successor.

And then we have fact issues which the panel has to consider. For one thing, why did Alaron wait so long to cancel this guarantee? Under the NFA regulations, the moment when a guarantee terminated, Alaron is supposed to notify the NFA, and waited three months to terminate the agreement. So Alaron itself as conceded this agreement was in effect from July 29th to October 13, '05. They concede it, that it was in effect. The question for the panel to deliberate upon is whether or not this continuity of ownership makes Corporate Commodity the successor. It's a fact issue which the panel needs to deliberate on, to consider whether or not under these circumstances Corporate Commodity was a successor.

Black's Law Dictionary says, "In the case of corporations, the term 'successor' normally indicates statutory succession when a corporation changes its name and retains same property." So the name change can eas – the name always changes with its succ – often changes with its successor. We also have fact allegations regarding, or fact questions regarding what Alaron did. According to the NFA regulatory requirements which you heard today, Alaron should have checked out the disciplinary history of the AP's of ProTrade before entering this guarantee. It never did. I think if it had, it wouldn't have so casually entered into a guarantee without knowing who it was guaranteeing. Entering into a guarantee is serious business. To enter into a guarantee, if they checked out the background of Mr. Goldberg, they would have found that he was with five prior

firms, and I doubt they would have let this guarantee remain in effect for three months, as they did.

And also, the language of the CFTC form, which is the guarantee itself, is quite broad. And this is CFTC-dictated language. I'm talking about CFTC Form 1-FR. The CFTC wrote this in a broad way. It says, "This guarantee agreement shall be enforceable, regardless of the subsequent incorporation, merger, consolidation of either the futures commission merchant or the introducing broker for any change," any change, "in the composition, nature, personnel, or location of the FCM or the introducing broker." It continues, "This guarantee agreement is binding and shall remain in full force and effect, unless terminated." So given the broad language which the CFTC has put in this guarantee, that it applies despite any subsequent incorporation, merger, consolidation, change in composition, change in nature, change in personnel or location, was incumbent. The prudent thing for Alaron to have done, given the broad language it signed, would have been to terminate the guarantee, not only because of this broad language, because of the fact that they never even heard from these guys. And they signed a guarantee agreement with a company whose AP's had a very long history of regulatory problems. They signed the guarantee, despite the broad language that the CFTC dictates. They don't do anything to terminate it. That was something that I think sure with 20/20 hindsight they would have done.

As far as damages, we did show damages in the form of realized losses. Realized losses counts. Realized losses is what was actually lost. If we came up with a hypothetical number about hypothetical damages, if all positions had been liquidated as of October 13th, we would have gotten the objection, "Well, that's hypothetical," because he maintained these positions. I'm talking about actual realized losses. You heard the

3

numbers from the professor, who said actual realized losses during the period of the guarantee were $167,600, offset by $15,000 gained.  In addition, actual paid commissions during the period, $483,110.  This is real money, totalling $635,610.  That the whole unrealized loss, unrealized gain was a red herring because the accounts were not liquidated at that time.  They continued on.  They were actually – positions were later closed.  Real, larger losses were incurred.  But there's no question that realized losses and real damages did occur, both in terms of commissions and fees.  So for that reason, we would propose (INAUDIBLE).

PANEL MEMBER:      Can I ask a question?

ATTORNEY PROSNITZ:      Sure.

PANEL MEMBER:      As far as you know, as of today, do both ProTrade and CCI exist?  Are they corporations (INAUDIBLE)?

ATTORNEY PROSNITZ:      That I don't know.  They were barred from the industry in--.

PANEL MEMBER:      Well, barred from the industry.  As far as the – what's--.

ATTORNEY PROSNITZ:      The corporate structure?

PANEL MEMBER:      Wasn't the Florida Secretary of State's website--?

ATTORNEY PROSNITZ:      Oh, I don't know the answer to that.

CHAIRMAN:   We'll take your motion under advisement.  We don't need to reply.

(INAUDIBLE).  Mr. Sinclair.

ATTORNEY SINCLAIR:       I was going to make a motion, as well.  But frankly, I feel at

a real disadvantage in terms of time.  The Claimant has taken almost the entire hearing

period and sort of left me in a position where I've got to wrap my case up in 40 minutes

or 50 minutes.

CHAIRMAN:   You don't have to.  As long as you want.

ATTORNEY SINCLAIR:       No, because again we (INAUDIBLE).

CHAIRMAN:   Here.  Let me strengthen the guidance that the panel has offered.  We

(INAUDIBLE) with that.  This is a case where the facts and the law are so (INAUDIBLE).

To argue one without the other (INAUDIBLE) official enough to warrant the time spent in

doing it.  And given where we are in the hearing and the evidence yet to be presented, it

seems to us to do oral closing arguments of just the facts wouldn't have enough benefit

even to outweigh the time it would take to do (INAUDIBLE) because we are – even if you

don't (INAUDIBLE), we are very likely, almost certain, (INAUDIBLE) positions.  So our

sense is that closing statements, though certainly allowed and in the majority of cases

given, this might be one of those cases (INAUDIBLE).  That the facts in dispute are not

so significant or complex that the panel can't (INAUDIBLE) based on the evidence that's

been submitted.  Rather, it's the application of those facts to the relevant law on both

sides of the case that merit just consideration.  So with that mere guidance, I would

suggest that you go ahead, Mr. Sinclair, and you let us know where you think you are,

(INAUDIBLE), okay?

ATTORNEY SINCLAIR:        I appreciate that.  I appreciate (INAUDIBLE).  Okay.  Well, I'm going to briefly (INAUDIBLE) the case (INAUDIBLE) for our prima facie case.  And number two, that (INAUDIBLE) stated that ComTrust should not be (INAUDIBLE) this is the basis.  Whether or not there are losses in the account, the Claimant has failed to provide enough evidence, credible evidence, that Mr. Bell didn't approve every one of those trades.  And, in fact, Mr. (INAUDIBLE) testified that in early July, Mr. Bell was concerned because Mr. Goldberg wasn't getting in touch with him.  Yet, Mr. Bell continued to trade for five or six months and sent the majority of his money during that time.  He also had two other accounts trading simultaneously.  Now, Mr. Bell is an adult. The testimony has been that he was of sound mind (INAUDIBLE) at the time when he made these agreements, when he made these trades, when he got involved in these trades.  And there is nothing to indicate anywhere that he didn't agree to the trades.  But on top of that, even if we can say that there was (INAUDIBLE), as far as ComTrust, he ratified every single trade because he never, and we've already had testimony, had never, ever complained to ComTrust about any trade, even though you've seen already introduced into evidence the account form, the statements, how (INAUDIBLE) on (INAUDIBLE), okay.  He testified – there's some testimony that he actually spoke with Mr. Ciarmella when it came to transferring the account, after his original problem with Mr. Goldberg.  And there's no evidence that he ever said anything to ComTrust about his account.  ComTrust is at least entitled to some notice   And that's what ratification is all about.  How could ComTrust stop this from going on if Mr. Bell doesn't complain and continues to send money every single time?  And oddly, it wasn't (INAUDIBLE) with their money.  It wasn't (INAUDIBLE) every single month.  Mr. Bell has stated he doesn't believe that ComTrust should be here.  He doesn't know why ComTrust is here.  And in the statement that he put together, which I believe has been established, that Mr. Maylor

did not solicit, did not influence, (INAUDIBLE) Mr. (INAUDIBLE)'s statement.  He does

not claim anything against ComTrust.  It's against ProTrade.  It's against (INAUDIBLE).

And other (INAUDIBLE).  So therefore, without any – not proving their prima facie case

that there actually was some misleading of Mr. Bell, the only testimony we can rely on is

Mr. Bell's.  And I do feel very sorry for Mr. Bell.  I do apologize for, you know, badgering

a little bit.  I certainly didn't mean to make him uncomfortable.  The fact is I had to find

out what – and I had to show the panel whether his testimony was reliable.  They have

to bring the evidence.  They can't bring in a gentleman (INAUDIBLE) and say, "Believe

this thing, don't believe that thing."  His testimony frankly was not (INAUDIBLE) to prove

that he was misled by (INAUDIBLE) trading in his account (INAUDIBLE) cluster

allocation.  Plus his admission that ComTrust shouldn't be here.


Now--.


MALE:          (INAUDIBLE).


ATTORNEY SINCLAIR:          In addition, Claimant, if you get beyond the point in how to

say that yes, there is liability somewhere, (INAUDIBLE) for ProTrade or Corporate.  The

Claimant has to prove its agency relationship.  There's no evidence there was any

(INAUDIBLE).  There's no evidence that Mr. Goldberg represented himself as an

employee of ComTrust.  In fact, in his statements, Mr. Bell talks about ProTrade and

Corporate.  And those are very significant things that are required.  There's no evidence

that (INAUDIBLE) that respondents are – that the Claimant is relying on was ever seen

by Mr. Bell.  In fact, the date of that document is dated in May of 2006, long after the

trading was completed.  And so you can't, even if you were trying to say that there was

an agency relationship, you can't rely on those documents because no one has testified

that Mr. Bell ever looked at those documents and relied on them.  The agreement

between the IB and between ComTrust clearly states that (INAUDIBLE) supervising the

people.  There's no – nothing where (INAUDIBLE) where ComTrust provides leads.  We

already have the testimony that ComTrust does not provide leads.  That ComTrust did

not provide compliance.  ComTrust did not provide bookkeeping, except for keeping of

the accounts as they were required by the CFTC.  To show this agency relationship is

not just a walk in the park.  It has to be substantial.  Now, Mr. Bell (INAUDIBLE) is

relying, to bring in Alaron, is relying on the NFA BCC case against ProTrade and

Corporate.  The Claimant can't have it both ways.  He can't say that that only applies to

the issue of the relationship and the successor liability without also accepting the fact

that ComTrust was never named as having an agency relationship with ProTrade or

Corporate.  Now, in the same – and I don't (INAUDIBLE) but in the same case, there

was no regulatory matter.  Here, we have the (INAUDIBLE), not naming someone they

could name in (INAUDIBLE) had a count of supervision and they weren't.  There's no

evidence that there was an agency relationship.  So based on those two facts, those two

issues, number one that – or, I'm sorry, three of them.  That there has been no prima

facie proof that those trades were (INAUDIBLE).  Number two, that Mr. Bell said

ComTrust shouldn't be here.  He didn't know why ComTrust was here.  And that that is

held out in the statement that he put together that Ms. McDonald typed.  And that even if

you find there was a liability, that there was actually something wrong with the way the

account was handled, you've got to then get the agency's (INAUDIBLE).  And they

haven't met the burden of proof of (INAUDIBLE).


CHAIRMAN:   Okay.  What we've just done here is done closing arguments under the

guise of some of the (INAUDIBLE) in terms of the argument.  We can't do them both

ways.  We can't use the time for evidence and then have a protracted argument and motions.  So Mr. Prosnitz, you can decide, very briefly, please.

ATTORNEY PROSNITZ:        Well, I'd kind of like guidance.  I mean, they had 10, 20, I mean, what do I do?

CHAIRMAN:   They didn't have 10 or 20.

ATTORNEY PROSNITZ:        (INAUDIBLE)

MALE:            (INAUDIBLE)

ATTORNEY PROSNITZ:        I don't want to hurry but I don't want to waive anything.  But I guess I'll do the best I can.  I'll name the big points.  But I do want to briefly (INAUDIBLE), okay?  The big points start with the NFA's guide where you, the panel, (INAUDIBLE) legal and procedural issues.  The section entitled "Clearing Firm Responsibility for Introduced Accounts."  This lays out the law for you.  It says, "Section 2-A-1-A of the Commodity Exchange Act provides (INAUDIBLE) superior when a principal agency enters to imposing liability."  Okay.  It also says the fact that an IB is independent does not mean that it cannot be held to be an agent of an FCM.  Rather, the arbitrator must look to all the facts to determine if there was an agency relationship. McClodes Reed v. Sage, that's our primary authority.  I mean, our case is, is Reed v. Sage, Reed v. Sage applies, we should win because of Reed v. Sage.  I'm not going to go into it, but I questioned every witness about the facts in Reed v. Sage.  They all apply.  These documents show that ComTrust had the power to obtain documents relating to ProTrade, the power to inspect and audit the books and records, everything

laid out in Reed v. Sage is right here in this case. That's really the end of the case, from a legal analysis. Let me just comment quickly, ratification. There's been a finding here, it's not contested. There was an underlying fraud. These allegations were admitted, there's fraud. You cannot weigh fraud. You cannot ratify fraud. There's ample Second Circuit authority on that point and I'll be happy to cite it in my brief. You cannot ratify fraud. Mr. Bell unfortunately is not competent at this point. He thought he retired at age 30. He thought he worked for three years at a company he worked for, for 30 years. The fact that he says that he doesn't know why ComTrust is here really, I mean, I think the panel understands what's at issue. So, you know, and ComTrust knew what was happening there. ComTrust – there's enough to get to the panel. ComTrust saw these huge, huge debit balances. There's more than enough for this case to go to (INAUDIBLE).

CHAIRMAN:    We'll take both these motions under advisement.

ATTORNEY DAVID:   Just one note. And I'm not going to – don't mean to argue. But please look at the NFA BCC decisions. There were no findings of fact in those decisions. They didn't ratify anything that had to do with the allegations made. Both cases (INAUDIBLE) resolved by agreement. The people withdrew. They agreed to withdraw. There are no – there's never been a hearing, nothing in the BCC (INAUDIBLE).

CHAIRMAN:    The fact that you're not arguing, reply, response, or whatever, isn't necessary here because I think we, the panel, understand that many of these arguments made on both sides are being very actively disputed, both on the fact and on the law. And so nothing that we say should be inferred to think we have a position on this. It's

just that if a party makes an argument, there's no need for the other party to (INAUDIBLE) saying, "We disagree with all of them," because we understand that to be the case.  Based on arguments that have already been made here and the evidence, it's fairly clear what the disputed issues are.  So that's where we are.  And I don't want you to walk away thinking we don't understand, because we do.  Mr. Sinclair, I'm sorry.

ATTORNEY SINCLAIR:        I call Mr. Maylor.

CHAIRMAN:   Okay.  Mr. Maylor, you're already sworn under oath, so--.

ATTORNEY SINCLAIR:        (INAUDIBLE-speaking simultaneously) you've identified yourself.  When you decide to do business with an independent IB, what liability, if any, do you take on financially?

STUART MAYLOR:    Our responsibilities as have been stated to me through NFA in one of their forms where I specifically asked their counsel to answer a question about that, because it was a concern of mine, has to do with accepting funds, recording, and functions pertaining to anti-money laundering.  That's it?

ATTORNEY SINCLAIR:        Yeah.  If an IB (INAUDIBLE) introduced (INAUDIBLE), an account (INAUDIBLE) goes debit, who is responsible ultimately for the debit?  If it's not paid?

STUART MAYLOR:    I'm sorry.

ATTORNEY SINCLAIR:        If a customer goes debit, he's got a debit in his account, and the IB doesn't satisfy it and the customer doesn't satisfy it, who has to satisfy it?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:        (INAUDIBLE), right?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:        So we have ComTrust dealing with an IIB, its financial condition would be important, right?

STUART MAYLOR:    Yes.

ATTORNEY SINCLAIR:        Okay.  If there was a customer debit and you wanted – after all, you didn't introduce the customer, right?  If you wanted to collect the money, what would you have – from the IB, what would you have to do?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:        And then?

STUART MAYLOR:    (INAUDIBLE) the customer.

ATTORNEY SINCLAIR:          Okay.  But what kind of information would you want from the IIB to meet an indemnification where they have a liability for a customer they introduced?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:          Is there any documents they'd have that you'd want to see?

STUART MAYLOR:    In their client bar?

ATTORNEY SINCLAIR:          Some records?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:          So the purpose of this agreement, and I'm referring to Claimant's Exhibit 26, is a matter of credit and particularly (INAUDIBLE), right?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:          So places in here where you (INAUDIBLE) asked (INAUDIBLE) there's an indemnification.  Can you tell us – tell the panel why you need an indemnification?

STUART MAYLOR:    When we enter into an agreement with an introducing IB, as independent, we choose not to take on any liability pertaining to the account activity,

other than those areas that I mentioned earlier.  And we want the IB to clearly understand that we are not going to take on any supervisory responsibility or any other type of responsibility, other than those items pertaining to clearing, reporting, and anti-money laundering.  And anti-money laundering is something that has come up since this Sage case because it predates 09-11 and the Patriot Act.  And so I choose not to interpret an agency relationship with the new requirements that have been imposed upon an FCM, not only in the area of anti-money laundering, but also in the area of creditworthiness pertaining to an ability to make good on a particular debit.  So we incorporated that in the IB agreement.

ATTORNEY SINCLAIR:     Okay.  Now, let's go to the account.  Why don't you describe how the account form is provided.

STUART MAYLOR:  It's either provided in booklet form or it's attached to the (INAUDIBLE) or it's available on the website to be downloaded.

ATTORNEY SINCLAIR:     And there are certain documents that are recorded and signed, right?

STUART MAYLOR:  Right.

ATTORNEY SINCLAIR:     Okay.  And which documents are those?  They are documents you require and there's a document the government requires.

STUART MAYLOR:  Well, documents that are required are the Regulation 155, Risk Disclosure.  The Option Disclosure Statement.

ATTORNEY SINCLAIR:        Those are government required, right?

STUART MAYLOR:    (INAUDIBLE).  An Individual Information Form that is signed at the bottom to basically state that the information provided is accurate to the best of their knowledge.   A Consent to Jurisdiction.   An Arbitration Agreement is not required, it's optional.   A Joint Account Agreement (INAUDIBLE), when it applies.   Non-Cash Margin Disclosure.  Margin (INAUDIBLE) Authorization (INAUDIBLE) to transfer the funds.   A Hedge Confirmation Form, when it applies.   And it is required that the account opener provide documentation to support their identity.

ATTORNEY SINCLAIR:        And who requires that?

STUART MAYLOR:    I believe it's the Treasury Department.   It says the International Money Laundering (INAUDIBLE) and Anti-Terrorism (INAUDIBLE) back to 2001 requires that we get this disclosure.   And NFA and/or CFTC deem that ComTrust as an FCM (INAUDIBLE) that requirement.

ATTORNEY SINCLAIR:        Is there any requirement, to your knowledge, that you must receive back from the customer a document that is signed, that deals with (INAUDIBLE)?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        But that does come in your standard package, correct?

STUART MAYLOR:    NFA's checklist requires that we give disclosure about the risks associated with options, as well as (INAUDIBLE) money options.  And we provide this to customers as a form of disclosure.

ATTORNEY SINCLAIR:        Now, let's talk about the 155 risk disclosure statement.  Because this is a very important document.  In that (INAUDIBLE)?

STUART MAYLOR:    I believe it's the CFTC in conjunction with the NFA.

ATTORNEY SINCLAIR:        And that document is required to be signed before any account is opened, correct?

STUART MAYLOR:    That's correct.

ATTORNEY SINCLAIR:        You also have a (INAUDIBLE) license (INAUDIBLE)?

STUART MAYLOR:    For over 20 years.

ATTORNEY SINCLAIR:        And a securities license.  When you open up a standard securities account, is there any risk disclosure that is required?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        So there is a big difference in terms of opening a security account versus opening a futures account?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:       And what does this document do, in terms of--?

ATTORNEY PROSNITZ:       Irrelevant.  He's asking about securities.

CHAIRMAN:   I think we've already passed that point (INAUDIBLE) understanding the last question.

ATTORNEY SINCLAIR:       Yeah, I mean, I'm (INAUDIBLE).

CHAIRMAN:   Yeah, I meant to overrule his objection--.

ATTORNEY SINCLAIR:       Oh--.

CHAIRMAN:   --(INAUDIBLE-speaking simultaneously) I don't understand the relevance to securities (INAUDIBLE).  Go ahead.

ATTORNEY SINCLAIR:       What do you understand was the purpose for providing the risk disclosure statement, you know, from the CFTC's and the NFA's (INAUDIBLE)?

STUART MAYLOR:   There is a significant difference in securities and commodities. And I believe that the regulatory bodies have recognized that giving disclosure ahead of time is of paramount importance.   I've never viewed suitability to be an issue in commodities because there is no suitability requirement in commodities, as opposed to what I was used to in securities.  So this is the first page in the document, because it is

perhaps one of the most important documents that we encode prior to an account being reviewed and approved.

ATTORNEY PROSNITZ:    I'm going to object to all questions about this document because it was never signed by Mr. Bell. It's a very different document from what Mr. Bell signed. And there's no testimony Mr. Bell ever got it.

CHAIRMAN:   Overruled. Go ahead.

ATTORNEY SINCLAIR:    And the (INAUDIBLE), what kind of document is that?

STUART MAYLOR:   It's an option disclosure statement that basically discloses the additional risks the customer may enter into if they transact the options.

ATTORNEY SINCLAIR:    Now, let me refer you, refer you to Claimant's Exhibit (INAUDIBLE).

MALE:        It's under Tab 11.

ATTORNEY SINCLAIR:    Okay.  Now, in the document, and this is a – do you recognize this document?  And this is the first page from Exhibit 19.  (INAUDIBLE) what is that?

STUART MAYLOR:   Option disclosure statement.

ATTORNEY SINCLAIR:    Okay.  Who's signature (INAUDIBLE)?

STUART MAYLOR:     John T. Bell.

ATTORNEY SINCLAIR:        And this document?

STUART MAYLOR:     The 004, yes.

ATTORNEY SINCLAIR:        (INAUDIBLE)?

STUART MAYLOR:     It's the individual information form.

ATTORNEY SINCLAIR:        Who signed it?

STUART MAYLOR:     John T. Bell.

ATTORNEY SINCLAIR:        What's the next document?

STUART MAYLOR:     The 004-1, Regulation 1.55, risk disclosure statement.

ATTORNEY SINCLAIR:        Okay.  Who signed it?

STUART MAYLOR:     John T. Bell.

ATTORNEY SINCLAIR:        The next page?

STUART MAYLOR:     The 004-2, arbitration agreement, signed by John T. Bell.

ATTORNEY SINCLAIR:        And what's beneath that?

STUART MAYLOR:    Joint account (INAUDIBLE).

ATTORNEY SINCLAIR:        Is this a joint account?

STUART MAYLOR:    Not to my knowledge.

ATTORNEY SINCLAIR:        The next page?

STUART MAYLOR:    Consent to jurisdiction.

ATTORNEY SINCLAIR:        Signed by?

STUART MAYLOR:    John T. Bell.

ATTORNEY SINCLAIR:        And then the next document?  Mmm-hmm, yes.

STUART MAYLOR:    Basically says, "Please be advised that in the event that this is an introduced account, ComTrust's role and liability is limited to execution in clearing matters only.  Please see paragraph 23."

ATTORNEY SINCLAIR:        So this is – outlines separately right in the document as to what the liability of ComTrust is?

STUART MAYLOR:    (INAUDIBLE)  I'd like to add that since this has been printed, and the only other additional liability pertains to anti-money laundering, which was provided to me by counsel at NFA.

ATTORNEY SINCLAIR:        Okay.  Let's look at B-45.  Who's form is that?

STUART MAYLOR:    That form is provided to us by ProTrade Futures and Options.

ATTORNEY SINCLAIR:        Okay.  And what does it have on it?

STUART MAYLOR:    Notifications of fees and charges.

ATTORNEY SINCLAIR:        The amount – I mean the signature?

STUART MAYLOR:    John T. Bell.

ATTORNEY SINCLAIR:        Does this document have ComTrust's name on it anyplace?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:        So it would be fair to say all the documents that required signatures in the package, which is ComTrust (INAUDIBLE), were signed by Mr. Bell?

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY SINCLAIR:        Now, let's go to the account statements.  B0 – I'm sorry, Exhibit No. 21 (INAUDIBLE) 0141.  Produced by (INAUDIBLE).  Is this document representative of the statements that you sent out?

STUART MAYLOR:   After every transaction, regardless of what takes place in a customer's account, a statement is generated to be mailed to a customer.

ATTORNEY SINCLAIR:        Okay.   And what does it say on the bottom of that statement?

STUART MAYLOR:    "Please report any discrepancies to ComTrust at 1-800-749-1000 immediately.  Failure to immediately exercise your rights to have errors corrected will be deemed that the statement is correct (INAUDIBLE)."

ATTORNEY SINCLAIR:        Now, there are (INAUDIBLE), assuming that the numbers are the same, (INAUDIBLE) 141 to B-0279, there's been 138 statements that Mr. Bell received from ComTrust?

STUART MAYLOR:   Well, I didn't count but he did receive statements for every transaction.

ATTORNEY SINCLAIR:        And every time he got one of those statements, what did it say on the bottom?  (INAUDIBLE)?

STUART MAYLOR:    The same.

ATTORNEY SINCLAIR:     The same (INAUDIBLE).  Do you think if Mr. Bell had a problem with any trade in his account, you would have expected him to call you?  Call ComTrust?

STUART MAYLOR:   Actually, we put that there for checks and balances, in the event that if there is a discrepancy, if there is a (INAUDIBLE), we want the customer to have an ability to communicate with us, as well, even though we're just the, for lack of a better term, (INAUDIBLE) account (INAUDIBLE).

ATTORNEY SINCLAIR:     So we then look to the customer agreement.  In the customer agreement, there's language regarding a similar type of issue, regarding notifying if trades are not the right trades?

STUART MAYLOR:   (INAUDIBLE).

ATTORNEY SINCLAIR:     Okay.  But one might argue that's sort of, you know, buried in the agreement, right?  But--.

STUART MAYLOR:   (INAUDIBLE).

ATTORNEY SINCLAIR:     --But here, you're giving him this every single time.  Is that (INAUDIBLE)?

STUART MAYLOR:   Correct.

ATTORNEY SINCLAIR:      And Mr. – and to the best of your knowledge, there's no dispute here that Mr. Bell received these statements?  You haven't heard any testimony to the contrary?

STUART MAYLOR:   (INAUDIBLE)   I'd like to make a comment because I think it's important to answer that question.   2007, it is common practice to offer e-mail statements to customers.   We've gotten a request from a number of customers to provide them with paperless statements.   And though we're moving in that direction as a society, it's the way things are, ComTrust, through my recommendation, continues to send paper statements because I think it's imperative that we get some sort of proof that if a statement is not delivered properly, that it be returned to us.   And we have never received a returned statement that has not been delivered to Mr. Bell.

ATTORNEY PROSNITZ:      I move to strike what ComTrust policy is on e-mails.  E-mail and Internet accounts in 2007 is not (INAUDIBLE) this case.  Now, it's a speech by the witness about 2007.

CHAIRMAN:   It was actually prefatory to the answer which was (INAUDIBLE) a point to Mr. Sinclair's question.

MALE:         (INAUDIBLE).

CHAIRMAN:   (INAUDIBLE) strike that (INAUDIBLE) testimony.  It's not – it's not in the question.

ATTORNEY PROSNITZ:      Okay.

ATTORNEY SINCLAIR:    I'm going to show you (INAUDIBLE) which was Respondent ComTrust Exhibit 40.  And was that – and I understand you're accepting all this into (INAUDIBLE).  What is this document?

STUART MAYLOR:    That's what we consider a detailed basic registration status of ComTrust.

ATTORNEY SINCLAIR:    Okay.

STUART MAYLOR:    And it's a list of principals, along with any regulatory arbitration preparation claimed history.

ATTORNEY SINCLAIR:    And let me point you to the section that says "regulatory actions."  Has ComTrust ever had any regulatory action?  CFTC?

STUART MAYLOR:    No.

ATTORNEY SINCLAIR:    Let's talk about your audits.  Tell the panel a little bit about what happens when NFA comes and audits you, audits ComTrust.

STUART MAYLOR:    Every year, year and a half, I'm not sure exactly the timeline, NFA shows up at our office unannounced to review the – to determine whether or not we are in compliance with all rules and regulations.  And they usually stay for anywhere from a week up to two weeks or longer, to scrutinize, pick apart, dissect, microdissect, our business.    It covers everything under the sun, including trade tickets, account

documents, business disaster plans, anti-money laundering plans, our agreements with our introducing brokers, independent (INAUDIBLE) guarantee. They truly dissect our business during the time that they're there.

ATTORNEY PROSNITZ:     Move to strike. There's no allegations (INAUDIBLE) we're not charging they come and they audit. I don't understand what the relevance is (INAUDIBLE).

ATTORNEY SINCLAIR:     Well, we all know--.

CHAIRMAN:  Overruled. Go ahead.

ATTORNEY SINCLAIR:     That – okay.

STUART MAYLOR:  They also ask us questions about what we provide our IB's or those IB's that do business with us. And they recognize the introducing broker agreement with independent IB's as one where we have zero responsibility as it pertains to the supervision, the review of the trading account, or the review of the principals, or the review of the associated persons. Never once have they brought to our attention that we are required to use that as part of, or have that as part of our function. In fact, if we were to get involved in any type of supervisory function pertaining to any of those things, it could work against us. So it's best for us to maintain an arm's length relationship with all of our IB's because it's sort of like if you're a physician and you see someone on the street and you go to assist them, it's unfortunate but if you assist them and you do something wrong while you're doing that, you're held responsible. So oftentimes, you don't get involved because you could be held responsible by getting

involved.  Consequently, we do not get involved in that and NFA recognizes that and acknowledges that.

ATTORNEY PROSNITZ:      I move to strike the witness' testimony as to what the NFA supposedly believes about liability on a future commission (INAUDIBLE) hearsay.  It's addressing a legal conclusion.  The NFA view is in the NFA publication.  The arbitrators, which happens to be opposite of what the witness is saying.

CHAIRMAN:   Overruled.  He's entitled to his views.

ATTORNEY SINCLAIR:      And when was your last audit completed?

ATTORNEY PROSNITZ:      Objection, relevance.

ATTORNEY SINCLAIR:      Well, the relevance is that the audit encompassed the time that Mr. Bell's account was trading options.

CHAIRMAN:   (INAUDIBLE), overruled.

ATTORNEY SINCLAIR:      When was your last audit concluded?

STUART MAYLOR:   Last year.

ATTORNEY SINCLAIR:      And did that cover the period during which Mr. Bell's account was open?  Was open and operating?

STUART MAYLOR:    I believe it did.

ATTORNEY SINCLAIR:        And what was the result of your audit?

STUART MAYLOR:    We received a letter from NFA thanking us, without any items whatsoever which was a pleasant surprise to us, because NFA has a knack of finding something, even if it's a recommendation.   And there was no reference to even a recommendation in that last audit as to what we can improve upon.

ATTORNEY SINCLAIR:        I have more but it's 4:00.  And Mr. Maylor has a 5:45 flight. (INAUDIBLE).

CHAIRMAN:   You need to make a decision.   You can ask (INAUDIBLE) if you like. We're here.

ATTORNEY PROSNITZ:        I object (INAUDIBLE) and 5:00 is standard time.  If we go to 5:00, we can finish.  I think it's unfair to my client.  I think we can conclude this hearing today before 5:00.  I think it's unfair to my client to (INAUDIBLE).

ATTORNEY SINCLAIR:        You know--.

MALE:          (INAUDIBLE).

CHAIRMAN:   It can't be (INAUDIBLE) because you've used 10 of your 11 hours of this hearing for your case-in-chief.  So to the extent--.

ATTORNEY PROSNITZ:     Alright, alright.

CHAIRMAN:   --(INAUDIBLE-speaking simultaneously), you know, the--.

ATTORNEY PROSNITZ:     Alright, alright.

CHAIRMAN:   However, it would be highly unusual (INAUDIBLE) highly unusual, without concluding that witness' testimony.  It's unusual, in fact, to adjourn a hearing once it's in progress, absent really extenuating circumstances.  Now, if what you have to ask is at the core of your defense in the case, I urge you to do it.  If it's, I don't mean to be (INAUDIBLE) perhaps you can decide in a very short amount of time whether that's necessary or not.

(End of Disk 10, Track #1.  Begin Track #2.)

CHAIRMAN:   While you were out of the room, we had a (INAUDIBLE) something was said (INAUDIBLE).  The goal here is to make sure we get all the (INAUDIBLE) resolution of this case.  I feel it's not (INAUDIBLE) just to preclude parties from introducing evidence that in their considered mind is relevant to the issue.  So if we need to have additional time (INAUDIBLE) hearing in order to accomplish that goal, I'm willing to consider it.  (INAUDIBLE) today, if one or more (INAUDIBLE) feel they're being rushed or cut short of time, I don't think (INAUDIBLE) fairness (INAUDIBLE) excuses.  So assuming that the Claimant will have some questions of Mr. Maylor (INAUDIBLE) make that assumption (INAUDIBLE) so far, (INAUDIBLE) certainly not meaning to inconvenience Mr. Maylor, just by the accident that he's the last witness of the day, that didn't (INAUDIBLE) but he is and to (INAUDIBLE) out his arrangements ahead of time to

accommodate that, if he possibly can.  On the other hand, Mr. Sinclair, if you have additional evidence (INAUDIBLE) others or Mr. David, if you have the same, I'm certainly willing to make some accommodation for that, if that's necessary.  I want to be clear about what the panel's position (INAUDIBLE) the evidence (INAUDIBLE) considered minds of the lawyers (INAUDIBLE) it's necessary (INAUDIBLE).  So I leave it to you, Mr. Sinclair, (INAUDIBLE).

ATTORNEY SINCLAIR:      (INAUDIBLE)   Has there been a determination that we're going to do our closings and briefs together in writing?

CHAIRMAN:   The answer is no.  Have we determined that?  No.  Is it our strong sense that we should?  Yes.  The panel certainly thinks--.

ATTORNEY PROSNITZ:      (INAUDIBLE).

ATTORNEY SINCLAIR:      Mr. Prosnitz, do you have (INAUDIBLE), would you have a lot of questions for Mr. Maylor?

ATTORNEY PROSNITZ:      No, about 10 minutes.

ATTORNEY SINCLAIR:      If you – and again, I don't want to preclude, but he's got a 5:45 flight, so I'm willing to allow the cross-examination, anticipated.  I will not ask any more questions.  I think we've brought everything pretty much out here.  And if Mr. Prosnitz will be able to move through – limit his cross to--.

CHAIRMAN:   Mr. Prosnitz, that's a generous offer.  Accept that in the spirit--.

ATTORNEY PROSNITZ:        Sure.

CHAIRMAN:    --(INAUDIBLE-speaking simultaneously) direct?

ATTORNEY PROSNITZ:        Sure.

ATTORNEY SINCLAIR:        (INAUDIBLE).

CHAIRMAN:   I understand.  Go ahead.

ATTORNEY PROSNITZ:        Let me be direct.   When was Claimant's 23, the blank forms, when was that – when did you start using these forms, what year?

STUART MAYLOR:    23, back page, it says 01 of '05.

ATTORNEY PROSNITZ:        Alright.   But the – so you had these forms in effect when Mr. Bell opened his account, correct?

STUART MAYLOR:    Well, we made revisions in the forms, but they were all basically, even those prior to or after account disclos – required to disclose--.

ATTORNEY PROSNITZ:        (INAUDIBLE-speaking simultaneously)--.

STUART MAYLOR:    --(INAUDIBLE-speaking simultaneously.)

ATTORNEY PROSNITZ:    So 23 was in existence as of January 2005.  However, you did not have Mr. Bell sign the option disclosure agreement in the – he signed – let me re – let me – no, he did sign this.  But you did not provide him with this page 4, this option disclosure statement, even though you had it, correct?  It's not part of his account agreements?

STUART MAYLOR:    No, that's correct.

ATTORNEY PROSNITZ:    Well, look at Claimant's 11.

CHAIRMAN:    We also have, and I'm sure (INAUDIBLE).

ATTORNEY PROSNITZ:    What I'm doing is I'm comparing Claimant's 23 to Claimant's 11.  Claimant's 23 is the blank one that was dated January – that was int – dated January 2005.  Claimant's 11 is what was actually signed.

MALE:        (INAUDIBLE) 23 (INAUDIBLE)?

ATTORNEY PROSNITZ:    The entire 23 (INAUDIBLE).  But I'm looking right now at the option disclosure--.

MALE:        (INAUDIBLE).

ATTORNEY PROSNITZ:    It's two pages.  Well, it's more than that.  It's actually – it's actually five pages.  So my question is simply this.  There is a five page, five page

detailed options disclosure statement that you had in 2005 that you did not give to Mr. Bell, is that correct?

STUART MAYLOR:    That's not correct.

ATTORNEY PROSNITZ:    It is not part of the signed documents of Mr. Bell, is that correct?

ATTORNEY SINCLAIR:    It doesn't require a signature.

STUART MAYLOR:    The documents that are in 11 or 23, they may be in different order, they may be in a different format, but the contents are the same, and they had been disclosed and--.

ATTORNEY PROSNITZ:    Alright.  You--.

STUART MAYLOR:    Let me finish, please?

ATTORNEY PROSNITZ:    (INAUDIBLE).  Alright.  Let's look at ComTrust exhibits, okay?  ComTrust exhibit book.  Exhibit 1, Claimant's account opening documents, okay?  This was what your attorney has given to the panel as Claimant's opening account documents, okay?  I ask you again, sir, is it not true this five page option disclosure statement is not in your own exhibit book as part of Mr. Bell's client documents?

STUART MAYLOR:   The only documents that are included in the Exhibit 1 are the, for the most part, signed documents.  But they are in the form of a book that we provided to (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:      (INAUDIBLE-speaking simultaneously), you know, I'd like you to make your point.   But I also want answers to my question.   Is this options disclosure statement, five pages, in your Exhibit Book No. 1, yes or no?

STUART MAYLOR:    It's in there, it's--.

ATTORNEY PROSNITZ:      Okay.   Alright.   How about additional disclosure material, pages 9 and 10, is this in the book, as your customer agreement?

STUART MAYLOR:    No, it's not.  None of the signed documents (INAUDIBLE) because that's what (INAUDIBLE).

ATTORNEY PROSNITZ:      And, in fact, the individual information form is different, is it not, in this blank set of series than what was actually signed by Mr. Bell?

STUART MAYLOR:    It's a different form.   The one he filled in.   The individual information form.

MALE:        Claimant's 23 and – Claimant's 23 (INAUDIBLE) No. 1, is that correct?

STUART MAYLOR:    I'm not so sure that it's (INAUDIBLE) fax copy.   Looks a little different.

ATTORNEY PROSNITZ:       Right.  (INAUDIBLE)

STUART MAYLOR:    (INAUDIBLE).

ATTORNEY PROSNITZ:       Alright.  Okay.  Okay.  Alright.  Alright.  And, I'm sorry, can you--?

STUART MAYLOR:    What were you saying about that?  (INAUDIBLE)?

MALE:         (INAUDIBLE) on the record (INAUDIBLE).

ATTORNEY PROSNITZ:       Well, it's hard to tell from the copies whether (INAUDIBLE-speaking simultaneously)--.

STUART MAYLOR:    Well, it's easy for me to tell that they are the same.

ATTORNEY PROSNITZ:       Okay.  It's easy for you to tell they're the same?  Alright.

STUART MAYLOR:    In terms of the importance of what's being asked and what has been disclosed, yes.

ATTORNEY PROSNITZ:       Okay.  However, we continue with what's in your exhibit book as No. 1.  Some of these pages are in your exhibit as part of the agreement, even though they're not signed, right?  For instance, the statements to please read the customer – customer commodity agreement is now signed?

STUART MAYLOR:   On page number – I guess that's item #1, Tab 1, B-0043, the last signature basically states that commodity customer agreement contains contractual agreement, do not sign until you have read it carefully.   When signing below, the undersigned represents and warrants to you that all information contained herein or in any other account form (INAUDIBLE) from the undersigned is true and correct and that if any changes to such information occur, the undersigned will immediately inform you in writing of such changes.   By signing below, the undersigned acknowledges that he has read and understands all of the terms and conditions of the commodity customer agreement and shall be bound by it.

ATTORNEY PROSNITZ:     I go back to my original question, which is, Claimant's Exhibit 23, the January form is a blank form, right?   It's not something that was signed by Mr. Bell, correct?

STUART MAYLOR:   It's a sample form, yes.

ATTORNEY PROSNITZ:     And you have no proof whatsoever that Mr. Bell ever got this five page options disclosure statement, which is not included within what your counsel put together as Mr. Bell's opening account documents, correct?

STUART MAYLOR:   It is not in as an exhibit.   However, it is not separated when it's distributed to (INAUDIBLE-speaking simultaneously)--.

ATTORNEY PROSNITZ:        What proof, sir, does this panel have that these five pages were ever seen by Mr. Bell, other than the fact that they're in part of a blank group of documents with no signature?

STUART MAYLOR:  Because we send customers blank account documents, in addition to receiving documents from them.

ATTORNEY PROSNITZ:        Do you have any explanation for why your counsel chose not to include this five page statement as part of Mr. Bell's customer opening account documents?

STUART MAYLOR:    Other than those are the only required signatures, no.

ATTORNEY PROSNITZ:        So is it your testimony that Mr. Bell got every – all these documents?

STUART MAYLOR:    Yes.

ATTORNEY PROSNITZ:        And what is the basis for that?

STUART MAYLOR:  The documents are sent out in a booklet form or they're downloaded via the Internet.  Mr. Bell downloaded the documents.  He chose to only send those that were required.  That was his – at his discretion.  And he chose to rip out the pages and send out those that pertained to – those that required, that was done at his discretion.  But regardless, a complete booklet is sent out, if that's non – if it's distributed that way.

ATTORNEY PROSNITZ:    Well, have you seen any documents – have you seen these documents produced as part – when Mr. Bell – Claimant's Exhibit 11, Mr. Bell's exhibit, do you see these documents in what Mr. Bell produced?

ATTORNEY SINCLAIR:    I'm going to respond to that--.

CHAIRMAN:    Yeah, I think we--.

ATTORNEY PROSNITZ:    Alright, we (INAUDIBLE-speaking simultaneously)--.

CHAIRMAN:    I've actually circled this issue twice now, so--.

ATTORNEY PROSNITZ:    Okay.  Okay.  Alright.  Let's go on to 11.  Claimant's Exhibit 11, okay?  Turn to Tab 11, please.  Is it correct that there is a blank as to who this account was introduced by?  The first page, Tab 11.

STUART MAYLOR:    That is correct.

ATTORNEY PROSNITZ:    Let's go to the third page, the Regulation 1.55, risk disclosure.  Base B-0041.

STUART MAYLOR:    Sure.

ATTORNEY PROSNITZ:    This document was also left blank as to who the account was introduced by?

STUART MAYLOR:    Correct.

ATTORNEY PROSNITZ:    Okay.    Let's flip ahead to the notification of fees and charges.  You agree that was sent to Mr. Bell by ComTrust, do you not?

STUART MAYLOR:    No, it was not.  Well, let me see, where in the tab?

ATTORNEY PROSNITZ:    We're still within Tab 11.

MALE:    Four and five at the bottom.

ATTORNEY PROSNITZ:    That was not sent by ComTrust?

STUART MAYLOR:    No, we do not send documents to customers.    It's the responsibility of the IB to provide the documents, if they so do it, because they may be doing business with another FCM.

ATTORNEY PROSNITZ:    But I thought you said you sent everything--?

STUART MAYLOR:    This document is not in a package.  This is a ProTrade document. Everything else is a ComTrust document.--

ATTORNEY PROSNITZ:    Alright.  Let me ask you this question.  Why in your exhibit binder for Claimant's opening account documents did you include this notification of fees and charges as part of the opening account documents?

STUART MAYLOR:   Because in order for us to know how to debit Mr. Bell's account, the IB needs to inform us what the fee schedule is, so we could set him up on that format.

ATTORNEY PROSNITZ:      So your testimony is this was sent separately to him from ProTrade?

STUART MAYLOR:   No.   My testimony is that that document is not a ComTrust document nor in the booklet that goes out, that the IB sends out.  That is an addendum that IB's send out among other documents that they elect to add to ComTrust's documents--.

ATTORNEY PROSNITZ:      Who sent – this document is in your book of Bell ComTrust account documents (INAUDIBLE).  Who sent this to Mr. Bell?

STUART MAYLOR:   I'm going to speculate that it was a representative at ProTrade.  But I can testify that it was not any representative at ComTrust.

ATTORNEY PROSNITZ:      Alright.  And then we go on to this--.

STUART MAYLOR:   Two minutes, please, if possible.

MALE:        One more.

ATTORNEY PROSNITZ:    (INAUDIBLE) I'll be really fast.    The option disclosure statement, B-0049, left blank as to who it was introduced by, right?

STUART MAYLOR:    It is common practice for certain IB's now to--.

ATTORNEY PROSNITZ:    Sir, you know, I want you to make your plane.  It's a yes or no question.  Is there a blank, yes or no?

STUART MAYLOR:    There's a blank.

ATTORNEY PROSNITZ:    Okay.  Let's go on to this ComTrust account form.  Is it correct that ComTrust decided at – ComTrust sent the transfer form to Mr. Bell?  Can you explain this, what was being transferred from whom to whom?

STUART MAYLOR:  I believe what happened was, and I'm only going on the recollection that for convenience purposes Mr. Bell had contacted Mr. Ciarmella at some time.  He wanted to know the status of this account.  And I believe a courtesy was sent to Mr. Bell as an FCM is responsible to respond to customers when they make inquiries to us.  And I believe, to the best of my recollection, as a courtesy, Mr. Ciarmella e-mailed Mr. Bell the transfer form.

ATTORNEY PROSNITZ:    Alright.  Last question.  You said that the – just like a doctor shouldn't treat someone who is injured, that you keep IB's at arm's length, correct?

STUART MAYLOR:    Depending on the relationship, yes.

ATTORNEY PROSNITZ:      And you said you keep arm's length all IB's, right?   You keep – you said, "We keep all IB's at arm length," right?

STUART MAYLOR:    Well, by – when I'm – what I--.

ATTORNEY PROSNITZ:      Did you say that, sir, or not?   Do you remember what you said?

STUART MAYLOR:    No.

ATTORNEY PROSNITZ:      Okay.   And, in fact--.

STUART MAYLOR:    (INAUDIBLE-speaking simultaneously) were--.

ATTORNEY PROSNITZ:      --Let me ask the next question.   Which is, this is the final question, is it even though you testified before this panel that you keep IB's all at arm lengths, that's exactly 180 degrees opposite from what you represent to them on your website, where you say, "We don't just (INAUDIBLE) your business.   We assist you," in like six different aspects.   You find a niche, not by clearing IB business, by helping them. So you said--.

STUART MAYLOR:    (INAUDIBLE-speaking simultaneously) GIB's.

ATTORNEY PROSNITZ:     Okay.  But, of course, it doesn't say GIB.  It doesn't say guaranteed IB.  This says you're to help them.  So unlike the doctor example, you offer to help them--.

STUART MAYLOR:    GIB's (INAUDIBLE)--.

ATTORNEY PROSNITZ:     Alright.

CHAIRMAN:  You can be excused, Mr. Maylor.  Thank you very much for your (INAUDIBLE).

STUART MAYLOR:    Thank you.

MALE:        Take the train.

MALE:        You sure?

FEMALE:      The train will be faster.

ATTORNEY PROSNITZ:     Oh, yeah.  The train--.

MALE:        You've got to go.

MALE:        Going to Midway?

STUART MAYLOR:    Yeah.

MALE:          Go right downstairs.


(End of Disk 10.)


AAA/cmy